Edmundo P. Robaina (No. 018125)
Gregory I. Stoltz (No. 027519)
**ROBAINA & KRESIN PLLC**
2730 E. Broadway, Suite 160
Tucson, Arizona 85716
Telephone: (520) 822-8393
Facsimile: (520) 844-1011
epr@robainalaw.com
gis@robainalaw.com

Ty D. Frankel (No. 027179))
*Law Offices of*
**BONNETT, FAIRBOURN,
FRIEDMAN & BALINT, P.C.**
2325 E. Camelback Road, Suite 300
Phoenix, Arizona 85016
Telephone: (602) 274-1100
Facsimile: (602) 274-1199
tfrankel@bffb.com

*(Additional counsel listed on signature page)*

*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Teresa Mejia, on behalf of herself and all others similarly situated,<br><br>         Plaintiff,<br>v.<br><br>Bimbo Bakeries USA, Inc.,<br><br>         Defendant. | Case No.  4:16-cv-00654-JAS<br><br>**PLAINTIFF TERESA MEJIA'S MOTION FOR CONDITIONAL FLSA CLASS CERTIFICATION AND TO AUTHORIZE NOTICE TO SIMILARLY SITUATED PERSONS UNDER 29 U.S.C. § 216(b) AND FOR EXPEDITED DISCOVERY** |

Plaintiff Teresa Mejia ("Mejia") moves this Court for entry of an order (1) conditionally certifying this lawsuit as a collective action under the Fair Labor Standards Act ("FLSA"), (2) authorizing Mejia to mail notice to other potential plaintiffs, (3) approving the Proposed Notice and Consent to Opt-In to Collective Action attached hereto as Exhibits 1 and 2, respectively, and (4) requiring that, within ten (10) days of the Court's ruling on this Motion, Defendant Bimbo Bakeries USA, Inc. ("BBUSA") produce the names and addresses of all current and former BBUSA distributors who worked for BBUSA in Arizona from September 30, 2013 to the present (the "Distributors"). In support of this Motion, Mejia relies on the pleadings of record, declarations executed by Plaintiff Teresa Mejia ("Mejia Decl." attached hereto as Ex. 3), Opt-In Plaintiff Troy Korver ("Korver Decl." attached hereto as Ex. 4), Opt-In Plaintiff John Rosales ("Rosales Decl." attached hereto as Ex. 5), and company documents – specifically, the Franchise Agreement (Mejia Decl. at Ex. A), the Franchise Operational Guidelines Manual (Mejia Decl. at Ex. B), BBUSA Communications Board from the BBUSA depot that distributes BBUSA's Sara Lee brand (Mejia Decl. at Ex. C.), Notice of Breach of Franchise Agreement (Mejia Decl. at Ex. E), BBUSA Distribution Agreement (Rosales Decl. at Ex. A), and BBUSA Communications Board from the BBUSA depot that distributes BBUSA's Orowheat brand (Rosales Decl. at Ex. B).

The evidence and pleadings presented by Mejia sufficiently demonstrate that, pursuant to BBUSA policy, Mejia and other similarly situated Distributors were improperly classified as independent contractors, despite their economic dependence on BBUSA and the extensive control exercised over them by the company, and were not paid overtime in violation of the FLSA, 29 U.S.C. §§ 201-219. Since each member of the putative collective action class performed the same basic job duties pursuant to the same compensation practices, their overtime wage claims can readily be adjudicated on a collective basis. Thus, Mejia respectfully requests that the Court conditionally certify this case as a collective action under § 216(b) of the FLSA and order that notice be issued on an expedited basis to all current and former BBUSA Distributors.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

Plaintiff Mejia filed this collective action under the FLSA on behalf of herself and other similarly situated BBUSA Distributors. Mejia alleges that BBUSA Distributors were required to work significant overtime hours without receiving the proper overtime rate in violation of the FLSA.  This case presents precisely the kind of wage and hour abuses the FLSA and Arizona's wage laws are meant to remedy.  Through this action, Mejia seeks to recover the overtime compensation the Distributors have earned but not been paid.[1]

Numerous similarly situated Distributors continue to be victimized by BBUSA's illegal wage practices.[2]  To date, ten (10) Distributors have opted in to this lawsuit and filed consent forms joining the case as individuals who are similarly situated to Mejia.  (Dkt. at 5-9, 11, 19-22.)  Mejia requests authorization to send notice to potential opt-in plaintiffs and expedite discovery of the names and addresses of all current and former BBUSA Distributors who worked for BBUSA from September 30, 2013 to the present.[3]

**II.   FACTUAL BACKGROUND**

BBUSA produces and distributes baked goods and is believed to be the largest bakery company in the United States. (Compl. at ¶ 29.)  BBUSA owns brands such as Sara Lee, Orowheat, Entenmann's, and Boboli. (*Id.*)  BBUSA's bread products are sold to

---

[1] Mejia also alleges violations of the Arizona Wage Statute, A.R.S. §§ 23-351-353 and anticipates pursuing class action certification for her state claims under Federal Rule of Civil Procedure 23 at a later time.

[2] BBUSA employs more than 22,000 associates and distributes products through 11,000 sales routes throughout the United States, including 324 in Arizona. *See* BBUSA website at https://bimbobakeriesusa.com/about-us, last accessed February 15, 2017. *See also* Mejia Decl. at ¶ 6; Rosales Decl. at ¶ 4.

[3] A two-year statute of limitations exists for filing a case under the FLSA, but when the cause of action arises from a willful violation, the statute of limitations extends to three years. 29 U.S.C. § 255(a); *see also Sullivan v. City of Phoenix*, 845 F. Supp. 698, 704 (D. Ariz. 1993).  The statute of limitations continues to run for each individual's claim until he or she opts in, and thus notifying potential opt-in plaintiffs of this action and their right to opt in is critical. 29 U.S.C. § 256(b); *see also Chastain v. Cam*, No. 3:13-cv-01802-SI, 2014 WL 3734368, at *12 (D. Or. July 28, 2014).  With each passing day, many Distributors suffer a reduction in the amount they can recover.

customers through retail outlets such as grocery stores and convenience stores. (*Id.* at ¶ 30.) BBUSA negotiates contracts with retail outlets that control the price of baked goods and the timing of their deliveries. (*Id.* at ¶ 31.) These deliveries are accomplished by way of Distributors such as Teresa Mejia whose work is controlled by BBUSA. (*Id.* at ¶ 32; *see also* Mejia Decl. at ¶¶ 8-22.)

Distributors are an integral part of BBUSA's business of selling fresh baked goods in Arizona. (Compl. at ¶ 33; Mejia Decl. at Ex. A.; Rosales Decl. at Ex. A.) There are presently 324 BBUSA routes in Arizona that are serviced by Distributors operating pursuant to uniform BBUSA policies and procedures. (Mejia Decl. at ¶ 6; Rosales Decl. at ¶ 4.) Distributors are all assigned by BBUSA to a specific BBUSA depot where bread is stored. (Compl. at ¶ 34.) Distributors go to the depot in the early hours of the morning, pick up fresh baked goods, and deliver them to BBUSA's customers. (*Id.*). The Distributors stock and arrange BBUSA's merchandise at the customer's outlets, remove stale or damaged items, and rotate stock on the shelves in accordance with BBUSA's policies for performing these duties. (Compl. at ¶ 35; Mejia Decl. at ¶¶ 9-22; Korver Decl. at ¶¶ 8-15; Rosales Decl. at ¶¶ 7-16.) Distributors then return to the depot and input customer orders for resupply. (Compl. at ¶ 36.). They also use their personal vehicles to make frequent "pull-ups" at stores where they are required to monitor BBUSA products. (Mejia Decl. at ¶ 25; Korver Decl. at ¶ 18; Rosales Decl. at ¶ 19.) Distributors regularly work over forty (40) hours a week and are not paid overtime wages. (Compl. at ¶¶ 63-67; Mejia Decl. at ¶¶ 23-30; Korver Decl. at ¶¶ 16-20; Rosales Decl. at ¶¶ 17-24.)

BBUSA has policies in place that uniformly govern the way the Distributors must perform their work, regardless of the depot they operate from. (Compl. at ¶¶ 69-70; *see also* Mejia Decl., Korver Decl., Rosales Decl.) There are BBUSA policies that tell the Distributors when they can be in the depot. (Compl. at ¶ 53; Mejia Decl. at ¶ 13; Korver Decl. at ¶ 11; Rosales Decl. at ¶ 10.) There are BBUSA policies that tell the Distributors when they can arrive at their outlets and by when they must leave. (Compl. at ¶ 53; Mejia Decl. at Ex. B at 49-59.) There are BBUSA Communications Boards at the BBUSA depots

in Arizona advising the Distributors of the promotions they must be apprised of, as well as a written Code of Business Conduct the Distributors must adhere to. (Mejia Decl. at ¶¶ 19, 20, Exs. C, D; Rosales Decl. at ¶ 15, Exs. B, C.)  The BBUSA District Manager has the authority to change the orders that the Distributors make from one day to the next. (Compl. at ¶ 51; Mejia Decl. at ¶ 14; Rosales Decl. at ¶ 11.)

Mejia began her affiliation with BBUSA's predecessor in interest in 2001. (Mejia Decl. at ¶ 2.)  Until 2004, Mejia was paid a salary and received benefits. (*Id.* at ¶ 3.)  In 2004 Mejia and her bread delivery driver colleagues were informed that they were all being terminated and could purchase a "route" to become an "independent" delivery driver. (*Id.* at ¶ 4.)  She did so and paid approximately $74,000 for her first delivery route. (*Id.* at ¶ 5.)  Although her compensation method changed in 2004, the level of supervision and control BBUSA exerted did not. (*Id.* at ¶¶ 7-15.)  BBUSA maintained the same level of supervision and control over the Distributors when they were employees.  Nothing is "independent" about how they perform their work, yet BBUSA does not pay overtime wages.  *See* Mejia Decl., Korver Decl., Rosales Decl.

In 2011, BBUSA circulated a Franchise Operational Guidelines Manual[4] to the Distributors and made each Distributor sign to acknowledge receipt. (Mejia Decl. at ¶ 17.) That Manual, attached as Exhibit B to the Mejia declaration, contains policies that govern the specific ways the Distributors are to perform their jobs. (*Id.*)  Each policy starts with a "Scope" section that indicates that the policies apply to "All franchisees and/or their representatives contracted to distribute baked food goods with [the Company]." (*See e.g.* Mejia Decl. at Ex. B.)  Indeed, the Manual governs how the Distributors must perform their jobs when they carry out BBUSA's business of stocking retail stores throughout Arizona with BBUSA products. (*Id.*)

---

[4] The Franchise Operations Manual indicates it is from Sara Lee, but BBUSA now owns Sara Lee and the policies remain applicable to the Distributors.  (Mejia Decl. at ¶¶ 17-18.) To the extent relevant documents and policies discussed in Plaintiff's Motion are applicable to BBUSA (as well as Sara Lee), Plaintiff refers to Sara Lee as "the Company."

For example, the Manual contains a policy that requires all Distributors to use a handheld computer with specific software loaded on it. (Mejia Decl. at Ex. B at 24.) The policy states that "All Franchisees are required to utilize a compatible Hand Held Computer hardware and [the Company] software system in the daily operation of their business." (*Id.*) The policy requires all distributors to "record the amount of 'off code' being removed from the Outlet." (*Id.*)

The Manual also contains a section in which the specific demands of each major grocery outlet are incorporated into the Distributor's job duties. (*Id.* at 49-59.) The section is entitled "Customer Service Guidelines" and the scope includes "all Franchisees and/or their representatives contracted to distribute baked food goods by [the Company]." (*Id.* at 49.) The first included outlet is Fry's grocery store. Its "service requirements" are drafted in the form of rules for Distributors. They state such things as "All Independent Operators must deliver fresh bread to all Fry's stores 5 days a week" and "All Independent Operators must do afternoon pull-ups between 1p.m. – 3 p.m." (*Id.* at 50.)

The Manual also contains a section describing how all Distributors are to be paid. (*Id.* at 67-88.) The scope of the payment policy is, like the previously described policies, applicable to all "franchisees and/or their representatives…." (*Id.* at 67.) Nowhere in the policies does it describe payment for hours worked over forty (40) in a week. Rather, the compensation is based on a complex "settlement" formula that does not account for overtime. (*Id.* at 67-94.) In fact, BBUSA concedes that it did not pay Mejia overtime. (Answer at ¶ 77.)

Although the Distributors may have entered into a Franchise Agreement with a different BBUSA-owned brand, the Franchise Agreements are substantially the same. (*See* Mejia Decl. at Ex. A; Rosales Decl. at Ex. A.) The Distributors are required to purchase routes from BBUSA and BBUSA classifies them as "independent contractors," but the terms of the agreements require the Distributors to deliver BBUSA products to entities that contract with BBUSA and the deliveries must be made in compliance with detailed rules set forth by BBUSA. (*Id.*) Further, BBUSA's business practices with respect to the

- 5 -

Distributors are universal. (Mejia Decl. at ¶¶ 8-21, Exs. B, D; Korver Decl. at ¶¶ 7-15; Rosales Decl. at ¶¶ 6-16, Ex. C.)

As demonstrated above, BBUSA dictates the Distributors' job duties, their profitability, and the compensation practices they must adhere to. (*Id.*) Ultimately, BBUSA improperly classifies its Distributors as independent "franchisees" but the reality is that BBUSA uniformly controls its Distributors to ensure they follow company policies in carrying out BBUSA's business of delivering the company's baked goods. In fact, there are currently ten Opt-In Plaintiffs alleging these practices applied to them, including three who provided declarations identifying between them numerous other Distributors who they know also work under the same conditions and compensation practices. (Mejia Decl. at ¶¶ 18, 30; Korver Decl. at ¶ 20; Rosales Decl. at ¶¶ 14, 24.)

**III.   LEGAL ARGUMENT**

**A.   CONDITIONAL CERTIFICATION OF AN FLSA COLLECTIVE ACTION IS APPROPRIATE BECAUSE MEJIA IS SIMILARLY SITUATED TO OPT-IN PLAINTIFFS AND PUTATIVE OPT-IN PLAINTIFFS.**

Congress enacted the FLSA to shield employees from oppressive working hours and substandard wages. *See Barrentine v. Arkansas-Best Freight Sys.*, 450 U.S. 728, 739 (1981). The FLSA enables workers to receive "[a] fair day's pay for a fair day's work" and protects them from the "evil of 'overwork' as well as 'underpay.'" *Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 578 (1942) (quoting 81 CONG. REC. 4983 (1937) (message of President Roosevelt)) (superseded by statute on other grounds). § 216(b) of the FLSA allows aggrieved employees to represent their similarly situated co-workers through a procedural device known as a "collective action:"

> *An action to recover the liability ... may be maintained against any employer... in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated.* No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

- 6 -

29 U.S.C. § 216(b) (emphasis added).  Thus, to maintain a collective action under § 216(b), two requirements must be met: (1) the plaintiffs must be similarly situated and (2) the plaintiffs must consent in writing to taking part in the suit.  *See* 29 U.S.C. § 216(b).

Pursuant to § 216(b), courts may authorize notice to a class that is "similarly situated" to the named plaintiff.  *Stickle v. SCI W. Mkt. Support Ctr.*, No. 08-083-PHX-MHM, 2009 WL 3241790, at *2 (D. Ariz. Sept. 30, 2009); *Wertheim v. State of Arizona*, No. CIV 92-453 PHX RCB, 1993 WL 603552, at *1 (D. Ariz. Sept. 30, 1993).  If the plaintiff satisfies the requisite "notice stage" determination that plaintiffs are similarly situated, conditional certification of the proposed class is proper and the case should proceed to the period of notification, which will permit potential class members to opt into the lawsuit.[5]  *See Stickle*, 2009 WL 3241790, at *2; *Wertheim*, 1993 WL 603552, at *1. The "similarly situated" standard utilized for collective action certification is less stringent than the requirements of Federal Rule of Civil Procedure 23(b)(3). *Taylor v. AutoZone Inc.*, No. CV-10-8125-PCT-FJM, 2014 WL 5843522, at *2 (D. Ariz. Nov. 12, 2014) (FLSA "similarly situated" standard "remains less stringent than the requirement that common questions predominate in certifying class actions under Rule 23"); *see also Grayson v. K Mart Corp.*, 79 F.3d 1086, 1096 (11th Cir. 1996) (finding that claims and positions of employees need not be identical to meet § 216(b) similarly situated standard); *Wilson v. Maxim Healthcare Servs., Inc.*, No. C14-789RSL, 2014 WL 7340480, at *2 (W.D. Wash. Dec. 22, 2014) (noting that the "similarly situated" standard is "considerably less stringent" than Rule 23's requirement that common questions predominate over individual ones).

**1.    The initial conditional certification requirement is "lenient."**

"'The majority of courts,' including those within the District of Arizona, have 'adopted the two-tiered approach[]' in deciding whether to grant FSLA [sic] collective

---

[5] Courts accept consents to opt-in to the action from similarly situated employees who have learned about the case prior to the court's official authorization of noticing other similarly situated persons.  *See Wertheim*, 1993 WL 603552, at *8.  To date, ten Distributors have opted in to this lawsuit and asserted they are similarly situated to Mejia.

action status." *Villarreal v. Caremark LLC,* No. CV-14-00652-PHX-DJH, 2014 WL 4247730, at *3 (D. Ariz. Aug. 21, 2014) (citing *Anderson v. Ziprealty, Inc.,* No. CV 2012-0332-PHX-JAT, 2013 WL 1882370, at *2 (D. Ariz. May 3, 2013) (citing cases)); *Barrera v. U.S. Airways Group, Inc.,* No. CV-2012-02278-PHX-BSB, 2013 WL 4654567, at *2 (D. Ariz. Aug. 30, 2013) (same); *Stickle,* 2009 WL 3241790, at *2 (same).[6] "'At this first stage, the court require[s] nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan.'" *Villarreal,* 2014 WL 4247730, at *3 (quoting *Stickle,* 2009 WL 3241790, at *2) (internal quotation marks and citations omitted). "'All that need be shown by the plaintiff is that some identifiable factual or legal nexus binds together the various claims of the class members in a way that hearing the claims together promotes judicial efficiency and comports with the broad remedial policies underlying the FLSA.'" *Wertheim,* 1993 WL 603552, at *1. What is more, "'[p]laintiffs need show only that their positions are similar, not identical, to the positions held by the putative class members.'" *Juvera v. Salcido,* 294 F.R.D. 516, 520 (D. Ariz. 2013) (quoting *Hipp v. Liberty Nat'l Life Ins. Co.,* 252 F.3d 1208, 1217 (11th Cir. 2001)).

The requirement is a "lenient" burden of illustrating that a plaintiff is similarly situated to others, which may be satisfied with affidavits and the complaint alone. *Goudie v. Cable Commc'ns, Inc.*, No. 08-CV-507-AC, 2008 WL 4628394, at *3-4 (D. Or. Oct. 14, 2008; *see also Bonilla v. Las Vegas Cigar Co.*, 61 F. Supp. 2d 1129, 1138-39 (D. Nev. 1999); *Adams v. Inter-Con Sec. Sys., Inc.*, 242 F.R.D. 530, 536 (N.D. Cal. 2007). As can be seen, at this initial, so-called notice stage, a plaintiff's burden "is low." *Villarreal,* 2014 WL 4247730, at *3 (citing, *inter alia, Wellens v. Daiichi Sankyo Inc.,* No. C-13-00581

---

[6] In addition, the two-tiered approach has been affirmed by five United States Courts of Appeals. *See White v. Baptist Mem'l Health Care Corp.,* 699 F.3d 869, 877 (6th Cir. 2012)); *Myers v. Hertz Corp.,* 624 F.3d 537, 554–55 (2d Cir. 2010); *Sandoz v. Cingular Wireless LLC,* 553 F.3d 913, 915 n.2 (5th Cir. 2008); *Morgan v. Family Dollar Stores, Inc.,* 551 F.3d 1233, 1260 (11th Cir. 2008); *Thiessen v. Gen. Elec. Capital Corp.,* 267 F.3d 1095, 1105 (10th Cir. 2001).

DMR, 2014 WL 1422979, at *2 (N.D. Cal. Apr. 11, 2014) (internal quotation marks and citations omitted) ("[S]ome court have held that the plaintiff bears a very light burden in substantiating allegations at this [notice] stage.")) "The Court uses a fairly lenient standard because the Court does not have much evidence" in that ordinarily, as here, no discovery has been conducted yet. *See Juvera,* 294 F.R.D. at 520 (citing *Hipp,* 252 F.3d at 1217–1218) (other citation omitted).

### 2. BBUSA's employment practices are uniformly applied to all of the Distributors.

Given this lenient burden, motions to certify a class for notification purposes are "typically" granted. *Kesley v. Entm't U.S.A. Inc.*, 67 F. Supp. 3d 1061, 1065 (D. Ariz. 2014); *Villarreal v. Caremark LLC*, 66 F. Supp. 3d 1184, 1189 (D. Ariz. 2014). Mejia need only show an identifiable factual or legal nexus between her claims and those of the similarly situated Distributors, such that hearing the claims together promotes judicial efficiency and comports with the broad remedial policies of the FLSA. *See Stickle*, 2009 WL 3241790, at *3. (citing *Wertheim*, 1993 WL 603552, at *1). In fact, courts within this District have consistently granted motions for conditional certification under the FLSA in actions brought by individuals who worked as drivers like the Distributors here. *See, e.g., Collinge v. Intelliquick Delivery, Inc.*, No. 2:12-cv-00824 JWS, 2012 WL 3108836, at *3 (D. Ariz. July 31, 2012) (granting plaintiff's motion for conditional certification of class of delivery drivers); *Bogor v. American Pony Express, Inc.*, No. 09-2260-PHX-JAT, 2010 WL 1962465, at *5 (D. Ariz. May 17, 2010) (granting plaintiff's motion for preliminary certification of class of taxicab drivers); *Coyle v. Flowers Foods Inc.*, No. CV-15-01372-PHX-DLR, 2016 WL 4529872, at *5-6 (D. Ariz. Aug. 30, 2016) (granting plaintiff's motion for conditional certification of class of bread delivery drivers and noting that allegations of misclassification are sufficient to show drivers are similarly situated); *Romero v. Producers Dairy Foods, Inc.* 235 F.R.D. 474, 484 (E.D. Cal. 2006) (granting plaintiff's motion for conditional certification of class of dairy delivery drivers). BBUSA distributors obtained conditional certification as a result of having been classified as

1 independent contractors in a case like this one in another district. *Scott v. Bimbo Bakeries,*
2 *USA, Inc.*, Civ. A. No. 10-3154, 2012 WL 645905, at *8 (E.D. Pa. Feb. 29, 2012) ("all
3 drivers are classified as an 'independent contractor' under the Agreement, which weighs
4 in favor of conditional certification") (abrogation on other grounds recognized by *Razak v.*
5 *Uber Technologies, Inc.*, Civ. A. No. 16-573, 2016 WL 5874822, at *6 n.2 (E.D. Pa. Oct.
6 7, 2016)).

7 Here, Mejia readily satisfies the standard for conditional certification. The key issue
8 is whether the Distributors should be treated as employees and thus would be entitled to
9 overtime for the hours they worked over forty (40) in a workweek. The key facts in this
10 case revolve around uniform policies applicable to all the Distributors, including how they
11 are required to perform their duties and the level of economic dependence they have on
12 BBUSA when they perform their duties. They are all required to work overtime to perform
13 their duties and subject to the same uniform compensation practices that denies them the
14 premium overtime rate for the hours they work over forty (40) in a workweek. (Compl. at
15 ¶¶ 67-71; Mejia Decl. at ¶¶ 23-30; Korver Decl. at ¶¶ 16-20; Rosales Decl. at ¶¶ 17-24)

16 Distributors have provided declaration testimony regarding the uniformity of their
17 duties, including the extensive control exercised by the company and the Distributors'
18 dependence on the company for business. For example, BBUSA has uniform policies
19 governing how all the Distributors order BBUSA products for distribution, prohibits them
20 from delivering any other baked good products besides BBUSA's, and sets the prices that
21 are charged for the products stocked by the Distributors. (Compl. at ¶¶ 46, 47, 49, 55; Mejia
22 Decl. at ¶¶ 8-16, 20, Exs. A, B; Korver Decl. at ¶¶ 7-15; Rosales Decl. at ¶¶ 6-13, Ex. A.)
23 BBUSA even mandates how the Distributors must arrange the products when they are
24 delivered. (Compl. at ¶ 35; Mejia Decl. at ¶ 13, Ex. B; Rosales Decl. at ¶ 10.) If these
25 policies are not followed by the Distributors, a BBUSA supervisor will reprimand the
26 Distributors, (*See e.g.* Mejia Decl. at ¶¶ 21-22, Ex. E, Notice of Breach of Franchise
27 Agreement; Korver Decl. at ¶¶ 14-15; Rosales Decl. at ¶ 16) and even has complete
28

authority to change the amount and type of products ordered by the Distributor. (Compl. at ¶ 51; Mejia Decl. at ¶ 14; Rosales Decl. at ¶ 11.)

BBUSA also uniformly requires all the Distributors to operate under the same compensation scheme that denies them overtime pay for the numerous hours they work over forty (40) in a workweek. (Compl. at ¶¶ 67-71; Mejia Decl. at ¶¶ 23-30; Korver Decl. at ¶¶ 16-20; Rosales Decl. at ¶¶ 17-24.) The BBUSA Distributors work as long as eighty (80) hours per week, which is necessary to perform the numerous distribution tasks mandated by the company. (*Id.*) None of the distributors are paid overtime despite the long hours they work. (*Id.*) In addition, the Franchise Operational Guidelines Manual, with policies applicable to all the Distributors, documents the BBUSA policies dictating how the Distributors perform their job and receive compensation. (Mejia Decl. at ¶ 17, Ex. B.) The Distributors are also required to enter into a Distribution Agreement that governs how they must perform their duties for BBUSA, which they each enter into with BBUSA or one of its brands; the Distribution Agreements are essentially the same, classifying the Distributors as "independent contractors" despite the control exercised over them. (Mejia Decl. at Ex. A; Rosales Decl. at Ex. A.) The profitability of the Distributors is also controlled by BBUSA, which serves as the "agent" of the distributor for the purpose of pursuing business opportunities and negotiating prices of the products the Distributors are required to disseminate for BBUSA. (Mejia Decl. at ¶¶ 8-14; Korver Decl. at ¶¶ 7-15; Rosales Decl. at ¶¶ 6-11.)

Given the foregoing analysis, Mejia has more than satisfied the similarly situated requirement, especially given that the "lower standard for conditional certification applies." *See Vaszlavik v. Storage Tech. Corp.*, 175 F.R.D. 672, 678 (D. Colo. 1997) ("At the notice stage, courts . . . require nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan[.]") (internal quotation marks and citation omitted). The pleadings and evidence demonstrate that all of the Distributors were improperly classified by BBUSA as independent contractors, subject to uniform company rules and policies controlling the manner in which

they perform their duties and their economic dependence on the company, and were subject to the same compensation practices that resulted in them not being paid overtime. The Court should conditionally certify this matter as a collective action under the FLSA so that notice to other Distributors can go forward.

### B. NOTICE SHOULD BE GIVEN TO SIMILARLY SITUATED DISTRIBUTORS.

The many other similarly situated Distributors victimized by BBUSA's practices should be notified about this lawsuit so they may opt-in if they desire. While the FLSA does not provide specific procedures by which claimants may opt-in, the United States Supreme Court has held that "district courts have discretion, in appropriate cases, to implement 29 U.S.C. § 216(b) . . . by facilitating notice to potential plaintiffs."[7] *Hoffmann-La Roche, Inc. v. Sperling,* 493 U.S. 165, 169 (1989).

The court's facilitation of notice to potential opt-in plaintiffs serves the broad remedial purpose of the FLSA. *See Brooks v. BellSouth Telecomms., Inc.,* 164 F.R.D. 561, 566 (N.D. Ala. 1995). As the Supreme Court explained, the benefits of a collective action proceeding under § 216(b) "depend on employees receiving accurate and timely notice concerning the pendency of the collective action, so that they can make informed decisions about whether to participate." *Hoffman-LaRoche*, 493 U.S. at 170. Once the Court certifies the collective action, there is a strong presumption that authorization of notice follows. *See Wertheim*, 1993 WL 603552, at *6 (providing plaintiffs with multiple chances to draft an acceptable form of notice after defendants' objections to language in notice); *see Ballaris v. Wacker Silttronic Corp.*, No. 00-1627-KI, 2001 WL 1335809 at *3 (D. Or. Aug. 24, 2001) (judge offering "If the parties are unable to reach agreement [on the form of notice], I am available to assist via a telephone conference").

---

[7] Although *Hoffman-La Roche* involved litigation arising under the Age Discrimination in Employment Act, subsequent courts have adopted its holding in actions arising under the FLSA. *See, e.g., Shaffer v. Farm Fresh, Inc.,* 966 F.2d 142, 147 n.5 (4th Cir. 1992); *H & R Block, Ltd. v. Housden,* 186 F.R.D. 399, 400 (E.D. Tex. 1999); *Garner v. G.D. Searle Pharm. & Co.,* 802 F. Supp. 418, 422 (M.D. Ala. 1991). The District of Arizona has applied the *Hoffman-La Roche* notice analysis in connection with FLSA suit. *Villarreal v. Caremark LLC,* 2014 WL 4247730 (D. Ariz. Aug. 21, 2014).

The requirement for notice is the same similarly situated standard applied in the decision to certify the action as collective. The plaintiff must establish that there are similarly situated individuals who may desire to opt into the action. *See Dybach v. State of Florida Dept. of Corrections,* 942 F.2d 1562, 1567-68 (11th Cir. 1991); *see Camper v. Home Quality Mgmt., Inc.*, 200 F.R.D. 516, 519-20 (D. Md. 2000) (explaining that prior to issuing notice in a collective action, plaintiffs must make "some factual showing by affidavit or otherwise" that potential plaintiff group is similarly situated); *D'Anna v. M/A-COM, Inc.,* 903 F. Supp. 889, 893-94 (D. Md. 1995) (requiring only a "preliminary factual showing that a similarly situated group of potential plaintiffs exists" prior to issuing notice). This lenient requirement is satisfied by a "modest factual showing" that the named plaintiffs and other potential plaintiffs "were victims of a common policy or plan that violated the law." *Gjurovich v. Emmanuel's Marketplace, Inc.,* 282 F. Supp. 2d 101, 104 (S.D.N.Y. 2003); *Realite v. Ark Rests. Corp.*, 7 F. Supp. 2d 303, 306 (S.D.N.Y. 1998). When analyzing whether the plaintiff has made the required showing, the court should not evaluate the merits of the plaintiffs' claim. *Hoffmann v. Sbarro, Inc.,* 982 F. Supp. 249, 262 (S.D.N.Y. 1997). Also, "[f]actual disputes do not negate the appropriateness of court facilitated notice." *Camper,* 200 F.R.D. at 520.

As explained above, Mejia readily satisfies the similarly situated standard. The pleadings and evidence demonstrate that she and similarly situated Distributors have the same job duties and are subject to the same uniform rules and policies systematically imposed on them by the company. The Distributors were improperly classified as independent contractors and denied overtime wage compensation according to company policies uniformly applied to them. Absent notice, the Distributors likely will not receive timely, complete and accurate information about this action, nor will they have meaningful access to the court or an efficient method of vindicating their rights. *Cf. Hoffman-LaRoche,* 493 U.S. at 170 ("[a] collective action allows . . . plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources").

### C. NOTICE MUST BE EXPEDITED DUE TO THE RUNNING OF THE STATUTE OF LIMITATIONS.

Similarly situated Distributors unknowingly depend on this Court to authorize notice of the pendency of this case. Notice to prospective plaintiffs should be expedited to toll the running of the statute of limitations as to the claims of potential opt-ins. Under applicable provisions of the Portal-to-Portal Pay Act, the statute of limitations on the claims of potential plaintiffs continues to run until each individual files a written consent to join the action as a party plaintiff. *See* 29 U.S.C. § 256. Since similarly situated Distributors' claims are eroding with each passing day, notice should be promptly authorized to reduce the losses suffered. In fact, courts have tolled the statute of limitations during the pendency of a decision for conditional certification for equitable reasons. *See McGlone v. Contract Callers, Inc.*, 867 F. Supp. 2d 438, 445 (S.D.N.Y. 2012).

Authorizing early notice to potential plaintiffs follows the Supreme Court's suggestion that a district court "begin its involvement early, at the point of the initial notice" in actions brought under § 216(b). *Hoffmann-La Roche,* 493 U.S. at 171. The Court discussed the benefits of early involvement by courts:

> A trial court can better manage a major [FLSA] action if it ascertains the contours of the action at the outset. The court is not limited to waiting passively for objections about the manner in which the consents were obtained. By monitoring preparation and distribution of the notice, a court can ensure that it is timely, accurate, and informative. Both the parties and the court benefit from settling disputes about the content of the notice before it is distributed. This procedure may avoid the need to cancel consents obtained in an improper manner.

*Id.* at 171-72. Notice must therefore be expedited because time is of the essence.

### D. THE PROPOSED NOTICE IS FAIR AND ADEQUATE.

As stressed by the Supreme Court, the effectiveness of a collective action depends "on employees receiving accurate and timely notice concerning the pendency of the collective action, so that they can make informed decisions about whether to participate." *Id.* at 170. Court-authorized notice prevents dissemination of "misleading communications" and reduces the likelihood that subsequent corrective notices will be necessary. *Id.* at 171.

- 14 -

Mejia's proposal for court-approved notice, which is attached as Exhibit 1, is "timely, accurate, and informative," *id.* at 172, and is similar to the types of notices approved by other courts. *See, e.g., Gjurovich,* 282 F. Supp. 2d at 106-08. The Proposed Notice includes the following information: provides notice of the pendency of the action (Ex. 1, § I); accurately describes Mejia's claims and BBUSA's denial of liabilities (Ex. 1, § II); accurately describes the composition of the class (Ex. 1, § III); notifies potential plaintiffs of the opportunity to opt-in, explains the procedure for exercising their right to opt-in and informs individuals that they are not required to participate (Ex. 1, § III); explains the legal effects of joining the lawsuit and the legal effects of not participating in the lawsuit (Ex. 1, §§ IV & V); advises that the Court expresses no opinion regarding the merits of Mejia's claims or BBUSA's liability (Ex. 1, § VI); accurately recites the prohibition against retaliation for participation in an FLSA action (Ex. 1, § VII); and accurately conveys the unenforceability of any waiver of rights to compensation due under the FLSA (Ex. 1, § VIII).

Mejia requests that the attached Proposed Notice and Consent to Opt-In to Collective Action be mailed by first class mail to all current and former BBUSA employees who worked as Distributors for BBUSA in Arizona from September 30, 2013 to the present. Those individuals interested in participating would be required to return their consents to Mejia's counsel in time for their consents to be filed with the Court within 90 days of the mailing of the notice. *See Ambrosia v. Cogent Commc'ns, Inc.*, 312 F.R.D. 544, 559 (N.D. Cal. 2016) (approving 90-day deadline for filing consents); *Adams,* 242 F.R.D. at 542 (same). The Proposed Notice is fair and should be approved for distribution.

**IV.  MEJIA'S REQUEST FOR EXPEDITED DISCOVERY OF NAMES AND ADDRESSES OF ALL CURRENT AND FORMER DISTRIBUTORS IS ESSENTIAL TO ENSURE ACCURATE AND TIMELY NOTICE**

Mejia seeks expedited discovery of the names and addresses of all current and former BBUSA employees who worked as Distributors for BBUSA in Arizona from September 30, 2013 to the present, so they may receive the Proposed Notice and Consent to Opt-In to Collective Action form. This information is clearly relevant to the subject

matter of the action. *See Hoffmann-La Roche,* 493 U.S. at 170 (holding that the requirement that a defendant produce the names and addresses of former employees for the purposes of facilitating notice is "relevant to the subject matter of the action and that there were no grounds to limit the discovery under the facts and circumstances of [the] case"). Production of this information is necessary to ensure all potential plaintiffs receive notice informing them of the action and their opportunity to opt in. *See Gjurovich,* 282 F. Supp. 2d at 108 (ordering defendants to produce the names and addresses of similarly situated individuals to facilitate distribution of the court-approved notice); *Taylor v. AutoZone, Inc.*, No. CV-10-8125-PCT-FJM, 2011 WL 2038514, at *5 (D. Ariz. May 24, 2011); *Rodriguez v. SGLC, Inc.*, No. 2:08-cv-01971-MCE-KJM, 2009 WL 454613, at *2 (E.D. Cal. Feb. 5, 2009). Due to the time sensitivity, Mejia requests an order for BBUSA to produce the relevant names and addresses within ten (10) days of the Court's ruling on this Motion.

## V.  CONCLUSION

Mejia's evidence satisfies the minimal preliminary showing that she and other similarly-situated employees who worked as Distributors were improperly classified as independent contractors and did not receive overtime in violation of the FLSA. Certification of this lawsuit as a collective action and the issuance of notice is therefore appropriate. Mejia requests that the Court approve the Proposed Notice, which fairly and accurately describes the litigation and the potential plaintiffs' rights to participate. Finally, to facilitate distribution of the court-authorized notice, Mejia requests that BBUSA be ordered to immediately produce the names and last known addresses of all current and former BBUSA Distributors in Arizona from September 30, 2013 to the present.

DATED: April 5, 2017

BONNETT, FAIRBOURN, FRIEDMAN & BALINT, P.C.

By /S Ty D.Frankel
Ty D. Frankel
2325 E. Camelback Road, Suite 300
Phoenix, Arizona 85016
Telephone: (602) 274-1100
Facsimile: (602) 798-5860

*Law Offices of*
***BONNETT, FAIRBOURN, FRIEDMAN & BALINT, P.C.***
*600 W. Broadway, Suite 900*
*San Diego, California 92101*
*Telephone: (619) 756-7748*
*Patricia N. Syverson (AZ Bar No. 20191)*
[psyverson@bffb.com](psyverson@bffb.com)

**ROBAINA & KRESIN PLLC**
Edmundo P. Robaina (No. 018125)
Gregory I. Stoltz (No. 027519)
2730 E. Broadway, Suite 160
Tucson, Arizona 85716
Telephone: (520) 822-8393
Facsimile: (520) 844-1011

Attorneys for Plaintiff

**CERTIFICATE OF SERVICE**

I, Karen Vanderbilt, hereby certify that a true copy of the foregoing document filed through the ECF system will be electronically sent to the registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent to those indicated as non-registered participants on April 5, 2017.

/s/ Karen Vanderbilt