MEJIA V. BIMBO BAKERIES USA, INC.
16-cv-00654-JAS

INDEX OF EXHIBITS

Exhibit 1        Notice of Pending FLSA Lawsuit

Exhibit 2        Consent to Opt-In

Exhibit 3        Mejia Declaration

                 Ex. A Franchise Agreement

                 Ex. B Operational Guidelines Manual

                 Ex. C. Communications Board

                 Ex. D. BBUSA Code of Business Conduct

                 Ex. E  Notice of Breach of Franchise Agreement Letter

Exhibit 4        Korver Declaration

                 (No exhibits)

Exhibit 5        Rosales Declaration

                 Ex. A Distribution Agreement

                 Ex. B Communications Board

                 Ex. C BBUSA Code of Business Conduct

# EXHIBIT 1

**<u>NOTICE OF PENDING FAIR LABOR STANDARDS ACT LAWSUIT</u>**

**NOTICE OF YOUR RIGHTS IN CONNECTION WITH PENDING FAIR LABOR STANDARDS ACT LAWSUIT AGAINST BIMBO BAKERIES USA, INC., A DELAWARE CORPORATION, ("Defendant" or "BBUSA"):**

TO:        All individuals who worked as Distributors for BBUSA pursuant to Distribution (or "Franchise") Agreements with either BBUSA or its predecessors in interest, in Arizona, classifying them as "independent contractors" and/or "independent operators" for BBUSA from September 30, 2013 to the present ("Distributors").

RE:        Fair Labor Standards Act ("FLSA") lawsuit against BBUSA for alleged failure to pay overtime to Distributors for BBUSA from September 30, 2013 to the present.

## I.    *<u>INTRODUCTION</u>*

The purpose of this Notice is to inform you of the existence of a collective action lawsuit in which you potentially are "similarly situated" to the named Plaintiff, to advise you of how your rights may be affected by this suit, and to instruct you on the procedure for participating in this suit.

## II.    *<u>DESCRIPTION OF THE LAWSUIT</u>*

On September 30, 2016, Plaintiff Teresa Mejia filed a Complaint in the United States District Court, District of Arizona against BBUSA.  Plaintiff was a Distributor at BBUSA who provided delivery of baked goods to established customers of BBUSA.  The case number is: 4:16-cv-00654-JAS.

Plaintiff alleges that she and other Distributors for BBUSA are owed overtime pay under the FLSA, 29 U.S.C. § 207, for their hours worked in excess of forty (40) per week.  The lawsuit contends that BBUSA unlawfully classified Distributors as independent contractors, which resulted in them not receiving overtime compensation to which they are entitled.  Plaintiff also alleges that

BBUSA willfully violated the federal Fair Labor Standards Act of 1938, 29 U.S.C. § 216(b) by failing to pay overtime.

Plaintiff seeks to recover damages, on behalf of herself and other Distributors for BBUSA, including the amount of overtime wage compensation they have been denied, pre- and post-judgment interest on the amount of overtime wage compensation denied, liquidated damages, equitable relief, an award of reasonable attorneys' fees, costs and expenses, and such other relief as the Court may deem proper.  The lawsuit is currently in its early stages.

BBUSA denies the allegations in Plaintiff's Complaint and contends, among other things, that no wages are due.

**III.**   **_YOUR RIGHT TO JOIN THIS SUIT AS A PARTY PLAINTIFF_**

If you worked for BBUSA and performed duties as a Distributor anytime from September 30, 2013 to the present, you may join this case (that is, you may "opt in") by completing and mailing the attached "Consent to Opt-In to Collective Action" form to the Plaintiff's counsel at the following address:

> Ty D. Frankel, Esq.
> BONNETT, FAIRBOURN, FRIEDMAN & BALINT, P.C.
> 2325 East Camelback Road
> Suite 300
> Phoenix, AZ 85016-3422
> (602) 274-1100

The form must be sent to the Plaintiff's counsel in sufficient time to have Plaintiff's counsel file it with the federal court on or before _____, 2017 [90 days after mailing of notice].  If you fail to return the Consent to Opt-In to Collective Action form to the Plaintiff's counsel in time for it to be filed with the

federal court on or before the above deadline, you may not be able to participate in this lawsuit.  You are not required to participate.

**IV.**   ***EFFECTS OF JOINING THIS SUIT***

If you choose to join this suit, you will be bound by the judgment, whether it is favorable or unfavorable, or any settlement of this action.  While the suit is proceeding, you may be required to provide information, appear for a deposition, and/or testify in court.

The attorneys for the named Plaintiff are being paid on a contingency fee basis, which means that if there is no recovery, there will be no attorneys' fee.  If there is a recovery, the Plaintiff's counsel will receive a part of any settlement obtained or money judgment entered in favor of all the members of the collective action.  If you sign and return the Consent to Opt-In to Collective Action form attached to this Notice, you are agreeing to designate the named Plaintiff in the collective action as your agent to make decisions on your behalf concerning the litigation, the method and manner of conducting this litigation, the entering of an agreement with Plaintiff's counsel concerning attorneys' fees and costs, and all other matters pertaining to this lawsuit.  The decisions and agreements made and entered into by the named Plaintiff will be binding on you if you join this lawsuit.   However, the Court has retained jurisdiction to determine the reasonableness of any contingency fee agreement entered into by the Plaintiff with counsel and to determine the adequacy of the Plaintiff's counsel.

Furthermore, you can join this lawsuit by counsel of your own choosing.  If you do so, your attorney must file an "opt-in" consent form by _____, 2017 [90 days from the date of notice mailing].

## V.     *EFFECTS IN NOT JOINING THIS LAWSUIT*

If you choose not to join this suit, you will not be affected by the judgment, favorable or unfavorable.  If you do not choose to file a consent form with the District Court, you will not receive any compensation for BBUSA's failure to pay overtime if Plaintiff prevails.

## VI.    *NO OPINION EXPRESSED AS TO THE MERITS OF THE CASE*

This Notice and its contents have been authorized by the federal District Court.  The Court has taken no position regarding the merits of Plaintiff's claims or BBUSA's defenses.

## VII.   *NO RETALIATION OR DISCRIMINATION PERMITTED*

Federal law makes it illegal for BBUSA to retaliate against you because you have exercised your right under the Fair Labor Standards Act to participate in this lawsuit.

## VIII.  *NO WAIVER OF FLSA RIGHTS*

If you have signed a release or waiver regarding overtime or any other rights under the FLSA, it may not be valid.  You may still participate in this litigation.

## IX.    *LEGAL REPRESENTATION IF YOU JOIN THE SUIT*

If you choose to join this suit, you will be represented by the law firms of Robaina & Kresin PLLC and Bonnett, Fairbourn, Friedman & Balint, P.C.  The names and address for the Plaintiff's attorneys and the individuals who opt-in to

4

this lawsuit are: Edmundo P. Robaina and Gregory I. Stoltz, Robaina & Kresin PLLC, 2730 E. Broadway, Suite 160, Tucson, Arizona 85716, (520) 822-8393 and Ty D. Frankel and Patricia N. Syverson, Bonnett, Fairbourn, Friedman, & Balint, P.C., 2325 East Camelback Road, Suite 300, Phoenix, AZ 85016-3422, (602) 274-1100.

## X.   *ADDITIONAL INFORMATION*

Further information about this Notice, the deadline for filing a Consent to Opt-Into Collective Action, or questions concerning this lawsuit may be obtained by writing or phoning the Plaintiff's counsel at the telephone number and address stated in Paragraph IX above.  E-mailing Plaintiff's counsel is also permitted at tfrankel@bffb.com, psyverson@bffb.com, or epr@robainalaw.com, gis@robainalaw.com

Dated: _____, 2017.


_____
Ty D. Frankel
Patricia N. Syverson
BONNETT,  FAIRBOURN,  FRIEDMAN  &
BALINT, P.C.
2325 East Camelback Road, Suite 300
Phoenix, AZ 85016-3422

Edmundo P. Robaina (No. 018125)
Gregory I. Stoltz (No. 027519)
**ROBAINA & KRESIN PLLC**
2730 E. Broadway, Suite 160
Tucson, Arizona 85716

5

# EXHIBIT 2

1  Edmundo P. Robaina (No. 018125)
   Gregory I. Stoltz (No. 027519)
2  **ROBAINA & KRESIN PLLC**
   2730 E. Broadway, Suite 160
3  Tucson, Arizona 85716
   Telephone: (520) 822-8393
4  Facsimile:  (520) 844-1011
   epr@robainalaw.com
5  gis@robainalaw.com

6  Ty D. Frankel (AZ Bar No. 027179)
   Law Offices of
7  **BONNETT, FAIRBOURN,**
   **FRIEDMAN & BALINT, P.C.**
8  2325 E. Camelback Road, Suite 300
   Phoenix, Arizona 85016
9  Telephone:  (602) 274-1100
   Facsimile:  (602) 274-1199
10 tfrankel@bffb.com

11 *Attorneys for Plaintiff*

12          **IN THE UNITED STATES DISTRICT COURT**

13                  **DISTRICT OF ARIZONA**

14 Teresa Mejia, on behalf of herself and all
   others similarly situated,                    No. 4:16-cv-00654
15
16          Plaintiff,                            **CONSENT TO OPT-IN TO**
                                                  **COLLECTIVE ACTION**
17 v.

18 Bimbo Bakeries USA, Inc,

19          Defendant.

20

21         I, _____, pursuant to 29 U.S.C. §§ 216(b) and 256, hereby

22 consent and opt-in to the above-captioned lawsuit.

23         I am similarly situated to the Plaintiff in this lawsuit because I worked for Bimbo

24 Bakeries USA, Inc. ("Bimbo Bakeries") within the past three years and performed duties

25 as a Distributor; during the time I worked for Bimbo Bakeries I did not receive overtime

26 wages.

27         I hereby consent to opt-in to this lawsuit and specifically authorize counsel of

28 record to pursue this lawsuit on my behalf along with all those similarly situated.  I

                              - 1 -

understand the named representative will act as my agent and make decisions on my behalf.

Date: _____

_____
Signature

_____
Printed Name

_____
Street Address

_____
City, State ZIP

_____
Telephone Number

_____
Email Address

# EXHIBIT 3

**Declaration of Teresa Mejia**

1.    I am resident of Pima County, Arizona.

2.    I have worked for Bimbo Bakeries USA, Inc. ("BBUSA") or its predecessors in interest since 2001.

3.    From 2001 to 2004 I received benefits and was called "an employee."

4.    In 2004 I was presented the option of either being terminated with a severance package as a cash payout, or applying it to the purchase of a "route" to deliver fresh baked bread products under terms unilaterally set by the company.

5.    In 2004 I paid approximately $74,000 for my first route. I bought my current BBUSA route in January 2011. The franchise agreement for my current route, which is also referred to as a distribution agreement, is attached as Exhibit A.

6.    To my knowledge, there are currently 324 BBUSA bread routes in Arizona, which are each served by a BBUSA distributor like myself.

7.    In all meaningful respects, my job duties and level of supervision were the same when I was officially deemed an employee and when I had purchased a distribution route.

8.    I do not exercise independent business judgment in connection with the services I perform for BBUSA.

9.    BBUSA mandates the pricing of the products I deliver to the outlets on my route.

10.    BBUSA requires me to use a handheld computer it provides, which is preloaded with a particular price and inventory structure for the BBUSA products I am required to distribute.

11.    BBUSA utilizes the same system for ordering bread and invoicing customers across all of its depots in Arizona.

12.    BBUSA prohibits me from delivering fresh baked goods that are in direct competition with brands represented by BBUSA, on pain of termination.  As a result, I

cannot distribute any goods other than those required by BBUSA.

13.     BBUSA also employs my supervisor who works at the BBUSA depot and who enforces strict rules and requirements set forth by BBUSA, such as when I can arrive and depart from the depot, when I must deliver stale products to the discount store, and how that product must be physically arranged when I deliver it.

14.     It is a common practice for my BBUSA supervisor to change the amount and type of BBUSA products I have ordered from one day to the next. I am incapable of blocking those changes.

15.     BBUSA has created written policies and procedures outside of the Distribution Agreements that I am required to follow.  The written policies are drafted by BBUSA management personnel.  These written rules typically relate to the return of BBUSA products for credit and placing orders for BBUSA product.  The written policies are handed to all the distributors at the depot by the BBUSA District Manager. All distributors are required to sign an acknowledgement of receipt of the new BBUSA policy.

16.     I know the BBUSA job requirements and policies that applied to me, as well as the hours I regularly worked, applied to all the BBUSA distributors who work in the position I do.

17.     In 2011 my District Manager, Pat Patterson, approached all of the distributors at the Tucson BBUSA depot and handed out the new Operational Guidelines Manual to me and my coworkers. He required us to acknowledge receipt in writing. I observed my colleagues at the depot receiving the manual and watched them sign for it, as I did. That manual includes policies that apply to all BBUSA distributors. See Exhibit B.

18.     I have observed BBUSA's policies, such as those regarding the ordering of BBUSA products, the expected hours of service, and payment of wages, applied to my coworkers who also worked as distributors, including Troy Korver, John Rosales, John Diaz, Tony Painter, Bill Belander, and my own brother Mark Salyers.

19.     It is also common for me to receive new BBUSA policies by email or by word of mouth. These policies govern the ordering of product, frequency of deliveries and

manner of store service.  For example, BBUSA has a policy of refusing to accept "excessive" returned products.  There is also a BBUSA Communications Board displayed for the distributors to be apprised of company promotions and policies. The policies on this board include the hours we are allowed to be in the depot.  See Exhibit C.

20.    The policies on the board also include a BBUSA Code of Business Conduct that the distributors are required to follow, which is attached at Exhibit D.  It contains policies regarding how we must perform our duties, including policies controlling how we maintain records and preventing us from accepting outside business activities.

21.    My BBUSA supervisor provides written warnings to me if he believes I have failed to keep all BBUSA products within code or violated a policy set by the company. These written warnings are called "Cure Letters" or "Notice of Breach" letters. Attached at Exhibit E is a cure letter sent to my coworker Christopher Steele.

22.    These warnings usually come with a threat of a "breach," which is a unilateral termination of my Distribution Agreement and effectively terminates my ability to work for the company.

23.    I typically work seven (7) days a week, approximately eighty (80) hours per week.

24.    On Mondays I work from 2:00 a.m. to 5:00 p.m., on Tuesdays from 2:00 a.m. to 4:00 p.m., on Wednesdays from 6:00 a.m. to 12:00 p.m. and from 2:00 p.m. to 4:00 p.m., on Thursdays from 2:00 a.m. to 5:00 p.m., on Fridays from 6:00 a.m. to 11:00 a.m. and from 1:00 p.m. to 4:00 p.m., on Saturdays from 2:00 a.m. to 5:00 p.m., and on Sundays from 6:00 a.m. to 12:00 p.m. and from 2:00 p.m. to 5:00 p.m.

25.    BBUSA requires distributors like me to do "pull-ups" as a condition of working for BBUSA as a distributor multiple times per week. These are trips to the stores distributors like myself are required to service for BBUSA that are performed in the distributors' personal vehicles during which we are required to rotate BBUSA stock. My personal vehicle is a 2009 Mustang and it weighs less than 10,000 pounds. To comply with BBUSA policy, I do pull-ups in my personal vehicle multiple times a week.

26.     When I arrive at the depot at 2 a.m., I interact with my fellow distributors. We discuss our working conditions regularly. I also converse with them by phone or text during the work day as we deliver bread. When I return to the depot after my deliveries, I interact with them again.

27.     Through that regular contact and communication, I am aware of the working hours of my fellow distributors. They all regularly work over forty (40) hours per week.

28.     Through that contact and communication, I know that my fellow distributors are required to do pull-ups multiple times a week in their personal vehicles as well.

29.     My fellow distributors and I are all paid directly by BBUSA, in a procedure BBUSA calls a "settlement." My settlement and that of my fellow distributors does not compensate us properly for time worked above forty (40) hours per week.  We are not paid overtime.

30.     I have discussed the settlement process with coworkers who work as distributors so I know that they are paid in a similar manner to me, including the long hours they worked over forty in a workweek and the failure of the company to pay them overtime for these hours.  For example, I have spoken with Mark Salyers, Bill Belander, Troy Korver, John Diaz, Raymond Sardinia, Chris Steele, Craig Burns, Anthony Santa Cruz, Frank Quiroga, and Jesus Lizarraga.


I declare under the penalty of perjury under the laws of the United States of America that the forgoing is true and correct.


_____          2-09-17
          Teresa Mejia                              Date

- 4 -

# EXHIBIT A



## SARA LEE DISTRIBUTION, LLC.
### FRANCHISE AGREEMENT

**THIS FRANCHISE AGREEMENT** ("Agreement") is made effective **January 2, 2011** ("Effective Date") by and between **SARA LEE DISTRIBUTION, LLC**, a Delaware limited liability company with its principal offices at **3500 LACEY ROAD, DOWNERS GROVE, ILLINOIS 60515** (herein referred to as "COMPANY"), and **TERESA P MEJIA INC.**, having a principal place of business at **7125 S. AVENIDA SOMBRA, TUCSON, ARIZONA 85746** (herein referred to as "FRANCHISEE") .

W I T N E S S E T H :

    **WHEREAS,** COMPANY and its affiliates distribute and sell Products as hereinafter defined throughout a large part of the United States; and

    **WHEREAS,** FRANCHISEE has the ability and experience necessary to sell and distribute Products successfully within a specific geographic area; and

    **WHEREAS,** FRANCHISEE desires to acquire Distribution Rights in the Sales Area (as such terms are hereinafter defined) from COMPANY or from another FRANCHISEE; and

    **WHEREAS,** the parties desire to enter into a written agreement describing and setting forth the terms and conditions under which they will do business with each other;

    **NOW THEREFORE,** in consideration of the premises, covenants and conditions set forth herein, and for other good and valuable consideration given and received, the parties mutually agree as follows:

Page 1

# ARTICLE 1
## DEFINITIONS

**§1.1**    **CHAIN:**   Shall mean a person or business entity that operates more than one Outlet, and makes decisions centrally regarding purchasing and/or billing of Products for its Outlets.

**§1.2**    **COMPANY OWNED/OPERATED THRIFT STORES:**   Shall mean Outlets that specialize in the sale of Off Code Products to the public and identify themselves to the public by a trade name that includes one of the Marks.

**§1.3**    **DIRECT STORE DELIVERY:**   Shall mean FRANCHISEE's physical delivery to and/or merchandising of Products ordered by an Outlet at the place of business where the Outlet (i) sells merchandise, including Products, to the public, or (ii) buys Products for use and consumption at the Outlet. Examples of (i) include retail stores, and examples of (ii) include restaurants, schools, universities and other learning institutions; stadiums and arenas; prisons; military bases; corporate and government commissaries that provide food services to their employees; and similar types of institutions.

**§1.4**    **DISTRIBUTION RIGHTS:**   Shall mean the sole right to sell and distribute Products by Direct Store Delivery to Outlets in the Sales Area subject to the terms of this Agreement and the Operational Guidelines Manual.

**§1.5**    **FORCE MAJEURE:**   Shall mean an Act of God, declared or undeclared war, fire, explosion, riot, looting, terrorism, civil commotion, failure of machinery or plant, restrictions by a Government or any competent authority, strikes or lock-outs at either party's premises or in any related trade or business, or any other similar circumstances of whatsoever kind beyond the control of the party affected, which affects either party's performance of its obligations under this Agreement.

**§1.6**    **INDEPENDENT THRIFT STORES:**   Shall mean Outlets that specialize in the sale of Off Code Products to the public and identify themselves by a trade or brand name that does not include any of the Marks.

**§1.7**    **MARKS:**   Shall mean collectively the specific trade or brand names, trademarks, designs, graphics, logos, and other commercial symbols that COMPANY designates in writing from time to time for FRANCHISEE's use subject to the provisions of this Agreement. For purposes of this Agreement, the Marks as of the effective date are listed on **Schedule B**.

**§1.8**    **OFF CODE PRODUCT:**   Shall mean Products that exceed the "sell by" and all pull by dates established by COMPANY for the removal of Products from sale to the public. For purposes of defining "Off Code Product," FRANCHISEE understands and agrees that COMPANY, alone, shall determine the "sell by", pull by and any other removal dates for all Products covered by this Agreement which will be established in the Operational Guidelines Manual and may be modified from time to time.

Page 2

**§1.9**   **FRANCHISE DISCLOSURE DOCUMENT:**  Shall mean COMPANY's Franchise Disclosure Document that FRANCHISEE acknowledges receiving before executing this Agreement or paying any consideration to COMPANY or COMPANY's affiliates for the Distribution Rights.

**§1.10**   **OUTLETS:**  Shall mean all retail stores, restaurants and institutional accounts that fall within the sales categories described in **Schedule C**, including, "seasonal," "will call," "remodeled" and "new" Outlets, but only to the extent that sales of Products are made by Direct Store Delivery. Outlets shall not include COMPANY Owned/Operated Thrift Stores, street vendors, concessionaires, sales by vending machines or comparable devices, or other types of sales categories not described in **Schedule C**.

**§1.11**   **OPERATIONAL GUIDELINES MANUAL**:  Shall mean, collectively, all procedures and instructions in written or electronic format that may now, or in the future, be issued by the COMPANY pertaining to the sale of Products or the parties' rights and duties under this Agreement.

**§1.12**   **PRODUCTS:**  Shall mean all fresh baked breads, rolls, bagels, cookies, cereal bars, muffins, cakes, pies, bread stuffing, packaged croutons and similar types of fresh baked goods intended by COMPANY to be sold as fresh that COMPANY sells under the Marks, subject to COMPANY's right to change the Marks. COMPANY may, at any time, in its sole discretion, discontinue the production of certain Products, identify new fresh baked goods as Products, and cease offering certain Products for sale in particular markets including in the Sales Area.  If COMPANY discontinues production of any Products, ceases to offer any Products for sale in the Sales Area, or ceases to sell fresh baked goods under the Marks, COMPANY shall notify FRANCHISEE of all such changes in writing reasonably promptly after COMPANY decides to make the change and before the date that COMPANY establishes for the change to take effect.  After such date, the Products or fresh baked goods affected thereby shall no longer be classified as Products for purposes of this Agreement.  FRANCHISEE understands and agrees that Products shall exclude (i) Off Code Products, and (ii) Products within the scope of Section §12.8.

**§1.13**   **SALES AREA:**  Shall mean that geographic area as more specifically described in **Schedule A** attached hereto and made a part hereof.

## ARTICLE 2
## RELATIONSHIP

**§2.1**   **GRANT OF FRANCHISE**:  Upon the payment of the purchase price set forth in Schedule A ("Purchase Price"), and subject to the terms and conditions set forth herein, COMPANY hereby grants to FRANCHISEE during the Term of this Agreement, the Distribution Rights regarding the Sales Area.  The Distribution Rights are licensed to FRANCHISEE.  FRANCHISEE shall conduct the business of exercising its Distribution Rights in accordance with the terms of this Agreement and with all instructions, rules and procedures which may be prescribed COMPANY from time to time with respect to this Agreement.  FRANCHISEE agrees not to sell or distribute the Products, either directly or indirectly, outside of the Sales Area and shall take commercially reasonable steps to prevent the distribution of the Products outside of the Sales Area by its agents or employees.  Upon mutual agreement by the parties, COMPANY may grant FRANCHISEE the

right to distribute Products outside of the Sales Area pursuant to an agreement between the parties.

**§2.2**   **INDEPENDENT CONTRACTORS:**   The parties intend to create an independent contractor relationship.   It is of the essence of this Agreement that FRANCHISEE be an independent contractor for all purposes and identifies itself as such in all third party dealings.   Any contrary final determination by any board, tribunal or court of competent jurisdiction shall require the amendment of this Agreement in any way necessary to establish an independent contractor relationship.   As an independent contractor, FRANCHISEE has the right to operate the business using FRANCHISEE's own judgment and discretion, and shall bear all risks and costs of operating such business.   FRANCHISEE has no authority to retain any person on behalf of COMPANY.   It is expressly understood that FRANCHISEE has no claim, or right under any circumstances, to any benefits or other compensation currently paid by COMPANY to employees, or hereafter declared by COMPANY for the benefit of employees.   Except as specifically recited herein, this Agreement does not create a fiduciary relationship between the parties for any purpose.

**§2.3**   **EXTENT AND DURATION:**

i.     COMPANY hereby recognizes FRANCHISEE's Distribution Rights, which rights will continue until the Distribution Rights expire or are sold or transferred as provided herein.

ii.     The initial term of this Agreement ("Term") shall be for a period of ten (10) years commencing on the Effective Date, unless sooner terminated by COMPANY as provided for in this Agreement.

**§2.4**   **TERM OF APPOINTMENT:**

i.     FRANCHISEE's appointment is limited to the Term of this Agreement.   Notwithstanding the foregoing, FRANCHISEE shall perform the duties set forth in this Agreement that expressly, or by their nature, require FRANCHISEE's performance after the Term ends after expiration or termination.

ii.     Company hereby grants FRANCHISEE the option ("Re-Write Option") to be re-appointed as Company's authorized FRANCHISEE in the Sales Area under the re-write conditions set forth in Section §2.5.

iii.     FRANCHISEE understands that the Re-Write Option does not give FRANCHISEE the right or option to extend or renew this Agreement.   Instead, the Re-Write Option grants FRANCHISEE the right, subject to the conditions set forth in Section §2.5, to be re-appointed as Company's authorized FRANCHISEE in the Sales Area under the terms of Company's then-current form of contract ("Re-Write Contract") on which Company is awarding new franchises for the distribution of Products.   The Re-Write Contract shall not modify the Sales Area's boundaries unless the parties mutually agree in writing to a modification.

iv.     FRANCHISEE understands and accepts the risk that (i) Company may not be awarding new franchises for the distribution of Products when FRANCHISEE applies for re-write, in which case FRANCHISEE shall have no Re-Write Option or claim against Company arising from

Company's decision to cease awarding new franchises; and (ii) the Re-Write Contract which Company offers to FRANCHISEE may materially differ from the provisions of this Agreement including, without limitation, requiring payment of additional or different fees to Company and establishing a term which is longer or shorter than the Term.

**§2.5** **RE-WRITE CONDITIONS:** If FRANCHISEE meets the following conditions precedent to exercising FRANCHISEE's Re-Write Option, FRANCHISEE may be re-appointed as Company's authorized FRANCHISEE after the Term ends:

i.      Not earlier than 270 days before, but not later than 180 days before, expiration of the Term, FRANCHISEE must give Company written notice ("FRANCHISEE's Request for Re-Write) indicating that FRANCHISEE desires to be re-appointed as Company's authorized FRANCHISEE and be considered for re-write. The rights and obligations of FRANCHISEE upon renewal shall be identical to the rights and obligations of COMPANY'S then current form of Franchise Agreement and length of term being offered to its new FRANCHISEE's at the time of the exercise of this option to renew.

ii.      To be eligible for re-write:

a)      Company must be granting new franchises for the distribution of Products in the state in which FRANCHISEE operates his or her Sara Lee Distribution Business when FRANCHISEE serves FRANCHISEE's Request for Re-Write.

b)      FRANCHISEE must be in compliance with the provisions of this Agreement when FRANCHISEE serves FRANCHISEE's Request for Re-Write and on the last day of the Term.

c)      FRANCHISEE must not have received 3 or more Breach Notices (as defined below) of default within any 12-month period during the Term.

d)      FRANCHISEE must execute the Re-Write Contract within twenty (20) days after Company delivers it to FRANCHISEE. The parties' relationship shall be governed by, and extended for the term identified in, the Re-Write Contract beginning on the day following expiration of the Term.

e)      During the term of the Re-Write Contract, FRANCHISEE shall operate his or her Sara Lee Distribution Business in conformity with the Distribution Program then administered by Company.

f)      Simultaneous with executing the Re-Write Contract, FRANCHISEE shall execute and deliver a general release, in form satisfactory to Company, of any and all claims against Company, Company's affiliates and their respective officers, directors, shareholders, employees and agents.

iii.      If the conditions for re-write are not met, FRANCHISEE's Distribution Rights shall automatically end on the last day of the Term; provided, however, the parties shall remain bound

by the provisions of this Agreement which expressly, or by their nature, require performance after the Term ends.

**§2.6**   **TERMINATION OF THIS AGREEMENT:**   The parties agree that the FRANCHISEE's Distribution Rights must be exercised in compliance with the terms of this Agreement, and that in the event of any termination or expiration of this Agreement either FRANCHISEE or COMPANY shall have the right to sell, for the account of FRANCHISEE, such Distribution Rights as provided herein.

## ARTICLE 3
## SALE OF PRODUCTS

**§3.1**   **TITLE**:  Products will be sold to FRANCHISEE, and title to and risk of loss of the Products shall pass to FRANCHISEE upon delivery in accordance with §3.2 below.

**§3.2**   **DELIVERY**: Except as otherwise provided herein, COMPANY agrees to sell and deliver to FRANCHISEE and FRANCHISEE agrees to buy and accept, at such location as COMPANY may from time to time reasonably designate or approve, sufficient quantities of the Products to adequately and properly supply the Outlets in the Sales Area.  COMPANY agrees to use commercially reasonable efforts to fill FRANCHISEE's orders in a reasonable and timely fashion but recognizes that orders will be filled based on availability.  In case of strike, shortage of materials, breakdown or other cause, COMPANY reserves the right to fill orders on a reasonable basis as circumstances then permit.   COMPANY   and   FRANCHISEE   recognize   that variances and, on rare occasions, cancellations of deliveries, in whole or in part, are an unavoidable aspect of fresh baked goods production.  If variances occur, the parties shall use their respective business judgment to accommodate the variances in a way that best protects the reputation and good will of the Marks.  Depending on the circumstances causing the variances, the accommodation may require the FRANCHISEE to sell substitute Products, the COMPANY to reasonably allocate available Products among all authorized   FRANCHISEE'S, or the FRANCHISEE to reasonably allocate available Products among Outlets in the Sales Area as circumstances then permit.   FRANCHISEE agrees to promptly return all transportation equipment including trays, racks, baskets and dollies to the COMPANY

**§3.3**   **STALE REPURCHASE–DAMAGE–OFF CODE**: COMPANY agrees to repurchase at FRANCHISEE's cost, and give credit for, damaged or Off Code Product which is not damaged or Off Code by reason of FRANCHISEE's negligence and which does not exceed established stale levels, and which has been promptly returned to a reasonable location designated by COMPANY in accordance with COMPANY's then current Off Code and damage repurchase policy.

**§3.4**   **TERMS**:  Products will be sold to FRANCHISEE on terms and prices established and published by COMPANY from time to time.  COMPANY may sell Products at different prices to its authorized FRANCHISEE'S, including FRANCHISEE, in compliance with applicable laws.

**§3.5**   **PURCHASE OF RECEIVABLES**:  In cases where the FRANCHISEE sells and distributes Products to Chains or Outlets whose credit has been approved by COMPANY, COMPANY shall, at the request of FRANCHISEE, purchase accurate, properly filled out and executed invoices and customer receiving documents from the FRANCHISEE at their face value, net of all discounts,

Page 6

and credit FRANCHISEE's account therefor. FRANCHISEE shall promptly remit all such invoices and customer receiving documents to COMPANY each service day, and sign such assignments and agreements as may be necessary to transfer to COMPANY all receivables and accounts evidenced by such invoices. If any Outlet elects to settle with FRANCHISEE on the basis of scan results, rather than invoices, the credit to FRANCHISEE shall be adjusted for any difference between the invoices and the actual sales reflected by the scan based sale data.

**§3.6**  **SETTLEMENT OF ACCOUNT:**  On or before Saturday of each week, the parties agree to settle their accounts for all Products delivered to FRANCHISEE during the preceding week, acknowledging FRANCHISEE's credit for any damaged or Off Code Product repurchased in accordance with §3.3 and receivables purchased pursuant to §3.5. The settlement will reflect any adjustments based on the level of services which Outlets require FRANCHISEE to perform in connection with FRANCHISEE's sale of Products to Outlets in accordance with the adjustment terms and conditions set forth in the Operational Guidelines Manual.

**§3.7**  **DISCOUNT PARTICIPATION PROGRAM:**  In cases where FRANCHISEE wishes to sell Products to Outlets at prices which are less than those reflected on COMPANY's then current Suggested Price List, and COMPANY, at FRANCHISEE's request, agrees to participate in such discount price, COMPANY will credit to FRANCHISEE'S account an amount equal to the discount in accordance with COMPANY's discount participation policy as amended from time to time as set forth in the Operational Guidelines Manual.

**§3.8**  **SECURITY INTEREST:**  To secure the payment of any indebtedness or liability of FRANCHISEE to COMPANY, now or hereafter arising, pursuant to this Agreement or otherwise, FRANCHISEE hereby grants and conveys to COMPANY a continuing and general security interest in the Distribution Rights, all other assets used in connection with the exercise and operation of the Distribution Rights, all rights hereunder and all Products and receivables of the FRANCHISEE, and grants to COMPANY the rights of a secured party. FRANCHISEE shall execute any financing statement(s) required by COMPANY to evidence COMPANY's security interest. If COMPANY requests that FRANCHISEE execute a separate Security Agreement consistent with the foregoing terms, FRANCHISEE shall promptly execute the form of Security Agreement that is an exhibit to the Franchise Disclosure Document. FRANCHISEE's default under the Security Agreement shall be a default under this Agreement.

**§3.9**  **DEFAULT:** Nothing herein shall be deemed to require COMPANY to fill an order of FRANCHISEE during any time when FRANCHISEE is in default of any payment or other obligation to COMPANY.

## ARTICLE 4
## FRANCHISEE'S OBLIGATIONS

**§4.1**  **BEST EFFORTS:**  In addition to its other duties under this Agreement FRANCHISEE agrees to use its best efforts to develop and maximize sales of Products to Outlets within the Sales Area, by maintaining an adequate and fresh supply of Products in all Outlets; selling Products only to Outlets where they have been authorized for sale; distributing and selling Products to Outlets in a manner that enhances the reputation and goodwill of the Marks; rotating Products to promote their sale before they become Off Code; promptly removing all Off Code Products; participating

SLD - Franchise Agreement 2008 Term 10 Multi State V-1.1

14742286\V-5

in all marketing programs; utilizing peripheral display units and other point-of-sale materials to increase Product sales; satisfying the merchandising and service requirements of the Outlets; providing service on a basis consistent with good industry practice to all Outlets in the Sales Area requesting service, maintaining and operating a computer assisted record-keeping system compatible and in compliance with the system maintained by COMPANY now or in the future; soliciting new accounts for the sale of Products in order to achieve the highest practicable distribution of Products in the Sales Area; conducting business in a professional, honest and ethical manner; and fairly representing the quality and characteristics of Products in accordance with COMPANY's sales policies.

§4.2 **OUTLET PROFITABILITY**: FRANCHISEE is not required to service any Outlet in the Sales Area that has proven consistently to be unprofitable; provided however, FRANCHISEE hereby agrees that if a Chain requires that one or more of its Outlets in the Sales Area be served as a condition to COMPANY serving the Chain's other outlets located elsewhere (either within or outside of the Sales Area), then the profitability of serving the particular Outlet or Outlets in the Sales Area that are part of that Chain shall be judged on the basis of the profitability to COMPANY of serving the Chain as a whole.

§4.3 **OTHER ACTIVITIES:**  Nothing herein shall be deemed to prohibit FRANCHISEE from carrying and distributing merchandise for other companies or otherwise engaging in any other business activity, unless and except to the extent that such other merchandise is competitive with Products distributed by COMPANY, or could contaminate the Products, or such other business activity is inconsistent with or interferes with the obligations of the FRANCHISEE hereunder.

§4.4 **COMPLIANCE:**  FRANCHISEE shall operate the business in compliance with all federal, state and local laws, rules and regulations, including without limitation the Federal Motor Carrier Safety Administration requirements for drivers of vehicles that fall into the 10,000 to 26,000 lb. range.  In addition, FRANCHISEE agrees to operate its business hereunder in a professional, honest and ethical manner and in accordance with the COMPANY's Global Standards for Business Partners. If FRANCHISEE shall finance the purchase of the Distribution Rights with a third party loan the repayment of which is guaranteed by COMPANY, FRANCHISEE shall comply with the terms of the third party loan agreements.  FRANCHISEE's misrepresentation in obtaining any financing or breach of any loan terms shall constitute a material breach of this Agreement and grounds for termination.

§4.5 **FRANCHISEE'S PERSONNEL:**  FRANCHISEE shall be free to engage such persons as FRANCHISEE deems appropriate to discharge or assist in discharging FRANCHISEE's responsibilities hereunder.  FRANCHISEE shall have the exclusive right to select, fix the compensation of, discharge and otherwise to manage, supervise and control all persons engaged by FRANCHISEE and shall, with respect to all such persons, perform all obligations and discharge all liabilities imposed upon FRANCHISEE under all government laws, rules or regulations ("Laws"), whether such Laws relate to labor, employment standards, worker's compensation, unemployment insurance, pay equity or any other governmental requirement; file all required tax information and reports and pay and/or withhold all applicable payroll-related taxes with respect to any employees of FRANCHISEE.  FRANCHISEE in all events shall be and remain responsible for insuring that all persons engaged by FRANCHISEE comply fully with all the terms and conditions of this Agreement.  FRANCHISEE shall be responsible for notifying COMPANY of individuals engaged by FRANCHISEE who will be performing functions under

the Agreement on COMPANY property.  Any breach of this Agreement by any person engaged by FRANCHISEE shall be deemed to be a breach by FRANCHISEE.

**§4.6**     **BUSINESS ENTITY; PERSONAL GUARANTY:**  FRANCHISEE represents that it is a business entity in good standing, has authority to enter into this Agreement, and the person signing this Agreement on FRANCHISEE's behalf has authority to bind FRANCHISEE.  FRANCHISEE agrees to maintain its business entity in good standing at all times.  As a material condition of this Agreement, FRANCHISEE shall cause each person who now owns, or later acquires, TWENTY FIVE PERCENT (25%) or more of the equity or voting interests of FRANCHISEE to furnish COMPANY with a current financial statement disclosing the person's net worth and execute a Personal Guaranty in the form that COMPANY then requires.  Until further notice, the form of Personal Guaranty that COMPANY requires is the form of Personal Guaranty that is an exhibit to the Franchise Disclosure Document.  COMPANY may, from time to time, ask each guarantor to provide COMPANY with a more current financial statement.

**§4.7**     **NON-COMPLIANCE:**  Failure to carry out the obligations listed in this Article or elsewhere in this Agreement shall be considered a material breach of this Agreement and shall entitle COMPANY to terminate this Agreement, except that FRANCHISEE shall not be responsible for failures caused by Force Majeure; provided, however, that an event of Force Majeure shall not excuse FRANCHISEE from any obligations to pay for Products pursuant to Article §3.

**ARTICLE 5**
**COMPANY 'S OBLIGATIONS**

**§5.1**     **DELIVERY AND COOPERATION:**  COMPANY shall use its best efforts to deliver to FRANCHISEE sufficient quantities of the Products to supply Outlets requesting service in the Sales Area, to assist in the development of new Outlets, to pursue the development of new Products, to preserve and develop the quality and marketability of the Products, and to assist and cooperate with FRANCHISEE's sales efforts, except that COMPANY shall not be responsible for failures caused by Force Majeure.  COMPANY shall provide assistance to Outlets in the Sales Area in response to specific sales and merchandising issues that either Outlets or FRANCHISEE bring to COMPANY's attention.   COMPANY has the right to monitor FRANCHISEE's performance and the satisfaction of Outlets in the Sales Area with FRANCHISEE's delivery and merchandising services to verify FRANCHISEE's compliance with this Agreement.

**§5.2**     **SALES TO CHAINS:**  COMPANY and FRANCHISEE acknowledge and agree that substantial opportunities for sales of Products to Outlets in the Sales Area depend on satisfying the needs and purchasing requirements of Chains that desire shipments of Products to multiple Outlets, including Outlets within the Sales Area and Outlets outside of the Sales Area that may be served by other FRANCHISEES' of COMPANY or by COMPANY or its affiliates.  Both COMPANY and FRANCHISEE are aware of the fact that many Chains, for their own convenience and efficiency, establish uniform or maximum purchase prices and standard terms and conditions of sale, and require centralized billing and communication systems in which the Chain expects a supplier in the position of COMPANY to take responsibility for (i) billing the Chain on behalf of all FRANCHISEE's of the supplier that sell Products to the Chain's Outlets, and (ii) communicating with the Chain regarding the price, terms and conditions of sale, billing and similar matters pertaining to the sale and delivery of Products to the Chain's Outlets.  In order to

Page 9

accommodate the purchasing needs and requests of Chains, and thereby maximize the opportunity for COMPANY's FRANCHISEE's to sell Products to the Chains' Outlets, FRANCHISEE agrees that COMPANY may engage in such communications with Chains, address subjects such as uniform or maximum prices being sought by a Chain, standard terms and conditions of sale, centralized billing and similar matters pertaining to the sale and delivery of Products to the Chain's Outlets, and may transmit such information to FRANCHISEE. FRANCHISEE further agrees that COMPANY may perform centralized billing on the terms that a Chain requires when FRANCHISEE sells to the Chain's Outlets in the Sales Area. FRANCHISEE agrees that, in communicating with Chains and performing centralized billing COMPANY is acting in its own interest in order to maximize the sale of Products for itself and for all of its FRANCHISEE's, and not acting as the agent or joint venturer of FRANCHISEE. Nothing in this Agreement precludes or limits FRANCHISEE from pursuing its own communications with any Chain, any Outlets of the Chain in the Sales Area, or any other existing or prospective customer in the Sales Area willing to deal with FRANCHISEE individually.

**§5.3**   **OPERATIONAL GUIDELINES MANUAL**:  COMPANY shall deliver to FRANCHISEE one copy of its Operational Guidelines Manual.  FRANCHISEE's copy shall remain COMPANY's sole property and FRANCHISEE shall promptly return the Operational Guidelines Manual to COMPANY upon termination of this Agreement.   FRANCHISEE understands that all information in the Operational Guidelines Manual is Confidential Information as hereinafter defined.   COMPANY may add to, delete or otherwise modify the policies, procedures and instructions in the Operational Guidelines Manual at any time.  All revisions will be reflected in written or electronic updates to the Operational Guidelines Manual and shall become effective immediately upon receipt.  FRANCHISEE is responsible for keeping its copy of the Operational Guidelines Manual updated.   FRANCHISEE agrees to comply with the COMPANY's Operational Guidelines Manual as promulgated and amended from time to time. The Operational Guidelines Manual is an integral part of this Agreement.   All provisions now or hereafter contained in the Operational Guidelines Manual or otherwise communicated to FRANCHISEE in writing or electronically are expressly incorporated in this Agreement by this reference and made a part hereof. FRANCHISEE understands and agrees that a breach of any mandatory requirement of the Distribution Programs expressed in the Operational Guidelines Manual or otherwise communicated to FRANCHISEE in writing or electronically shall constitute a breach of this Agreement and grounds for termination of FRANCHISEE's authority to sell Products.

**ARTICLE 6**
**CONFIDENTIALITY**

**§6.1**   **CONFIDENTIAL INFORMATION**: As a result of this Agreement, FRANCHISEE may have access to or obtain certain information not available to the general public regarding COMPANY's business ("Confidential Information").   FRANCHISEE acknowledges that the Confidential Information constitutes valuable trade secrets to COMPANY and FRANCHISEE agrees that it shall use COMPANY's Confidential Information solely in accordance with the provisions of this Agreement and it will not disclose, or permit the disclosure of same, directly or indirectly, to any third party without COMPANY's prior written consent. FRANCHISEE agrees to exercise due care in protecting the Confidential Information from unauthorized use and disclosure and shall require all of its employees to do the same.  However, FRANCHISEE has no responsibility for safeguarding any information that it can document in writing (i) is in the public domain through

Page 10

no fault of its own, (ii) was properly known to it, without restriction, prior to disclosure by COMPANY, (iii) was properly disclosed to it, without restriction, by another person with the legal authority to do so, (iv) is independently developed by FRANCHISEE without use or reference to COMPANY's proprietary information or (v) is required to be disclosed pursuant to a judicial, administrative or legislative order or proceeding; provided that, to the extent permitted by and practical under the circumstances, FRANCHISEE provides to COMPANY prior notice of the intended disclosure and an opportunity to respond or object to the disclosure or if prior notice is not permitted or practical under the circumstances, prompt notice of such disclosure.

§6.2    **INJUNCTIVE RELIEF:**  In the event of actual or threatened breach of the provisions of this Article §6, COMPANY will be entitled to immediate injunctive and other equitable relief, without bond and without the necessity of showing actual damage.

Page 11

## **ARTICLE 7**
## **TRANSFER OF RIGHTS**

**§7.1**   **SALES OR TRANSFERS BY FRANCHISEE:**

i.      FRANCHISEE has a license to the Distribution Rights, but agrees that it may not sell or otherwise transfer the Distribution Rights, in whole or in part, voluntarily or by operation of law, to a third party except with the prior written approval of COMPANY, which approval COMPANY agrees not to unreasonably withhold in the exercise of its business judgment.  The transfer of a controlling interest of a FRANCHISEE that is a business entity shall be deemed a transfer of the Distribution Rights.  For purposes of this Agreement, a "controlling interest" means an interest large enough to enable the holder of the interest to cast enough votes to change the management or policies of a business entity.

ii.      Before reviewing FRANCHISEE's request for approval to sell or otherwise transfer the Distribution Rights to a third party, COMPANY shall have a right of first refusal to acquire the Distribution Rights from FRANCHISEE on the same terms and conditions that are offered to FRANCHISEE ("Offer") by a bona fide purchaser (the "Proposed Purchaser"), except that COMPANY may substitute cash in lieu of any installment payment terms that are part of the Offer.  COMPANY shall notify FRANCHISEE in writing within ten (10) business days after the last to occur of the following three events if it will exercise its right of first refusal on the terms of this Agreement and, if not, if it will approve the proposed sale or transfer to the named Proposed Purchaser:

> a)      receipt by COMPANY of FRANCHISEE's written notice of intent to sell or transfer to a named Proposed Purchaser on terms and conditions fully set forth in such notice; and

> b)      a personal interview of the Proposed Purchaser's management and each person who owns a controlling interest of the Proposed Purchaser by a designated COMPANY representative; and

> c)      receipt by COMPANY of current financial statements for the Proposed Purchaser and each person owning a controlling interest of the Proposed Purchaser, together with such additional information as is relevant concerning the Proposed Purchaser's management and controlling owner's financial condition, health, credit, driving record, and other matters reasonably appropriate to enable COMPANY to decide if it will approve the proposed sale or transfer or exercise its right of first refusal.

iii.      If, in COMPANY's business judgment, the proposed sale or transfer is not a bona fide transfer for value, the price that COMPANY shall pay if it exercises its right to acquire the Distribution Rights shall be the price calculated in accordance with Section §7.3(ii) and **Schedule C** of this Agreement in lieu of the price set forth in the Offer.

SLD - Franchise Agreement 2008 Term 10 Multi State V-1.1

14742286\V-5

iv.     If COMPANY elects not to exercise its right of first refusal and approves the proposed sale or transfer to the named Proposed Purchaser, FRANCHISEE may consummate the transfer to the Proposed Purchaser, but only on the terms and conditions of the Offer.  COMPANY shall have no liability to FRANCHISEE if it elects not to exercise its right of first refusal and rejects the proposed sale or transfer in the exercise of its business judgment.

**§7.2     CONDITIONS OF SALES OR TRANSFERS PURSUANT TO SECTION 7.1:**

i.     In the event of a sale or transfer to COMPANY pursuant to Section §7.1, FRANCHISEE shall execute the Purchase Agreement in the form that is an exhibit to the Franchise Disclosure Document then being used, or any other transfer documents then being used by the COMPANY, conveying to COMPANY good and marketable title in and to the Distribution Rights on the terms of the Offer and the conditions of this Agreement.

ii.     In the event of a sale or transfer to a Proposed Purchaser pursuant to Section §7.1, at the closing COMPANY shall execute a new Franchise Agreement with the Proposed Purchaser in the form of agreement then being used by COMPANY.

iii.     In connection with the closing of a sale or transfer pursuant to Section §7.1, whether to COMPANY or to a Proposed Purchaser:

a)     FRANCHISEE shall pay a Transfer Fee to COMPANY in an amount equal to TWO PERCENT (2%) of the sales price in consideration for the administrative activities undertaken by COMPANY in connection therewith.

b)     COMPANY and FRANCHISEE shall settle FRANCHISEE's account as of the closing date.  FRANCHISEE shall pay COMPANY the following sums: (i) any monies owed by FRANCHISEE to COMPANY; (ii) a reasonable reserve against open accounts in the amount determined by COMPANY; (iii) all reasonable costs and expenses in connection with the sale (including without limitation the cost of removing any Off Code or damaged Products in FRANCHISEE's Sales Area); and (iv) any outstanding debts, liens or other obligations pertaining to the Distribution Rights that FRANCHISEE owes to third parties, unless, in the case of a sale or transfer to a Proposed Purchaser, the Proposed Purchaser agrees, and is permitted, to assume the outstanding debts, liens or other obligations that FRANCHISEE owes to third parties.  When COMPANY purchases the Distribution Rights, COMPANY may deduct these sums from the purchase price.  When a Proposed Purchaser purchases the Distribution Rights, FRANCHISEE shall pay COMPANY these sums by no later than the closing date.

c)     Upon the settlement of FRANCHISEE's account with COMPANY, COMPANY shall discharge the persons who executed a Personal Guaranty of FRANCHISEE'S obligations to COMPANY and cancel their Personal Guaranty.  Until the settlement of FRANCHISEE's account with COMPANY, the persons who executed a Personal Guaranty shall remain liable for the sums owed to COMPANY pursuant to this Section notwithstanding the termination of this Agreement.

d)     On or before the closing date, FRANCHISEE shall return to COMPANY any COMPANY-owned property in FRANCHISEE's possession pertaining to, or used in

Page 13

connection with, the Distribution Rights, including, without limitation, the Operational Guidelines Manual, racks, transport equipment, all computer equipment and printers subject to the Computer Equipment Lease Agreement entered into by the parties in the form that is Exhibit P to the Franchise Disclosure Document. COMPANY shall cancel the Computer Equipment Lease Agreement as of the closing date.

e)      After the closing date, FRANCHISEE shall not (i) use the Marks in any manner whatsoever; (ii) use any trademarks, trade names or other designations associated with or confusingly similar to said Marks, or (iii) make any representations, directly or indirectly, that FRANCHISEE continues to have the right to sell or distribute Products or use the Marks.

f)      This Agreement shall terminate concurrently upon the closing date, provided, however, the parties shall remain bound by the provisions of this Agreement that survive termination.

g)      FRANCHISEE shall execute and deliver to COMPANY a general release in favor of COMPANY (i) terminating, canceling and surrendering FRANCHISEE's rights under this Agreement and under any other contracts entered into by the parties concurrently, or in connection with, FRANCHISEE's purchase of the Distribution Rights, and (ii) releasing any and all claims against COMPANY, COMPANY affiliates, and their respective officers, directors, shareholders, employees, successors and assigns arising under or out of this Agreement and FRANCHISEE's purchase of Distribution Rights.

## §7.3    COMPANY'S RIGHT TO PURCHASE:

i.      At any time within 120 days from the date of this Agreement, COMPANY may exercise an option to purchase the Distribution Rights from FRANCHISEE including, without limitation, FRANCHISEE's accounts receivable, for a price equal to ONE HUNDRED FIVE PERCENT (105%) of the amount FRANCHISEE originally paid to COMPANY for the Distribution Rights and on the additional terms and conditions set forth in **Schedule C**. To exercise its right to purchase pursuant to this subsection, COMPANY shall give written notice of election before the end of the 120 day period and indicate a closing date in the notice, which shall not be later than thirty (30) days from the date of the notice. The provisions of this Section apply only when FRANCHISEE acquires the Distribution Rights directly from COMPANY and do not apply when FRANCHISEE acquires the Distribution Rights from another FRANCHISEE.

ii.      At any time after one (1) year from the date of this Agreement, COMPANY may exercise an option to purchase the Distribution Rights from FRANCHISEE including, without limitation, FRANCHISEE's accounts receivable, for a price computed in accordance with, and on the additional terms and conditions set forth in, **Schedule C**. Upon request, FRANCHISEE shall provide COMPANY with access to FRANCHISEE's books and records to calculate the purchase price. To exercise its right to purchase pursuant to this subsection, COMPANY shall give FRANCHISEE written notice of election and indicate a closing date in the notice, which shall not be earlier than thirty (30) days from the date of the notice.

SLD - Franchise Agreement 2008 Term 10 Multi State V-1.1

14742286\V-5

**§7.4**   **FRANCHISEE'S BUY BACK RIGHTS:**  Subject to the conditions set forth in this Section, at anytime within one (1) year from the date of this Agreement, FRANCHISEE may elect to sell the Distribution Rights to COMPANY for a price equal to the amount FRANCHISEE originally paid to COMPANY for the Distribution Rights and on the additional terms and conditions set forth in **Schedule C.**  FRANCHISEE shall give the Company written notice of election anytime before the end of the one (1) year period and indicate a closing date in the notice, which shall be at least thirty (30) days from the date of FRANCHISEE's notice.  The provisions of this Section apply only when FRANCHISEE acquires the Distribution Rights directly from COMPANY and do not apply when FRANCHISEE acquires the Distribution Rights from another FRANCHISEE.

**ARTICLE 8**
**TEMPORARY SERVICES - CHANGES IN SERVICES:**
**CHAIN STORE SUPPORT SERVICES**

**§8.1**   **TEMPORARY SERVICE BY COMPANY:**  If FRANCHISEE is not able to or does not perform the obligations imposed by this Agreement, FRANCHISEE shall make other adequate provision for such performance at its expense.  If no such provision is made, COMPANY, within the limits of its ability to do so, may make arrangements to have these obligations performed for the account of FRANCHISEE, charging to FRANCHISEE the reasonable expenses of such performance.  Such temporary performance shall not relieve FRANCHISEE of any of the obligations imposed by this Agreement, constitute an assumption by COMPANY of any obligations of FRANCHISEE, nor act to cure any default that may exist on the part of FRANCHISEE by reason of such non-performance.

**§8.2**   **CHANGE IN DELIVERY METHOD:**  In the event any Outlet or Chain makes the determination to require delivery of the Products by any method other than Direct Store Delivery, and so informs COMPANY or FRANCHISEE, COMPANY shall thereafter be permitted to make other arrangements to serve the Outlet or Chain, which service shall not be deemed to violate FRANCHISEE's rights hereunder and FRANCHISEE shall not be entitled to any proceeds derived from such service. However, FRANCHISEE shall continue to own the right to engage in Direct Store Delivery of the Products to all Outlets in the Sales Area that request or require Direct Store Delivery.

**§8.3**   **NON-DSD SUPPORT SERVICES:**

i.      If COMPANY sells Products to a Chain by any method other than Direct Store Delivery, COMPANY may offer FRANCHISEE the opportunity to perform specific support services at Outlets of the Chain that may include, without limitation, restocking Products and performing other merchandising assistance with respect to Products (the "Support Services").   If FRANCHISEE declines to perform the specific Support Services requested by COMPANY, COMPANY may make arrangements with another FRANCHISEE, employee or third party to perform the specific Support Services pursuant to terms agreed upon by the Company and the third party or employee. If the FRANCHISEE agrees to perform non-DSD support services, COMPANY and FRANCHISEE shall mutually agree in writing upon the compensation payable to FRANCHISEE for performing the specific Support Services requested by COMPANY.  In addition, COMPANY shall pay FRANCHISEE the mutually agreed upon compensation on a weekly basis as part of the settlement of account described in Article 3.  FRANCHISEE shall be

Page 15

entitled to compensation only for performing specific Support Services at COMPANY's request. Nothing in this Agreement guarantees that the amount paid to FRANCHISEE for performing specific Support Services at Outlets of a Chain within the Sales Area shall be the same amount paid to another FRANCHISEE, employee or third party for performing the same or comparable Support Services at other Outlets of the same Chain outside of the Sales Area.

ii.      At any time and for any reason, COMPANY may request that FRANCHISEE perform additional or different Support Services for Outlets of a Chain within the Sales Area, or accept a different rate of compensation for performing Support Services at Outlets of a Chain. COMPANY shall notify FRANCHISEE of the changes that it intends to make reasonably promptly after COMPANY decides to make the change and 30 days before the date that COMPANY establishes for the change to take effect.   Reasonably promptly after receiving COMPANY's notice, and before the date indicated in Company's notice for the changes to take effect, FRANCHISEE shall notify COMPANY in writing if FRANCHISEE accepts the changes identified in COMPANY's notice and will continue to perform the specific Support Services requested by COMPANY on the modified terms identified in COMPANY's notice.   The parties recognize that it will take COMPANY some time to make alternative arrangements for performing Support Services at Outlets of a Chain within the Sales Area if FRANCHISEE is unwilling to accept the changes identified in COMPANY's notice.   Therefore, the parties agree that FRANCHISEE's failure to notify COMPANY of its decision before the date indicated in Company's notice for the changes to take effect shall signify FRANCHISEE's decision not to accept the changes and not to perform the specific Support Services on the modified terms identified in COMPANY's notice.

iii.      At any time and for any reason, COMPANY may decide to discontinue providing Support Services at all, or to specific, Outlets of a Chain within the Sales Area.  COMPANY shall notify FRANCHISEE reasonably promptly after COMPANY determines that Support Services will be discontinued at all, or specific Outlets, of a Chain within the Sales Area, and before the last day for the performance of Support Services.

iv.      FRANCHISEE may discontinue performing specific Support Services requested by COMPANY at any time and for any reason effective upon no less than thirty (30) days prior written notice to COMPANY.

## ARTICLE 9
## TERMINATION

**§9.1**   **BREACH:**   Except as set forth in this Article, or upon the sale or transfer of all of the FRANCHISEE's Distribution Rights, this Agreement shall not be terminated or canceled, provided FRANCHISEE carries out the terms hereof.  In the event FRANCHISEE breaches any obligations or covenants under this Agreement, COMPANY may terminate the Agreement as set forth below.

Page 16

**§9.2**   **NON-CURABLE BREACH:**  If the breach by FRANCHISEE involves criminal activity, fraud, threatens public health or safety, constitutes an abandonment of any portion the Sales Area, or threatens to do significant harm to COMPANY or its affiliates, the Marks, or their commercial reputation, COMPANY may terminate this Agreement immediately upon written notice and FRANCHISEE shall have no right to cure.

**§9.3**   **CURABLE BREACH:**  In the event of a breach by FRANCHISEE other than under Section 9.2, COMPANY shall give FRANCHISEE three (3) business days written notice within which FRANCHISEE may cure the breach.  If FRANCHISEE fails to cure such breach within said three (3) business day period, COMPANY may thereafter terminate this Agreement and FRANCHISEE shall have no further right to cure;, further, the parties agree that repeated violations constitute a chronic breach and in such event COMPANY shall be entitled to terminate this Agreement pursuant to Section 9.2 and FRANCHISEE shall have no further right to cure.

**§9.4**   **COMPANY'S ASSUMPTION OF TERRITORY:**

i.      Upon Termination, FRANCHISEE shall cease to exercise its Distribution Rights and shall not thereafter, directly or indirectly, represent to the public or hold itself or as a present FRANCHISEE of the COMPANY.  During the period beginning with the termination of the FRANCHISEE'S Distribution Rights hereunder and the sale or transfer of the Distribution Rights (the "Transition Period") to either a qualified purchaser subject to the COMPANY'S right of first refusal and other provisions under Section §7.1 hereof COMPANY shall be entitled, at its sole option, to elect to continue operation of the business for the account of the FRANCHISEE. During the Transition Period, COMPANY shall deduct from the revenues generated the reasonable expenses of COMPANY's performance and shall deliver the balance of revenues if any, to FRANCHISEE at the closing of the sale or transfer of the Distribution Rights.  Nothing in this paragraph shall obligate COMPANY to assume or to be responsible for any indebtedness, liability or obligation due or accrued prior to the time COMPANY assumed direct control during the Transition Period.

ii.      Upon Termination FRANCHISEE shall sell the Distribution Rights to a qualified purchaser subject to COMPANY's right of first refusal and the other provisions of Section §7.1. If FRANCHISEE does not consummate a sale of the Distribution Rights to a qualified purchaser within 90 days of the date of termination, COMPANY shall purchase the Distribution Rights from FRANCHISEE within 120 days of the date of termination at a purchase price computed in accordance with, and on the additional terms and conditions set forth in, **Schedule C**.

**ARTICLE 10**
**TRADEMARKS, TRADE NAMES**
**AND COMPUTER SOFTWARE USAGE**

**§10.1**   **PERMISSION FOR USE:**  Subject to the terms of this Agreement, COMPANY hereby grants to FRANCHISEE a limited, non transferable (except as provided pursuant to the provisions of Article 7 of this Agreement), non-exclusive right, in the Sales Area only, to use the Marks set forth on **Schedule B** and any other trademarks, trade names or graphical designations on the

Page 17

packaging of the Products, solely to identify the Products and to identify FRANCHISEE as a FRANCHISEE of the COMPANY. COMPANY may, at any time, for any reason, in its sole discretion, modify, add to, or discontinue using specific Marks after the effective date of this Agreement. Other than as expressly set forth in this Agreement, FRANCHISEE is granted no rights in the Marks.

i.      FRANCHISEE understands that changes that COMPANY may make to the Marks may modify the list of Products that FRANCHISEE may sell and distribute in the Sales Area. COMPANY shall notify FRANCHISEE of all such changes in writing reasonably promptly after COMPANY decides to make the change and before the date that COMPANY establishes for the change to take effect.

ii.     If COMPANY elects to discontinue using a specific Mark, COMPANY agrees, thereafter, not to sell or distribute Products bearing the discontinued Mark by Direct Store Delivery to Outlets in the Sales Area or permit any other person or business entity to do so. Furthermore, if COMPANY resumes selling or distributing Products by Direct Store Delivery bearing a Mark which COMPANY had previously discontinued, FRANCHISEE shall have the right to distribute and sell Products bearing the readopted Mark by Direct Store Delivery to Outlets in the Sales Area.

iii.    FRANCHISEE acknowledges that the Marks are the exclusive property of COMPANY, or its affiliates, or, if applicable, the licensor(s) thereof, as the case may be (the "Marks Owners"), and FRANCHISEE agrees that it will not dispute or contest the exclusive right, title and interest of COMPANY, its affiliates or the Marks Owners in, or the validity of, any of the Marks, or assist others in doing same. FRANCHISEE acknowledges that it does not have, and will not acquire, any right, title or interest or any claim, monetary or otherwise, in any of the Marks or in the goodwill now or hereafter attaching thereto, and that all such goodwill shall inure solely to the benefit of each of the Marks Owners. FRANCHISEE agrees that it shall not use any of the Marks in the business or trade name of any business entity of FRANCHISEE, or with which the FRANCHISEE may become affiliated or related through ownership or otherwise. FRANCHISEE agrees that it may only use the Marks in the manner specified in this Agreement and solely in connection with its sale, marketing and distribution of the Products.

iv.     FRANCHISEE expressly agrees that it shall not package or distribute any other product bearing the Marks or otherwise display or use any Marks or any portion thereof or any other marks or designs confusing therewith on the packaging or labeling for any other product. FRANCHISEE agrees that it shall not tamper with any of the Marks or other written matter or graphical designations on the packaging of the products supplied by COMPANY or its affiliates to FRANCHISEE hereunder and shall not otherwise modify or change the packaging thereof in any way.

v.      Any marketing or promotional material proposed to be used by FRANCHISEE which references or uses the Marks (other than marketing or promotional material supplied by COMPANY or any of the Marks Owners) shall be submitted to COMPANY for approval, and said material shall not be used without the prior written consent of COMPANY. FRANCHISEE acknowledges that the limited rights to use any particular Marks as granted under this Section 10.1 shall continue only so long and to the extent that COMPANY holds rights to those particular

Marks. Any particular Mark or Mark's in which COMPANY loses its rights, shall be referred to hereinafter as the Terminated Marks.

**§10.2** **SOFTWARE ACCOUNTING SYSTEM:** Subject to the terms of this Agreement, COMPANY grants a limited personal, non transferable (except as provided pursuant to the provisions of Article §7 of this Agreement), non-exclusive license to load and use the object code version of any proprietary software system and program developed by COMPANY for route sales accounting, as same may be amended for time to time. FRANCHISEE shall acquire no other interest or right in the software, other than this limited use and shall not attempt to modify, decompile, disassemble or otherwise reverse engineer the software or request or authorize any other person to do so for any reason whatsoever. FRANCHISEE expressly agrees that it will not transfer to any third party the subject software. FRANCHISEE shall use the software solely to perform its obligations under this Agreement and for no other purpose.

**§10.3** **ENFORCEMENT OF MARKS:** FRANCHISEE agrees to notify COMPANY of any apparent infringement of or challenge to any of the Marks in the Sales Area and to fully cooperate with COMPANY in any legal action relating to enforcement of rights in the Marks. COMPANY shall have the exclusive right to control any legal or administrative action regarding enforcement of rights in the Marks and COMPANY will bear the cost and expense of any legal action and be entitled to any recovery associated with such legal action.

## ARTICLE 11
## DISPUTE RESOLUTION

**§11.1** **RESOLUTION OF DISPUTES:** Any dispute between COMPANY and FRANCHISEE arising out of the relationship created by this Agreement shall be subject to the dispute resolution provisions set forth below.

**§11.2** **MEDIATION:** Except as otherwise provided in this Agreement, if the parties are not able to resolve a dispute arising out of their relationship or this Agreement, either party has the right (which it may or may not choose to exercise) to initiate a mediation proceeding within thirty (30) days of the date on which facts respecting the dispute first come to such party's attention, by submitting a written request for mediation to the other party. The parties agree that the mediation shall be conducted by Judicial Arbitration & Mediation Services, Inc. ("JAMS) according to its procedures, or any other mediation service mutually agreed to by the parties according to its procedures. The parties shall promptly mutually select a mediator and begin the mediation process so that it may be concluded within thirty (30) days of the day the request for mediation is made, unless the parties mutually otherwise agree. If the parties are unable to agree upon a mediator, the parties authorize the mediation service to appoint the mediator. Any and all discussions, negotiations, findings or other statements by the mediator and/or the parties made in connection with the mediation shall be privileged and confidential and shall not be admissible into evidence in any litigation. All mediation proceedings shall take place in the county where all or a majority of the Sales Area is located. The expenses of the mediation service shall be borne equally by both parties, and all other expenses relating to such mediation shall be borne by the party incurring them. Initiation of mediation shall not prevent either party from commencing an action to enjoin any actual or threatened breach of this Agreement or any other act which is, or may be, detrimental or harmful to the reputation or goodwill of COMPANY, the Marks or

Page 19

Products.  Furthermore, neither party shall be excused from performing its obligations under this Agreement from the time a mediation is initiated until it is concluded, except that COMPANY agrees that it will not sell, nor require FRANCHISEE to sell, the Distribution Rights, as called for by Section §9.4 above, until the mediation is concluded.

§11.3   **LITIGATION:**  All disputes which the parties cannot resolve by mediation and all disputes not subject to mediation shall be brought in any state or federal court having jurisdiction over the parties.  EXCEPT AS MAY OTHERWISE BE PROHIBITED BY APPLICABLE LAW, THE PARTIES HEREBY EXPRESSLY AGREE TO WAIVE TRIAL BY JURY IN ANY SUCH LEGAL PROCEEDING.

§11.4   **BUSINESS JUDGMENT:**  The parties hereto agree, and any mediator, or judge is affirmatively advised, that this Agreement reserves to COMPANY the right to take (or refrain from taking) certain actions in the exercise of its business judgment based on its good faith assessment of the overall best interests of the network and/or Distribution Program.  Where such discretion has been exercised in good faith, and is supported by the good faith reasonable business judgment of COMPANY, neither a mediator nor a judge shall substitute his or her judgment of what may be reasonable under the circumstances for the good faith reasonable business judgment exercised by COMPANY.  The parties agree that if COMPANY's judgment complies with the requirements of this section, it shall not be replaced by the judgment of a mediator or judge even though other reasonable alternatives to COMPANY's reasonable business judgment may exist.

§11.5   **DAMAGES AND LIMITATION OF AWARDS:**  EXCEPT IN CONNECTION WITH ENFORCING A RIGHT TO FULL INDEMNIFICATION AS PROVIDED IN SECTION 12.6 OF THIS AGREEMENT, NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES AND ALL CLAIMS TO SUCH DAMAGES ARE HEREBY WAIVED, AND EACH IS LIMITED TO RECOVERING FROM THE OTHER ONLY THE ACTUAL DAMAGES PROVEN TO HAVE BEEN SUSTAINED BY IT.  COMPANY and FRANCHISEE further agree not to bring or maintain an action or proceeding whether arising from this Agreement or otherwise, except in accordance with the provisions hereof.

§11.6   **ATTORNEY'S FEES:**  The prevailing party in any action brought to interpret or enforce this Agreement will be entitled to recover its attorney's fees, expert fees, costs and expenses in connection with such action.

SLD - Franchise Agreement 2008 Term 10 Multi State V-1.1

14742286\V-5

## ARTICLE 12
## MISCELLANEOUS

**§12.1**   **NO IMPLIED RIGHTS.**   FRANCHISEE understands that this Agreement grants FRANCHISEE no other rights, either implied by course of conduct or otherwise, to distribute or sell Products.  COMPANY reserves for itself and its affiliates all rights not expressly made a part of FRANCHISEE's Distribution Rights granted by this Agreement.  COMPANY's rights within the Sales Area include, without limitation, (i) the right to sell and distribute Products and other merchandise by any method of distribution (other than by Direct Store Delivery) to Outlets and to other buyers in the Sales Area that are not Outlets, and (ii) the right to sell and distribute Products by Direct Store Delivery to COMPANY Owned/Operated Thrift Stores in the Sales Area and to other buyers in the Sales Area that are not Outlets.

**§12.2**   **NOTICES:**   Any notice required or permitted under this Agreement shall be deemed properly given when personally received, or one (1) day after delivery to an overnight courier service for first day delivery, or five (5) days after deposit in the mails, return receipt requested, first class postage pre-paid.  All notices shall be addressed to FRANCHISEE and COMPANY to their respective addresses stated above.  Either party may designate another address for receipt of notices by written notice duly given in accordance with this Section 12.1.

**§12.3**   **SURVIVAL; ASSIGNMENT BY COMPANY:**   This Agreement shall be binding upon heirs, personal representatives, successors or permitted assigns of the parties hereto.  COMPANY may transfer or assign this Agreement or any of its rights or duties under this Agreement at any time to any person or business entity that agrees to assume COMPANY's obligations without prior written notice to, or consent from, FRANCHISEE.

    i.      FRANCHISEE's death shall constitute an Event of Transfer; provided, however, Company shall allow FRANCHISEE's legal representatives ninety (90) days from the date of death in which to sell FRANCHISEE's Sara Lee Distribution Business to an approved buyer, subject to Company's right of first refusal and the conditions imposed on Events of Transfer stated in this Agreement.

    ii.     Company shall have no obligation to exercise its right of first refusal or otherwise to purchase FRANCHISEE's Sara Lee Distribution Business in the event of FRANCHISEE's death.

    iii.    If FRANCHISEE's estate fails to sell FRANCHISEE's Sara Lee Distribution Business within ninety (90) days from the date of death, Company may terminate this Agreement without liability to FRANCHISEE, in which event the parties shall comply with the provisions of this Agreement applicable upon termination of this Agreement.

**§12.4**   **INCORPORATION BY REFERENCE:**   This Agreement is subject to and affected by the terms and conditions of the schedules executed or agreed upon concurrently herewith in the form that is an exhibit to the Franchise Disclosure Document.  All such schedules are incorporated herein by reference as though fully set forth in this Agreement.

Page 21

**§12.5   ENTIRE AGREEMENT:**  This Agreement and schedules (the "Agreement"), and any other agreements executed between the parties on the date herewith, constitutes the entire agreement between the parties and supersedes all prior agreements, discussions, negotiations, understandings, representations, conditions, warranties and covenants between them with respect to this subject matter; provided that nothing in this Agreement is intended to disclaim the representations COMPANY made in the Franchise Disclosure Document furnished to FRANCHISEE. No change, modification, amendment or waiver of any of the provisions hereby, including by custom, usage of trade, or course of dealing or performance, shall be effective and buding upon either party unelss it is in writing, signed by both parties.

**§12.6   INDEMNIFICATION:**  FRANCHISEE agrees to defend at its own cost and to indemnify and hold harmless COMPANY, its, officers, employees, affiliates and agents, from and against any and all loss, costs, expenses (including attorneys' fees), damages and liabilities, however caused, resulting directly or indirectly from or pertaining to (i) the FRANCHISEE's performance or non-performance under this Agreement; (ii) failure of the FRANCHISEE to comply with any of this Agreement; (iii) failure of the FRANCHISEE to comply with the laws, statutes, ordinances, regulations or governmental requirements applicable to FRANCHISEE and the work contemplated by this Agreement; or (iv) the acts, omission or negligence of the FRANCHISEE or any of its employees, subcontractors, servants or agents.   Provided, however, that FRANCHISEE's indemnity shall not include any losses, claims, costs, expenses, damages, or liabilities that were proximately and directly caused through the negligence of COMPANY or any of its agents or employees.

**§12.7   LIMITED POWER OF ATTORNEY:**  FRANCHISEE hereby irrevocably grants COMPANY a limited power of attorney with full and complete authority to transfer FRANCHISEE's Distribution Rights, or perform any of FRANCHISEE's obligations hereunder for FRANCHISEE's account in accordance with the terms of this Agreement. This appointment shall survive the death or disability of FRANCHISEE's controlling owner(s) or the termination of this Agreement.

**§12.8   ACQUISITIONS:**  This Agreement shall not apply to any Products that COMPANY or COMPANY's affiliates have the right to sell or distribute by virtue of an acquisition that either of them completes after the date hereof.

**§12.9   CONTROLLING LAW:**  The validity, interpretation and performance of this Agreement shall be controlled by and construed in accordance with the laws of the State of Illinois, without regard to its choice of law provisions, except if the subject matter of the dispute arises under federal law, in which case federal law shall govern.

**§12.10  NECESSARY MODIFICATION:**  In the event any provision of this Agreement is found to be invalid, contrary to, or in conflict with any applicable present or future law or regulation in a final ruling by any court, agency or tribunal possessing competent jurisdiction, this Agreement shall be deemed modified to the extent necessary to conform with any such ruling, law or regulation. The remainder of this Agreement shall not be affected thereby and shall remain in full force and effect.

**§12.11  COUNTERPARTS:**  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same instrument.

SLD - Franchise Agreement 2008 Term 10 Multi State V-1.1

14742286\V-5

**§12.12  TIME CALCULATION:**  In computing the number of days for purposes of this Agreement, all days shall be counted, including Sundays and holidays.

**IN WITNESS WHEREOF**, COMPANY and FRANCHISEE have caused this Agreement to be duly executed as of the day and year first above written.

| COMPANY: | FRANCHISEE: |
|---|---|
| SARA LEE DISTRIBUTION, LLC,<br>A Delaware limited liability company | TERESA P MEJIA INC.,<br>A ARIZONA CORPORATION |
| By: _____<br>JOHN SHEPARD, VICE PRESIDENT<br>ALTERNATIVE DISTRIBUTION | By: _____<br>TERESA P. MEJIA<br>PRESIDENT |

Page 23

SCHEDULE "A"
SALES AREA DESCRIPTION AND PURCHASE PRICE

**BUSINESS AREA: Arizona**                                   **SALES AREA # 716**

Unless otherwise indicated, only the inside (side facing the interior of the territory) of all the city, town, county or state lines, rivers or other natural boundaries or border streets and highways is included in the Sales Area. The location of any Outlet shall be determined by its street address. There are no additions or exceptions unless noted. Schedule written referencing all known roads, railroad tracks and other boundaries using Microsoft MapPoint 2006.

## GENERAL TERRITORY LOCATION: Portions of Pima County, AZ

- **Beginning at a point at the intersection of W Hardy Rd and SR77/N Oracle Rd near Tucson, AZ**
- **Proceed south on SR77/N Oracle Rd to W Ina Rd**
- **Proceed west on W Ina Rd to N La Canada Dr**
- **Proceed south on N La Canada Dr to W Rudasill Rd**
- **Proceed west on W Rudasill Rd to N La Cholla Blvd**
- **Proceed north on N La Cholla Blvd to W Orange Grove Rd**
- **Proceed west on W Orange Grove Rd to N Mona Lisa Rd**
- **Proceed north on N Mona Lisa Rd to W Ina Rd**
- **Proceed west on W Ina Rd to N Thornydale Rd**
- **Proceed north on N Thornydale Rd to W Rudolf Dr**
- **Proceed east on then south on W Rudolf Dr to N Meredith Blvd**
- **Proceed northeast on N Meredith Blvd to the end of the road**
- **Proceed southeast along an imaginary line from the northeastern end of N Meredith Blvd to the southwestern end of N Sun Flair Dr**
- **Proceed northeast on N Sun Flair Dr to W Magee Rd**
- **Proceed southeast then east on W Magee Rd to N La Cholla Blvd**
- **Proceed north on N La Cholla Blvd to W Hardy Rd**
- **Proceed east on W Hardy Rd to N Peter Wy**
- **Proceed east along an imaginary line from the corner of W Hardy Rd and N Peter Wy to the intersection of N La Canada Dr and W Hardy Rd**
- **Proceed east on W Hardy Rd to N Northern Ave**
- **Proceed north on N Northern Ave to N Camino de Anza/W Hardy Rd**
- **Proceed east on W Hardy Rd to the point and place of the beginning.**

## ADDITIONS:

This Sales Area also includes the Outlet(s) located at the following address now or in the future and presently known as:

None.

## EXCEPTIONS:

This Sales Area also excludes the Outlet(s) located at the following address now or in the future and presently known as:

**SCHEDULE "A"**
**SALES AREA DESCRIPTION AND PURCHASE PRICE**

**BUSINESS AREA: Arizona**                                       **SALES AREA #716**

Unless otherwise indicated, only the inside (side facing the interior of the territory) of all the city, town, county or state lines, rivers or other natural boundaries or border streets and highways is included in the Sales Area.  The location of any Outlet shall be determined by its street address.  There are no additions or exceptions unless noted.  Schedule written referencing all known roads, railroad tracks and other boundaries using Microsoft MapPoint 2006.

**None.**

**PURCHASE PRICE: $  94,207**

## SCHEDULE B

## MARKS

The MARKS as per the Effective Date of this Agreement as referenced and further defined in Section 1.7 are as follows:

**SARA LEE,   BALL PARK,  COUNTRY MEAL, EARTHGRAINS,  IRON KIDS, MASTER, RAINBO, SMITH**

Products shall also include similar fresh baked product sold under the trade names **Grant's Farm and Sun Maid;** except that these rights shall continue only for so long as SARA LEE retains the franchise rights to these brand names in your Sales Area.

SLD Franchise Agreement 2008 Term 10 Multi State V-1.1

14742286\V-5

## SCHEDULE C

## ADDITION TERMS AND CONDITIONS APPLICABLE TO COMPANY'S REPURCHASE OF THE DISTRIBUTION RIGHTS

### 1. PURPOSE OF SCHEDULE C:

This **Schedule C** explains the terms and conditions that apply to COMPANY's purchase of the Distribution Rights from FRANCHISEE pursuant to Sections §2.5, §7.3, §7.4 or §9.4.  This **Schedule C** furthermore identifies the formula for computing the purchase price if COMPANY purchases the Distribution Rights from FRANCHISEE after one year pursuant to Section 7.3(ii) or following termination of FRANCHISEE pursuant to Section 9.4.

### 2. COMPUTATION OF PURCHASE PRICE:

If COMPANY purchases the Distribution Rights from FRANCHISEE pursuant to Sections §7.3(ii) or §9.4, the parties shall compute the purchase price payable to FRANCHISEE by using a multiple of the Net Sales History of Outlets in the Sales Area as explained below.

When COMPANY purchases the Distribution Rights pursuant to Section §7.3(ii), the purchase price shall be an amount equal to ONE HUNDRED TWENTY FIVE PERCENT (125%) of the amount computed in accordance with this **Schedule C**.  When COMPANY purchases the Distribution Rights pursuant to Sections §2.5(ii,a.) or §9.4 following the termination of this Agreement on account of FRANCHISEE's breach, the purchase price shall be an amount equal to ONE HUNDRED PERCENT (100%) of the amount computed in accordance with this **Schedule C**.

"Net Sales" mean the actual proceeds from the sale of Products to Outlets during COMPANY's most recent 12 accounting periods ending (i) immediately before the effective date of termination in the case of a purchase pursuant to Sections §2.5 or §9.4, or (ii) immediately before the date of COMPANY'S written notice exercising its option to acquire the Distribution Rights in the case of a purchase pursuant to Section 7.3(ii).

"Net Sales History" means the Outlet's average weekly Net Sales during COMPANY's most recent 12 accounting periods.

**Page 26**

In calculating the purchase price, COMPANY shall include seasonal Outlets, will call Outlets, remodeled Outlets, and new Outlets as described in this **Schedule C** in accordance with the explanation below, but shall exclude Outlets that discontinued services anytime before the end of COMPANY's most recent accounting period:

| Category | Explanation |
|----------|-------------|
| Seasonal | Seasonal Outlets are those that may have closed during part of COMPANY's most recent 12 accounting periods generally due to population shifts. In computing the purchase price, COMPANY will take the actual Net Sales of seasonal Outlets and divide that number by the number of weeks that the seasonal Outlets were serviced to compute an average weekly figure. |
| Will Call | "Will Call" Outlets are those that bought Products only when the Outlet called to place an order. In computing the purchase price, COMPANY will take the actual Net Sales of "will call" Outlets and divide that number by the number of weeks that "will call" Outlets were serviced to compute an average weekly figure. |
| Remodeled | Remodeled Outlets are those that were closed for renovations during part of COMPANY's most recent 12 accounting periods. In computing the purchase price, COMPANY will take the actual Net Sales of remodeled Outlets for the number of weeks that the remodeled Outlet was actually open and serviced to compute an average weekly figure. |
| New | New Outlets are those that began purchasing Products at some point during COMPANY's most recent 12 accounting periods and were in service on the last day of the last period. There is no minimum time period that a new Outlet must buy Products in order to include the new Outlet's sales in the computation of the purchase price. In computing the purchase price, COMPANY will take the actual Net Sales of new Outlets for the number of weeks that the new Outlet bought Products to compute an average weekly figure. |

SLD Franchise Agreement 2008 Term 10 Multi State V-1.1

14742286\V-5

To calculate the purchase price, COMPANY shall use a different multiple depending on the nature of the sale to the specific Outlets purchasing Products from FRANCHISEE during COMPANY's most recent 12 accounting periods, as follows:

| Sales Category | Explanation | Multiple |
|---|---|---|
| Branded Full Service Outlets | Products sold to Outlets requiring ordering, merchandising and removal of Off Code where the Products bear one of the Marks that COMPANY owns or licenses under a long-term license. | 13 x |
| Membership Club Stores | Products sold to Outlets in the membership club store channel of distribution.  Examples of membership club stores are Sam's Club and Costco. | 5 x |
| Non-Branded/Private Label Sales | Products sold to Outlets as private label brands under a private label manufacturing arrangement between COMPANY and the brand owner. | 3 x |
| Restaurant & Institutional Outlets (full ordering, merchandising, and removal of Off Code | Products sold to restaurants, schools, universities, stadiums, prisons, military bases (food service, but not on-site grocery), corporate and government cafeterias and commissary and other institutional types of Outlets. | 5 x |
| Drop Sales (limited service) | Products sold to restaurants and other Outlets where the Outlets place orders directly with FRANCHISEE and FRANCHISEE provides no ordering or merchandising services. | 2 x |
| Independent Thrift Stores | Off Code Products sold to Independent Thrift Stores. | 8 x |

### 3. OFFSETS FROM PURCHASE PRICE.

When COMPANY purchases the Distribution Rights from FRANCHISEE pursuant to Sections §7.3, §7.4 or §9.4, COMPANY may reduce the purchase price by the sum of the following: (i) any monies owed by FRANCHISEE to COMPANY; (ii) a reasonable reserve against open accounts in the amount determined by COMPANY; (iii) COMPANY's reasonable costs and expenses in connection with the sale (including without limitation the cost of removing any damaged or Off Code Products in FRANCHISEE's Sales Area); (iv) any outstanding debts, liens or other obligations pertaining to the Distribution Rights that FRANCHISEE owes to third parties; and (v) any cost to bring vehicle back to "reasonably acceptable" condition if FRANCHISEE exercises its rights under Section 3 of this Exhibit.

Additionally, when COMPANY purchases the Distribution Rights pursuant to Section §9.4, the purchase price computed in accordance with this **Schedule C** shall be further reduced by the aggregate of COMPANY's damages and costs that COMPANY suffers as a result of FRANCHISEE's breach of this Agreement.

### 4. OPTION RE: DELIVERY VEHICLES.

In connection with COMPANY's purchase of Distribution Rights from FRANCHISEE pursuant to Sections §7.3, §7.4 or §9.4, FRANCHISEE shall have the option to sell to COMPANY in "reasonably acceptable" condition all of FRANCHISEE's right, title and interest in and to any delivery vehicles that FRANCHISEE leases under COMPANY'S optional lease-to-purchase program.  To exercise the option, FRANCHISEE must give COMPANY written notice of its election at least fifteen (15) days before the

scheduled closing date.    If FRANCHISEE gives timely notice, COMPANY shall acquire FRANCHISEE's interest in and to the delivery vehicles and assume and hold FRANCHISEE harmless from any debts or obligations that FRANCHISEE owes to third parties with respect to the delivery vehicles effective as of the closing date.  COMPANY shall not be required to reimburse FRANCHISEE for payments which FRANCHISEE has made under any lease or financing agreement relating to a period before the closing date.

## 5. **CLOSING PROCEDURES.**

On the closing date of COMPANY's purchase of Distribution Rights from FRANCHISEE pursuant to Sections §7.3, §7.4 or §9.4:

a.      The parties shall execute the Purchase Agreement in the form that is an exhibit to the Franchise Disclosure Document then being used,  or any other transfer documents then being used by the COMPANY, conveying to COMPANY good and marketable title in and to the Distribution Rights and, if FRANCHISEE exercises the option described in this **Schedule C**, the delivery vehicles.  COMPANY shall acquire the Distribution Rights and, if FRANCHISEE exercises the option described in this **Schedule C**, the delivery vehicles free and clear of all debts, liens or other obligations that FRANCHISEE owes to third parties except that, if FRANCHISEE exercises the option regarding the delivery vehicles, COMPANY shall assume FRANCHISEE's obligations under any vehicle leases, but only as to the period from and after the closing date.

b.      COMPANY and FRANCHISEE shall settle FRANCHISEE's account as of the closing date.  Upon the settlement of FRANCHISEE's account with COMPANY, COMPANY shall discharge the persons who executed a Personal Guaranty of FRANCHISEE'S obligations to COMPANY and cancel their Personal Guaranty.  Until the settlement of FRANCHISEE's account with COMPANY, the persons who executed a Personal Guaranty shall remain liable for the sums owed to COMPANY pursuant to this Section notwithstanding the termination of this Agreement.

c.      FRANCHISEE shall return to COMPANY any COMPANY-owned property in FRANCHISEE's possession pertaining to, or used in connection with, the Distribution Rights, including, without limitation, the Operational Guidelines Manual and all computer equipment subject to the Computer Equipment Lease Agreement entered into by the parties in the form that is an exhibit to the Franchise Disclosure Document.  COMPANY shall cancel the Computer Equipment Lease Agreement as of the closing date.

d.      After the closing date, FRANCHISEE shall not (i) use the Marks in any manner whatsoever; (ii) use any trademarks, trade names or other designations associated with or confusingly similar to said Marks, or (iii) make any representations, directly or indirectly, that FRANCHISEE continues to have the right to sell or distribute Products or use the Marks.

e.      This Agreement shall terminate concurrently upon the closing date, provided, however, the parties shall remain bound by the provisions of this Agreement that survive termination.

f.      FRANCHISEE shall execute and deliver to COMPANY a general release in favor of COMPANY (i) terminating, canceling and surrendering FRANCHISEE's rights under this Agreement and under any other contracts entered into by the parties concurrently, or in connection with, FRANCHISEE's purchase of the Distribution Rights, and (ii) releasing any and all claims against COMPANY, COMPANY affiliates, and their respective officers, directors, shareholders, employees, successors and assigns arising under or out of this Agreement and FRANCHISEE's purchase of Distribution Rights.

# EXHIBIT B



## Sara Lee Distribution, LLC

## Franchise

# OPERATIONAL GUIDELINES MANUAL

# EFFECTIVE: January 1, 2011

Confidential



**FRANCHISEE**
**OPERATIONAL GUIDELINES MANUAL**
**ACKNOWLEDGEMENT**

I have received a copy of the Operations Manual titled **"Sara Lee Distribution, LLC, Franchise, OPERATIONAL GUIDELINES MANUAL, EFFECTIVE: January 1, 2011"** which maybe referenced in the Agreement as **"Policy Manual"**.  I understand this manual shall remain the sole property of Sara Lee Distribution, LLC and that all information in the Manual is Confidential Information as described in the Franchise Agreement or Distribution Agreement.

Bakery # _____

Corp Name: _____

Sign Name: _____

Print Name: _____

Date: _____

Route # Owned _____

## Franchisee COPY

Confidential

# Sara Lee Operational Guidelines Manual

**EFFECTIVE: January 1, 2011**

## Table of Contents

1. Contacts

2. TCOM Problems

3. Global Business Standards

4. Clothing / Apparel – Authorized Vendors

5. Depot Hours, Location and Parking – Return of Equipment

6. Product Ordering Schedule

7. Inventory Control

8. HHC Procedures

9. Scan Based Trading

10. Off Code and Damage Returns

11. Corporation in Good Standing

12. Communication Device

13. Cost to Service

14. Customer Service Guidelines

15. Authorized Products - Price List / Gross Margin and Other Information

16. Discount / Price Reduction request process

17. Settlement Process

18. "Person to Person" Selling/Transfer

19. Career Builder – Franchise Posting Forms

20. Franchisee Information  Change Form

21. Request to Spit  Route and Transfer Stops

10/25/2010

## <u>Contact Information – EFFECTIVE: January 1, 2011</u>

# Franchise Support Services

**Kathy Stokes**     Director                    323-277-8557

    kathy.stokes@saralee.com

Christina Shimizu     Finance Manager          323-277-8698

    christina.shimizu@saralee.com

Rhoda Veals     Franchise Administrator        323-277-8514

    rhoda.veals@saralee.com

Hilda Maldonado     Franchise Sales Coordinator   323-277-8607

    hilda.maldonado@saralee.com          Central, South, and Eastern US

Tony Valencia     Franchise Sales Coordinator   323-277-8529

    antonio.valencia@saralee.com          Western, Southwestern and Texas

Confidential

# Contact Information – EFFECTIVE: <u>January 1, 2011</u>

### Franchise Settlement Services

Toll Free Service Line: (888)890-6238
Group Email: franchise.settlement@saralee.com

| Last Name | First Name | Title | Email | Office # |
|---|---|---|---|---|
| Gilsinn | Kate | Sr. Accounting Clerk | kate.gilsinn@saralee.com | (314)513-7314 |
| Hellmann | Mary | Accounting Clerk | mary.hellmann@saralee.com | (314)513-7656 |
| Ramirez | Christina | Accounting Clerk | christina.ramirez@saralee.com | (314)513-7147 |
| Stidhum | Barb | Mgr, Franchise Settlement | barbara.stidhum@saralee.com | (314)513-7151 |

| Zone Assignments | | |
|---|---|---|
| Kate Gilsinn | Mary Hellmann | Christina Ramirez |
| 4197 – Johnson City | 4020 – Atlanta | 4005 – El Paso / Albuquerque |
| 4203 – Las Vegas | 4105 – Dothan | 4090 – Dallas |
| 4245 – Chattanooga | 4158 – Alabama | 4150 – Harlingen |
| 4247 – North Bay | 4190 – St. Louis | 4155 – Houston |
| 4300 – Sacaramento | 4220 – Memphis | 4193 – Pacific Northwest |
| 4347 – Southern California | 4222 – Mississippi | 4210 – Lubbock |
| | 4225 – Gulfport | 4275 – Phoenix / Tucson |
| | 4240 – Nashville | |
| | 4305 – Grand Junction | |

## TCOM Problems

**EFFECTIVE: January 1, 2011**

When you call the number (1-877-519-6425) and the CTCOM department is open (see open hours below), a TCOM Coordinator will answer your call and direct you to your bakery's coordinator. If busy or unavailable, the coordinator answering your call will assist you. If all coordinators are busy or unavailable, you will reach the CTCOM Voice Mail Message. By leaving a message, a page will be sent to the coordinator on call and you will receive a return call as soon as possible.

When you call the number above and the CTCOM department is closed (see closed hours below), you will reach the CTCOM Voice Mail Message. Follow that message to determine the routing of your call.

**HOURS CTCOM DEPARTMENT IS OPEN:**

**02:00 – 10:00 (CDT) MON, TUE, THU, FRI & SAT**

Telephone will be answered by the A.M. Coordinator. Assistance will be provided for HHC failures, TCOM problems, a.m. TCOM assistance and any other situation directly related to the handheld computer as well as bakery reports processed by CTCOM. HHC printer problems for the old HHC's need to be directed to your sales manager, bakery champion or other designated individual (**Printer issues for the new HHC's should be called into the CTCOM Group**).

**10:00 – 22:00 (CDT) MON, TUE, THU & FRI**
**13:00 – 22:00 (CDT) SATURDAY (No staffing from 10am-1pm)**

Telephone will be answered by one of the CTCOM staff members on duty. If available, caller will be transferred to the coordinator assigned to your bakery; if not available, other staff members will assist you. You will not be given a case number; you should not have to wait for a return call unless all coordinators are busy.

**HOURS CTCOM DEPARTMENT IS CLOSED:**

22:00 – 02:00 (CDT) MON, THU & FRI
22:00 TUE until 02:00 THU
10:00 SAT until 13:00 SAT
22:00 SAT until 02:00 MON
Calls will be answered by voice mail. Leave message with Name, Bakery, Depot, a telephone number where you can be reached and the nature of your problem; an on-call CTCOM coordinator will return your call within 30-45 minutes.

**TEXT OF VOICE MAIL MESSAGE YOU MAY RECEIVE WHEN CALLING THE CTCOM HOTLINE:**

"You have reached the voice mail for Central TCOM's hot line. Please leave your name, route number, bakery location and return telephone number as well as a brief message stating the problem with your HHC. Your call will be returned as soon as possible. Thank you."

Confidential



PROJECT
BREAD

Bakery Redesign of Environment, Application, and DMS

Return Material Authorization (RMA/Returns) Process

**PURPOSE:**  To return defective equipment to the vendor for repair or replacement.

**SCOPE:**  This procedure applies to Fresh Bakery District Managers, Route Service or Independent Operator Representatives.

**KEY WORDS:**  TCOM Coordinator. sVision

**INSTRUCTIONS:**

1.  The Sara Lee end user (DM, RSR or IO) determines they have a defective unit and places a call to the Sara Lee Central T-Com Group.  The RSR or IO must give the name and phone number of their DM to the Central T-Com Agent.

2.  The Sara Lee Central T-Com Agent troubleshoots the defective unit. If the unit cannot be fixed, The T-Com Agent will issue an RMA through the Stratix Portal. This end-user must give the following information:

    - Contact name
    - E-mail address
    - Mailing address (must be a manned site that can accept deliveries)

3.  The Stratix Service Support Advocate (SSA) will receive and process the request. All requests received by 3pm EST during normal business hours will have a replacement shipped out the same day provided there is available inventory from the spare pool.  Requests received after 3pm EST will ship the next business day.

4.  The spare pool shipment will contain a replacement unit, instructions for sending back the broken unit and a return shipping label.  The Sara Lee end user should open the box immediately upon receipt and remove the replacement unit and the documentation. (If the defective unit still has the SIM and SD card, they should be removed prior to returning the broken unit.) Place the defective unit in the box and seal it. Place the return label on the outside of the box and return it.

    **Note:**  Defective printers will not be shipped to the OEM for repairs.  All defective printers will be repaired on-site at Stratix.

Confidential

10/25/2010

Global Standards for Business Partners

---

**EFFECTIVE: January 1, 2011**



**OUR**
# MIRROR TEST
Is it **Legal**?
What will others **Think**?
Is it **Right**?

**Do the Right Thing!**

*SaraLee*

# Global
# Standards
*f o r*
# Business
# Partners

## Questions or Concerns
Sara Lee strongly encourages any business partner
who feels pressured by a Sara Lee employee or
another business partner to violate these Standards
to contact Sara Lee's Business Practices Office
immediately. Contact the Sara Lee Resource Line
at **+1-800-285-7964** or **+1-312-345-5715**
or www.SaraLeeResourceLine.com, or e-mail
Business.Practices@saralee.com.

## In Summary, we expect all business partners to:
1. Comply with the law.
2. Do the right thing.
3. Communicate concerns about inappropriate
   business practices promptly to us.
Living up to these responsibilities will help create
continued success for Sara Lee and its valued
business partners.

*SaraLee*  | Copyright 2008

Confidential

10/25/2010



Sara Lee believes in doing business with those business partners, including suppliers, manufacturers, contractors, joint venture partners, agents, distributors, and consultants, who embrace and demonstrate high standards of ethical business behavior.

The following *Global Standards for Business Partners* define the minimum requirements for Sara Lee's business partners.



## Product Quality and Safety

*Sara Lee has a fundamental responsibility to ensure that consumers can trust the safety and quality of its products.*

Business partners are expected to provide goods and services that meet or exceed all government and all agreed upon quality and safety standards. Any threats to product safety must be immediately reported to Sara Lee.

## Employment Practices

*Sara Lee has a strong commitment to treating its employees fairly, and with dignity and respect. We believe in doing business with business partners who share this commitment, and we expect business partners to comply with all applicable employment* laws and to support fundamental human rights for all people. Our expectations include:

- **Child labor** - Business partners will not employ individuals in violation of the local mandatory school age, or under the legal employment age in each country where they operate. Moreover, in no case will business partners employ non-family workers under age 15, except for child actors and models employed in advertising or media who are protected by applicable child labor requirements.

- **Compensation** - Business partners will, at a minimum, comply with applicable wage and hour laws and regulations, including those relating to minimum wages.

- **Discrimination** - Business partners will not discriminate based on personal characteristics or beliefs. Sara Lee will favor those business partners who provide equal opportunity to all.

- **Forced labor** - Business partners will not use forced or involuntary labor whether bonded, prison or indentured, including debt servitude.

- **Freedom of association and collective bargaining** - Business partners will respect the right of employees to exercise their lawful right of free association. Similarly, business partners will recognize the lawful rights of their employees to choose or not choose collective bargaining representation.

- **Safety and health** - Business partners will operate a safe and healthy work environment for their employees. Where applicable, this also applies to housing and eating facilities.

- **Workplace harassment or abuse** - Business partners will not subject employees to physical, verbal, sexual, or psychological harassment, nor use corporal or physical punishment to discipline employees.

- **Working hours** - Business partners will comply with all applicable laws and regulations regarding working hours.

Confidential

## Environment

*Sara Lee believes in doing business with business partners who share its commitment to protecting the quality of the environment around the world through sound environmental management.*

Business partners are expected to comply with all applicable environmental laws.

Sara Lee will favor business partners who seek to minimize the use of non-renewable resources, reduce and recycle waste, and minimize the environmental impact of their operations.

## Conflicts of Interest

*Sara Lee expects business decisions to be made in the best interest of the company. Any situation that creates or appears to create a conflict between personal interests and the interests of Sara Lee must be avoided.*

A conflict of interest may arise when doing business with an organization that employs or is partially or fully owned by a Sara Lee employee or an employee's family members or close personal friends.

Business partners are expected to disclose actual or potential conflicts of interest to Sara Lee.

## Anti-corruption

*Sara Lee strictly abides by all applicable laws relating to anti-corruption, including the Foreign Corrupt Practices Act, and expects business partners to act in a similar manner.*

Business partners may not pay bribes or engage in corrupt practices in order to advance Sara Lee's business interests. This includes, directly or indirectly, offering, promising to pay or authorizing the payment of money or anything of value to local government officials, political parties, party officials, candidates for political office, or officials of public international organizations (like the European Union or the World Bank) in an effort to influence any official decision that would assist Sara Lee in obtaining or retaining business, or securing any improper commercial advantage.

## Gifts, Favors and Entertainment

*Gifts, favors and entertainment are not needed in order to conduct business with Sara Lee, and may lead or appear to lead to a conflict of interest.*



In many industries and countries, gifts, favors and entertainment are used to strengthen business relationships. Throughout the world, one principle is common and clear: No gift, favor or entertainment should be provided or accepted if it will obligate or appear to obligate the recipient.

Gifts or entertainment may be provided if they are reasonable complements to business relationships, or of modest value, and, in any event, not against the law or Sara Lee policy. Sara Lee employees may not accept gifts, favors and entertainment valued at more than $250USD in any year from the same company. In some instances, the Sara Lee entity you are dealing with may have a lower limit. Sara Lee policy expressly prohibits the following situations for Sara Lee employees:

- Requesting or soliciting personal gifts, favors, entertainment, or services.
- Exploiting their position to solicit vendors, including financial institutions, to provide individual preferential treatment in pricing, terms or loans.
- Accepting bribes or kickbacks.
- Receiving cash or cash equivalents.
- Being provided with lavish or excessive gifts and entertainment.
- Being entertained at clubs or organizations that discriminate on the basis of race, color, gender, national origin, religion, or sexual orientation.
- Being entertained at sexually oriented establishments, such as "gentlemen's clubs," "strip bars" or brothels.
- Being entertained in a manner that places them at a risk of physical harm.



## Confidential Information

*Business partners are expected to safeguard Sara Lee's confidential information by keeping it secure, limiting access to those who have a need to know in order to do their job, and avoiding discussion of confidential information in public areas, for example on planes, in elevators and on mobile phones.*

Sara Lee's confidential information may not be disclosed as it provides Sara Lee a competitive advantage. Examples of confidential information include trade secrets, detailed sales and profit figures, new product or marketing plans, research and development ideas or information, manufacturing processes, personnel information, and information about potential acquisitions, divestitures and investments. The obligation to preserve Sara Lee's confidential information may be ongoing, even after the business relationship ends.

Sara Lee will respect and safeguard the confidential information of our business partners.

## Fair Competition and Antitrust

*Sara Lee believes in free and open competition, and strictly abides by all applicable fair competition and antitrust laws in the many countries where Sara Lee conducts business.*

Business partners are expected to comply with all applicable laws and regulations regarding fair competition and antitrust.

## Accuracy of Business Records

*Business partners are expected to record and report information accurately and honestly.*

Business partners are expected not to hide, fail to record, or make false entries in connection with any business records. All records, including financial and operational records, are expected to accurately reflect transactions, payments and events, to be filed in a timely fashion, and to conform to any requirements of Sara Lee made known to business partners.

## Other Legal Requirements

Business partners are expected to comply with all applicable laws not otherwise set forth in these Standards. When used in these Standards, "applicable laws" include all applicable local, state, provincial, and national laws, codes, rules and regulations as well as all applicable treaties.

## Communication

We expect our business partners to communicate these Standards to their employees and business partners, and for their employees and business partners to adhere to them.

## Monitoring and Compliance

Business partners are expected to notify Sara Lee immediately if they become aware of any non-compliant practices by themselves, their employees and their business partners under these Standards. Business partners are further expected to promptly develop and implement plans or programs to correct any such practices. Business partners should also be aware of the fact that Sara Lee engages in various monitoring activities to confirm compliance with these Standards, including conducting its own and independent third-party site inspections and audits.

## Our Expectation

We expect all business partners to live up to these Standards and do the right thing. Sara Lee employees around the world use the following "Mirror Test" as their guide. We encourage business partners to use our "Mirror Test" as well.

A business partner's failure to observe and abide by these Standards may result in Sara Lee ceasing to do business with it.

## Approved Clothing under Advertising Agreement

**EFFECTIVE: January 1, 2011**

### Scope

All Franchisees and/or their representatives contracted to distribute baked food goods with Sara Lee. This policy is limited to those that chose to participate under the Clothing Advertising Agreement.

### Purpose

Provide vendors who carry approved clothing under the Clothing Advertising Agreement

### Policy

- The Franchisee and/or their representatives must obtain, wear and maintain approved clothing in order to receive advertising monies for clothing from Sara Lee at all times when performing the responsibilities under the Distribution/Franchise Agreement.  Clothing containing the logos of other companies or sports teams cannot be worn during the performance of responsibilities in order to receive the advertising payments.

- From time to time Sara Lee may provide the Franchisee and/or their representative's apparel that can not be found under an approved vendor. This usually follows a National Marketing Plan.

- Must maintain clothing in good condition

### Procedures

- Contact and order approved clothing from an authorized vendor.

- Keep all apparel neat and clean and must be worn at all times while meeting the service and merchandising requirements of the customer.

## Approved Clothing under Advertising Agreement
## Apparel Catalogue

**EFFECTIVE: January 1, 2011**



**Sara Lee Independent Operator**
**Promotional Products Catalogue**



**Item #SL874 Dickies® Traditional 874® Work Pant**
8.5oz twill, 65% polyester/35% cotton. Does not feature logo.
Lead Time: ships 48 hours upon receipt of order.
Color: Khaki, Black
Waist Sizes: 28"-42" (even)
Inseams: 30", 32", 34", 36"
Price: $17.51 ea.

---





**Item #SL1358 Dickies® Pleated Work Pant**
7.75oz twill, 65% polyester/35% cotton. Does not feature logo.
Lead Time: ships 48 hours upon receipt of order.
Color: Khaki, Black
Waist Sizes: 30"-42" (even)
Inseams: 30" (30"-42" waist), 32" (30"-42" waist), 34" (32"-38" waist only)
Price: $19.13 ea.

---



**Item #SL42234 Dickies® 8" Traditional Flat Front Short**
7.75oz twill, 65% polyester/35% cotton. Does not feature logo.
Lead Time: ships 48 hours upon receipt of order.
Color: Khaki, Black
Waist Sizes: 30"-40" (even)
Inseams: 30" (30"-42" waist), 32" (30"-42" waist), 34" (32"-38" waist only)
Price: $18.04 ea.

---



**Item #SL42274 Dickies® 13" Work Short**
8.5oz twill, 65% polyester/35% cotton. Does not feature logo.
Lead Time: ships 48 hours upon receipt of order.
Color: Charcoal, Black
Waist Sizes: 28"-40" (even)
Price: $18.51 ea.

---



**Item #SL44274 Dickies® 8" Traditional Pleated Front Short**
7.75oz twill, 65% polyester/35% cotton. Does not feature logo.
Lead Time: ships 48 hours upon receipt of order.
Color: Khaki, Black
Waist Sizes: 30"-40" (even)
Price: $14.58 ea.

---



**Item #SLFP110 Dickies® Women's Pleated Front Pants**
7oz mechanical stretch twill, 65% polyester/35% cotton. Does not feature logo.
Lead Time: ships 48 hours upon receipt of order.
Color: Khaki, Black
Sizes: Women's 4-16 (even)
Price: $15.31 ea.



1

**Sara Lee Independent Operator - Promotional Products Catalogue**



### Item #SLFR111 Dickies® Women's Flat Front Pant

7oz mechanical stretch twill, 65% polyester/35% cotton. Does not feature logo.
Lead Time: ships 48 hours upon receipt of order.
Color: Khaki, Black
Sizes: Women's 4-16 (even)
Price: $35.33 ea.



### Item #SLFR110 Dickies® 8" Women's Pleated Front Short

7oz mechanical stretch twill, 65% polyester/35% cotton. Does not feature logo.
Lead Time: ships 48 hours upon receipt of order.
Color: Khaki, Black
Sizes: Women's 4-14 (even)
Price: $12.69 ea.



### Item #SLFR111 Dickies® 8" Women's Flat Front Short

7oz mechanical stretch twill, 65% polyester/35% cotton. Does not feature logo.
Lead Time: ships 48 hours upon receipt of order.
Color: Khaki, Black
Sizes: Women's 4-14 (even)
Price: $12.69 ea.



### Item #SL901 Stoneware Mug

12oz white stoneware mug. Features 1-color Sara Lee logo.
Lead Time: ships 48 hours upon receipt of order.
Color: White
Price: $5.01 ea.



### Item #SL97 5" x 7" Clear Plastic Cover Notebook

100 sheets of lined 55-pound paper, double-wire bound, with pen loop. Features 2-color Sara Lee logo.
Lead Time: ships 48 hours upon receipt of order.
Color: Clear
Price: $6.36 ea.



### Item #SLDUO Ballpoint/Highlighter Combo - Pack of 5

Pack of 5 ballpoint/highlighter combination with trendy clip and grip. Features 2-color Sara Lee logo on each pen.
Lead Time: ships 48 hours upon receipt of order.
Color: Red
Price: $17.40 per pack of 5.



### Item #SL1620 Tech Tumbler

Stainless steel thumb slide for easy drinking, double-wall construction of 18/8 stainless steel, stylish rubber strip for easy handling, includes gift box. 14oz. 2.5"W x 7"H. Features 2-color Sara Lee logo.
Lead Time: ships 48 hours upon receipt of order.
Color: Steel
Price: $7.26 ea.



2

Confidential

**Sara Lee Independent Operator - Promotional Products Catalogue**



**Item #47001251 Triumph 19" Sport Duffel**
18"L x 9"W x 11"H. Large zippered main compartment, front zippered pocket, front water bottle pocket, 2 side accessory pockets, detachable shoulder strap. Features 2-color Sara Lee screenprint.
Lead Time: ships 7-10 business days upon receipt of order.
Color: Red
Price: $9.37 ea.
**MINIMUM ORDER QUANTITY: 18 duffels.**



**Item #0165 Vantage® Color Blocked Cap with Sandwich Visor**
100% cotton brushed twill constructed cap, low-profile six-panel crown, sewn eyelets, contrasting pre-curved visor with sandwich inset, contrasting top button, adjustable cotton back closure. Features Sara Lee Independent Operator embroidery on front. One size.
Lead Time: ships 5-7 business days upon receipt of order.
Color: Stone/Black
Price: $15.55 ea.
**MINIMUM ORDER QUANTITY: 24 caps**



**Item #2201 Vantage® Women's Velocity Repel & Release Twill Shirt**
100% cotton brushed twill constructed cap, low-profile six-panel crown, sewn eyelets, contrasting pre-curved visor with sandwich inset, contrasting top button, adjustable cotton back closure. Features Sara Lee Independent Operator embroidery on left chest.
Lead Time: ships 5-7 business days upon receipt of order.
Colors: Light Blue, White, Black
Sizes: XS, SM, MD, LG, XL, 2X, 3X
Price: $29.95 ea. (XS-XL), $31.95 ea. (2X, 3X)



**Item #1210 Vantage® Velocity Repel & Release Oxford Shirt**
60% cotton/40% polyester, 4oz oxford cloth twill button-down collar and sleeves stand and sleeves, buttons sleeve placket, buttons placket, back yoke with box pleat and locker loop, buttoning sleeve placket and cuff, replacement buttons. Features Sara Lee Independent Operator embroidery on left chest.
Lead Time: ships 5-7 business days upon receipt of order.
Color: White
Sizes: XS, SM, MD, LG, XL, 2X, 3X, 4X, 5X
Price: $28.95 ea. (XS-XL), $30.95 ea. (2X, 3X), $32.95 (4X, 5X)



**Item #2501 Vantage® Women's Velocity Cotton Pique Polo**
100% cotton, 6oz pique body, solid trim, narrow 3-button reverse placket, woodtone buttons, double-needle topstitching, dropped tail, replacement button. Features Sara Lee Independent Operator embroidery on left chest.
Lead Time: ships 5-7 business days upon receipt of order.
Colors: White, Black
Sizes: XS, SM, MD, LG, XL, 2X, 3X
Price: $22.95 ea. (XS-XL), $24.95 ea. (2X, 3X)



**Item #2790 Vantage® Vansport™ Body Mapped Blocked Polo**
100% polyester, Vansport™ moisture management jersey body with lightweight mesh blocked panels in sweat zones, UV protection, cold chill knit collar, three-button Velcro placket, clean finish bottom with tailored side vents. Features Sara Lee Independent Operator embroidery on left chest.
Lead Time: ships 5-7 business days upon receipt of order.
Colors: White/Gray, Ebony/Dark Gray
Sizes: XS, SM, MD, LG, XL, 2X, 3X
Price: $38.95 ea. (XS-XL), $40.95 ea. (2X, 3X)

**Item #2900 Vantage® Vansport™ Tournament Double-Tuck Pique Polo**
55% cotton/55% polyester, 6oz, Vansport™ moisture management double-tuck pique body, welt-knit collar, low-profile Velcro placket, smoke pearl snap buttons with pewter center, ribbed cuffs, locker patch, double-needle topstitching, striped twill tape in neck and vents, dropped tail, replacement button. Features Sara Lee Independent Operator embroidery on left chest.
Lead Time: ships 5-7 business days upon receipt of order.
Colors: White, Black
Sizes: XS, SM, MD, LG, XL, 2X, 3X, 4X, 5X
Price: $29.57 ea. (XS-XL), $31.57 ea. (2X, 3X), $33.57 (4X, 5X)



Confidential

10/25/2010



### Item #7196 Vantage® Reflectek Microfiber Jacket

100% highcount microfiber polyester body with watercresistant finish, zipout hooded nest with elasticized drawcord and cordlocks, reflective zipper and back piping, front pouch pockets, elasticized cuffs, inside cell phone pocket, Zocket™, elasticized drawcord bottom with cordlocks, mesh lining. Features Sara Lee Independent Operator embroidery on left chest.
Lead Time: ships 5-7 business days upon receipt of order.
Color: Black
Sizes: XS, SM, MD, LG, XL, 2X, 3X
Price: $42.62 ea. (XS-XL), $44.62 ea. (2X, 3X)



### Item #7261 Vantage® Women's Quilted Commuter Jacket

100% microfiber polyester diamond lightweight quilted taffeta body with waterrepellent finish, convertible collar, oneway full zip front, zipper front slash pockets, front and back princess seams, inside cell phone & PDA pockets, Zocket™, set-in knit cuffs, Perform bottom button hung. Features Sara Lee Independent Operator embroidery on left chest.
Lead Time: ships 5-7 business days upon receipt of order.
Colors: White, Black
Sizes: XS, SM, MD, LG, XL, 2X, 3X
Price: $53.00 ea. (XS-XL), $55.00 ea. (2X, 3X)



### Item #ALOW4002 Vantage® aka Men's Soft Shell Jacket

100% polyester bonded microfiber. Waterresistant with bonded fleece lining for extra protection. Contrast reverse full zipper front with protective zipper guard for comfort and to block wind and moisture. Reverse zipper side pockets. Contrast front and sleeve seams with topstitch. Drop tail hem for extra coverage. Features Sara Lee Independent Operator embroidery on left chest.
Lead Time: ships 5-7 business days upon receipt of order.
Color: Black
Sizes: SM, MD, LG, XL, 2X
Price: $71.00 ea. (SM-XL), $73.00 ea. (2X)



### Item #ALOW4002 Vantage® aka Women's Soft Shell Jacket

100% polyester bonded microfiber. Waterresistant with bonded fleece lining for extra protection. Reverse full zipper front, side and chest pockets. Zip guard folds over top of collar for comfort and to block from wind and moisture. Drop tail hem for extra coverage. Features Sara Lee Independent Operator embroidery on left chest.
Lead Time: ships 5-7 business days upon receipt of order.
Color: Black
Sizes: SM, MD, LG, XL, 2X
Price: $42.00 ea. (SM-XL), $44.00 ea. (2X)



### Item #IZOD0064 Vantage® IZOD Men's Cool FX Pin-Stripe Polo

100% polyester, pinstripe body with driwicking technology, antimicrobial and solar protection properties. rib knit collar with narrow edge stripe, three-button placket, clear buttons with printed IZOD-XFG logo, hemmed sleeves, locker patch, dropped tail. IZOD-XFG logo embroidered on right sleeve and "2" at base neck. Features Sara Lee Independent Operator embroidery on left chest.
Lead Time: ships 5-7 business days upon receipt of order.
Colors: Oyster, Black
Sizes: SM, MD, LG, XL, 2X, 3X
Price: $40.00 ea. (SM-XL), $42.00 ea. (2X, 3X)



### Item #IZOD0075 Vantage® IZOD Men's Wicking Pique Polo

100% polyester, pique body with driwicking technology, antimicrobial and solar protection properties, solid rib knit collar, two-button placket, matching pearl buttons, pearl shoulder, hemmed sleeves, locker patch, even hem bottom with latest side vents, IZOD logo printed on right sleeve. Features Sara Lee Independent Operator embroidery on left chest.
Lead Time: ships 5-7 business days upon receipt of order.
Color: White
Sizes: SM, MD, LG, XL, 2X, 3X
Price: $31.28 ea. (SM-XL), $33.28 ea. (2X, 3X)



### Item #0270 Vantage® Solid Brushed Twill Constructed Cap

100% cotton brushed twill constructed cap, lowprofile sixpanel crown, sewn eyelets, precurved visor, adjustable velcro back closure. Features Sara Lee Independent Operator embroidery on front of cap.
Lead Time: ships 5-7 business days upon receipt of order.
Color: Black

Price: $6.49 ea.
**MINIMUM ORDER QUANTITY: 24**



4

Confidential

10/25/2010

**Sara Lee Independent Operator • Promotional Products Catalogue**

## Vantage Apparel Size Chart

For Vantage apparel items ONLY; does not apply to Dickies® apparel.

NOTE: Women's slo and I200 apparel is more fitted. We recommend buying one size up for the best fit.



**MEN'S**

Neck—Measure around the base of the neck.
Chest—Measure at the fullest part of the chest, under the armpits and over the shoulder blades, keeping the tape measure firm and level.
Sleeve—Bend elbow slightly. Measure from center back of neck across shoulder, over the slightly bent elbow, and down to the wrist.
Waist—Measure around the narrowest part of your waist.

|  | XS | SM | MD | LG | XL | 2XL | 3XL | 4XL | 5XL |
|---|---|---|---|---|---|---|---|---|---|
| Neck | 15 | 15.5 | 16 | 16.5 | 17.5 | 18.5 | 19.5 | 20.5 | 21.5 |
| Chest | 30-32 | 34-36 | 38-40 | 42-44 | 46-48 | 50-52 | 54-56 | 58-60 | 62-64 |
| Sleeve | 31.5 | 32.5 | 33.5 | 34.5 | 35.5 | 36.5 | 37.5 | 38.5 | 39.5 |
| Waist | 28-29 | 30-31 | 32-33 | 38-39 | 43-45 | 46-47 | 48-51 | 52-55 | 56-59 |

**UNISEX SIZE SCALE**

Many of our products have unisex apparel so we've sized them to better fit both sexes. Refer to this size scale when buying one style for both men and women.

| Mens | XS | SM | MD | LG | XL | 2XL |
|---|---|---|---|---|---|---|
| Womens | S | SM | MD | LG | XL | 2XL | 3XL |



**WOMEN'S**

Bust/Chest—Measure around the chest at the fullest point of the bust.
Waist—Measure around the narrowest part of your waist.
Hip/Seat—Measure around the fullest point of your seat while standing.

|  | XS | SM | MD | LG | XL | 2XL | 3XL |
|---|---|---|---|---|---|---|---|
| Size | 0-2 | 4-6 | 8-10 | 12-14 | 16-18 | 20-22 | 24-26 |
| Bust | 32-33 | 34-35 | 36-37.5 | 38.5-40.5 | 41.5-44.5 | 45-48.5 | 50-52.5 |
| Waist | 24-25 | 26-27 | 28-29.5 | 30.5-32.5 | 34-36.5 | 38.5-40.5 | 42.5-44.5 |
| Hip | 34-35 | 36-37 | 38-39 | 40.5-42.5 | 44-46.5 | 48-50.5 | 52-54.5 |

**Sara Lee Independent Operator • Promotional Products Order Form**

## Payment Method

☐ Mastercard     ☐ Discover     ☐ Visa     ☐ American Express

Credit Card #:

Name, as it appears on credit card:

Signature:

## Shipping Address   Please select a FedEx shipping method:   ☐ Ground   ☐ 2 Day   ☐ Overnight

Name

Address

City                    State          Zip Code

Phone Number

## Contact Information

Name

Address

City                    State          Zip Code

Phone Number



5

## Sara Lee Independent Operator - Promotional Products Order Form

| Item # | Color | Size | Unit Price | Quantity | Extended Price |
|---|---|---|---|---|---|
| SL874 | Khaki | 26"w/32"t | $17.81 | 2 | $35.62 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | SUBTOTAL* | |

*Does not include applicable taxes, shipping, or handling costs, which will be charged to your credit card.

## To order, fax pages 5 & 6 to 800-804-4249.

## Questions? Please do not hesitate to call us at 312-254-1070.



Confidential

10/25/2010

## Depot Hours, Locations and Parking

**EFFECTIVE: January 1, 2011**

### Scope

All Franchisees and/or their representatives contracted to distribute baked food goods with Sara Lee. This policy is limited only to Franchise Agreements/Distribution Agreement that reference Depots.

### Purpose

Establish guidelines for Franchisee use of Depots

### Policy

- The Franchisee and/or their representatives will be given access to their assigned Depot with sufficient time to conduct business.

- Depot Hours of Operation will be posted in the all depots for your convenience. Product may not be available after for pick up after depot hours.

- The Location of each Depot is determined by Sara Lee. Sara Lee tries to locate Depots to best fit market location, size, type and cost.

- The Franchisee may request that Sara Lee re-evaluate which Depot or Time Window they have been assigned by submitting a written request to Sara Lee Management Person. Sara Lee will try to work with the Independent Franchisee but may be limited based on Transportation Logistics, Depot Size or other Business Factors.

- Professional conduct must be maintained at all times in all Sara Lee Facilities.

- Guns or other weapons are not allowed on any Sara Lee property at any time.

- Parking area for the Franchisee and/or their representatives will be provided as available. The protection of each vehicle parked is the responsibility of the owner.

- All depot doors including entry, exit and dock doors must be kept closed at all times.

- All Sara Lee Depots are non-smoking facilities. There is to be no smoking in any office or warehouse area and all cigarettes should be disposed of properly.

- Sara Lee Safety and Food Safety standards must be maintained at all times
- Empty Baskets, Dollies, Racks and Trays are to be placed in designated area
- Trash disposed of in designated receptacles
- Out of Code Product (stale) for credit must be left in designated area along with the required documentation

Confidential

## Sara Lee Product Transportation Equipment

**EFFECTIVE: January 1, 2011**

## Scope

All Franchisees and/or their representatives contracted to distribute baked food goods with Sara Lee.

## Purpose

- Establish Guidelines for the return of Company Provided Baskets, Transport Racks, Trays and Dollies which are owned by Sara Lee.

## Policy

- Equipment owned by Sara Lee and provided to the Franchisee for the transport of product to the market represents a significant capital investment by Sara Lee.  Further, without daily return of this equipment to the manufacturing facility, may cause Sara Lee disruption of its operations or additional capital expense.

- The Franchisee and/or their representatives must return all such equipment, not holding product to Sara Lee on a daily basis.

- Equipment is to be placed in the designated depot location

- Empty equipment such as baskets and trays are not to be left at outlet locations at any time

- A deposit for use of  this equipment may be charged to Franchisees who neglect to return equipment on a daily basis

- A Recovery Fee may be assessed to the Franchisee should the Company be required to return equipment from the market to the manufacturing facility in order to supply Franchisee timely delivery of product

- The Cost of Lost equipment due to Franchisee negligence may be assessed against the Franchisee.

## Procedures

- Return all empty delivery/transportation equipment to the depot daily

Confidential

## Product Ordering Schedule

**EFFECTIVE: January 1, 2011**

### Scope

All Franchisees and/or their representatives contracted to distribute baked food goods with Sara Lee.

### Purpose

Establish guidelines for Franchisee to Order Products.

### Policy

- Ordering Schedules are determined by each Bakery
- Ordering Schedules can be different for different types of Products
- All products should be ordered through the HHC.

### Procedures

- Follow the HHC products availability and ordering schedule when ordering through the HHC
- Sometimes a Bakery allows for adjustment outside the HHC time windows and these procedures will be given to the Franchisee and or their approved representative.

### HHC Ordering Schedule

| Day | Lead Day 3 | | Lead Day 4 | | Lead Day 5 | |
|---|---|---|---|---|---|---|
| | Pre-post | Final | Pre-post | Final | Pre-post | Final |
| Monday | Saturday | Thursday | Saturday | Friday | Saturday | Saturday |
| Tuesday | Monday | Friday/Saturday | Monday | Saturday | Monday | Monday |
| Thursday | Tuesday | | Tuesday | Monday | Tuesday | Tuesday |
| Friday | Thursday | Monday | Thursday | Tuesday | Thursday | Thursday |
| Saturday | Friday | Tuesday | Friday | Thursday | Friday | Friday |

- **Refer to Section 15 for all products along with the Lead Days and Days Available**

**Inventory Control**

**EFFECTIVE: January 1, 2011**

## Scope

All Franchisees and/or their representatives contracted to distribute baked food goods with Sara Lee.

## Purpose

Establish guidelines for Franchisee to properly account for variances in their received load versus their ordered product.

## Policy

- Any request for product adjustments must be reported before leaving a Depot

- Any Adjustment must be submitted on the supplied form by 7:00 am the product is received

- Product ordered and delivered is not eligible for adjustments

### Procedures

- Account for all product compared to your Load Sheet

- Any Adjustments from the Load Sheet must be recorded and submitted to the Bakery on the supplied form before leaving depot facility.

- Any Transferring of Products to or from another route must be submitted on the supplied form on the day the transfer occurs.

- All transactions turned in by 7:00 am on the supplied form should be processed the same day and can been seen on the RTAC document at the end of day.

- Franchisee should review daily RTAC– Dump Sheet and retain to verify accuracy of processed adjustments and report variances within 24 hours

## Inventory Control

**EFFECTIVE: January 1, 2011**

### IO Route Charge/Credit Sheet
Fax by 7:30 a.m. to receive charge/credit the same day.

**Route #** _____     **Depot:** _____

Date _____     Submitted By _____

| Line # | 1932 Difference to Load Sheet (Short) Over | 1930 Stale Credit (Charge) | (1932) / 1936-07 Cripples Received from MFG |
|---|---|---|---|
| | | | ( ) |
| | | | ( ) |
| | | | ( ) |
| | | | ( ) |
| | | | ( ) |
| | | | ( ) |
| | | | ( ) |
| | | | ( ) |
| | | | ( ) |
| | | | ( ) |
| | | | ( ) |
| | | | ( ) |
| | | | ( ) |
| | | | ( ) |
| | | | ( ) |
| | | | ( ) |
| | | | ( ) |

**1933 Transfers**

| Charge Transfer To Route# | Credit Transfer From Route# | Line # | Transfer Units |
|---|---|---|---|
| | ( ) | | |
| | ( ) | | |
| | ( ) | | |
| | ( ) | | |
| | ( ) | | |
| | ( ) | | |
| | ( ) | | |
| | ( ) | | |
| | ( ) | | |
| | ( ) | | |
| | ( ) | | |
| | ( ) | | |
| | ( ) | | |
| | ( ) | | |
| | ( ) | | |
| | ( ) | | |
| | ( ) | | |

**Difference to Load Sheet -** This should only be used to charge or credit IO for diffrence of units actually received compared to charge on Load Sheet
**DO NOT USE FOR ORDERING ERRORS - YOU NEED TO SELL OR TRANSFER.**
**Stale -** Used to charge IO for Stale product. (This may not apply in all Bakeries)
**Cripples -** Used for cripples received from MFG. Do not use for cripples that occur after receiving product which should added to stale sheet.
**Transfers -** Use for product received from or given to other routes. Only one IO needs to turn this in, not both involved with the transfer.

Revised 1/19/2009

Confidential

10/25/2010

**Hand Held Computer Operations**

**EFFECTIVE: January 1, 2011**

### Scope

All Franchisees and/or their representatives contracted to distribute baked food goods with Sara Lee.

### Purpose

Establish guidelines for Franchisees to properly utilize the Hand Held Computer in order to receive pricing and customer updates, generate accurate and complete orders, to generate customer charge, SBT and credit invoices, to properly track inventories, to record on hand counts for SBT customers, to invoice for credit from Sara Lee for returned out of code product and to transmit accurate and complete data back to Sara Lee.

### Policy

All Franchisees are required to utilize a compatible Hand Held Computer hardware and Sara Lee software system in the daily operation of their business.

### Procedures

- Normal service days should be established and submitted for entry to your TDM for all customers

- Carry over amounts for all products in each outlet will mutually be established and are used by the ordering software logic to ensure appropriate orders and to ensure adequate and fresh product on the market for the consumer.

- Complete and accurate data should be entered for each customer at the time of service and invoicing. Complete data includes:

  - ✓ Record the amount of "Off Code" being removed from Outlet

  - ✓ Record the "On Hand" or "Carry Over" remaining in Outlet

  - ✓ Record the actual amount of Product you are delivering by individual item number. The quantity delivered plus the actual on hand should be the amount needed to bring the total amount of Product in the outlet up to the Pre-Post quantity

Confidential

- ✓ Allow the HHC to Auto Pre Post. This allows the HHC Software to generate an accurate order based on the Historical Sales Data and transmit an order to Sara Lee for the Predominate Day.

- Hand Held Computer end of day.

  - ✓ You should utilize the HHC Market Report to analyze the entire market or to modify the Pre-Post or future orders as needed for each product and customer.
  - ✓ Evaluate the actual Carry Over by product and customer and adjust utilizing the Get Right Schedule.

- Holidays, Seasonality and Promotional Activity will affect your averages and should be considered when determining the proper amount of product for each customer's order.

- The Maintenance Agreement covers Normal Wear and Tear of the HHC and Printer. Franchisees are responsible for loss of leased equipment or damage which is not covered under the maintenance agreement.  Holsters are available for both the HHC and the Printer and are designed to protect the equipment.  The printer must be in its holster to charge properly.  Damage that occurs to equipment not holstered is considered outside of Normal Wear and Tear.

Confidential

**Scan Based Trading Procedures**
**SBT, Inventory Advance Program & Training Guide**

---

**EFFECTIVE: January 1, 2011**

**Scan Based Trading Procedures**

## Scope

All Franchisees and/or their representatives contracted to distribute baked food goods with Sara Lee.

## Purpose

Establish a guideline for Franchisee to follow in order to receive credit from Customers that use Scan Based Trading as their form of payment.

## Policy

- If any Outlet elects to settle with Franchisee on the basis of scan results, rather than invoices, the credit to Franchisee shall be adjusted for any difference between the invoices and the actual sales reflected by the scan based sales data.

**Procedures**

- Hand Held Computer data must match actual Customer activity, daily.

  - ✓ Actual Delivered Units
  - ✓ Actual Stale Units credited to customer
  - ✓ Daily On-Hand amounts on all products
  - ✓ Complete On-Hands for all products must be taken on last day of the quarter to possible get credit for inventory
  - ✓ All invoices must be submitted to Sara Lee as part of daily settlement process

- Variances to SBT True up may be caused by:

  - ✓ Any difference between the customers recorded price and the Franchisees invoiced price
  - ✓ Any unauthorized products sold or invoiced to SBT customer
  - ✓ Any product not scanned through register
  - ✓ Fluctuations in un-sold inventory levels

Confidential

## Scan Based Trading Procedures

**EFFECTIVE: January 1, 2011**

- Create an accurate charge and return invoice at time of delivery in your hand held for all scan based customers.
- Your hand held invoices for SBT customers will still process as they do now in the week that you T-COM the invoice.
- The following week, your hand held invoices for SBT customers from the previous week will be reversed and the actual scan invoice we received from the previous week from the customer will be credited.
- A report will print weekly from settlement showing the reversal of the hand held invoices and the new actual scan sales.
- Your weekly settlement reports will showing the running total, for the quarter, between your handheld invoices to SBT customers and the actual scan for these customers.
- On Week #1 of each quarter, the difference of the hand held SBT invoices and the actual scan sales invoices will be charged or credited from the prior quarter through settlement and will affect your overall settlement check.
- All SBT adjustments will be made on a weekly basis and applied to Franchisee settlement by quarter.
- If SBT True Up is a negative balance (proceeds, already paid to you on the weekly settlements, that exceed the amount that your customer paid to Sara Lee through scan) then the total quarter's negative amount will be shown on the first Weekly Settlement Summary report of the new quarter however, the negative amount will be deducted in 13 payments over the next quarter instead of deducting the entire amount owed immediately.
- If SBT True Up is a positive balance (proceeds, already paid to you on the weekly settlements, which are less than the amount that your customer paid to Sara Lee through scan) then the total positive amount, for the quarter, will be shown on the Weekly Settlement Summary report and will be paid in full on the first Settlement of the next quarter.  If there have been positive SBT proceeds for two consecutive quarters, the second quarter positive proceeds will be held pending the results of an audit of the invoice data.
- To assist you in identifying any variances by store, totals by store will print on the Weekly Settlement Report. Along with this, your TDM will have access to line # specific detail by store by week.
- Any reimbursement for shrink paid by the chain or customer shrink allowance payments will be credited to you each quarter on the same week as the quarterly True Up occurs.



# Sara Lee Franchise
## *SBT Settlement Training*

Many stores require that their vendors will receive payment from them only through a method of payment called Scan Based Trading. In scan based trading, a vendor does not usually require you to check in with a receiver to verify the type and quantity of products being placed in the outlet at the time of delivery of product nor do they verify what product is being taken out of their store by you, the supplier. Instead, these outlets ONLY pay for the product which is scanned through their registers at the time their customers purchase your company's product.

To avoid the delay in payments to you for the products that you are placing in these outlets, Sara Lee Distribution accepts, at face value, the unverified invoice charge and credit tickets that you present to us through T-Com for payment. Payment for these invoices is made to your company on a weekly basis, however, on the following week, these invoices are reversed and replaced with the actual payment for the scan sales which are received from the outlet. This is done in accordance under Article 3 in your Distribution Agreement which states that **"If any Outlet elects to settle with DISTRIBUTOR on the basis of scan results, rather than invoices, the credit to DISTRIBUTOR shall be adjusted for any difference between the invoices and the actual sales reflected by the scan based sales data."** The difference between the original paid invoice and the actual customer payment is shown on a weekly basis and running totals of these differences are transmitted to you on the Sales Customer List SBT Invoice Report. The difference between the original hand held invoices and the payment for the actual scan sales is adjusted on settlement on the first week of each accounting quarter.

Confidential

## SALES CUSTOMER LIST SBT INVOICES

If you have customers who require their vendors to participate in scan based trading, you will receive this settlement report on a weekly basis.

This report will show all invoices which were created by your company and transmitted and paid by Sara Lee to you for the previous week. These invoices will be reversed.

```
RUN DATE.: 03/10/2008                DISTRIBUTION MANAGEMENT SYSTEM                          PAGE:      1
RUN TIME : 15:51:03                     CUSTOMER NOT DEFINED                                 PGM.: B157336B
APPL DATE: 01/12/2008           SALES CUSTOMER LIST SBT INVOICES - TYPE II    - 155          RPT : R00

DISTRIBUTOR NUMBER:            WEEK ENDING: 01/12/2008          ROUTE:

DLVRY DATE  INVOICE  A/R    CUSTOMER #/NAME            INVOICE #      GROSS        PA*S     PROMO PA*S       NET
----------  -------  ---    --------------            ---------   ----------   ---------  -------------   --------
*** PREVIOUS WEEK INVOICES FROM HHC ***

12/31/2007  12/31   01/02  01710 HEB PANTRY       C  76508      61.80-        0.00       1.39-       60.41-
12/31/2007  12/31   01/02  01710 HEB PANTRY       0  76509     180.55         0.00       2.24       178.31
12/31/2007  12/31   01/02  04804 KROGER           0  76510      95.30-        0.00       6.55-       88.75-
12/31/2007  12/31   01/02  04804 KROGER           0  76511     244.30         0.00      26.40       217.90
12/31/2007  12/31   01/02  08835 WALMART          0  76502      77.47-        4.59-      0.72-        72.16-
12/31/2007  12/31   01/02  08835 WALMART          0  76503     640.00        38.51      51.46       550.03
12/31/2007  12/31   01/02  08835 WALMART          0  76504      14.30-        0.80-      0.00         13.50-
```

It will also show the detail of the payments we received from these outlets that will be remitted to you in place of the original invoices that your company created.

```
RUN DATE.: 03/10/2008                DISTRIBUTION MANAGEMENT SYSTEM                          PAGE:      1
RUN TIME : 15:51:03                     CUSTOMER NOT DEFINED                                 PGM.: B157336B
APPL DATE: 01/12/2008           SALES CUSTOMER LIST SBT INVOICES - TYPE II    - 155          RPT : R00

DISTRIBUTOR NUMBER:            WEEK ENDING: 01/12/2008          ROUTE:

DLVRY DATE  INVOICE  A/R    CUSTOMER #/NAME            INVOICE #      GROSS        PA*S     PROMO PA*S       NET
----------  -------  ---    --------------            ---------   ----------   ---------  -------------   --------
*** PREVIOUS WEEK INVOICES FROM HHC ***

12/31/2007  12/31   01/02  01710 HEB PANTRY       C  76508      61.80-        0.00       1.39-        60.41-
12/31/2007  12/31   01/02  01710 HEB PANTRY       0  76509     180.55         0.00       2.24        178.31
12/31/2007  12/31   01/02  04804 KROGER           0  76510      95.30-        0.00       6.55-        88.75-
12/31/2007  12/31   01/02  04804 KROGER           0  76511     244.30         0.00      26.40        217.90
12/31/2007  12/31   01/02  08835 WALMART          0  76502      77.47-        4.59-      0.72-         72.16-
12/31/2007  12/31   01/02  08835 WALMART          0  76503     640.00        38.51      51.46        550.03
12/31/2007  12/31   01/02  08835 WALMART          0  76504      14.30-        0.80-      0.00          13.50-
01/03/2008  01/03   01/04  09188 WM DELI BRD SC   0  76505      17.37         1.26       0.00          16.11
01/03/2008  01/03   01/04  01710 HEB PANTRY       0  00307      66.61-        0.00       0.81-         65.80-
01/03/2008  01/03   01/04  01710 HEB PANTRY       0  00308      97.51         0.00       1.12          96.39
01/03/2008  01/03   01/04  04804 KROGER           0  00309      45.19-        0.00       0.90-         44.49-
01/03/2008  01/03   01/04  04804 KROGER           0  00310     205.81         0.00      21.26         184.55
01/03/2008  01/03   01/04  08835 WALMART          0  00303     105.90-        4.36-      9.00-         92.54-
01/03/2008  01/03   01/04  08835 WALMART          0  00303     594.90        29.34      44.40         481.16
01/04/2008  01/04   01/05  09188 WM DELI BRD      0  00304      17.37         1.26       0.00          16.11
01/04/2008  01/04   01/05  01710 HEB PANTRY       0  00417      12.60         0.00       0.00          12.60
01/04/2008  01/04   01/05  04804 KROGER           0  00418       1.78         0.00       0.00           1.78
01/04/2008  01/04   01/05  08835 WALMART          0  00416      35.42         3.10       0.00          36.32
01/05/2008  01/05   01/07  01710 HEB PANTRY       0  00506       8.10-        0.00       0.00           8.10-
01/05/2008  01/05   01/07  01710 HEB PANTRY       0  00507      41.61         0.00       1.66          39.95
01/05/2008  01/05   01/07  04804 KROGER           0  00500      27.41-        0.00       2.46-         25.02-
01/05/2008  01/05   01/07  04804 KROGER           0  00501      81.88         0.00       1.10          81.78
01/05/2008  01/05   01/07  08835 WALMART          0  00502      56.39-        3.60-      4.22-         49.17-
01/05/2008  01/05   01/07  08835 WALMART          0  00503     214.34         5.16      13.68         195.52
01/05/2008  01/05   01/07  09188 WM DELI BRD      0  00504       3.86-        0.28-      0.00           3.88-
                                                              ------------  ---------  -------------  --------
              ** ROUTE TOTALS       25 ENTRIES                 1,783.31       71.00     137.30        1,575.01

*** PREVIOUS WEEK SCAN SALES FROM CUSTOMER ***

12/30/2007  01/02   01/02  01710 HEB PANTRY          003576401       5.34        0.00       0.00           5.34
12/30/2007  01/02   01/02  04804 KROGER              095076400      39.32        0.07-      3.73          39.26
12/30/2007  01/02   01/02  08835 WALMART             077770401       6.77        0.00       1.32           5.45
12/31/2007  01/02   01/02  01710 HEB PANTRY          003576500      60.23        0.15-      0.66          59.82
12/31/2007  01/02   01/02  04804 KROGER              095076500      64.97        0.28-     10.40          54.85
12/31/2007  01/02   01/02  08835 WALMART             077776500     206.80        7.66     23.68         177.46
12/31/2007  01/02   01/02  09188 WM DELI BRD         077776501      13.28        1.34      0.24          11.50
01/01/2008  01/02   01/02  01710 HEB PANTRY          077776500      13.51        0.98      0.00          12.53
01/01/2008  01/02   01/02  08835 WALMART             003500100      13.30        0.00      0.00          13.30
01/02/2008  01/03   01/03  08835 WALMART             077700100     120.00        5.05     15.23         107.71
01/02/2008  01/03   01/03  04804 KROGER              095000300      22.76        0.00      2.78          19.98
01/02/2008  01/03   01/03  01710 HEB PANTRY          003500300      28.89        0.00      0.27          28.62
01/02/2008  01/03   01/03  08835 WALMART             077700200     158.93        7.42     16.59         134.92
01/02/2008  01/03   01/03  09188 WM DELI            077700300       3.86        0.28      0.00           3.58
01/02/2008  01/04   01/04  04804 KROGER              095000200      48.51        3.33-     4.89          46.95
01/02/2008  01/04   01/04  08835 WALMART             077700201       6.66        0.13      0.63           6.10
01/03/2008  01/04   01/04  09188 WM DELI BRD SC      077700301       1.93        0.14      0.00           1.79
01/03/2008  01/04   01/04  01710 HEB PANTRY          003500300      37.82        0.14      0.00          37.68
01/03/2008  01/04   01/04  08835 WALMART             077700300     189.34       13.77     13.86         162.71
01/03/2008  01/04   01/04  09188 WM DELI BRD         077700300       3.86        0.28      0.00           3.58
```

Confidential                                                                              10/25/2010

It will display the net difference between the HHC Sales Invoices and the actual payment for the scanned sales.

```
RUN DATE.: 03/10/2008                    DISTRIBUTION MANAGEMENT SYSTEM                          PAGE:        2
RUN TIME : 15:51:03                          CUSTOMER NOT DEFINED            - 155               PGM.: B157336B
APPL DATE: 01/12/2008                SALES CUSTOMER LIST SBT INVOICES - TYPE II                  RPT : R00

DISTRIBUTOR NUMBER:              WEEK ENDING: 01/12/2008         ROUTE:

DLVRY DATE  INVOICE  A/R   CUSTOMER #/NAME            INVOICE #       GROSS         PA*S       PROMO PA*S          NET
----------  -------  ---   --------------            ---------    ----------   ----------   -----------    ----------
01/03/2008  01/05    01/05  04804 KROGER             095000300        60.12       3.18-          3.73        59.57
01/03/2008  01/05    01/05  08835 WALMART :          077003301         6.09        0.00          1.16         4.93
01/04/2008  01/05    01/05  01710 HEB PANTRY         003100400        28.16        0.07          0.64        27.55
01/04/2008  01/05    01/05  08835 WALMART            077700400       184.03        9.84         15.95       158.24
01/04/2008  01/05    01/05  09188 WM DELI            077700400         3.86        0.28          0.00         3.58
01/04/2008  02/07    01/07  04804 KROGER             095000400        55.63        0.97-         2.67        53.93
01/05/2008  02/07    01/07  08835 WALMAR1            077700401         4.26        0.00          0.77         3.49
01/05/2008  02/07    01/07  01710 HEB PANTRY         095000300        70.09        0.15-         0.29        69.95
01/05/2008  02/07    01/07  04804 KROGER             095000500        91.85        8.70-         9.24        91.31
01/05/2008  02/07    01/07  08835 WALMART            077700500       202.62        9.95         19.04       174.03
01/05/2008  02/07    01/07  09825 WALMART :          077700501         8.14        0.54          0.64         7.06
01/05/2008  02/07    01/07  09188 WM DELI BRD        077700600         7.72        0.56          0.00         7.16
01/06/2008  02/07    01/07  01710 HEB PANTRY         003500600        40.21        0.00          0.00        40.21
01/06/2008  02/07    01/07  08835 WALMART            077700600       198.59       10.35         12.94       175.30
01/06/2008  02/07    01/07  09188 WM DELI ,          077700600         3.86        0.28          0.00         3.58
                                                                   ----------   ----------   -----------    ----------
         **  ROUTE TOTALS        39 ENTRIES                          2,019.11      52.04        160.05      1,807.02


         **  SBT ADJUSTMENTS FOR 01/12/2008            PA ADJUSTMENT   INVOICE DIFFERENCE   TOTAL ADJUSTMENT
                                                           2.83             232.01              234.84
         **  TOTAL SBT ADJUSTMENTS FOR PERIOD
                                                           2.83             232.01              234.84
```

These weekly totals will be reflected on a continuing basis for each week of the accounting period.

```
RUN DATE.: 03/20/2008                    DISTRIBUTION MANAGEMENT SYSTEM                          PAGE:        2
RUN TIME : 15:37:30                          CUSTOMER NOT DEFINED            - 155               PGM.: B157336B
APPL DATE: 02/09/2008                SALES CUSTOMER LIST SBT INVOICES - TYPE II                  RPT : R00

DISTRIBUTOR NUMBER:              WEEK ENDING: 02/09/2008         ROUTE:

DLVRY DATE  INVOICE  A/R   CUSTOMER #/NAME            INVOICE #       GROSS         PA*S       PROMO PA*S          NET
----------  -------  ---   --------------            ---------    ----------   ----------   -----------    ----------
01/30/2008  02/01    02/01  08835 WALMART C--- . -   077703001         7.67        0.48          0.53         6.66
01/31/2008  02/01    02/01  01710 HEB PANTRY         003503100        30.10        0.21          0.00        29.89
01/31/2008  02/01    02/01  08835 WALMART            077703100       133.00       11.00          5.15       116.85
01/31/2008  02/01    02/01  09188 WM DELI            077703100        11.58        0.84          0.00        10.74
01/31/2008  02/02    02/02  04804 KROGER             095003100        54.72        0.93-         6.76        48.89
01/31/2008  02/02    02/02  08835 WALMART            077703101         6.76        1.18          0.00         5.58
02/01/2008  02/02    02/02  01710 HEB PANTRY         003503200        55.11        1.16-         1.16        55.11
02/01/2008  02/02    02/02  08835 WALMART            077703200       216.67       12.90         10.26       193.51
02/01/2008  02/04    02/04  04804 KROGER             095003200        46.34        0.59          3.25        42.50
02/02/2008  02/04    02/04  08835 WALMART            077703301        10.12        1.34          0.00         8.78
02/02/2008  02/04    02/04  01710 HEB PANTRY         003503300        55.89        0.52          0.29        55.08
02/02/2008  02/04    02/04  04804 KROGER             095003300        59.28        0.29-         4.31        55.26
02/02/2008  02/04    02/04  08835 WALMART            077703300       191.05        9.75          9.94       171.36
02/02/2008  02/04    02/04  08835 WALMART            077703301        10.12        2.18          0.00         7.94
02/03/2008  02/04    02/04  01710 HEB PANTRY         003503400        35.14        1.09          0.00        34.05
02/03/2008  02/04    02/04  08835 WALMART            077703400       237.71       13.36          7.86       216.49
                                                                   ----------   ----------   -----------    ----------
         **  ROUTE TOTALS        37 ENTRIES                          2,136.28      99.73         83.62      1,952.93


         **  SBT ADJUSTMENTS FOR 01/12/2008            PA ADJUSTMENT   INVOICE DIFFERENCE   TOTAL ADJUSTMENT
         **  SBT ADJUSTMENTS FOR 01/12/2008                2.83             232.01              234.84
         **  SBT ADJUSTMENTS FOR 01/19/2008                8.93-            216.30-             225.23-
         **  SBT ADJUSTMENTS FOR 01/26/2008                8.21-            135.95-             146.16-
         **  SBT ADJUSTMENTS FOR 02/02/2008               23.16-            312.54-             335.70-
         **  SBT ADJUSTMENTS FOR 02/09/2008               39.17             428.28              467.45
                                                        ----------       ----------           ----------
         **  TOTAL SBT ADJUSTMENTS FOR PERIOD              1.70               4.50-               2.80-
```

At the bottom of the report, the information will be provided both in totals by week:

| | | PA ADJUSTMENT | INVOICE DIFFERENCE | TOTAL ADJUSTMENT |
|---|---|---|---|---|
| ** | SBT ADJUSTMENTS FOR 04/11/2009 | 8.94- | 896.73 | 887.79 |
| ** | SBT ADJUSTMENTS FOR 04/18/2009 | 148.26- | 1,399.22- | 1,547.48- |
| ** | SBT ADJUSTMENTS FOR 04/25/2009 | 142.07 | 563.48 | 705.55 |
| ** | SBT ADJUSTMENTS FOR 05/02/2009 | 28.87- | 277.15- | 306.02- |
| ** | SBT ADJUSTMENTS FOR 05/09/2009 | 106.25 | 449.29 | 555.54 |
| ** | SBT ADJUSTMENTS FOR 05/16/2009 | 7.73- | 941.65- | 949.38- |
| ** | SBT ADJUSTMENTS FOR 05/23/2009 | 50.13 | 770.57 | 820.70 |
| ** | SBT ADJUSTMENTS FOR 05/30/2009 | 177.01- | 1,947.90- | 2,124.91- |
| ** | SBT ADJUSTMENTS FOR 06/06/2009 | 39.60- | 827.86- | 867.46- |
| ** | SBT ADJUSTMENTS FOR 06/13/2009 | 245.45 | 1,343.31 | 1,588.76 |
| ** | TOTAL SBT ADJUSTMENTS FOR QUARTER | 133.49 | 1,370.40- | 1,236.91- |

As well as the total by individual outlet:

| CUSTOMER # and NAME | WEEKLY HHC INV TOTAL | WEEKLY HHC PA TOTALS | WEEKLY SCAN INV TOTAL | WEEKLY SCAN PA TOTALS | INV ADJ DIFFERENCE | PA ADJ DIFFERENCE | QTR TO DATE INV ADJ | QTR TO DATE PA ADJ |
|---|---|---|---|---|---|---|---|---|
| 12345 WALMART 3 | 1,605.94 | 202.66 | 2,288.36 | 328.32 | 682.42 | 125.66 | 468.53- | 142.70 |
| 22345 WALMART 4 | 2,444.69 | 318.95 | 3,014.30 | 470.01 | 569.61 | 151.06 | 988.73- | 23.49 |
| 32345 TARGET 1111 | 2.80 | 0.13 | 94.08 | 33.93 | 91.28 | 33.80 | 86.86 | 2.78 |
| TOTALS: | 4,053.43 | 521.74 | 5,396.74 | 832.26 | 1,343.31 | 310.52 | 1,370.40- | 168.97 |

It is important to review this information weekly.   Be sure that you have received scan payments for all outlets within your territory.  You should receive scan payments from each outlet daily.  Many Wal-Mart stores remit payment for scan twice a day.  On the scan portion of these reports, the date shown under the delivery date column "DLVRY DATE" is the register date for the scan payment.  These payments will be credited to your company in the week that the payment is received from the customer regardless of what actual week the register date falls into.  As long as all scan is received by the last day of the accounting quarter, there will be no adverse effect on your SBT true up results.

If you have obtained your franchise during the accounting quarter, only the results for the first full accounting month that you operated your Sara Lee Franchise will be settled against your franchise business.

All SBT true up reports and transactions will have a one week delay to ensure that all data has been received.

On the first week of each accounting quarter's settlement report, the total SBT True Up results for the previous quarter will be reflect on the Settlement Summary report as seen below:

```
RUN DATE.: 04/08/2009              DISTRIBUTION MANAGEMENT SYSTEM              PAGE:      9
RUN TIME : 09:20:51                                                           PGM.: B157331B
APPL DATE: 04/04/2009              IO WEEKLY SETTLEMENT SUMMARY - TYPE II      RPT : RCU
DISTRIBUTOR NUMBER:        WEEK ENDING: 04/04/2009          ROUTE:
            (A) CREDITS                                     (B) CHARGES


CUSTOMER INVOICES           $8,735.42     PURCHASES                 $9,137.89
PA REIMBURSEMENT               $14.72
PROMO PA"S                    $723.12     STALE CREDIT            $1,401.76-
PROMOTION BILLBACK            $138.30-    DROP SHIPMENT ADJ            $0.00

TOTAL CREDITS:              $9,334.96     TOTAL CHARGES:          $7,736.13


           WEEKLY SETTLEMENT (A - B)                       $1,598.83

                        SBT ADJUSTMENT - QUARTER
SBT SCAN SALES             $71,893.81     SBT HHC INVOICES         $72,506.54
SBT SCAN PA REIMBURSEMENT   $6,346.10     SBT HHC PA REIMBURSEMENT  $6,619.36

TOTAL                      $78,239.91     TOTAL                    $79,125.90

        QUARTERLY SBT ADJUSTMENT
        $885.99- TOTAL TO BE DEDUCTED IN 13 PAYMENTS OF $68.15-/WEEK


                     ACCOUNTS PAYABLE SECTION

        WEEKLY SETTLEMENT DUE DISTRIBUTOR (A - B - C)      $1,598.83


                          GL ACCT #  COST CENTER
        ALLSTATE INSURANCE PAYMENT    316103   42755003    $77.00
        ADVERTISING                   820044   42755003   $100.00-
        HHC PAYMENT                   820030   42755003    $30.00
        B & G VEHICLE LEASE           316105   42755003   $263.34
        B OF A LOAN PAYMENT           316200   42755003   $110.07
        DSA BOOKKEEPING               316102   42755003    $17.31
        SUPPLIES                      820035   42755003     $5.00
        QUARTERLY SBT ADJUSTMENT      135416   42755003    $68.15
        TOTAL ADJUSTMENTS                                            $470.87

        CHECK ISSUED FOR:                                          $1,127.96



        DISTRIBUTOR OWES SARA LEE:                              ==============
                                                                    $0.00
                                                                ==============
```

If the total SBT True Up is positive, the full amount will be paid on the settlement on that week.  In cases where there are two consecutive quarters of positive scan which means that for a period of 6 months, the chain has reported that it has sold more product than has been delivered to it during that period, the second quarter positive proceeds will be held and an audit of the invoicing will be done.

If the total SBT True Up is negative, the amount will be deducted in 13 weekly installments over the next accounting quarter.  If your company has elected to participate in the SBT Inventory Advance Program which will advance you the value of any additional inventory that you placed in the store but which has not yet sold through the register, the amount of the inventory advance will be calculated and paid to you in 12 weekly installments as shown below:

```
                    ACCOUNTS PAYABLE SECTION

WEEKLY SETTLEMENT DUE DISTRIBUTOR                             $2,327.17

                          GL ACCT #   COST CENTER

ALLSTATE INSURANCE PAYMENT   316103    42755003      $77.00
ADVERTISING                  820044    42755003     $100.00-
HHC PAYMENT                  820030    42755003      $30.00
B & G VEHICLE LEASE          316105    42755003     $263.34
B OF A LOAN PAYMENT          316200    42755003     $110.00
DSA BOOKKEEPING              316102    42755003      $17.31
SUPPLIES                     820035    42755003       $5.00
SBT INVENTORY ADVANCE        876007    42755003      $37.53-
QUARTERLY SBT ADJUSTMENT     135416    42755003      $68.15
TOTAL ADJUSTMENTS                                              $433.34

CHECK ISSUED FOR:                                            $1,893.83
                                                       ================
```

If you have received advances for SBT Inventory, those advances will be reversed when there are positive SBT True Up funds which reflect that the product has now sold through the register in the subsequent quarters.

It is critical that all invoicing be accurate to minimize any negative impact that may result in the difference between what your company has invoiced and what the customer has paid.  Be sure to:
- Create all delivery invoices at the time the delivery is made
- Accurately invoice each item and quantity delivered
- Issue a return tick for all stale, out of code or damaged product
- Take accurate on hands

Additional reports are available upon request which display the variances by store and by item number.

| Acct # 1019 | WALMART 3381 SC | | | | | | | | | | | | | | | | If number is negative more units were invoiced than scanned at account |

| | | 233928 | | | | 233906 | 233912 | | | | | 233910 | 233911 | | | | 233911 | QTR | QTR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Line # | Product | 03-14 | 03-21 | 03-28 | 04-04 | Total | 04-11 | 04-18 | 04-25 | 05-02 | 05-09 | Total | 05-16 | 05-23 | 05-32 | 05-05 | Total | Unit Var | $ Var |
| 42 | IRONKID SANDWICH | 11 | 8 | (19) | 17 | 17 | (2) | (11) | | 12 | (24) | (24) | (21) | 11 | 9 | | (1) | (6) | $(14) |
| 627 | G F STONEGROUND | 2 | (7) | 2 | 6 | 3 | | (2) | (1) | (1) | 6 | 1 | | | | | | 4 | $6 |
| 628 | G F POTATO | (1) | (2) | (1) | 6 | 4 | 2 | (6) | (1) | | 6 | 1 | | | | | | 6 | $10 |
| 6908 | SL WG NO FDOG S | | | 2 | (2) | | 2 | | | (1) | 6 | 2 | | | | | | 2 | $3 |
| 6904 | SL WG HAMBURGER BU | (4) | 6 | 4 | 3 | 1 | (3) | (2) | 1 | (3) | 3 | | (2) | 2 | | | | 1 | $1 |
| 6480 | BL WHEAT KB CL | (4) | 2 | (2) | (1) | (6) | 1 | | 1 | | | 4 | | | | | | (1) | $(2) |
| 6484 | HH WHEAT CL-HOT | (2) | (1) | 6 | | 3 | | (3) | 2 | (1) | 6 | | | | | | | 2 | $2 |
| 6488 | SL WHITE 68 4.5 HB | (6) | (1) | 2 | 3 | (1) | 1 | (3) | 2 | (3) | 2 | 1 | | | | | | | $2 |
| 6486 | SL 100% WW HB | (4) | (6) | 6 | | (1) | 1 | (3) | 2 | (3) | 2 | 6 | | | | | | | $(3) |

## SBT Inventory Adjustments Examples for 1st Quarter on Inventory Consideration
(Using Q4 as example of starting quarter)

Going forward, Franchisees will have the possibility of receiving an advance credit for SBT True Up balances that may occur due to an increase in inventory units that sell through the register or until the route is transferred.
In this way, display activity, additional space, seasonality and new stores that can have a negative impact on SBT True Up can be credited on a temporary basis.
For the first quarter only that a Franchisee is eligible for Inventory Advances, the program will take into consideration the current and previous quarter to determine the maximum potential inventory advance amount as shown in the examples below.

Note:  All SBT True Up balances are automatically deducted from the Settlement in 13 weekly installments.  The inventory advance requires manual set up and will occur the week following the SBT True Up and will be credited in 12 weekly installments.

### Scenario #1 - Two Positive Quarters of SBT True Up Regardless of Inventory Change
If the results of SBT True Up for Q4 were positive and the SBT True Up result of Q3 were positive, then the two quarter results will be combined and regardless of ANY change in inventory levels, no further advance will be issued.
Two consecutive positive quarterly SBT True Ups will flag the route for audit.

| Inventory Calculation Example Rt #123 | Total Amt | Weekly Charge / Credit |
|---|---|---|
| Positive SBT True Up for Q3 (Jan, Feb, Mar) | $681.81 | |
| Q4 SBT True Up Results | $1,688.63 | |
| Net Negative Potential Inventory Adj | $2,370.44 | |
| Net Inventory Change End of Q3 vs. End Q4 | $3,630.26 | |
| Net SBT True considering inventory advance | $0.00 | $0.00 |

### Scenario #2 - Two Negative Quarters With An Increase of Inventory
If the results of SBT True Up for Q3 was negative and the SBT True Up result of Q4 were negative, then the two quarter results will be combined and any increase of inventory level will be advanced to the IO provided that the inventory increase amount does not exceed the total negative SBT results of Q3 and Q4. If the inventory change exceeds the SBT results then only the SBT total will be advanced.  If the inventory change is less than the SBT results, the inventory change amount will be advanced
The advance for inventory will be paid in 12 equal payments over the quarter.

| Inventory Calculation Example Rt #234 | Total Amt | Weekly Charge / Credit |
|---|---|---|
| Negative SBT True Up for Q3 (Jan, Feb, Mar) | -$737.20 | |
| Q4 SBT True Up Results | -$3,877.14 | -$298.24 |
| Net Negative Potential Inventory Adj | -$4,614.34 | |
| Net Inventory Change End of Q3 vs. End Q4 | $1,539.09 | |
| Net SBT True considering inventory advance | $1,539.09 | $128.26 |

Confidential

## SBT Inventory Adjustments Examples for 1st Quarter on Inventory Consideration
(Using Q4 as example of starting quarter)

### Scenario #3 - Q3 Results Positive Q4 Results Negative With Inventory Level Increase
If the results of SBT True Up for Q3 were positive and the SBT True Up result of Q4 were negative, then only the Q4 negative results will be taken and any increase of inventory level will be advanced to the IO provided that the inventory increase amount does not exceed the total negative SBT results of Q4. If the inventory change exceeds the SBT results then only the SBT total will be advanced. If the inventory change is less than the SBT results, the inventory change amount will be advanced. The advance for inventory will be paid in 12 equal payments over the quarter.

| Inventory Calculation Example Rt #345 | Total Amt | Weekly Charge / Credit |
|---|---|---|
| Positive SBT True Up for Q3 (Jan, Feb, Mar) | $1,904.24 | |
| Q4 SBT True Up Results | -$3,109.86 | -$239.22 |
| Net Negative Potential Inventory Adj | -$3,109.86 | |
| Net Inventory Change End of Q3 vs. End Q4 | $874.99 | |
| Net SBT True considering inventory advance | $874.99 | $72.92 |

### Scenario #4 - Q3 Results Negative Q4 Results Positive With Inventory Level Increases
If the results of SBT True Up for Q3 were negative and the SBT True Up result of Q4 were positive, then the two quarter results will be combined and any increase of inventory level will be advanced to the IO provided that the inventory increase amount does not exceed the cumulative negative SBT results of Q3 and Q4. If the inventory change exceeds the SBT results then only the SBT total will be advanced. If the inventory change is less than the SBT results, the inventory change amount will be advanced. The advance for inventory will be paid in 12 equal payments over the quarter.

| Inventory Calculation Example Rt #456 | Total Amt | Weekly Charge / Credit |
|---|---|---|
| Negative SBT True Up for Q3 (Jan, Feb, Mar) | -$2,769.94 | |
| Q4 SBT True Up Results | $835.01 | |
| Net Negative Potential Inventory Adj | -$1,934.93 | $0.00 |
| Net Inventory Change End of Q3 vs. End Q4 | $7,209.65 | |
| Net SBT True considering inventory advance | $1,934.93 | $161.24 |

## SBT Inventory Adjustments Examples for 1st Quarter on Inventory Consideration
(Using Q4 as example of starting quarter)

### Scenario #5 - If the Cumulative Q3 & Q4 Results are Negative With NO Inventory Level Increases
If the results of SBT True Up for Q3 and the SBT True Up result of Q4 are negative in any
combination but the inventory difference shows a decrease (NOT an INCREASE) in inventory
levels, then NO advance will be given as the inventory has not increased and does not
play a factor in the SBT True Up numbers.

| Inventory Calculation Example Rt #567 | Total Amt | Weekly<br>Charge / Credit |
|---|---|---|
| Negative SBT True Up for Q3 (Jan, Feb, Mar) | -$2,311.04 | |
| Q4 SBT True Up Results | $1,975.74 | |
| Net Negative Potential Inventory Adj | -$335.30 | |
| Net Inventory Change End of Q3 vs. End Q4 | -$475.40 | |
| Net SBT True considering inventory advance | $0.00 | $0.00 |

## SBT Inventory Adjustments Examples for Subsequent Qtrs on Inventory Consideration
(Using Q4 as example of starting quarter)

The inventory advance program for SBT will continue to look at inventory levels and SBT True Up results on a quarterly basis in subsequent quarters until that inventory sells through the register or until the route is transferred. For each subsequent quarter, the change in the quarterly end inventory level will be compared to the closing inventory level of the previous quarter and the SBT Inventory Advance will either be increased or deducted based upon the actual change in inventory.

Note: All SBT True Up balances are automatically deducted from the Settlement in 13 weekly installments. The inventory advance requires manual set up and will occur the week following the SBT True Up and will be credited in 12 weekly installments.

### Scenario #1 - Two Positive Quarters of SBT True Up Regardless of Inventory Change
When the results of ANY two consecutive quarter SBT True Up results in positive scan, no credits will be issued for inventory and the positive SBT True Up Balance will be held pending the results of an accounting route audit. The route audit will be completed within 21 days and will compare invoices, scan data, load adjustments, and fresh/stale product reconciliation records. The results of the audit will be provided in writing. See the Distribution Agreement for actions resulting from a breach of the Agreement for Fraud.

### Scenario #2 A & B - Current Quarter With Increase in Inventory with No Prior Inventory Advance

**Example 2A - True Up is larger than Inventory Increase**
If the results of SBT True Up for the new quarter were negative and there is no outstanding SBT Inventory Advance, then the amount of the increased inventory over the previous quarter will be advanced in full if the value of the inventory increase is less than the SBT True Up balance.

| Inventory Calculation Example Rt #230 | Total Amt | Weekly Charge / Credit |
|---|---|---|
| Subsequent Quarterly SBT True Up Results | -$2,215.12 | -$170.39 |
| Net Negative Potential Inventory Adj | -$2,215.12 | |
| Net Inventory Change End of over Previous Quarter | $1,539.09 | |
| Net SBT True considering inventory advance | $1,539.09 | $128.26 |

**Example 2B - True Up is less than Inventory Increase**
If the results of SBT True Up for the new quarter were negative and there is no outstanding SBT Inventory Advance, but the amount of the SBT True Up is less than the amount of the increase in inventory, then only the amount of the SBT True Up will be advanced.

| Inventory Calculation Example Rt #231 | Total Amt | Weekly Charge / Credit |
|---|---|---|
| Subsequent Quarterly SBT True Up Results | -$1,315.11 | -$101.16 |
| Net Negative Potential Inventory Adj | -$1,315.11 | |
| Net Inventory Change End of over Previous Quarter | $1,539.09 | |
| Net SBT True considering inventory advance | $1,315.11 | $109.59 |

Confidential

### SBT Inventory Adjustments Examples for Subsequent Qtrs on Inventory Consideration
(Using Q4 as example of starting quarter)

#### Scenario #3 A & B - Current Inventory Levels Increase with a Previous Inventory Advance

**Example 3A - True Up is Greater Than Inventory Increase**
If the results of SBT True Up for the new quarter were negative and an outstanding SBT Inventory Advance already exists, then the amount of the increased inventory over the previous quarter will be added to the existing SBT Inventory Advance in full if the value of the inventory increase is less than the SBT True Up balance.

**Previous Quarter SBT Advance = $324.44**

| Inventory Calculation Example Rt #340 | Total Amt | Weekly Charge / Credit |
|---|---|---|
| Subsequent Quarterly SBT True Up Results | -$3,109.86 | -$239.22 |
| Net Negative Potential Inventory Adj | -$3,109.86 | |
| Net Inventory Change End of over Previous Quarter | $874.99 | |
| Net SBT True considering inventory advance | $874.99 | $72.92 |

**Ending SBT Advance +$324.44+$874.99=$1199.34**

**Example 3B - True Up is Less Than Inventory Increase**
If the results of SBT True Up for the new quarter were negative and an outstanding SBT Inventory Advance already exists, but the inventory increase exceeds the SBT Quarterly Results, then only the SBT True Up balance will be added to the existing SBT Inventory Advance.

**Previous Quarter SBT Advance = $521.84**

| Inventory Calculation Example Rt #341 | Total Amt | Weekly Charge / Credit |
|---|---|---|
| Subsequent Quarterly SBT True Up Results | -$426.98 | -$32.84 |
| Net Negative Potential Inventory Adj | -$426.98 | |
| Net Inventory Change End of over Previous Quarter | $874.99 | |
| Net SBT True considering inventory advance | $426.98 | $35.58 |

**Ending SBT Advance +$521.84+$426.98=$948.82**

Confidential

### SBT Inventory Adjustments Examples for Subsequent Qtrs on Inventory Consideration
(Using Q4 as example of starting quarter)

#### Scenario #4 A & B - Current Quarter Results Are Positive With Previous SBT Inventory Advance

**Example 4A - True Up in Less Than Existing Outstanding SBT Inventory Advance**
If the results of current quarter SBT True Up are positive and an existing  SBT Inventory advance is outstanding, then the amount of the positive SBT True Up will be credited against the outstanding SBT Inventory Advance up to the full amount of the advance.

Previous Quarter SBT Advance = $521.84

| Inventory Calculation Example Rt #450 | Total Amt | Weekly Charge / Credit |
|---|---|---|
| Subsequent Quarterly  SBT True Up Results | $358.34 | |
| SBT True Up Settlement Payout | $358.34 | $358.34 |
| Net Inventory Change End of over Previous Quarter | | |
| Repayment of SBT Inventory Advance | -$358.34 | -$358.34 |

**Remaining Outstanding SBT Advance +$521.84-$358.34=$163.50**

#### Example 4B - True Up in Less Than Existing Outstanding SBT Inventory Advance
If the results of current quarter SBT True Up are positive and an existing  SBT Inventory advance is outstanding, then the amount of the positive SBT True Up will be credited against the outstanding SBT Inventory Advance up to the full amount of the advance.

Previous Quarter SBT Advance = $2215.15

| Inventory Calculation Example Rt #451 | Total Amt | Weekly Charge / Credit |
|---|---|---|
| Subsequent Quarterly  SBT True Up Results | $2,692.01 | |
| SBT True Up Settlement Payout | $2,692.01 | $2,692.01 |
| Net Inventory Change End of over Previous Quarter | | |
| Repayment of SBT Inventory Advance | -$2,215.15 | -$2,215.15 |
| Net Payment to Franchisee   +$2692.01-$2215.15=$476.86 | | |

**Remaining Outstanding SBT Advance +$2215.15-$2215.15=$00.00**

## Damage and Off Code Procedure

**EFFECTIVE: January 1, 2011**

### Scope

All Franchisees and/or their representatives contracted to distribute baked food goods by Sara Lee. This policy is limited only to Franchise Agreements / Distribution Agreement that reference a damage and Off Code policy.

### Purpose

To define the parameters for which Sara Lee will provide credit, at Franchisee cost, to Franchisee for Damaged or Off Coded product

### Policy

- Sara Lee will provide credit to Franchisee in accordance with Franchise Agreement.

- Sara Lee does not provide credit for fresh or undamaged product.

- Out of Code product, which has been picked up from an outlet and invoiced on a credit ticket and which has not been resold to a thrift outlet, must be invoiced by item number on the stale sheet, on the day the credit has been issued to the outlet in order for the repurchase credit to be received from Sara Lee.  The actual product and the stale sheet invoice must be delivered to the Sara Lee designated location.  Product which has not been previously placed in an outlet for sale or has not reached its pull by date is not eligible for credit through the stale repurchase program.

- Out of Code product that qualifies for resale to an independent thrift outlet is not eligible for credit through the stale sheet invoicing.

- Only Off Code or Damaged Product which is being returned to Sara Lee or Designated Bakery Thrift Outlet may be invoiced to Sara Lee on the Stale Sheet

- Sara Lee does not provide credit for return product which is not returned to the designated location.

- Sara Lee will reverse the credit given for damaged or Off Code product that is a result of the Franchisee's negligence. Stale that consistently exceeds established stale targets will be considered to be a result of Franchisee negligence. The intent of this is to protect and enhance the Marks and to assure the Consumer purchases the freshest Products. Having too much stale is a result of not using your Best Efforts in maintaining a Fresh and Adequate supply of products utilizing the Hand Held Computer System.

## Damage and Off Code Procedure

**EFFECTIVE:  January 1, 2011**

**Procedure**

- Quarterly stale targets will be calculated and established based upon mutually agreed upon carry over numbers for each customer and product for each sales area.  In the event that an Franchisee and/or their representative(s) total stales for the 13 week period  exceed the reasonably expected rate of Off Code product (stale target) for the quarter, Sara Lee may choose to limit the amount of credit provided to Franchisee.

  - Performance to be measured on a 13 week (Quarterly) basis
  - Step 1 – The first 13 week Quarter that the actual stale results exceed the established stale target, the Franchisee will be found to be negligent.  A notice of negligence will be issued to the Franchisee with no charge back of the stale happening for the quarter.
  - Step 2 – For the first accounting period after the issuance of the notification of stale negligence, if the stale target is still not met, the full cost of stale at the Franchisee cost of goods which exceeded the target will be reversed.
  - Step 3 – If the stale continues to exceed the stale target in following accounting periods, the excess amount of stale, will be deducted at Franchisee cost of goods on an ongoing basis each period.
  - At anytime, an Franchisee reaches their stale target for an entire period, the monthly charge for negligent stale will stop for the remainder of the current quarter

- Sara Lee shall require all off code product to be picked up by the purchased by date (this is based on the Fresh Shelf Life which can be found under Section 15) or the color code on the package. In most cases this will allow **for 7 day's in market time** and provide selling time for Bakery stores, depot or Extreme Value retailer to sell by the sell by date.

- Example of an Item with Fresh Shelf Life of 7:

| Sell day -Tag color | Pick up day |
|---|---|
| Monday Red | Monday |
| Tuesday White | Tuesday |
| Thursday Blue | Thursday |
| Friday  Orange | Friday |
| Saturday Yellow | Saturday |

Confidential

## Damage and Off Code Procedure

**EFFECTIVE: January 1, 2011**

- Sara Lee shall assign a Location for each Franchisee to return damaged and Off Code products, taking into consideration Franchisee's territory and location of such Outlet, Depot or Extreme Value retailer. Franchisee's territory could include Extreme Value retailers that buy DSD; therefore, only off code product should be sold to such a customer. If a Franchisee is assigned a Bakery Store or Depot, the Franchisee and/or representatives will sort all Off Code or Damaged products by line number in order to allow the Outlet representative or designated company employee to easily verify the Stale Sheet.

- If a route is assigned to a Bakery Outlet or Manned Depot, the Stale Sheet must be stamped and have proper signatures (Bakery Outlet Manager, Bakery Outlet Employee or Designated Warehouse Person in the event that the route is assigned to a manned-depot) in order for the route to receive credit.

- In the event that a Franchisee's route is assigned to return products to an unmanned depot, the Franchisee will sort product by line number, verify the returns, and leave returns in the designated location with a copy of the signed Stale Sheet. Should Franchisee not follow these instructions, Sara Lee may choose not to give credit for product and notify Franchisee accordingly.

- During the return process, Franchisees and/or their representative have the right to observe and dispute Sara Lee's calculation of credit amount. To dispute Sara Lee's calculation of credit for product returned, the Franchisee must:

1. Return products to their designated Outlet or warehouse location; and
2. Personally observe Sara Lee's check-in process

If a Franchisee chooses to dispute Sara Lee's calculation of credit amount, the Franchisee must:

1. Submit the dispute in writing to the Sara Lee employee doing the check-in; and
2. Not leave the facility premises prior to submitting the written dispute

Exceptions to this policy require special circumstances, and are made on a case by case basis with prior written approval by a Sara Lee Manager.

## Corporation in Good Standing

**EFFECTIVE: January 1, 2011**

### Scope

All Franchisees and/or their representatives contracted to distribute baked food goods with Sara Lee.

### Purpose

- To meet the Distribution Agreement and associated loan and lease agreements requirement to have and maintain your Corporation status in Good Standing.

### Policy

- To avoid default under the Agreements, the Franchisee's Corporation must remain a valid Corporation, in Good Standings in the State that the corporation was formed.

- Once a year and/or upon request, proof of Corporation in Good Standing must be submitted to Sara Lee or appropriate lending or leasing entity.

### Procedures

- Proof of Corporation in Good Standings from the appropriate state agency, along with the form must be sent or faxed to:

  Sara Lee - Franchise Support Services
  5200 S. Alameda Street
  Vernon, CA 90058

  Fax:  323-277-8324

## CONFIRMATION OF CORPORATION
## STATUS


### Distribution/Franchise Agreement Requirement

### (*This document must be submitted along with proof showing corporation is in Good Standing.*)


In connection with my Distribution/Franchise Agreement and associated lending agreements, I certify that the corporation named below is current and in good standing with the State Of _____.


Corporation Name: _____


Franchisee Signature:_____


Date: \_\_\_\_\_ / _____ / _____

Confidential

10/25/2010

## Communication Device

**EFFECTIVE: January 1, 2011**

### *Scope*

All Franchisees and/or their representatives contracted to distribute baked food goods with Sara Lee.

### *Purpose*

Establish a way for Outlets and Sara Lee to contact the Franchisee.

### *Policy*

- The Franchisee will need to maintain and provide a cell phone or beeper and provide this number to Sara Lee and Outlets within their Sales Area.
- The Franchisee should use the following Data Change Request Form to advise Vernon of any changes in their Contact Information.

**SARA LEE
INDEPENDENT OPERATOR
DATA CHANGE REQUEST FORM**



CORPORATE NAME: _____

ZONE: _____

ROUTE NUMBER: _____

*(PLEASE PRINT CLEARLY - CHANGES ONLY)*

STREET ADDRESS: _____

APT. OR SUITE NO.: _____

CITY: _____

STATE: _____

ZIP: _____

PHONE NUMBER:  ( _____ ) _____

E-MAIL ADDRESS: _____

_____
CORPORATE PRESIDENT SIGNATURE
*(Required)*

**Cost to Service Franchisee's Customers**

---

**EFFECTIVE: January 1, 2011**

### Scope

All Franchisees and/or their representatives contracted to distribute baked food goods with Sara Lee.

### Purpose

Establish guidelines for cost to service by Sara Lee to Franchisee's Outlets and or service their Territory as is specified in the Franchise Agreement or Distribution Agreement

### Policy

- The customer must be taken care of in a timely manner

- If the Franchisee and/or their representative cannot properly take care of their Outlets, SARA LEE can take care of the Outlets with all proceeds going to the Franchisee. The cost of this will be the responsibility of the Franchisee.

### Procedures

- Special Delivery "Hot Shot" for extra Product or Merchandising needs shall be charged out on a flat rate and mileage basis.

- If the Franchisees' Territory has to be serviced by SARA LEE the charge shall be based on a per diem and associated cost.

## "Hot Shot" Delivery
## $100.00 plus mileage expense (mileage rate is the current IRS Rate)

## Servicing Your Territory
## Rate per Diem
## $325.00 per day plus truck, fuel and any travel expense

**Customer Service Guidelines**

---

**EFFECTIVE: January 1, 2011**

## Scope

All Franchisees and/or their representatives contracted to distribute baked food goods by Sara Lee.

## Purpose

To define the service parameters for which all Franchisee's are made aware of any guidelines as published by the customer ("Outlets")



January 14, 2009

Fry's Food Stores
500 S. 99th Avenue
Tolleson, AZ 85353

Fry's Store Managers:

I wanted to address the Fry's service requirements of all Sara Lee Independent Operators in the state of Arizona.

Sara Lee's objective is to provide Gold Standard Customer service for all Fry's stores in Arizona on a daily basis.  Their commitment is to exceed the minimum service requirements everyday!  I will outline Sara Lee's fresh bread service requirements per our contractual agreement with Fry's:

**1. All Independent Operators must deliver fresh bread to all Fry's stores 5 days a week**

- Sara Lee is required to service Fry's stores by 8 a.m., if route has multiple Fry's stores they need to complete service by 9 a.m.

- All Independent Operators must sign in and sign out on the vendor log daily

**2. All Independent Operators must do afternoon pull-ups between 1 p.m. – 3 p.m.**

- All Independent Operators must sign in and sign out on the vendor log daily

**3. Down Day Service requirements:**

- First service must be completed before 8 a.m. for all Fry's stores

a) All Independent Operator personnel must sign-in and out on vendor log daily

- Afternoon pull-ups must be done between 1 p.m. – 3 p.m.

a) All Independent Operator personnel must sign-in and out on vendor log daily

Sara Lee is committed to not only meeting your service expectations but exceeding them on a daily basis.  Enclosed is a Sara Lee District Manager contact list for you to refer to in the event you have any service related questions.  Finally, Sara Lee's goal is to be your number one DSD vendor in every store and they will pursue that goal with a conviction and determination that we would expect from a vendor partner.

Sincerely,

Justin Ogburn
Director of Grocery Fry's Food & Drug

I/O Signature:_____  Date:_____  ZVP Signature:_____  Date:_____



# Commercial Bakery DSD Service Standards for Kroger Stores

## Varieties

- All varieties that are allocated in Coordinated Commercial Bakery Plan-0-Gram must be merchandised and in stock in every Kroger store DAILY.
- Only authorized items are to be placed in the supplier's allocated space.

## Stocking Conditions

- "Targeted Carry–Over" of all SKU's in the Plan-0-gram must be on hand 7 days a week.
- "Targeted Carry–Over" varies by store. It is the "normal" minimum of a single day's average movement sold for that store to be available on the shelf or in the backroom.
- This is to ensure that there are no "Out of Stocks" under normal conditions.

## Merchandising

- Manufacturers must maintain the assigned facings and allocations in accordance the Corporate Plan-0-Gram.
- Shelf Tags must be maintained and placed in the correct location for each SKU.
- DA-GLO price stickers as well as merchandising shelf strips must be approved by Kroger Coordinated Category Management.

## Mainstream Bread Service

- Stores will receive deliveries on Monday, Tuesday, Thursday, Friday and Saturday.
- Pull Up service will be provided a minimum of one time per day, seven days a week between the hours of 1:00pm and 4:00pm. Higher volume stores are to receive an additional Pull up between the hours of 10:00am and noon.
- Each store will be provided a contact name and phone number that can be contacted 24 hours per day, seven days per week for service issues.

## Premium Bread Service

- Stores will receive no less than **two** deliveries per week out of Monday, Tuesday, Thursday, Friday or Saturday. Saturday is a mandatory delivery day.
- Each store will be provided a contact name and phone number that can be contacted 24 hours per day, seven days per week. It is recommended that each company supply stores with sticker that can be place at the backdoor and Management office with the contact and phone number.

## Baked Sweet Goods Service

- Stores will receive no less than **three** deliveries per week out of Monday, Tuesday, Thursday, Friday or Saturday. A Friday or Saturday delivery is mandatory. If a Saturday delivery is not provided, then a Friday evening pull up is mandatory.
- Each store must be provided a contact name and phone number of an individual that can be contacted 24 hours per day, seven days per week.  It is recommended that each company supply stores with the contact information on a sticker that can be placed at the backdoor and Management office.

## "Unacceptable Service"

- Unacceptable service is defined as anything less than the standards listed above which will result in progressive discipline up to and including the temporary withdrawal of the Supplier's goods.

Confidential



**Coordinated Grocery Merchandising**
**Commercial Bakery Categories**
*Steve Stocker - Tel: 513-762-4757-steve.stocker@kroger.com*
*Tom Luken - Tel: 513-762-7095-tom.luken@kroger.com*
*FAX: 513-762-1177*

April 29, 2005

To: All DSD Commercial Bakery Suppliers
RE: Service Policy

One of the goals of our Customer First strategy is to make sure that we have the products that our customers want. We disappoint them much too often by being out of stock on any item they are looking for. We are very serious about solving this issue and we need your help to do so. The benefits are tremendous for all of us! With this in mind, we are forced to issue a Service Policy for all companies servicing our stores with commercial bakery products.

Effective 1st Week of Period 5, 2005 Kroger Coordinated Category Management for Commercial Bakery will implement the following penalties to companies that continue to provide unacceptable service to Kroger Co. Foods Stores on an on-going basis.

- All planned ads will be pulled for one (1) Kroger Sales Period for the entire Division involved.
- All Rollers will be cancelled and the items will be at regular retail with the promotional cost that was submitted on the contract.

After the initial penalty is assessed and service levels continue to be at an unacceptable level after one (1) Kroger Sales Period, the following action step concerning space allocation will be implemented:

- Allocated space will be reduced up to 25% and reallocated by the Coordinated Category Management Team. The space reduction will remain into effect until the next major Commercial Bakery Reset.

If service levels continue to be at an unacceptable level after two (2) Kroger Sales Periods, the following action steps concerning the ability for the supplier to place their Goods in designated Kroger Co. Food Stores:

- The temporary withdrawal of all Skus' of a Supplier's goods will be placed into effect for a minimum of one (1) Kroger Sales Period, and will remain in effect until there is a satisfactory service level solution that meets the Kroger Co.'s Customer First initiative.



Albertsons

## ALBERTSONS RECEIVING PROCEDURES

- All vendors will be received through the designated Receiving Door or Loading Dock during posted Receiving Hours only.

- Vendor Check in will be on a First-come First Serve basis (Dean Foods & IBC Albertsons Bread are priority trucks and will be unloaded before other vendors already in queue).

- Vendors must have all product staged and ready to scan before check in begins.

- Charges and Credits MUST be on separate invoices.

- Credits will be scanned out first, then the items placed outside the Receiving Area before the Charge invoice is scanned in.

- Receiver will scan each unique item's UPC and enter the quantity physically seen. Grouping of "same Cost" items is not allowed.

- Receiver will scan the UPC on the item itself, no Stickers or Scan Sheets will be allowed.

- Items must be scanned in the order they appear on the invoice UNLESS the invoice is in UPC Order.

- All non-factory sealed cases will be opened by the receiver to verify that the product enclosed and the item count are correct.

- Any Shortages will be taken by the Receiver at time of check-in.  Vendors CANNOT go back to the truck and bring in the missing product.

- If shorted product is needed by the store, vendor must create an invoice for just the shorted product which will be scanned in by the Receiver.

- The Receiver will ALWAYS use the ORIGINAL Cost & Quantities on the invoice, even if there are Shortages or Rejected items. The Shorts or Rejects will appear at the bottom of the Receiving Document generated after Check in.

- Both the Receiver and the Vendor must sign the Receiving Document before the vendor takes the product to the sales floor. The Receiver keeps the original and gives the copy to the vendor.

- Receiving Does are Proof of Delivery -- RECEIVERS WILL NOT SIGN VENDOR INVOICES.

- Vendor cannot throw credited product into Albertsons Trash containers.  The Receiver can dispose of any unwanted product.

- A Secondary "Audit" of the order may be performed by a department manager after the Receiver has processed the order.  This is a quality control procedure performed randomly on our vendors to assure the procedures above are being followed..



## SAFEWAY
Ingredients for life.

# Safeway (All Banners) Merchandising
## Bakery Categories

February 24, 2007

To: All DSD Commercial Bakery Suppliers
RE: Service / Out of Stock Policy

One of the goals of our Customer strategy is to ensure we have the products that our customers demand, when they demand them. We are very serious about solving the out of stock issue and we need your help to do so. The benefits are tremendous for all of us! With this in mind, we are communicating a service policy to all companies servicing our stores with commercial bakery products.

Effective March 1ˢᵗ, 2007 Safeway will implement the following service requirements to all DSD companies that provide fresh bakery products on an on-going basis.

### Authorized Items:

- All varieties that are allocated in Bakery SCOP must be merchandised and in stock in every Safeway store DAILY.
- Only authorized items are to be placed in the supplier's allocated space. Non-authorized items will be removed from the shelves, and will not be paid for when submitting invoice payments.

### Stocking Conditions:

- Our goal is to have all authorized products on hand when the consumers demand them.
- "Targeted Carry-Over" of all SKU's in the schematic must be on hand 7 days a week.
- "Targeted Carry-Over" varies by store. It is the "normal" minimum of a single day's average movement sold for that store to be available on the shelf or in the backroom (to ensure that there are no "Out of Stocks" under normal conditions).

Confidential

- Manufacturers must maintain the assigned facings and allocations in accordance with the Corporate schematics.
- Shelf Tags must be maintained and placed in the correct location for each SKU.

### *Merchandising:*

- Displays are to consist of authorized MED's and Secondaries only, and should be in support of active promotional product.
- In most instances, displays are to be on Safeway supplied tables, or manufacturer supplied wooden racks. Corrugate is authorized on an "exception" basis only.

### *DSD Bread Service*

- Stores will receive deliveries on Monday, Tuesday, Thursday, Friday and Saturday.
- Pull Up service will be provided a minimum of one time per day, five days a week (delivery days) between the hours of 1:00pm and 4:00pm.
- Safeway is committed to providing pull ups on down days (non-delivery days). Adequate product must be left in an organized manner and be placed in proper backroom location.
- Each store will be provided a contact name and phone number that can be contacted 24 hours per day, seven days per week for service issues.
- Each manufacturer is to supply a detailed, store level service schedule, with contact information, service days, and times.

### *Baked Sweet Goods Service*

- Stores will receive no less than three deliveries per week. A Friday or Saturday delivery is mandatory. If a Saturday delivery is not provided, then a Friday evening pull up is mandatory.
- Each store must be provided a contact name and phone number of an individual that can be contacted 24 hours per day, seven days per week. It is recommended that each company supply stores with the contact information on a sticker that can be placed at the backdoor and Management office.

### "Unacceptable Service"

* Unacceptable service is defined as anything less than the standards listed above which will result in progressive discipline up to and including the temporary withdrawal of the Supplier's goods.

Your adherence to the policies, as set forth, is both appreciated and required. The end goal is to offer our consumers a competitive variety and satisfactory shopping experience, as determined by Safeway's Corporate Consumer Demand department.

Confidential

*Costco's service requirements for your policy manual updates*

-----Original Message-----
From: Russell, Chris
Sent: 2007-09-25 11:32
To: St. Pierre, Willi; Smith, Dan
Subject: Fw: BBS Service Requirements

----------------------------------------------------------------------------------

*This transmission is intended only for use by the intended recipient(s). If you are not an intended recipient you should not read, disclose, copy, circulate or in any other way use the information contained in this transmission. The information contained in this transmission may be confidential and/or privileged. If you have received this transmission in error, please notify the sender immediately and delete this transmission including any attachments.*

----- Original Message -----
From: Mark Stacy <mstacy@costco.com>
To: W035MER <W035MER@costco.com>; W035MGR <W035MGR@costco.com>; W035MGR2Merch <w035mgr2@costco.com>; W035MGR3Admin <W035MGR3@costco.com>; W035MGR4Ancillary <W035MGR4@costco.com>; W121MER <W121MER@costco.com>; W121MGR <W121MGR@costco.com>; W121MGR2Merch <W121MGR2@costco.com <W827MER3@costco.com>; W827MGR <W827MGR@costco.com>; W827MGR2 <W827MGR2@costco.com>; W827MGR3 <W827MGR3@costco.com>; W827MGR4 <W827MGR4@costco.com>
Cc: Aimee Floyd <afloyd@costco.com>; Ron Vachris <rvachris@costco.com>; Bryan Blank <BBlank@costco.com>; Bob Hicok - Home (E-mail) <hicokr@aol.com>; SD Region All Whs Rcv <SD-RegionRcv@costco.com>; David Darrock <ddarrock@costco.com>; Debbie Calhoun <dcalhoun@costco.com>
Sent: Tue Sep 25 14:10:50 2007
Subject: BBS Service Requirements

I want to remind you of what we require from our DSD vendors and distributors.

1) All product on the sales floor must be in saleable condition (readable code dates, no out-of-code issues, no frosting on clamshells, torn bags, etc...)

2) On delivery days, all product must me delivered and stocked by 9:00am.

3) On non-delivery days, morning pull-ups must be completed by a representative of your company by 9:00am.

4) Afternoon pull-ups are required every day our buildings are open.  These must be completed by a representative of your company between 3pm and 5pm each day.

5) On all holidays that Costco is open, morning and afternoon pull-ups are required (see hours in Points #3 & #4) by a representative of your company.

Please feel free to contact me with any questions.

Mark Stacy
Costco Wholesale
Ph  858-812-1350
Fax 858-812-1308

Confidential

Case 4:16-cv-00654-JAS   Document 23-1   Filed 04/05/17   Page 105 of 215

**All Material Wal-Mart Confidential. © 2008**

Printed By: Carl Willet - oroville          Page Source: WIRE          Date Printed: Friday, July 11, 2008

Department Page Index

# DEPARTMENT 81 DSD BREAD AND CAKE SUPPLIER EXPECTATIONS

1.  Know and follow store receiving hours - these may vary by store. But it is imperative they be strictly adhered to. Plan your delivery schedule to match the needs of the store, however, in and out by 9:00 A.M.

2.  Manage your section as if it were your own store - product must be ready for sale (full and faced) by 9:00a.m., and the section must remain in top sales condition throughout all hours of sales. Make sure you are in and out of the aisles by 9:00 A.M. Also, make sure items are priced clearly and promotionally at all times.

3.  Anticipate and execute during times of extreme demand - this includes weekends all of our stores require merchandiser service or Wednesdays, Saturday, Sunday, holidays, and extreme weather conditions. Dropping the ball on service during one of these times is not acceptable and reflects very poorly on your company's service standards.

4.  Keep your damaged shop worn and out of date merchandise picked up and out of the store - with the sales volume that our stores generate. Do not use our stores as a dumping ground for distressed merchandise

5.  Keep your off shelf display stocked up and ready for sale at all times - off shelf displays are valuable floor space and are a privilege. These displays need to be managed as if they are an extension of your shelf. No unauthorized items will be allowed to be checked in, commonly known as "70 Typed". We need to make sure you feel an item is one you want, all the supplier needs to do is submit the item sheet and the item will be evaluated by the Buyer. We need to be able to track and account for all items and sales.

6.  Side Counter Sanitation   this means keeping shelves spotlessly clean and uncluttered.

7.  Backstock - work with your supplier and determine what is appropriate for your volume that will give you ample inventory to cover your daily sales. Make sure to plan for those down days when the bakeries are not in production.

8.  Pricing discrepancies and shelf label requirements - notify store personnel and your supervisor if retail discrepancies occur, i.e., different items in a line having different retails, etc. Make sure pricing is clearly and promotionally executed (shelf tag, SEM tags, Rollback signs, etc.). If shelf tags are missing it is the supplier's responsibility to find a store associate to have the shelf tags scanned and printed Supplier is not allowed to move shelf labels or change modular in any way- If you feel the modular is incorrect the supplier needs to bring it to the attention of the store or department management to resolve.

9.  Day glow stickers, coupons or supplier shelf labels are not allowed. If an item is to be priced it must be done with a Wal-Mart approved label

10. DSD Suppliers dress should be appropriate and follow their company's guidelines. No cut off shorts or t-shirts are allowed. No open toed shoes are allowed.

11. Keep the energy level Up! Up! Up! Up! - Adherence to these 11 expectations will have great impact on store cooperation and your ultimate success - we appreciate you and your help.



Sam's Club
2101 SE Simple Savings Drive
Bentonville, AR 72716-0745

## Expectations for Category 48

### Daily Service Schedule:

|  | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | Sunday |
|---|---|---|---|---|---|---|---|
| Delivery by | 7:00 AM | 7:00 AM | None | 7:00 AM | 7:00 AM | 7:00 AM | None |
| 1st Pull Up by | 2:00 PM | 2:00 PM | 7:00 AM | 2:00 PM | 12:00 PM | 12:00 PM | 9:00 AM |
| 2nd Pull Up by | None | None | 2:00 PM | None | 4:00 PM | 4:00 PM | 1:00 PM |

### Seasonal Requirements for 2010:
- A minimum of one additional pull-up service will be required for the following holidays.
    1. Memorial Day: May 27th- 30th
    2. 4th of July: June 30th- July 3rd
    3. Labor Day: September 2nd- 5th

### DSD Drivers' Responsibilities:
- Adherence to the Daily Service Schedule above.
- Accurate forecasting of product to ensure instock at all times.
- Ensuring that their items are merchandised exactly as they are drawn on the DSD Rack and Table Layouts.
- Ensuring that only Home Office approved displays are on the sales floor.
- Ensuring that any feature pallet that is placed outside of the Bakery Area is included on the Club's Transitional Planner (Club Associates can provide this information).
- Ensuring that 9-High Racks are not merchandised on the sales floor.

### Tracking of non-compliance:
- Sam's Club will be tracking each instance of non-compliance with the DSD Drivers' Responsibilities listed above.
- Each instance will be considered a strike against the offending driver.
- Strikes one and two will be handled between the DSD Driver and their Company.
  Strike Three:
- If any driver receives three strikes within a rolling 12 month period, Sam's Club will request that a new driver service the Club in question.

### Sam's Club Associates' Responsibilities:
- Fronting and Stocking product in between the scheduled DSD Driver deliveries and pull-ups.
- Working with our Members to receive one-time purchase amounts/ special orders at least 48 hours in advance. Once received, this information should be communicated to the DSD Driver to allow them to order and plan accordingly.
- Ensuring that all items are merchandised exactly as they are drawn on the DSD Rack and Table Layouts.
- Ensuring that only Home Office approved displays are on the sales floor.
- Ensuring that any feature pallet that is placed outside of the Bakery Area is included on the Club's Transitional Planner.
- Promptly keying in units and credits received.
- Receiving Saturday deliveries by 7:00 AM as noted in the DSD Service Schedule.

**Authorized Products - Price List / Gross Margin and Other Information**

**EFFECTIVE: January 1, 2011**

## Scope

All Franchisees and/or their representatives contracted to distribute baked food goods with Sara Lee.

## Purpose

Establish Authorized Products and cost of goods to Franchisees

## Policy

- The Franchisee will receive, from Sara Lee, a list of all products available with the cost to the Franchisee.

- The Franchisee may at any time request a copy of the then current price list from the Zone Operations Manager.

- **On the following report there is an "APPL DATE" in the upper left section and this is the EFFECTIVE DATE of pricing and All Other Information**

Confidential

```
RUN DATE : 12/08/2010                      DISTRIBUTION MANAGEMENT SYSTEM                              PAGE:  1
RUN TIME : 16:00:37                            SARA LEE - PHOENIX                                      PGM : B153171
APPL DATE: 12/10/2010                  FRANCHISE PRODUCT and PRICING REPORT  - 275                    RPT : RUG

RUNNING FOR DISCOUNT TABLE:  90

FRANCHISE:  90
```

| PRODUCT # / DESCRIPTION | BRAND | FRANCHISE COST | SUGGESTED WHOLESALE | DISCOUNT PERCENT | FRESH SHELF LIFE | EV SHELF LIFE | LEAD DAYS | S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 016 OLD FASHION 1# | RAINBO | 1.0842 | 1.3900 | 22.00 | 7 | 5 | 3 | N | Y | Y | Y | Y | Y | N |
| 068 THIN SANDWICH | RAINBO | 1.2636 | 1.6200 | 22.00 | 7 | 5 | 3 | N | Y | Y | Y | Y | Y | N |
| 072 IRON KIDS BREAD | RAINBO | 1.8174 | 2.3300 | 22.00 | 7 | 5 | 3 | N | Y | Y | Y | Y | Y | Y |
| 134 THIN SLICE 2PK | RAINBO | 2.6244 | 3.2400 | 19.00 | 7 | 5 | 3 | N | Y | Y | Y | Y | Y | N |
| 135 IRONKIDS 2-1K | IRON KIDS | 3.7746 | 4.6600 | 19.00 | 7 | 5 | 3 | N | Y | Y | Y | Y | Y | N |
| 360 COUNTRY MEAL | COUNTRY MEAL | 4.9656 | 5.5200 | 22.00 | 7 | 5 | 3 | N | Y | Y | Y | Y | Y | N |
| 361 2PK COUNTRY MEAL | COUNTRY MEAL | 1.0842 | 1.3900 | 22.00 | 7 | 5 | 3 | N | Y | Y | Y | Y | Y | N |
| 618 RAINBO WHEAT 16 OZ | RAINBO | 4.8924 | 6.0400 | 19.00 | 7 | 5 | 3 | N | Y | Y | Y | Y | Y | N |
| 683 SUNMAID RAISIN | SUN MAID | 3.3556 | 4.6000 | 19.00 | 7 | 5 | 3 | N | Y | Y | Y | Y | Y | N |
| 684 SUNMAID RASIN 2PK | SUN MAID | 4.8924 | 6.0400 | 19.00 | 7 | 5 | 3 | N | Y | Y | Y | Y | Y | N |
| 1023 4"HAM 12CT TWIN PK | RAINBO | 3.7260 | 4.6000 | 22.00 | 7 | 5 | 3 | N | Y | Y | Y | Y | Y | N |
| 1195 BUNS 4" 12CT RAINB | RAINBO | 1.9550 | 3.0000 | 15.00 | 7 | 4 | 4 | N | Y | Y | Y | Y | Y | N |
| 1266 6"HOT 12CT TWIN PK | RAINBO | 2.3000 | 3.0000 | 15.00 | 7 | 4 | 4 | N | Y | Y | Y | Y | Y | N |
| 1314 BALL PARK HOTS | BALL PARK | 1.7230 | 4.6000 | 19.00 | 7 | 5 | 3 | N | Y | Y | Y | Y | Y | N |
| 1392 4.5"KAISER 12 CT. | RAINBO | 2.4648 | 3.1000 | 22.00 | 7 | 5 | 3 | N | Y | Y | Y | Y | Y | N |
| 1556 BROWN & SERVE ROLL | RAINBO | 1.9110 | 3.1000 | 22.00 | 7 | 5 | 3 | N | Y | Y | Y | Y | Y | N |
| 1934 EGR NWT 100% MULTI | EARTH GRAINS | 2.4180 | 2.8000 | 22.00 | 7 | 5 | 3 | N | Y | Y | Y | Y | Y | N |
| 1386 EG SF EXT SOUR | EARTH GRAINS | 2.3800 | 2.8000 | 15.00 | 7 | 5 | 3 | N | Y | Y | N | Y | Y | N |
| 1987 EG SOURDOUGH FRENC | EARTH GRAINS | 4.4276 | 5.4200 | 15.00 | 7 | 5 | 3 | N | Y | Y | N | Y | Y | N |
| 2046 EG 6"SS STEAK ROLL | EARTH GRAINS | 2.1840 | 2.8000 | 22.00 | 7 | 5 | 4 | N | Y | Y | N | Y | Y | N |
| 2072 EG ONION HAMS 8PK | EARTH GRAINS | 1.8400 | 2.8000 | 22.00 | 7 | 5 | 3 | N | Y | Y | N | Y | Y | N |
| 2595 2# OVAL RYE | EARTH GRAINS | 2.3526 | 4.1700 | 22.00 | 7 | 5 | 3 | N | Y | Y | N | Y | Y | N |
| 2668 WHEAT SANDWICH | EARTH GRAINS | 1.9656 | 2.1200 | 22.00 | 7 | 5 | 3 | N | Y | Y | N | Y | Y | N |
| 2714 TEXAS TOAST 3/4 " | RESTAURANT PRODUCT | 1.8445 | 2.1700 | 15.00 | 7 | 5 | 3 | N | Y | Y | N | Y | Y | N |
| 2963 4" SS BUNS 12PK | RESTAURANT PRODUCT | 2.1930 | 2.5800 | 15.00 | 7 | 5 | 3 | N | Y | Y | N | Y | Y | N |
| 3517 1O"CT 12CT RAINB | RESTAURANT PRODUCT | 1.9550 | 2.3000 | 15.00 | 7 | 5 | 3 | N | Y | Y | N | Y | Y | N |
| 5303 SL HG WHITE HCT | SARA LEE | 1.9720 | 2.3200 | 15.00 | 7 | 6 | 3 | N | Y | Y | Y | Y | Y | N |
| 5304 SL HG WHITE HAM | SARA LEE | 1.6146 | 2.0700 | 22.00 | 7 | 6 | 4 | N | Y | Y | Y | Y | Y | N |
| 5422 SL SS WGW OMEGA 3 | SARA LEE | 1.9656 | 2.5200 | 22.00 | 7 | 5 | 4 | N | Y | Y | Y | Y | Y | N |
| 5423 SL 100% WW OMEGA 3 | SARA LEE | 1.9656 | 2.5200 | 22.00 | 7 | 5 | 3 | N | Y | Y | Y | Y | Y | N |
| 5483 SL HH WHEATHAMS 8C | SARA LEE | 1.6146 | 2.0700 | 22.00 | 7 | 5 | 3 | N | Y | Y | Y | Y | Y | N |
| 5484 SL HH WHEAT HOT 8C | SARA LEE | 1.6146 | 2.0700 | 22.00 | 7 | 5 | 3 | N | Y | Y | Y | Y | Y | N |
| 5486 SL WHITE SS HAM4.5 | SARA LEE | 1.8400 | 2.8000 | 22.00 | 7 | 5 | 3 | N | Y | Y | Y | Y | Y | N |
| 5486 SL S&S 100% W BUN | SARA LEE | 1.8174 | 2.3300 | 22.00 | 7 | 5 | 3 | N | Y | Y | Y | Y | Y | N |
| 5487 SL WHOL GRAIN WHIT | SARA LEE | 2.4180 | 3.1000 | 22.00 | 7 | 5 | 3 | N | Y | Y | Y | Y | Y | N |
| 5493 MILTON MULTIGR242 | MILTON'S | 1.9110 | 2.4500 | 15.00 | 7 | 5 | 3 | N | Y | Y | Y | Y | Y | N |
| 5507 SL DINNER ROLLS | SARA LEE | 1.9110 | 2.4500 | 22.00 | 7 | 5 | 9 | N | Y | Y | Y | Y | Y | N |
| 5510 SL WHEAT DINNER RL | SARA LEE | 3.7746 | 4.6600 | 22.00 | 7 | 5 | 9 | N | Y | Y | Y | Y | Y | N |
| 5514 SL SS 100% 2PK | SARA LEE | 1.9656 | 2.5200 | 19.00 | 7 | 5 | 4 | N | Y | Y | Y | Y | Y | N |
| 5518 SL SS 100% WW | SARA LEE | 1.0842 | 1.3900 | 22.00 | 7 | 5 | 4 | N | Y | Y | Y | Y | Y | N |
| 5523 SL S&S 100% W SAND | SARA LEE | 2.4648 | 3.1600 | 22.00 | 7 | 5 | 4 | N | Y | Y | Y | Y | Y | N |
| 5535 S&S 100%WHI SAND | SARA LEE | 1.0842 | 1.3900 | 22.00 | 7 | 5 | 4 | N | Y | Y | Y | Y | Y | N |
| 5685 KAISER SS 4.5 12CT | SARA LEE | 2.4648 | 4.6500 | 22.00 | 7 | 5 | 4 | N | Y | Y | Y | Y | Y | N |
| 5686 SL HAWAIIN ROL24CT | SARA LEE | 3.6270 | 4.6500 | 22.00 | 7 | 5 | 9 | N | Y | Y | Y | Y | Y | N |
| 5687 SL PLAIN DR 24 CT | SARA LEE | 3.6270 | 4.6500 | 22.00 | 7 | 5 | 9 | N | Y | Y | Y | Y | Y | N |
| 5688 SL WHEAT DR 24 CT | SARA LEE | 3.6270 | 4.6500 | 22.00 | 7 | 5 | 4 | N | Y | Y | Y | Y | Y | N |
| 6487 SL WHOLGRA WHI CT | SARA LEE | 3.7746 | 4.6600 | 19.00 | 7 | 5 | 9 | N | Y | Y | Y | Y | Y | N |
| 6526 SL S&S PLUS 2PK | SARA LEE | 3.7565 | .8900 | 19.00 | 7 | 5 | 9 | N | Y | Y | Y | Y | Y | N |
| 11142 ALB WHEAT 24 OZ | ALBERTSON'S | .7565 | .8700 | 15.00 | 7 | 5 | 3 | N | Y | Y | N | Y | Y | N |
| 11146 ALB WHITE 24OZ | ALBERTSON'S | .7395 | .8700 | 15.00 | 7 | 5 | 3 | N | Y | Y | N | Y | Y | N |

```
RUN DATE : 12/08/2010                          DISTRIBUTION MANAGEMENT SYSTEM                                      PAGE: 2
RUN TIME : 16:00:37                                  SARA LEE - PHOENIX                                            PGM : B153171
APPL DATE: 12/10/2010                        FRANCHISE PRODUCT and PRICING REPORT    - 275                        RPT : RUG

RUNNING FOR DISCOUNT TABLE:  90
```

| PRODUCT # / DESCRIPTION | BRAND | FRANCHISE COST | SUGGESTED WHOLESALE | DISCOUNT PERCENT | FRESH SHELF LIFE | EV SHELF LIFE | LEAD DAYS | S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11150 ALB SR MUFF 6PK | ALBERTSON'S | 1.0200 | 1.2000 | 15.00 | 7 | 5 | 4 | Y | N | Y | Y | Y | Y | N |
| 11151 ALB RRL MUFF 6PK | ALBERTSON'S | 1.0200 | 1.2000 | 15.00 | 7 | 5 | 4 | Y | N | Y | Y | Y | Y | N |
| 11152 ALB REG MUFF 6PK | ALBERTSON'S | 1.0200 | 1.2000 | 15.00 | 7 | 5 | 4 | Y | N | Y | Y | Y | Y | N |
| 11153 ALB B&S ROLL 12 PK | ALBERTSON'S | 1.0200 | 1.2000 | 15.00 | 7 | 5 | 9 | Y | N | Y | Y | Y | Y | N |
| 11161 ALB BUN 8 PK | ALBERTSON'S | .7140 | .8400 | 15.00 | 7 | 5 | 3 | Y | Y | N | Y | N | Y | N |
| 11162 ALB CONEY 8 PK | ALBERTSON'S | .7140 | .8400 | 15.00 | 7 | 5 | 3 | Y | Y | N | Y | N | Y | N |
| 14266 ALB SP TOP WHEAT | COUNTRY FARMS | 1.1475 | 1.3500 | 15.00 | 7 | 5 | 3 | Y | Y | N | Y | N | Y | N |
| 14271 CF STONE GRND | COUNTRY FARMS | 1.1475 | 1.3500 | 15.00 | 7 | 5 | 3 | Y | N | Y | N | Y | N | Y |
| 14280 C.F. 12 GRAIN | COUNTRY FARMS | 1.1475 | 1.3500 | 15.00 | 7 | 5 | 3 | Y | N | Y | N | Y | N | Y |
| 14283 CF WHEATBERRY | COUNTRY FARMS | 1.1475 | 1.3500 | 15.00 | 7 | 5 | 3 | Y | N | Y | N | Y | N | Y |
| 14300 ALB. WHITE SP TOP | COUNTRY FARMS | 1.1475 | 1.3500 | 15.00 | 7 | 5 | 3 | N | Y | N | Y | N | Y | N |
| 14307 CF BUTTERMILK 24OZ | COUNTRY FARMS | 1.1475 | 1.3500 | 15.00 | 7 | 5 | 3 | N | Y | N | Y | N | Y | N |
| 15314 SL DEL MULTIGR 2PK | SARA LEE | 4.4550 | 5.3500 | 15.00 | 7 | 5 | 9 | N | Y | N | Y | N | Y | N |
| 21422 GV SPLIT WHITE | GREAT VALUE | .7820 | .9200 | 15.00 | 7 | 5 | 3 | Y | N | Y | N | Y | N | Y |
| 21423 GV SPLIT WHEAT | GREAT VALUE | .7820 | .9200 | 15.00 | 7 | 5 | 3 | Y | N | Y | N | Y | N | Y |
| 21424 WW WHEAT | GREAT VALUE | .9860 | 1.1600 | 15.00 | 7 | 5 | 3 | Y | N | Y | N | Y | N | Y |
| 25517 SL OTH WHEAT 2PK | SARA LEE | 3.6348 | 4.6600 | 22.00 | 7 | 5 | 9 | N | Y | N | Y | N | Y | N |
| 25518 FS PREMIUM 7-GRAIN | SMART AND FINAL | 1.0710 | 1.2600 | 15.00 | 7 | 5 | 3 | Y | N | Y | N | Y | N | Y |
| 25519 FS PREM BUTTERMILK | SMART AND FINAL | 1.0710 | 1.2600 | 15.00 | 7 | 5 | 3 | Y | N | Y | N | Y | N | Y |
| 25521 FS PREM 100% WW | SMART AND FINAL | 1.0710 | 1.2600 | 15.00 | 7 | 5 | 3 | Y | N | Y | N | Y | N | Y |
| 25522 FS POTATO BREAD | SMART AND FINAL | 1.0710 | 1.2600 | 15.00 | 7 | 5 | 3 | Y | N | Y | N | Y | N | Y |
| 25523 FS SPLIT TOP WHITE | SMART AND FINAL | .7225 | .8500 | 15.00 | 7 | 5 | 3 | Y | N | Y | N | Y | N | Y |
| 25524 FS SPLIT TOP WHEAT | SMART AND FINAL | .7225 | .8500 | 15.00 | 7 | 5 | 3 | Y | N | Y | N | Y | N | Y |
| 25526 FS PREM WHP WHEAT | SMART AND FINAL | 1.0710 | 1.2600 | 15.00 | 7 | 5 | 3 | Y | N | Y | N | Y | N | Y |
| 25581 SL PREM WHEATBERRY | SARA LEE | 3.6348 | 4.6600 | 22.00 | 7 | 5 | 9 | N | Y | N | Y | N | Y | N |
| 26103 SL SS 100% WW 2PK | SARA LEE | 3.6348 | 4.6600 | 22.00 | 7 | 5 | 3 | N | Y | N | Y | N | Y | N |
| 26104 ALB WHITE 16 OZ | ALBERTSON'S | .6375 | .7500 | 15.00 | 7 | 5 | 3 | Y | N | Y | N | Y | N | Y |
| 26108 ALB WHEAT 16 OZ | ALBERTSON'S | .6375 | .7500 | 15.00 | 7 | 5 | 3 | Y | N | Y | N | Y | N | Y |
| 28830 SL POTATO BUN | SARA LEE | .6545 | .7700 | 15.00 | 7 | 5 | 3 | Y | N | Y | N | Y | N | Y |
| 28831 SL POTATO HOT | SARA LEE | .6545 | .7700 | 15.00 | 7 | 5 | 4 | Y | N | Y | N | Y | N | Y |
| 29001 LB RT WHITE 16OZ | LADY BAKE | 1.6146 | 2.0700 | 22.00 | 7 | 5 | 4 | Y | N | Y | N | Y | N | Y |
| 29002 LB WHR WHITE | LADY BAKE | 1.6146 | 2.0700 | 22.00 | 7 | 5 | 3 | Y | N | Y | N | Y | N | Y |
| 34002 OLD TIMEY WHITE | OLD TIMEY | .9265 | 1.0900 | 15.00 | 7 | 5 | 3 | Y | N | Y | N | Y | N | Y |
| 34009 OLD TIMEY WHEAT 16 | OLD TIMEY | .9265 | 1.0900 | 15.00 | 7 | 5 | 3 | Y | N | Y | N | Y | N | Y |
| 34014 WM VALUE WHITE 16 | WAL MART VALUE | 1.0965 | 1.2900 | 15.00 | 7 | 5 | 3 | Y | N | Y | N | Y | N | Y |
| 34015 WM VALUE WHEAT 16 | WAL MART VALUE | 1.0965 | 1.2900 | 15.00 | 7 | 5 | 3 | Y | N | Y | N | Y | N | Y |
| 34501 GV WHITE SANDWICH | GREAT VALUE | .6205 | .7300 | 15.00 | 7 | 5 | 3 | Y | N | Y | N | Y | N | Y |
| 34502 GV CLUSTER BUN 8PK | GREAT VALUE | .6715 | .7900 | 15.00 | 7 | 5 | 3 | Y | N | Y | N | Y | N | Y |
| 34503 GV CONEY WHEAT 8 | GREAT VALUE | .6460 | .7600 | 15.00 | 7 | 5 | 3 | Y | N | Y | N | Y | N | Y |
| 34505 GV WHEAT SANDWICH | GREAT VALUE | .6460 | .7600 | 15.00 | 7 | 5 | 3 | Y | N | Y | N | Y | N | Y |
| 34508 GREAT VALUE B&S | GREAT VALUE | .6985 | .8100 | 15.00 | 7 | 5 | 3 | Y | N | Y | N | Y | N | Y |
| 34525 FS STEAK ROLL 12 | FIRST STREET | 1.3335 | 1.5700 | 15.00 | 7 | 5 | 3 | Y | N | Y | N | Y | N | Y |
| 34526 FIRST STR HOT 12CT | FIRST STREET | .8925 | 1.0500 | 15.00 | 7 | 4 | 4 | Y | N | Y | N | Y | N | Y |
| 34527 FIRST STREET HOT 2 | FIRST STREET | 3.7230 | 4.3800 | 15.00 | 7 | 5 | 4 | Y | N | Y | N | Y | N | Y |
| 34528 FIRST STR BUN 12CT | FIRST STREET | .8925 | 1.0500 | 15.00 | 7 | 4 | 3 | Y | N | Y | N | Y | N | Y |
| 34529 FIRST STREET BUN 2 | FIRST STREET | 3.7230 | 4.3800 | 15.00 | 7 | 5 | 3 | Y | N | Y | N | Y | N | Y |
| 34530 FIRST STR 4.5 SS B | FIRST STREET | 1.1135 | 1.3100 | 15.00 | 7 | 5 | 3 | Y | N | Y | N | Y | N | Y |
| 34532 FIRST STR WHITE 24 | FIRST STREET | 1.1235 | 1.3100 | 15.00 | 7 | 5 | 3 | Y | N | Y | N | Y | N | Y |
| 34533 FIRST STR WHEAT 24 | FIRST STREET | .7225 | .8500 | 15.00 | 7 | 5 | 3 | Y | N | Y | N | Y | N | Y |
| 34534 FIRST STREET BUN 8 | FIRST STREET | .7225 | .8500 | 15.00 | 7 | 5 | 3 | Y | N | Y | N | Y | N | Y |
| 34535 FIRST STREET HOT 8 | FIRST STREET | .6205 | .7300 | 15.00 | 7 | 5 | 3 | Y | N | Y | N | Y | N | Y |
| 39630 KROGER VALUE HAMBU | SMITH | .5950 | .7000 | 15.00 | 7 | 5 | 3 | Y | N | Y | N | Y | N | Y |

```
RUN DATE : 12/08/2010                 DISTRIBUTION MANAGEMENT SYSTEM                        PAGE : 3
RUN TIME : 16:00:37                        SARA LEE - PHOENIX                               PGM  : B153171
APPL DATE: 12/10/2010              FRANCHISE PRODUCT and PRICING REPORT   - 275             RPT  : RUG
```

RUNNING FOR DISCOUNT TABLE:  90

| PRODUCT # / DESCRIPTION | BRAND | FRANCHISE COST | SUGGESTED WHOLESALE | DISCOUNT PERCENT | FRESH SHELF LIFE | EV SHELF LIFE | LEAD DAYS | S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40592 100%WW THIN BNS BS | EARTH GRAINS | 1.9344 | 2.4800 | 22.00 | 7 | 5 | 5 | N | Y | N | N | Y | N | N |
| 40593 100%WG THIN BNS BS | EARTH GRAINS | 1.9344 | 2.4800 | 22.00 | 7 | 5 | 5 | N | Y | N | N | Y | N | N |
| 40733 SL ORIGINAL W/HNY | SARA LEE | 1.7160 | 2.2000 | 22.00 | 7 | 5 | 4 | N | Y | N | Y | N | Y | N |
| 40741 SL WHEAT W/HONEY | SARA LEE | 1.7160 | 2.2000 | 22.00 | 7 | 5 | 4 | N | Y | N | Y | N | Y | N |
| 48614 SIMP VAL WHITE 16 | SIMPLY VALUE | .6630 | .7800 | 15.00 | 7 | 5 | 3 | N | Y | N | Y | N | Y | N |
| 48615 SIMP VAL WHEAT 16 | SIMPLY VALUE | .6630 | .7800 | 15.00 | 7 | 5 | 3 | N | Y | N | Y | N | Y | N |
| 48778 MILTON MWG 2FX 48 | MILTON'S | .6630 | .7800 | 15.00 | 7 | 5 | 3 | N | Y | N | Y | N | Y | N |
| 50030 EGR NAT WHT&RY | EARTH GRAINS | 5.0220 | 6.7800 | 13.00 | 7 | 5 | 4 | N | Y | N | N | Y | N | N |
| 50031 EGR NAT 7-GRAIN | EARTH GRAINS | 2.4180 | 3.1000 | 22.00 | 7 | 5 | 4 | N | Y | N | N | Y | N | N |
| 50032 EGR NAT W/HNY WW | EARTH GRAINS | 2.4180 | 3.1000 | 22.00 | 7 | 5 | 4 | N | Y | N | N | Y | N | N |
| 50038 SL ORIGINAL MUFFIN | SARA LEE | 1.7160 | 2.2000 | 22.00 | 7 | 5 | 4 | N | Y | N | Y | N | Y | N |
| 50080 SL DLXEVRYTHNGBGLQ | SARA LEE | 2.3400 | 3.0000 | 22.00 | 7 | 5 | 4 | N | Y | Y | Y | Y | Y | N |
| 50413 SL PITA WHITE | SARA LEE | 1.6146 | 2.0700 | 22.00 | 7 | 5 | 4 | N | Y | N | Y | N | Y | N |
| 50417 SL PITA WHEAT | SARA LEE | 2.3400 | 3.0000 | 22.00 | 7 | 5 | 4 | N | Y | N | Y | N | Y | N |
| 51210 SL S&S CINN BAGEL | SARA LEE | 2.3400 | 3.0000 | 22.00 | 7 | 5 | 4 | N | Y | Y | Y | Y | Y | N |
| 51211 SL S&S MINI BB BAG | SARA LEE | 2.3400 | 3.0000 | 22.00 | 7 | 5 | 4 | N | Y | Y | Y | Y | Y | N |
| 51265 SL S&S MINI PLAINB | SARA LEE | 2.3400 | 3.0000 | 22.00 | 7 | 5 | 4 | N | Y | Y | Y | Y | Y | N |
| 51266 SL DLX BB BAGEL | SARA LEE | 2.3400 | 3.0000 | 22.00 | 7 | 5 | 4 | N | Y | Y | Y | Y | Y | N |
| 51267 SL DLX CIN/RAL BAG | SARA LEE | 2.3400 | 3.0000 | 22.00 | 7 | 5 | 4 | N | Y | Y | Y | Y | Y | N |
| 51269 SL DLX ONION BAGEL | SARA LEE | 2.3400 | 3.0000 | 22.00 | 7 | 5 | 4 | N | Y | Y | Y | Y | Y | N |
| 51283 SL SS MINI 28CT PL | SARA LEE | 3.7400 | 4.8000 | 22.00 | 7 | 5 | 4 | N | Y | Y | Y | Y | Y | N |
| 51649 SL S&S 100% MINIBG | SARA LEE | 2.3400 | 3.0000 | 22.00 | 7 | 5 | 4 | N | Y | Y | Y | Y | Y | N |
| 51838 FRYS ORIGINAL ENG | FRY | .8500 | 1.0000 | 15.00 | 7 | 4 | 5 | N | Y | N | Y | N | Y | N |
| 51839 FRYS SOURDOUGH ENG | FRY | .9860 | 1.1600 | 15.00 | 7 | 4 | 5 | N | Y | N | Y | N | Y | N |
| 51840 FRYS CINN PLAIN ENG | FRY | .8330 | .9800 | 15.00 | 7 | 4 | 5 | N | Y | N | Y | N | Y | N |
| 51845 FRYS NG PL BAGEL | FRY | 1.1600 | 1.3647 | 15.00 | 7 | 5 | 5 | N | Y | Y | Y | Y | Y | N |
| 51847 FRYS NG CR BAGEL | FRY | 1.4790 | 1.7400 | 15.00 | 7 | 5 | 5 | N | Y | Y | Y | Y | Y | N |
| 51849 FRYS NG HW BAGEL | FRY | 1.4790 | 1.7400 | 15.00 | 7 | 5 | 5 | N | Y | Y | Y | Y | Y | N |
| 52284 MILTONS WG 24OZ | MILTON'S | 2.4180 | 3.1000 | 22.00 | 7 | 5 | 4 | N | Y | N | Y | N | Y | N |
| 52293 MILTON MUL 40OZ 2 | MILTON'S | 5.7024 | 7.0400 | 19.00 | 7 | 5 | 9 | N | Y | N | N | Y | N | N |
| 52295 MILTON MULTIGR 400 | MILTON'S | 2.8512 | 3.5200 | 19.00 | 7 | 5 | 9 | N | Y | N | N | Y | N | N |
| 52296 MILTON MULTIGR 24 | MILTON'S | 2.4180 | 3.1000 | 22.00 | 7 | 5 | 9 | N | Y | N | N | Y | N | N |
| 52395 SL CLSC 100% WW 16 | SARA LEE | 1.3032 | 1.6700 | 22.00 | 7 | 5 | 3 | N | Y | Y | Y | Y | Y | N |
| 52396 SL H&G JEWISH RYE | SARA LEE | 1.9032 | 2.4400 | 22.00 | 7 | 5 | 3 | N | Y | N | Y | N | Y | N |
| 52397 SL H&G RUSSIAN RYE | SARA LEE | 2.3010 | 2.9500 | 22.00 | 7 | 5 | 3 | N | Y | N | Y | N | Y | N |
| 53045 SL WHITE SAND 24OZ | SARA LEE | 1.8174 | 2.3300 | 22.00 | 7 | 5 | 3 | N | Y | Y | Y | Y | Y | N |
| 53057 SL CLAS WHEAT 22K | SARA LEE | 3.7746 | 4.6600 | 19.00 | 7 | 5 | 3 | N | Y | Y | Y | Y | Y | N |
| 53059 SL HONEY WHEAT 2FK | SARA LEE | 3.6348 | 4.6600 | 22.00 | 7 | 5 | 3 | N | Y | Y | Y | Y | Y | N |
| 53061 SL CLAS WHITE 2FK | SARA LEE | 3.6348 | 4.6600 | 22.00 | 7 | 5 | 3 | N | Y | Y | Y | Y | Y | N |
| 53062 SL CLAS WHEAT 2FK | SARA LEE | 3.6348 | 4.6600 | 22.00 | 7 | 5 | 3 | N | Y | Y | Y | Y | Y | N |
| 53066 SL CLASSIC WHITE | SARA LEE | 1.8174 | 2.3300 | 22.00 | 7 | 5 | 3 | N | Y | Y | Y | Y | Y | N |
| 53067 SL CLASSIC WHEAT | SARA LEE | 1.8174 | 2.3300 | 22.00 | 7 | 5 | 3 | N | Y | Y | Y | Y | Y | N |
| 53069 SL HONEY WHEAT | SARA LEE | 1.8174 | 2.3300 | 22.00 | 7 | 5 | 3 | N | Y | Y | Y | Y | Y | N |
| 53080 SL SOURDOUGH ROLLS | SARA LEE | 2.1840 | 2.8000 | 22.00 | 7 | 5 | 3 | N | Y | Y | Y | Y | Y | N |
| 53081 SL COUNTRY POTAT | SARA LEE | 2.1840 | 2.8000 | 22.00 | 7 | 5 | 3 | N | Y | Y | Y | Y | Y | N |
| 53082 SL CNTRY FREN RL | SARA LEE | 4.2120 | 5.4000 | 22.00 | 7 | 5 | 3 | N | Y | Y | Y | Y | Y | N |
| 53100 SL CLASSIC BUN 8CT | SARA LEE | 1.8174 | 2.3300 | 22.00 | 7 | 5 | 3 | N | Y | Y | Y | Y | Y | N |
| 53102 SL DELI ROLL 6 CT | SARA LEE | 1.8174 | 2.3300 | 22.00 | 7 | 5 | 3 | N | Y | Y | Y | Y | Y | N |
| 53105 SL CNTRY POTAT 2OZ | SARA LEE | 1.8174 | 2.3300 | 22.00 | 7 | 5 | 3 | N | Y | Y | Y | Y | Y | N |
| 53109 SL LITE WHEAT | SARA LEE | 2.1450 | 2.7500 | 22.00 | 7 | 5 | 3 | N | Y | N | Y | N | Y | N |

RUN DATE : 12/08/2010
RUN TIME : 16:00:37
APPL DATE: 12/10/2010

PAGE:      4
PGM : B153171
RPT : RUG

DISTRIBUTION MANAGEMENT SYSTEM
SARA LEE - PHOENIX
FRANCHISE PRODUCT and PRICING REPORT      - 275

RUNNING FOR DISCOUNT TABLE:  90

| PRODUCT # / DESCRIPTION | BRAND | FRANCHISE COST | SUGGESTED WHOLESALE | DISCOUNT PERCENT | FRESH SHELF LIFE | EV SHELF LIFE | LEAD DAYS | S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 53119 SL LIGHT WHEAT 2PK | SARA LEE | 4.4550 | 5.5500 | 19.00 | 7 | 5 | 9 | N | N | N | N | N | N | N |
| 53129 SL DEL WHEAT HAM | SARA LEE | 1.9110 | 2.4500 | 22.00 | 7 | 5 | 9 | N | N | N | N | N | N | N |
| 53130 SL D-LITE WW HONEY | SARA LEE | 2.1450 | 2.7500 | 22.00 | 7 | 5 | 3 | N | N | Y | N | N | Y | N |
| 53131 SL D-LITE MULTIGRN | SARA LEE | 2.1450 | 2.7500 | 22.00 | 7 | 5 | 3 | N | N | Y | N | N | Y | N |
| 53138 SL DEL WHEAT HOT | SARA LEE | 1.9110 | 2.4500 | 22.00 | 7 | 5 | 3 | N | N | Y | N | N | Y | N |
| 53168 SL DELI MULTI-GR 2PK | SARA LEE | 2.2320 | 2.8600 | 22.00 | 7 | 5 | 3 | Y | N | Y | N | Y | N | Y |
| 53171 SL 100% WW/HONEY 2PK | SARA LEE | 4.6750 | 5.5000 | 15.00 | 7 | 5 | 3 | Y | N | Y | N | Y | N | Y |
| 53174 SL 100% WW | SARA LEE | 2.4180 | 3.1000 | 22.00 | 7 | 5 | 3 | Y | N | Y | N | Y | N | Y |
| 53175 SL 100% WW/HONEY | SARA LEE | 2.4180 | 3.1000 | 22.00 | 7 | 5 | 3 | Y | N | Y | N | Y | N | Y |
| 55165 SL 100% MULTI-GRAI | SARA LEE | 2.4180 | 3.1000 | 22.00 | 7 | 5 | 3 | Y | N | Y | N | Y | N | Y |
| 55166 SL WHOLGRA WHI 2PK | SARA LEE | 3.7746 | 4.6600 | 19.00 | 7 | 5 | 3 | Y | N | Y | N | Y | N | Y |
| 55167 SL LIGHT WHEAT 2PK | SARA LEE | 4.4550 | 5.5000 | 19.00 | 7 | 5 | 3 | Y | N | Y | N | Y | N | Y |
| 55623 SL HONEY WHEAT 2PK | SARA LEE | 3.7746 | 4.6600 | 19.00 | 7 | 5 | 3 | Y | N | Y | N | Y | N | Y |
| 55625 SL TEXAS 3/4" | SARA LEE | 1.6926 | 2.1700 | 22.00 | 7 | 5 | 9 | N | N | N | N | N | N | N |
| 55628 SL BUNS 4" | SARA LEE | 1.7940 | 2.3000 | 22.00 | 7 | 5 | 9 | N | N | Y | N | N | Y | N |
| 55629 4" SS BUNS 12PK | SARA LEE | 1.7940 | 2.3000 | 22.00 | 7 | 5 | 4 | Y | N | N | N | Y | N | N |
| 55630 WW BUN 4" 12CT | SARA LEE | 1.8724 | 2.5800 | 22.00 | 7 | 5 | 4 | Y | N | N | N | Y | N | N |
| 55631 CONEY 6" 12CT | SARA LEE | 1.8720 | 2.3000 | 22.00 | 7 | 5 | 4 | Y | N | N | N | Y | N | N |
| 57098 OLD HOME 1G WHEAT | OLD HOME-SECONDARY | 1.7940 | 2.3000 | 22.00 | 7 | 5 | 3 | Y | N | Y | N | N | Y | N |
| 57100 OLD HOME HAM BUN | OLD HOME-SECONDARY | .9775 | 1.1500 | 15.00 | 7 | 5 | 3 | Y | N | Y | N | N | Y | N |
| 57101 OLD HOME HOT DOG | OLD HOME-SECONDARY | 1.0965 | 1.2900 | 15.00 | 7 | 5 | 3 | Y | N | Y | N | N | Y | N |
| 57105 OLD HOME CRACKED | OLD HOME-SECONDARY | 1.0965 | 1.2900 | 15.00 | 7 | 5 | 3 | Y | N | Y | N | N | Y | N |
| 57106 OLD HOME 16OZ WHIT | OLD HOME-SECONDARY | 1.3260 | 1.5600 | 15.00 | 7 | 5 | 3 | Y | N | Y | N | N | Y | N |
| 57109 OLD HOME WHEAT SAN | OLD HOME-SECONDARY | .9775 | 1.1500 | 15.00 | 7 | 5 | 3 | Y | N | Y | N | N | Y | N |
| 59102 SL S&S MINI BUN | OLD HOME-SECONDARY | 1.9110 | 2.2500 | 15.00 | 7 | 5 | 3 | Y | N | Y | N | N | Y | N |
| 59406 MSTR EM PL 12CTMUF | MASTER | 1.9890 | 2.5500 | 22.00 | 7 | 5 | 4 | Y | N | N | N | Y | N | N |
| 60821 WM VALUE HAM | WAL MART VALUE BUNS | .6460 | .7600 | 15.00 | 7 | 5 | 4 | Y | N | N | N | Y | N | N |
| 60822 WM VALUE HOT DOG | WAL MART VALUE BUNS | .6460 | .7600 | 15.00 | 7 | 5 | 3 | Y | N | Y | N | N | Y | N |
| 64121 SL DEL WHEAT 2PK | SARA LEE | 6.6825 | 8.2500 | 19.00 | 7 | 5 | 3 | Y | N | Y | N | N | Y | N |
| 65481 MILTON MULTI 2 48Z | MILTON'S | 5.0220 | 6.2000 | 19.00 | 7 | 5 | 4 | Y | N | N | N | Y | N | N |
| 66133 SFWY FL BGL 6CT | SAFEWAY | 1.2070 | 1.4200 | 15.00 | 21 | 5 | 7 | Y | N | N | N | N | N | N |
| 66134 SFWY CR BGL 6CT | SAFEWAY | 1.3430 | 1.5800 | 15.00 | 21 | 5 | 7 | Y | N | N | N | N | N | N |
| 66135 SFWY BB BGL 6CT | SAFEWAY | 1.4280 | 1.6800 | 15.00 | 21 | 5 | 7 | Y | N | N | N | N | N | N |
| 92123 SV CHEESE HORNS 3 | SVENHARD | 2.1845 | 2.5700 | 15.00 | 21 | 7 | 7 | Y | N | N | N | N | N | N |
| 92124 SV RAISIN SNAILS 3 | SVENHARD | 2.1845 | 2.5700 | 15.00 | 21 | 7 | 7 | Y | N | N | N | N | N | N |
| 92125 SV BEAR CLAWS 3 | SVENHARD | 2.1845 | 2.5700 | 15.00 | 21 | 7 | 7 | Y | N | N | N | N | N | N |
| 92126 SV CINNAMON ROLL | SVENHARD | 2.1845 | 2.5700 | 15.00 | 21 | 7 | 7 | Y | N | N | N | N | N | N |
| 92129 SV BUTTER HORN 3 | SVENHARD | 2.1845 | 2.5700 | 15.00 | 21 | 7 | 7 | Y | N | N | N | N | N | N |
| 92131 SV APPLE TREATS 2 | SVENHARD | .8925 | 1.0500 | 15.00 | 21 | 7 | 7 | Y | N | N | N | N | N | N |
| 92132 SV CHEESE TREATS 2 | SVENHARD | .8925 | 1.0500 | 15.00 | 21 | 7 | 7 | Y | N | N | N | N | N | N |
| 92133 SV CHERRY TREATS 2 | SVENHARD | .8925 | 1.0500 | 15.00 | 21 | 7 | 7 | Y | N | N | N | N | N | N |
| 92134 SV LEMON TREATS 2 | SVENHARD | .8925 | 1.0500 | 15.00 | 21 | 7 | 7 | Y | N | N | N | N | N | N |
| 92181 SV RAISIN HORNS 8 | SVENHARD | 3.9995 | 4.4700 | 15.00 | 21 | 7 | 7 | Y | N | N | N | N | N | N |
| 92182 SV BK CLAWS 8 | SVENHARD | 3.9995 | 4.4700 | 15.00 | 21 | 7 | 7 | Y | N | N | N | N | N | N |
| 92183 SV HORNS A PLTY 8 | SVENHARD | 3.9995 | 4.4700 | 15.00 | 21 | 7 | 7 | Y | N | N | N | N | N | N |
| 92184 SV CINNAMON HORN 8 | SVENHARD | 3.9995 | 4.4700 | 15.00 | 21 | 7 | 7 | Y | N | N | N | N | N | N |
| 92185 SV FRUIT HORNS 8CT | SVENHARD | 3.9995 | 4.4700 | 15.00 | 21 | 7 | 7 | Y | N | N | N | N | N | N |
| 92501 SV CINNAMON ROLLS | SVENHARD | 7.0975 | 8.3500 | 15.00 | 21 | 7 | 7 | Y | N | N | N | N | N | N |
| 92502 SV VARIETY PK 16CT | SVENHARD | 7.0975 | 8.3500 | 15.00 | 21 | 7 | 7 | Y | N | N | N | N | N | N |
| 92503 SV VARIETY PK 24CT | SVENHARD | 7.0975 | 8.3500 | 15.00 | 21 | 7 | 7 | Y | N | Y | N | Y | N | Y |
| 92503 SV VARIETY PK 30CT | SVENHARD | 9.1825 | 10.7000 | 15.00 | 21 | 7 | 7 | Y | N | N | N | N | N | N |
| 96002 FRYS WHITE SAND 24 | FRY | .6715 | .7900 | 15.00 | 7 | 5 | 3 | N | N | Y | N | Y | N | Y |

PAGE:      4
PGM : B153171
RPT : RUG

```
RUN DATE : 12/08/2010                    DISTRIBUTION MANAGEMENT SYSTEM                         PAGE: 5
RUN TIME : 16:00:37                              SARA LEE - PHOENIX                             PGM : B153171
APPL DATE: 12/10/2010              FRANCHISE PRODUCT and PRICING REPORT  - 275                 RPT : RUG

RUNNING FOR DISCOUNT TABLE:  90
```

| PRODUCT # / DESCRIPTION | BRAND | FRANCHISE COST | SUGGESTED WHOLESALE | DISCOUNT PERCENT | FRESH SHELF LIFE | EV SHELF LIFE | LEAD DAYS | DAYS AVAILABLE S M T W T F S |
|---|---|---|---|---|---|---|---|---|
| 96003 FRYS WHEAT SAND 24 | FRY | .6885 | .8100 | 15.00 | 7 | 5 | 3 | N Y N N Y Y N |
| 96004 FRYS GOLDEN GRAIN | FRY | 1.1815 | 1.3900 | 15.00 | 7 | 5 | 3 | N Y N N Y Y Y |
| 96009 FS 100% WHEAT | FRY | 1.0200 | 1.2000 | 15.00 | 7 | 5 | 3 | N Y N N N Y N |
| 96011 FRYS SPLIT WHEAT 2 | FRY | .7820 | .9200 | 15.00 | 7 | 5 | 3 | N Y N N Y Y N |
| 96012 FS MULTI-GRAIN 24Z | FRY | 1.0455 | 1.2300 | 15.00 | 7 | 5 | 3 | N Y N N Y Y N |
| 96013 FS HONEY OAT 24OZ | PRIVATE SLECTION | 1.0455 | 1.2300 | 15.00 | 7 | 5 | 3 | N Y N N Y Y N |
| 96014 FS CRCKD WHEAT 24Z | PRIVATE SLECTION | 1.0455 | 1.2300 | 15.00 | 7 | 5 | 3 | N Y N N Y Y N |
| 96023 KROGER VAL HOT DOG | FRY | .5950 | .7000 | 15.00 | 7 | 5 | 3 | N Y Y Y Y Y Y |
| 96024 KROGER VAL WHEA16Z | FRY | .5525 | .6500 | 15.00 | 7 | 5 | 3 | N Y N Y Y Y Y |
| 96025 KROGER VAL WHT 16Z | FRY | .5185 | .6100 | 15.00 | 7 | 5 | 3 | N Y N Y Y Y Y |
| 96044 FRYS CLUSTER BUN 8 | FRY | .5950 | .7000 | 15.00 | 7 | 5 | 3 | N Y N Y Y Y Y |
| 96045 FRYS CLUST CONEY8 | FRY | .5950 | .7000 | 15.00 | 7 | 5 | 3 | N Y N Y Y Y N |
| 96048 FRYS DINNER ROLL 1 | FRY | .8755 | 1.0300 | 15.00 | 7 | 5 | 3 | N Y N N Y Y N |
| 99441 WH FRY'S GOLDEN SE | WESTERN HEARTH | 1.3515 | 1.5900 | 15.00 | 7 | 7 | 5 | N N N Y Y Y N |
| 99442 WH FRY'S SWEET ONI | WESTERN HEARTH | 1.3515 | 1.5900 | 15.00 | 7 | 7 | 5 | N N N Y Y Y N |
| 99443 WH FRY'S CRACKED W | WESTERN HEARTH | 1.3515 | 1.5900 | 15.00 | 7 | 7 | 5 | N N N Y Y Y N |
| 99444 FRY'S WH COUNTRY P | WESTERN HEARTH | 1.3515 | 1.5900 | 15.00 | 7 | 7 | 5 | N N N Y Y Y N |
| 99445 FRY'S VDK 8CT PLAI | VAN DE KAMPS | 1.0625 | 1.2500 | 15.00 | 7 | 7 | 5 | N Y N Y Y Y N |
| 99447 FRY'S VDK 8CT ASSO | VAN DE KAMPS | 1.0625 | 1.2500 | 15.00 | 7 | 7 | 5 | N Y N Y Y Y N |
| 99448 FRY'S VDK 8CT CRUM | VAN DE KAMPS | 1.0625 | 1.2500 | 15.00 | 7 | 7 | 5 | N Y N Y Y Y N |
| 99449 FRY'S VDK 8CT POWD | VAN DE KAMPS | 1.0625 | 1.2500 | 15.00 | 7 | 7 | 5 | N Y N Y Y Y N |
| 99451 FRY'S VDK 6CT OLD | VAN DE KAMPS | 1.5090 | 1.7400 | 15.00 | 7 | 7 | 5 | N Y N Y Y Y N |
| 99452 FRY'S VDK 6CT CHOC | VAN DE KAMPS | 1.5895 | 1.8700 | 15.00 | 7 | 7 | 5 | N Y N Y Y Y N |
| 99453 FRY'S VDK MINI POW | VAN DE KAMPS | 1.4620 | 1.7200 | 15.00 | 7 | 7 | 5 | N Y N Y Y Y N |
| 99454 FRY'S VDK MINI CHO | VAN DE KAMPS | 1.4620 | 1.7200 | 15.00 | 7 | 7 | 5 | N Y N Y Y Y N |
| 99455 FRY'S VDK MINI CRU | VAN DE KAMPS | 1.4620 | 1.7200 | 15.00 | 7 | 7 | 5 | N Y N Y Y Y N |
| 99456 FRY'S VDK MINI CHOC | VAN DE KAMPS | 1.4280 | 1.6800 | 15.00 | 7 | 5 | 5 | N Y N Y Y Y N |
| 99607 GOURMET CONEYS | RAINBO | 2.1528 | 2.7600 | 22.00 | 7 | 5 | 3 | N Y N Y Y Y N |

## Pricing Participation Program

**EFFECTIVE: January 1, 2011**

### Scope

All Franchisees and/or their representatives contracted to distribute baked food goods with Sara Lee.

### Purpose

Establish guidelines for Franchisee's Margin within the scope of a product promotion program or discounted price initiated by the Franchisee as supported in the Franchise Agreement.

### Policy

- If a Franchisee negotiates a reduced cost to an Outlet that is not a Chain and wishes Sara Lee to share in the price reduction the Franchisee must submit a proposal to ZVP/ZOM for a participation agreement.

10/25/2010

**Franchise Settlement**
Weekly Settlement Training & Margin Adjustment on Promotional Pricing

**EFFECTIVE: January 1, 2011**

## Scope

All Franchisees and/or their representatives contracted to distribute baked food goods with Sara Lee.

## Purpose

Training guide on Franchise settlement and promotional margin calculation.

  

## Each Morning You Purchase Product from A Manufacturer

## Each Day You Resell Your Product to A Customer for A Marked Up Price

  

## The difference between what you purchased the product for and what you sold the product for is <u>your profit</u>.

Confidential

10/25/2010

## Franchise Weekly Settlement

As a Sara Lee Franchisee, you purchase product from us on a daily basis at a discounted cost. Your profit (or margin) is obtained by reselling this product to outlets within your territory for a higher cost. Sara Lee may participate in discounts given to your customers which results in the lowering of the cost that you initially paid for the product. Sara Lee also may have programs available in your area to reimburse you for all or part of any stale or unsold product that occurs in your business. Additionally, your profit will also depend on the level of service that you provide when reselling the product. As a Sara Lee Franchise company, you are provided with a daily accounting of the financial transactions that are received by Sara Lee which is called a RTAC Report (or dump sheet). Additionally, you receive a weekly summary which reflects all transactions received through Saturday each week. This summary and all supporting reports are referred to as the Weekly Settlement Reports.

This guide is designed to assist you in understanding how to read your Weekly Settlement Reports and your daily (RTAC) Dump Sheet, as well as to provide you with a daily tracking tool. IN ORDER TO ENSURE ACCURATE ACCOUNTING OF YOUR PROFITS AND PROPER AND TIMELY PAYMENTS, IT IS CRITICAL THAT YOU REVIEW YOUR DAILY FINANCIAL ACCOUNTING (DUMP SHEETS) FOR ACCURACY AND COMMUNICATE ANY ISSUES IMMEDIATELY.

Proper accounting of your business is your responsibility. If you have questions or problems, the Sara Lee Zone Territory Development Manager can assist you. Additionally, you are assigned a Settlement Specialist out of the Franchise Settlement Department who is also available to answer questions.

## General Settlement Overview

✓ Franchisees are invoiced for the product (load) that they ordered on a daily basis on the day that the delivery is made to the Sara Lee facility for pick up. This charge occurs on the day of delivery even if the product is not picked up by the Franchisee that day.

✓ Stale or out of code product may be sold back to Sara Lee under the guidelines established in the Operational Guidelines. In order to receive credit for stale product, it must be invoiced by the Franchisee through the stale sheet on the day that it is picked up from the outlet. A copy of this stale sheet (invoice) along with the product is to be delivered to Sara Lee at a designated location. Only product invoiced on the stale sheet and returned to a designated location will be credited.

✓ The original order is invoiced and detailed on each daily dump sheet.

✓ All product received should be verified by the Franchisee at the time of pick up. Any variations to the original load sheet are to be reported following the local process to ensure proper invoicing of the product received.

✓ Adjustments or transfers to your initial load are sent to the local route accounting office to be processed daily. Adjustments or transfers keyed to the Hand Held Computer (HHC) are NOT transmitted to the local route accounting office. All adjustments and transfers will be detailed on the daily dump sheet.

✓ All products are billed to you at Franchise cost (base price list less the discount rate) each day. Adjustments to the Franchise cost are done at the time your customer invoice is received by Sara Lee based upon the final sale price and the level of service provided to the customer.

✓ We purchase any invoices for product sold to charge customers that you TCOM at end of day. The confirmation of the purchase of these invoices will appear on the following day's dump sheet.

✓ A paper copy of all invoices and receiving documents must be submitted to your local route accounting office weekly. Delays in receiving the invoices can result in a delay of a check being released to you.

✓ Promotional adjustments are made on discounts for customers who the Franchisee has requested and Sara Lee has agreed to participate in a discount program. The adjustment is based upon the price on the invoice at the time of sale. A portion of these discounts are credited to your account for weekly settlement. The amount of this credit appears on the daily dump sheet.

✓ All payments set up for automatic settlement deduction, such as bank loans, vehicle leases, supplies, computer charges or insurance, are deducted from your settlement on a weekly basis.

✓ Advertising programs are paid weekly under the Accounts Payable / adjustment section of the Weekly Settlement Summary.

✓ Distributor Weekly Settlement reports are sent weekly via e-mail. These reports should be printed by you for your records. IRS guidelines require you to retain these records for 7 years. **It is your responsibility to print and maintain your business records.** If you require copies of settlement reports from Distributor Support Services, they are available upon request for a fee.

✓ Monies due Franchisee from weekly settlement can be received by direct deposit or through a check sent through the US Postal Service.

✓ Monies due Sara Lee from weekly settlement must be paid weekly upon receipt of the weekly settlement.

✓ Final settlement accounting for customers who pay though Scan Based Trading is done each accounting quarter. If you have a Scan Based Customer, please refer to instructions under Scan Based Trading for additional settlement instructions.

# SARA LEE – DISTRIBUTION FRANCHISES
## E-MAIL TRANSMISSION OF WEEKLY HOST REPORTS

**EFFECTIVE: January 1, 2011**

You will receive your weekly settlement reports through e-mail. In order to receive e-mail reports, you will need to complete the information below. If you have Yahoo, AOL, or GMail as your e-mail provider you will receive the settlement as an attachment. For other providers, you will need Outlook or Outlook Express on your computer to open these report files and read them. Outlook express is standard on most Microsoft Windows programs or can be downloaded through their website. Your weekly settlement reports will usually be sent out on Thursday to your e-mail address.

**CORPORATION NAME:** _____

**PRINCIPAL OPERATOR NAME:** _____

**TELEPHONE NUMBER:** _____

**ZONE & ROUTE NUMBER(s):** _____

**E-MAIL ADDRESS:** _____  @  _____

*Please print as clearly as possible.*
*Zeros should be listed with a line through them ( Ø ).*

**Dated:** _____   _____
**Corporation President Signature**

*Please fax the completed form to Distributor Support Services at*
*(323) 277-8324.*

Confidential

10/25/2010

## WEEKLY SETTLEMENT REPORTS

### IO WEEKLY SETTLEMENT SUMMARY Report – (Report #1)

This is a weekly summary report.  It reflects the totals for each category of transactions that affects the final weekly accounting that results in a payment made to the Franchisee.  The detail itemization of these numbers are shown on separate reports (REPORT #'s 2-7)

# REPORT #1

```
RUN DATE: 09/10/2008                DISTRIBUTION MANAGEMENT SYSTEM               PAGE:      20
RUN TIME: 09:29:11                                                              PGM.: B157331B
APPL DATE: 09/06/2008                   IO WEEKLY SETTLEMENT SUMMARY - TYPE II  RPT : ROU
DISTRIBUTOR NUMBER: 00000            WEEK ENDING: 09/06/2008        ROUTE: 000
                     (A) CREDITS                                (B) CHARGES

CUSTOMER INVOICES            $7,640.09       PURCHASES                  $8,103.50
PA REIMBURSEMENT               $952.58
PROMO PA'S                     $250.33       STALE CREDIT                 $528.76-
PROMOTION BILLBACK               $0.00       DROP SHIPMENT ADJ             $27.84

TOTAL CREDITS:               $8,743.00       TOTAL CHARGES:             $7,602.58

WEEKLY SETTLEMENT (A - B)                                       $1,140.42

                     SBT ADJUSTMENT - PERIOD
SBT SCAN SALES              $13,374.87       SBT HHC INVOICES          $13,081.81
SBT SCAN PA REIMBURSEMENT    $1,026.64       SBT HHC PA REIMBURSEMENT     $995.32

TOTAL                      $14,401.51        TOTAL                     $14,077.13

            PERIOD SBT ADJUSTMENT                                $324.38

            ACCOUNTS PAYABLE SECTION

WEEKLY SETTLEMENT DUE DISTRIBUTOR (A - B - C)                   $1,464.80

                     GL ACCT #   COST CENTER
ALLSTATE INSURANCE PAYMENT    316103   40055003      $41.00
ADVERTISING                   820044   40055003     $100.00-
HHC PAYMENT                   820030   40055003      $30.00
B OF A LOAN PAYMENT           316200   40055003     $127.29
SUPPLIES                      820035   40055003       $5.00
WAL-MART SBT CREDIT           076007   40055003      $47.38-
TOTAL ADJUSTMENTS                                              $55.91

CHECK ISSUED FOR:                                            $1,408.89

DISTRIBUTOR OWES SARA LEE:                                       $0.00
```

Confidential

10/25/2010

The top portion of this report shows "CREDITS", money we owe you for "Customer Invoices" and "Promotional PA's" discounts.

| (A) CREDITS | |
| --- | --- |
| CUSTOMER INVOICES | $7,640.09 |
| PA REIMBURSEMENT | $852.58 |
| PROMO PA'S | $250.33 |
| PROMOTION BILLBACK | $0.00 |
| TOTAL CREDITS: | $8,743.00 |

Customer Invoices is the total amount of invoices to charge customers purchased    from you by Sara Lee.

PA Reimbursement & Promo PA's are the additional discount you receive for product that you purchased then resold below base list price.  The "Promotional PA's" amount is calculated from the total Promotional PA's shown on the Sales Customer list.  It is based on your discount rate.  An example is if the item on Promotional PA is sold to you at a discount of 22% then you receive an adjustment of 78%, if the item on Promotional PA is sold to you at a discount of 15% then you receive an adjustment of 85%.

Promotion Billback are discounts taken by certain customers who require after invoicing discounts.

"CHARGES" details the money you owe Sara Lee for the Purchase of product from us less the credit for stale product and any adjustments for drop ship service level.

| (B) CHARGES | |
| --- | --- |
| PURCHASES | $8,103.50 |
| STALE CREDIT | $528.76− |
| DROP SHIPMENT ADJ | $27.84 |
| TOTAL CHARGES: | $7,602.58 |

Purchases are the Franchise cost of product purchased from Sara Lee.

Stale Credit is the stale product invoiced on a stale sheet at Franchise cost and returned to Sara Lee.

Drop Shipment Adjustment is the adjustment for the cost of product sold to drop ship accounts.

The "Weekly Settlement" total is the difference, before adjustments, of these two amounts. <u>This total plus any cash sales you are paid directly from customers is your company's gross profit before expenses.</u>

| (A) CREDITS | | (B) CHARGES | |
|---|---|---|---|
| CUSTOMER INVOICES | $7,640.09 | PURCHASES | $8,103.50 |
| PA REIMBURSEMENT | $852.58 | | |
| PROMO PA'S | $250.33 | STALE CREDIT | $528.76- |
| PROMOTION BILLBACK | $0.00 | DROP SHIPMENT ADJ | $27.84 |
| TOTAL CREDITS: | $8,743.00 | TOTAL CHARGES: | $7,602.58 |
| WEEKLY SETTLEMENT (A - B) | | | $1,140.42 |

The middle portion of this report will only generate for Franchisees who have customers who pay through Scan Based Trading. This section will only appear once a quarter, on the first week of each accounting quarter. Refer to the SBT section of your Operational Guidelines for further detail

| SBT ADJUSTMENT - PERIOD | | | |
|---|---|---|---|
| SBT SCAN SALES | $13,374.87 | SBT HHC INVOICES | $13,081.81 |
| SBT SCAN PA REIMBURSEMENT | $1,026.64 | SBT HHC PA REIMBURSEMENT | $995.32 |
| TOTAL | $14,401.51 | TOTAL | $14,077.13 |
| PERIOD SBT ADJUSTMENT | | | $324.38 |

The lower portion of this report or the "Accounts Payable Section" will show the adjustments made on your behalf that do not come directly from product you purchase or sales you generate.

| | GL ACCT # | COST CENTER | |
|---|---|---|---|
| ALLSTATE INSURANCE PAYMENT | 316103 | 40055003 | $41.00 |
| ADVERTISING | 820044 | 40055003 | $100.00- |
| HHC PAYMENT | 820030 | 40055003 | $30.00 |
| B OF A LOAN PAYMENT | 316200 | 40055003 | $127.29 |
| SUPPLIES | 820035 | 40055003 | $5.00 |
| WAL-MART SBT CREDIT | 876007 | 40055003 | $47.38- |
| TOTAL ADJUSTMENTS | | | $55.91 |

Confidential

In this lower portion of the statement, payments to you are shown as negative amounts and deductions made from your proceeds are shown as positive amounts. This portion of the statement will show loan payments, vehicle leases, insurance payments, supplies, and hand held rental as well as any court ordered garnishments.  Any advertising allowance payments will appear in this section. Only those adjustments that apply for that week will appear in this section.

The bottom of the statement will indicate the amount that will be received through direct deposited or issued as a check provided that there are not any amounts outstanding from previous weeks.  If funds are due by you to Sara Lee for the week, the total due will appear under "Distributor Owes Sara Lee".  You are responsible to make payment for any amounts shown under "Distributor Owes Sara Lee" on a weekly basis.

| | |
|---|---|
| CHECK ISSUED FOR: | $1,408.89 |
| DISTRIBUTOR OWES SARA LEE: | $0.00 |

This total is for the settlement week only.  It does not provide a running total of any previous amounts owed by you to Sara Lee for previous settlement weeks.  If there is a previous amount owed Sara Lee, then the "CHECK ISSUED FOR" amount will be reduced by the amount of previous balance owned.

## Distributor Purchase Invoice – (Report #2)

This report will show your purchases of product from Sara Lee by day and by product number.  This report will bill each unit at distributor cost and displays both the full price list store cost as well as the distributor cost which is full store cost less the applicable discount percent.  Reductions in your cost of product, when product is sold for less than full price list, are done through PA credits.

```
RUN DATE.: 09/10/2008                    DISTRIBUTION MANAGEMENT SYSTEM                          REPORT #2
TIME  : 09:28:46                                                                                 PGM : B157325B
APPL DATE: 09/05/2008                    IO PURCHASES INVOICE - TYPE II                          RPT : RED
DISTRIBUTOR NUMBER: 00000                WEEK ENDING: 09/06/2008         ROUTE: 000
```

| PROD PRODUCT NUM DESCRIPTION | STORE PRICE | IO PRICE | | SUN 08/31 | MON 09/01 | TUE 09/02 | WED 09/03 | THU 09/04 | FRI 09/05 | SAT 09/06 | WEEKS TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 066 RBG WHT 24 OZ | $1.8500 | $1.4615 | QTY: | 0 | 150 | 70 | 0 | 110 | 70 | 0 | 400 |
| | | | DOLLARS: | | $219.23 | $102.31 | | $160.77 | $102.31 | | $584.62 |
| 072 IRISHKIDS 24 OZ | $1.8500 | $1.4615 | QTY: | 0 | 20 | 25 | 0 | 40 | 25 | 0 | 110 |
| | | | DOLLARS: | | $29.23 | $36.54 | | $59.46 | $36.54 | | $160.77 |
| 683 SM R&N 16OZ | $2.8700 | $2.2673 | QTY: | 0 | 12 | 12 | 0 | 10 | 10 | 0 | 44 |
| | | | DOLLARS: | | $27.21 | $27.21 | | $22.67 | $22.67 | | $99.76 |
| 1269 RBG 16CT CONEY | $2.3000 | $1.8170 | QTY: | 0 | 0 | 3 | 0 | 0 | 5 | 0 | 8 |
| | | | DOLLARS: | | | $5.45 | | | $9.09 | | $14.54 |
| 1392 KAISER SS 4.5 12CT | $2.2300 | $1.7617 | QTY: | 0 | 20 | 25 | 0 | 20 | 20 | 0 | 85 |
| | | | DOLLARS: | | $35.23 | $44.04 | | $35.23 | $35.23 | | $149.73 |
| 1971 EG JEWISH RYE | $2.8000 | $2.2120 | QTY: | 0 | 18 | 20 | 0 | 20 | 18 | 0 | 76 |
| | | | DOLLARS: | | $39.82 | $44.24 | | $44.24 | $39.82 | | $168.12 |
| 1972 O F PUMP RYE | $2.8000 | $2.2120 | QTY: | 0 | 8 | 8 | 0 | 8 | 10 | 0 | 34 |
| | | | DOLLARS: | | $17.70 | $17.70 | | $17.70 | $22.12 | | $75.22 |
| 1991 SR PILLOW FR 1 1/2 | $2.7900 | $2.2041 | QTY: | 0 | 24 | 24 | 0 | 24 | 30 | 0 | 102 |
| | | | DOLLARS: | | $52.90 | $52.90 | | $52.90 | $66.12 | | $224.82 |
| 2522 EGR DF 100% WW | $2.5600 | $2.0224 | QTY: | 0 | 3 | 2 | 0 | 4 | 3 | 0 | 12 |
| | | | DOLLARS: | | $6.07 | $4.04 | | $8.09 | $6.07 | | $24.27 |
| 2528 EGR DF 100%MLTIGRN | $2.5600 | $2.0224 | QTY: | 0 | 3 | 2 | 0 | 4 | 3 | 0 | 12 |
| | | | DOLLARS: | | $6.07 | $4.04 | | $8.09 | $6.07 | | $24.27 |
| 2656 RBG WHEAT SAND | $2.2500 | $1.7775 | QTY: | 0 | 50 | 30 | 0 | 50 | 30 | 0 | 160 |
| | | | DOLLARS: | | $88.88 | $53.33 | | $88.88 | $53.33 | | $284.42 |
| 2714 RBG TX TOAST 24 OZ | $2.1100 | $1.7302 | QTY: | 0 | 50 | 40 | 0 | 50 | 55 | 0 | 195 |
| | | | DOLLARS: | | $86.51 | $69.21 | | $86.51 | $95.16 | | $337.39 |
| 2849 BUN 4" 12CT | $2.1000 | $1.6590 | QTY: | 0 | 15 | 15 | 0 | 20 | 15 | 0 | 65 |
| | | | DOLLARS: | | $24.89 | $24.89 | | $33.18 | $24.89 | | $107.85 |
| 2963 SS BUNS 4" 12CT | $2.3900 | $1.9698 | QTY: | 0 | 15 | 0 | 0 | 15 | 0 | 0 | 30 |
| | | | DOLLARS: | | $29.40 | | | $29.40 | | | $59.60 |
| 3109 4.5 24 CT BUNS | $4.5200 | $3.7064 | QTY: | 0 | 4 | 0 | 0 | 4 | 4 | 0 | 12 |
| | | | DOLLARS: | | $14.83 | | | $14.83 | $14.83 | | $44.49 |
| 3292 PP SS BUN 20 CT | $4.5000 | $3.6900 | QTY: | 0 | 12 | 10 | 0 | 12 | 8 | 0 | 42 |
| | | | DOLLARS: | | $44.28 | $36.90 | | $44.28 | $29.52 | | $154.98 |
| 3305 PP BUN 5" 20CT | $4.1000 | $3.3620 | QTY: | 0 | 22 | 22 | 0 | 16 | 44 | 0 | 104 |
| | | | DOLLARS: | | $73.96 | $73.96 | | $53.79 | $147.93 | | $349.64 |
| 3325 LOTTA 5" | $4.1000 | $3.3620 | QTY: | 0 | 20 | 0 | 0 | 18 | 18 | 0 | 56 |
| | | | DOLLARS: | | $67.24 | | | $60.52 | $60.52 | | $188.28 |
| 3408 CONEY 6" 12CT | $1.9400 | $1.5826 | QTY: | 0 | 6 | 6 | 0 | 12 | 12 | 0 | 36 |
| | | | DOLLARS: | | $9.20 | $9.20 | | $18.39 | $18.39 | | $55.18 |
| 3517 CNY 10" 6CT | $2.0100 | $1.6402 | QTY: | 0 | 8 | 16 | 0 | 8 | 16 | 0 | 48 |
| | | | DOLLARS: | | $13.19 | $26.37 | | $13.19 | $26.37 | | $79.12 |
| 5303 WGU CONEY 8 CT | $2.2000 | $1.7380 | QTY: | 0 | 15 | 9 | 0 | 15 | 12 | 0 | 51 |
| | | | DOLLARS: | | $26.07 | $15.64 | | $26.07 | $20.86 | | $88.64 |
| 5304 WGU HAMS 6CT | $2.2000 | $1.7380 | QTY: | 0 | 12 | 6 | 0 | 9 | 9 | 0 | 36 |
| | | | DOLLARS: | | $20.86 | $10.43 | | $15.64 | $15.64 | | $62.57 |
| 5471 SL CLAS BUNS SS4CT | $1.5000 | $1.1850 | QTY: | 0 | 8 | 8 | 0 | 8 | 0 | 0 | 24 |
| | | | DOLLARS: | | $9.48 | $9.48 | | $9.48 | | | $28.44 |
| 5482 SL HAM 8 CT | $1.8500 | $1.4615 | QTY: | 0 | 9 | 0 | 0 | 6 | 0 | 0 | 15 |
| | | | DOLLARS: | | $13.15 | | | $8.77 | | | $21.92 |
| 5483 SL HH WW BUN 8 CT | $2.2000 | $1.7380 | QTY: | 0 | 12 | 0 | 0 | 9 | 9 | 0 | 30 |
| | | | DOLLARS: | | $20.86 | | | $15.64 | $15.64 | | $52.14 |
| 5484 SL HH W HOTDOG 8CT | $2.2000 | $1.7380 | QTY: | 0 | 18 | 18 | 0 | 6 | 24 | 0 | 66 |
| | | | DOLLARS: | | $31.28 | $31.28 | | $10.43 | $41.71 | | $114.70 |

Confidential

The quantity purchased of each item and the distributor cost will be shown for each day and totaled for the week.

| PROD NUM | PRODUCT DESCRIPTION | STORE PRICE | IO PRICE | | SUN 08/31 | MON 09/01 | TUE 09/02 | WED 09/03 | THU 09/04 | FRI 09/05 | SAT 09/06 | WEEKS TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 068 | RBG WHI 24 OZ | $1.8500 | $1.4615 | QTY: | 0 | 150 | 70 | 0 | 110 | 70 | 0 | 400 |
| | | | | DOLLARS: | | $219.23 | $102.31 | | $160.77 | $102.31 | | $584.62 |

On some days, you may see the entry of an adjustment that shows a charge or a credit of just a few cents. These adjustments are done by the system to account for penny rounding.

| 57109 | OLD HOME WHEAT24OZ | $1.6200 | $1.3284 | QTY: | 0 | 10 | 12 | 0 | 10 | 2 | 1 | 35 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | DOLLARS: | | $13.28 | $15.97 | | $13.28 | $0.01- | $0.01 | $42.53 |

The bottom of the report will show the net load for each day.

| 57109 | OLD HOME WHEAT24OZ | $1.6200 | $1.3284 | QTY: | 0 | 10 | 12 | 0 | 10 | 2 | 1 | 35 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | DOLLARS: | | $13.28 | $15.97 | | $13.28 | $0.01- | $0.01 | $42.53 |
| | | TOTAL DAY ORDER QTY...: | | | 0 | 1,210 | 947 | 0 | 1,097 | 1,202 | 1 | 4,457 |
| | | TOTAL DAY ORDER DOLLARS: | | | | $2238.37 | $1657.53 | | $1961.87 | $2245.72 | $0.01 | $8103.50 |
| | | TOTAL POTENTIAL SALES..:$10200.86 | | | | | | | | | | |

SUMMARY FOR CURRENT WEEK'S ORDERS AND ADJUSTMENTS AGAINST PRIOR ORDERS:

```
OVERALL UNITS PURCHASED...:     4,457
OVERALL IO AMOUNT.........:    $8,103.50
OVERALL POTENTIAL SALES...:   $10,200.86
```

The net load will match with the Net Load value on your Daily Unit Charge (RTAC) report (dump sheet). There may be a few pennies difference as the Distributor Purchase Invoice amount extends four digits from the decimal point.

```
RUN DATE : 09/05/2008                 DISTRIBUTION MANAGEMENT SYSTEM                          PGM : BLSS073
RUN TIME : 10:43:19                         SARA LEE -                                        RPT : RH3
RUN BY   : DOA5903                   DAILY UNIT CHARGE/RTAC ROUTE SETTLEMENT                   PAGE:  90
                                       RTAC DATE 09/05/2008 - VERSION 001
                                                                                   DELIVERY DATE: 09/05/2008
ROUTE:                               DEPOT:     -

ORIGINAL ORDER:              068      70   072     25   683    10   1269     8   1392    20   1971    18
   1972    10   1991    30   2522      3   2528     3   2656    30   2714        2849    15   2963    15
   3109     4   3292     9   3205     44   3325    13   3408    12   3517    16   5303    12   5204    40
   5471     8   5483     9   5486     24   5485    70   5487    70   5493    36   5567    50   5515    40
   5518    40   5522    10   5529      4   5530     4   40535    10   40738    14   40740    14   50030     9
   50032    12   50080     4   51253        51255     6   51265     7   51266     7   51267     7   53046    50
   53066    40   53067    50   53069     16   53100    42   53101    12   53102     5   53103     7   53109    60
   53109    15   53128     8   53131     30   53171     7   53172     6   53174     7   53176     7   53176     5
   53180     3   53181        53182      6   53285     3   53286     3   54098     6
DISTRIBUTION ADJUSTMENTS:    51267      7-
SPECIALS:        5471      8-   53128     8-
HHC STALE FROM 09/04/2008:   2522      1   2528     2   2849     9   3325     2   3408     2   5306    10
   5493     1   5507      1   5510      2   5515     7   8510     3   5522     5   5529     2   40740     3
   50032     2   53045     3   53069     3   53105     3   53171     2   53175     3   53176     2   53180     3
   53181     2
LOAD VALUE    2280.53       YSTR A/R CHARGES    1965.58
LOAD ADJ        34.83-      YSTR TOTAL PA        379.44
TRANSFERS         .00       YSTR PA CREDIT       308.25
NET LOAD      2245.70       YSTR RETURNS         130.72
                            YSTR DROPSHIP ADJ     10.96
```

10/25/2010

The total cost of product from this report is reflected under the PURCHASES section of the Weekly Summary Report #1.

## REPORT #1

```
RUN DATE.: 09/10/2008              DISTRIBUTION MANAGEMENT SYSTEM
RUN TIME : 09:29:11                IO WEEKLY SETTLEMENT SUMMARY - TYPE II
APPL DATE: 09/06/2008              WEEK ENDING: 09/06/2008       ROUTE: 000
DISTRIBUTOR NUMBER: 00000                                       (B) CHARGES
               (A) CREDITS
```

| | | | |
|---|---|---|---|
| CUSTOMER INVOICES | $7,640.09 | PURCHASES | $8,108.50 |
| PA REIMBURSEMENT | $852.58 | | |
| PROMO PA'S | $250.33 | STALE CREDIT | $528.76- |
| PROMOTION BILLBACK | $0.00 | DROP SHIPMENT ADJ | $27.04 |
| TOTAL CREDITS: | $8,742.08 | TOTAL CHARGES: | $7,602.58 |

| | |
|---|---|
| WEEKLY SETTLEMENT (A - B) | $1,140.42 |

## REPORT #2

| | | | | QTY/DOLLARS | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 53180 | SL DELI STYLE100%W | $2.5500 | $2.0224 | QTY: | 0 | 3 | 3 | | 0 | 3 | 3 | | 0 | 12 |
| | | | | DOLLARS: | | $6.07 | $6.07 | | | $6.07 | $6.07 | | | $24.28 |
| 53181 | SL DELI STYLE WHIT | $2.5600 | $2.0224 | QTY: | 0 | 3 | 3 | | 0 | 3 | 3 | | 0 | 12 |
| | | | | DOLLARS: | | $6.07 | $6.07 | | | $6.07 | $6.07 | | | $24.28 |
| 53182 | SL SEEDED DELI SOL | $2.5800 | $2.0392 | QTY: | 0 | 6 | 4 | | 0 | 11 | 6 | | 0 | 27 |
| | | | | DOLLARS: | | $12.22 | $8.15 | | | $22.42 | $12.23 | | | $55.02 |
| 53285 | SL THICKSLD 100%WU | $2.1300 | $1.6827 | QTY: | 0 | 3 | 4 | | 0 | 4 | 3 | | 0 | 14 |
| | | | | DOLLARS: | | $5.05 | $6.73 | | | $6.73 | $5.05 | | | $23.56 |
| 53286 | SL THICK SLD WHY W | $2.1300 | $1.6827 | QTY: | 0 | 3 | 4 | | 0 | 4 | 3 | | 0 | 14 |
| | | | | DOLLARS: | | $5.05 | $6.73 | | | $6.73 | $5.05 | | | $23.56 |
| 54098 | SL CORN DUSTED RAI | $2.8000 | $2.2120 | QTY: | 0 | 6 | 6 | | 0 | 6 | 6 | | 0 | 24 |
| | | | | DOLLARS: | | $13.27 | $13.27 | | | $13.27 | $13.27 | | | $53.08 |
| 57100 | OLD HOME BUNS 8CT | $1.4900 | $1.2218 | QTY: | 0 | 9 | 10 | | 0 | 0 | 0 | | 0 | 19 |
| | | | | DOLLARS: | | $11.00 | $12.22 | | | | | | | $23.22 |
| 57101 | OLD HOME CONEY 8CT | $1.4900 | $1.2218 | QTY: | 0 | 9 | 10 | | 0 | 0 | 0 | | 0 | 19 |
| | | | | DOLLARS: | | $11.00 | $12.22 | | | | | | | $23.22 |
| 57102 | OLD HOME WHITE240Z | $1.5400 | $1.2628 | QTY: | 0 | 10 | 12 | | 0 | 0 | 0 | | 0 | 22 |
| | | | | DOLLARS: | | $12.69 | $15.15 | | | | | | | $27.78 |
| 57109 | OLD HOME WHEAT240Z | $1.6200 | $1.3284 | QTY: | 0 | 10 | 12 | | 0 | 10 | 2 | 1 | 35 |
| | | | | DOLLARS: | | $13.28 | $15.97 | | | $13.28 | $0.01- | $0.01 | $42.53 |
| | TOTAL DAY ORDER QTY...: | | | | 0 | 1,210 | 947 | | 0 | 1,097 | 1,202 | 1 | 4,457 |
| | TOTAL DAY ORDER DOLLARS: | | | | | $2239.37 | $1657.83 | | | $1961.97 | $2245.72 | $0.01 | $8103.50 |

```
                    TOTAL POTENTIAL SALES..:$10200.86
SUMMARY FOR CURRENT WEEK'S ORDERS AND ADJUSTMENTS AGAINST PRIOR ORDERS:
        OVERALL UNITS PURCHASED...:      4,457
        OVERALL IO AMOUNT.........:     $8,108.50
        OVERALL POTENTIAL SALES...:    $10,200.86
```

Confidential

## IO Stale Credit Invoice – (Report #3)

This report will show the credits you are receiving for stale product that you invoice on a stale sheet and return to Sara Lee. This report displays information in the same way that the purchase report does, by day and by product number. This report will credit each unit at distributor cost and displays both the full price list store cost as well as the distributor cost which is full store cost less discount. The total of the stale credits will appear on the Weekly Settlement report under the heading of "Stale Credit".

**Report #3**

```
.N DATE: 09/10/2008
RUN TIME: 09:28:53                  DISTRIBUTION MANAGEMENT SYSTEM
APPL DATE: 09/06/2008          ┌─────────────────────────────────────┐
DISTRIBUTOR NUMBER: 00000      │ IO STALE CREDIT INVOICE - TYPE II    │
                               │ WEEK ENDING: 09/06/2008  ROUTE: 000  │
                               └─────────────────────────────────────┘
```

| Prod Num | Description | Store Price | Week To Price | | SUN 08/31 | MON 09/01 | TUE 09/02 | WED 09/03 | THU 09/04 | FRI 09/05 | SAT 09/06 | Weeks Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40740 | SL HONEY WHEAT NUF | $2.6500 | $2.0938 | QTY: | 0 | 5 | 1 | 0 | 3 | 1 | 0 | 10 |
| | | | | DOLLARS: | | $10.47 | $2.09 | | $6.28 | $2.09 | | $20.93 |
| 50030 | EGR NAUGHTBRYE/HNY | $2.5600 | $2.0224 | QTY: | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| | | | | DOLLARS: | | $4.04 | | | | | | $4.04 |
| 50032 | EGR NAT 100% WU | $2.5600 | $2.0224 | QTY: | 0 | 3 | 0 | 0 | 4 | 5 | 0 | 12 |
| | | | | DOLLARS: | | $6.07 | | | $8.09 | $10.11 | | $24.27 |
| 51266 | SL DELUXE BB BAGEL | $2.8700 | $2.2673 | QTY: | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 2 |
| | | | | DOLLARS: | | $2.27 | $2.27 | | | | | $4.54 |
| 51267 | SL DLX CIN/RAISBGL | $2.8700 | $2.2673 | QTY: | 0 | 1 | 1 | 0 | 0 | 1 | 0 | 3 |
| | | | | DOLLARS: | | $2.27 | $2.27 | | | $2.27 | | $6.81 |
| 53045 | SL SNS SAND 24 OZ | $1.4800 | $1.1771 | QTY: | 0 | 11 | 0 | 0 | 3 | 0 | 0 | 14 |
| | | | | DOLLARS: | | $12.95 | | | $3.53 | | | $16.48 |
| 53066 | SL CLASSIC WHITE | $1.4900 | $1.1771 | QTY: | 0 | 1 | 2 | 0 | 0 | 0 | 0 | 3 |
| | | | | DOLLARS: | | $1.18 | $2.35 | | | | | $3.53 |
| 53069 | SL HONEY WHEAT | $1.9500 | $1.5405 | QTY: | 0 | 8 | 1 | 0 | 0 | 5 | 0 | 14 |
| | | | | DOLLARS: | | $12.32 | $1.54 | | | $7.70 | | $21.56 |
| 53100 | SL 4.5 WHITE | $2.8000 | $2.2120 | QTY: | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 |
| | | | | DOLLARS: | | | $2.21 | | | | | $2.21 |
| 53105 | SL POTATO 200Z | $2.1300 | $1.6827 | QTY: | 0 | 4 | 0 | 0 | 2 | 3 | 0 | 9 |
| | | | | DOLLARS: | | $6.73 | | | $3.37 | $5.05 | | $15.15 |
| 53109 | SL LC WHEAT | $2.3500 | $1.8565 | QTY: | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 2 |
| | | | | DOLLARS: | | $3.71 | | | | | | $3.71 |
| 53128 | SL CLASSIC BUNS4CT | $1.5000 | $1.1850 | QTY: | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 4 |
| | | | | DOLLARS: | | $2.37 | $2.37 | | | | | $4.74 |
| 53131 | SL DELUXE MULTIGRA | $2.3500 | $1.8565 | QTY: | 0 | 5 | 0 | 0 | 0 | 0 | 0 | 5 |
| | | | | DOLLARS: | | $9.28 | | | | | | $9.28 |
| 53171 | SL 100% WU W/HNY | $3.1000 | $2.4490 | QTY: | 0 | 1 | 0 | 0 | 2 | 0 | 0 | 3 |
| | | | | DOLLARS: | | $2.45 | | | $4.90 | | | $7.35 |
| 53172 | SL COUNTRY WHITE | $2.9500 | $2.3305 | QTY: | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| | | | | DOLLARS: | | | | | | $2.33 | | $2.33 |
| 53174 | SL NATURAL WU | $3.1000 | $2.4490 | QTY: | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | | | DOLLARS: | | $2.45 | | | | | | $2.45 |
| 53175 | SL 100%MULTI GRAIN | $3.1000 | $2.4490 | QTY: | 0 | 1 | 0 | 0 | 3 | 0 | 0 | 4 |
| | | | | DOLLARS: | | $2.45 | | | $7.35 | | | $9.80 |
| 53176 | SL WG 100% OAT | $3.1000 | $2.4490 | QTY: | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 2 |
| | | | | DOLLARS: | | $2.45 | | | | $2.45 | | $4.90 |
| 53160 | SL DELI STYLE100WU | $2.5600 | $2.0224 | QTY: | 0 | 5 | 2 | 0 | 3 | 0 | 0 | 10 |
| | | | | DOLLARS: | | $10.11 | $4.04 | | $6.07 | | | $20.22 |
| 53161 | SL DELI STYLE WHIT | $2.5600 | $2.0224 | QTY: | 0 | 4 | 2 | 0 | 0 | 0 | 0 | 6 |
| | | | | DOLLARS: | | $8.09 | $4.04 | | | | | $12.13 |
| 53285 | SL THICKSLD 100%WU | $2.1300 | $1.6827 | QTY: | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | | | DOLLARS: | | $1.68 | | | | | | $1.68 |
| 53286 | SL THICK SLD HNY W | $2.1300 | $1.6827 | QTY: | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| | | | | DOLLARS: | | $1.69 | | | | | | $1.69 |
| 57100 | OLD HOME BUNS 8CT | $1.4900 | $1.2218 | QTY: | 0 | 7 | 7 | 0 | 0 | 0 | 0 | 14 |
| | | | | DOLLARS: | | $8.55 | $8.55 | | | | | $17.10 |
| 57101 | OLD HOME CONEY 8CT | $1.4900 | $1.2218 | QTY: | 0 | 7 | 0 | 0 | 0 | 0 | 0 | 7 |
| | | | | DOLLARS: | | $8.55 | | | | | | $8.55 |
| 57109 | OLD HOME WHEAT240Z | $1.6200 | $1.3284 | QTY: | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 2 |
| | | | | DOLLARS: | | | $2.66 | | | | | $2.66 |

The Total Day Stale Dollars will match with the YSTR RETURNS total on your Daily Unit Charge (RTAC) report (dump sheet). There may be a few pennies difference as the Distributor Purchase Invoice amount extends four digits from the decimal point.

```
RUN DATE: 09/10/2008              DISTRIBUTION MANAGEMENT SYSTEM                    PAGE:   59
RUN TIME : 09:29:53                                                                 PGM.: B1S7926B
APPL DATE: 09/06/2008                     IO STALE CREDIT INVOICE - TYPE II         RPT : ROR
DISTRIBUTOR NUMBER: 00000    WEEK ENDING: 09/06/2008        ROUTE:  000
  PROD PRODUCT               STORE    IO          SUN      MON      TUE      WED      THU      FRI      SAT      WEEKS
  NBR DESCRIPTION            PRICE    PRICE       08/31    09/01    09/02    09/03    09/04    09/05    09/06    TOTALS
  ---------------------------------------------------------------------------------------------------------------------
                             TOTALS DAY STALE QTY...:        0      114       91        0       71       26        0      302
                             TOTAL DAY STALE DOLLARS..:           $187.37  $160.24          $130.73   $50.42             $528.76
                             TOTAL POTENTIAL STALE...: $666.10
SUMMARY FOR CURRENT WEEK'S STALE:
        OVERALL STALE UNITS......:        302
        OVERALL IO STALE AMOUNT...:    $528.76
        OVERALL POTENTIAL STALE...:    $666.10
```

The total credit for returned stale product from the IO STALE CREDIT INVOICE report (Report #3) is reflected under the STALE CREDIT section of the Weekly Summary Report #1.

```
RUN DATE.: 09/10/2008              DISTRIBUTION MANAGEMENT SYSTEM
RUN TIME : 09:29:11
APPL DATE: 09/06/2008                     IO WEEKLY SETTLEMENT SUMMARY - TYPE II
DISTRIBUTOR NUMBER: 00000    WEEK ENDING: 09/06/2008        ROUTE: 000
                        (A) CREDITS                                (B) CHARGES

CUSTOMER INVOICES            $7,640.09      PURCHASES                    $8,103.50
PA REIMBURSEMENT               $852.58
PROMO PA'S                     $250.33      STALE CREDIT                  $ 528.76-
PROMOTION BILLBACK               $0.00      DROP SHIPMENT ADJ             $27.84

TOTAL CREDITS:               $8,743.00      TOTAL CHARGES:               $7,602.58

WEEKLY SETTLEMENT (A - B)                                    $1,140.42
```

## Sales Customer List -- (Report #4)

This report will provide the detail of all charge customer invoices accepted through TCOM.  The report will indicate the net amount of the invoices as well as Promo PA's and PA's that were calculated from the invoice.

```
RUN DATE.: 09/10/2008              DISTRIBUTION MANAGEMENT SYSTEM        REPORT #4              PAGE:     35
RUN TIME : 09:29:02                                                                            PGM.: DLS7327E
APRL DATE: 09/05/2008                      SALES CUSTOMER LIST CHARGE - TYPE II                RPT : SCS
DISTRIBUTOR NUMBER: 00000           WEEK ENDING: 09/06/2008        ROUTE:
DLVRY DATE   INVOICE   A/R    CUSTOMER #/NAME            INVOICE #        GROSS          PA'S      PROMO PA'S         NET
09/01/2008   09/01   09/02   00000 GENERAL HOSPITAL     000024509        95.37         29.73          0.00          65.64
09/01/2008   09/01   09/02   00000 MOTOR INN REST       000024505        51.04          2.88          0.00          48.16
09/01/2008   09/01   09/02   00000 SONIC                000024510       163.02         70.26          0.00          94.76
09/01/2008   09/01   09/02   00000 BURGER PLACE         000024511        22.96          0.35-          0.00          23.31
09/01/2008   09/01   09/02   00000 LAKES GROCERY        000024518        99.37         21.19          0.00          78.18
09/01/2008   09/01   09/02   00000 PH MARKET            000024507       697.85          0.00         11.34         686.51
09/01/2008   09/01   09/02   00000 PH MARKET            000024508       213.18-          0.00          0.00         213.18-
09/01/2008   09/01   09/02   00000 DENNYS               000024502       102.63         14.14          0.00          88.49
09/01/2008   09/01   09/02   00000 DENNYS               000024504        31.00          2.74          0.00          28.26
09/01/2008   09/01   09/02   00000 WALMART SC           000024500       994.30         65.66         75.10         853.54
09/01/2008   09/01   09/02   00000 WALMART SC           000024503       164.63-        10.23-         9.41-        144.99-
09/01/2008   09/01   09/02   00000 COUNTY JAIL          000024516       198.10        110.20          0.00          87.90
09/01/2008   09/01   09/02   00000 RANCH MARKET         000024515       159.00         26.00          0.00         133.00
09/01/2008   09/01   09/02   00000 VICS                 000024501        78.91          0.00          0.00          78.91
                              ** DATE  TOTALS     14 ENTRIES            2,317.74        332.22        77.03       1,908.49

09/02/2008   09/02   09/04   00000 DO DROP INN          000024604        17.82          0.24-          0.00          18.06
09/02/2008   09/02   09/04   00000 SONIC                000024609       170.84         72.71          0.00          98.13
09/02/2008   09/02   09/04   00000 PH MARKET            000024601       424.21          0.00          6.51         417.70
09/02/2008   09/02   09/04   00000 PH MARKET            000024606        93.93-          0.00          0.00          93.93-
09/02/2008   09/02   09/04   00000 PH MARKET            000024608        18.70          0.00          0.42          18.28
09/02/2008   09/02   09/04   00000 DENNYS               000024602       130.61         10.58          0.00         120.03
09/02/2008   09/02   09/04   00000 WALMART SC           000024600       862.21         42.58         60.49         759.14
09/02/2008   09/02   09/04   00000 WALMART SC           000024603        17.88-          1.69-         0.55-         15.64-
09/02/2008   09/02   09/04   00000 VICS                 000024601        46.42          0.00          0.00          46.42
                              ** DATE  TOTALS      9 ENTRIES            1,619.00        123.94        66.87       1,428.19

09/04/2008   09/04   09/05   00000 MEMORIAL HOSPITAL    000024807       107.89         38.11          0.00          69.78
09/04/2008   09/04   09/05   00000 DO DROP INN          000024804        45.44          2.58          0.00          42.86
09/04/2008   09/04   09/05   00000 SONIC                000024808       141.80         59.94          0.00          81.86
09/04/2008   09/04   09/05   00000 BURGER PLACE         000024816        20.73          0.23-          0.00          20.96
09/04/2008   09/04   09/05   00000 LAKES GROCERY        000024819         8.20-          1.70-          0.00           6.50-
09/04/2008   09/04   09/05   00000 LAKES GROCERY        000024820       118.77         20.44          0.00          98.33
09/04/2008   09/04   09/05   00000 PH MARKET            000024805       538.12          0.00          5.88         532.24
09/04/2008   09/04   09/05   00000 PH MARKET            000024806       105.47-          0.00          2.45-        103.02-
09/04/2008   09/04   09/05   00000 DENNYS               000024802        99.58          8.48          0.00          91.10
09/04/2008   09/04   09/05   00000 WALMART SC           000024800     1,084.23         62.04         83.68         938.51
09/04/2008   09/04   09/05   00000 WALMART SC           000024803        96.89-          2.11-         4.14-         90.34-
09/04/2008   09/04   09/05   00000 COUNTY JAIL          000024818       127.20         70.90          0.00          56.30
09/04/2008   09/04   09/05   00000 RANCH MARKET         000024817       208.26         35.42          0.00         172.84
09/04/2008   09/04   09/05   00000 VICS                 000024801        60.66          0.00          0.00          60.66
                              ** DATE  TOTALS     14 ENTRIES            2,342.42        293.87        82.97       1,965.58

09/05/2008   09/05   09/06   00000 MEMORIAL HOSPITAL    000024907        58.72         16.38          0.00          42.34
09/05/2008   09/05   09/06   00000 DO DROP INN          000024904        57.75          1.00          0.00          56.75
09/05/2008   09/05   09/06   00000 SONIC                000024908       194.90         82.16          0.00         112.74
09/05/2008   09/05   09/06   00000 LAKES GROCERY        000024910        91.88         19.50          0.00          72.38
09/05/2008   09/05   09/06   00000 PH MARKET            000024905       684.25          0.00         10.71         673.54
09/05/2008   09/05   09/06   00000 PH MARKET            000024906        27.66-          0.00          0.00          27.66-
```

The daily net total of the invoices should match with the amount shown on your hand held "Daily Sales Summary" report under "Authorized Charges".  It should also match the amount shown under "YSTR A/R Charges" on the Daily Unit Charge (RTAC) report.

Confidential

10/25/2010

```
RUN DATE : 09/05/2008                DISTRIBUTION MANAGEMENT SYSTEM                       PGM : B155073
RUN TIME : 10:43:19                        SARA LEE -                                     RPT : RU3
RUN BY  : DONS903              DAILY UNIT CHARGE/RTAC ROUTE SETTLEMENT                     PAGE:    90
                                RTAC DATE 09/05/2008 - VERSION 001
ROUTE:    -                           DEPOT:    -                           DELIVERY DATE: 09/05/2008

ORIGINAL ORDER:          068    70    072    25    683    30   1269    5   1392    20   1571    18
  1972    10   1991    30   2522     3   2528     3   2656    30   2714    55   2849    15   2963    15
  3103     4   3202     8   3305    44   3325    18   3408    12   3517    16   5363    12   5304     9
  5471     8   5483     9   5484    24   5485     9   5487    70   5493    36   5607    50   5515    40
  5518    40   5522    10   5529     4   5530     4   40535   10   40738   14   40740   14   50030     9
  50032   12   50080     4   51253     7   51255     6   51265     7   51266     7   51267     7   53045    50
  53066   40   53067    50   53069    16   53100    42   53101    12   53102     5   53103     6   53105    60
  53109   15   53128     8   53131    30   53171     7   53172     6   53174     7   53175     7   53176     5
  53180     3   53181     3   53182     4   53285     3   53286     3   54098     6

DISTRIBUTION ADJUSTMENTS:     51267     7-

SPECIALS:        5471     8-  53128     8-

NRC STALE FROM 09/04/2008:    2522     1   2528     2   2849     5   3325     2   3408     2   5304    10
  5493     1   5507     1   5510     2   5515     7   5518     3   5522     1   5529     2   40740     3
  50032     4   53045     3   53069     5   53105     2   53171     2   53175     3   53176     1   53180     3
  53181     2

LOAD VALUE   2280.53     YSTR A/R CHARGES   | 1965.58 |
LOAD ADJ       34.83-
TRANSFERS        .00      YSTR TOTAL PA      379.44
NET LOAD     2245.70      YSTR PA CREDIT     308.25
                         YSTR RETURNS       130.72
                         YSTR DROPSHIP ADJ   10.96
```

The "Route Total - Net" amount shown at the bottom of this report is the amount
that appears under "Customer Invoices" on the CREDIT portion of your
Distributor Weekly Settlement report.

```
RUN DATE.: 09/10/2008                DISTRIBUTION MANAGEMENT SYSTEM                       PAGE:   36
RUN TIME : 09:29:02                                                                       PGM.: B157927B
APPL DATE: 09/05/2008              SALES CUSTOMER LIST CHARGE - TYPE II                   RPT : RG5
DISTRIBUTOR NUMBER: 00000         WEEK ENDING: 09/06/2008       ROUTE:  000
DLVRY DATE  INVOICE  A/R   CUSTOMER #/NAME         INVOICE #       GROSS      PA'S    PROMO PA'S       NET

09/05/2008  09/05  09/06  13351 DENNYS 6899        061824902     121.08      9.80       0.00       111.28
09/05/2008  09/05  09/06  13998 WALMART 5166 SC    061824900     909.30     48.93      61.43       798.94
09/05/2008  09/05  09/06  13998 WALMART 5166 SC    061824909      33.52-     1.45-      1.12-       30.95-
09/05/2008  09/05  09/06  54063 CONVENIENCE MGHT SE 320 061824901  63.01      0.00       0.00        63.01

            **  DATE  TOTALS    10 ENTRIES            2,099.71    176.92      71.02     1,852.37


09/06/2008  09/06  09/08  10849 SONIC 1892         061828002     107.80     46.81       0.00        61.49
09/06/2008  09/06  09/08  13351 DENNYS 6899        061828002      71.04      4.66       0.00        66.38
09/06/2008  09/06  09/08  13998 WALMART 5166 SC    061825000     380.46     22.00      18.88       339.58
09/06/2008  09/06  09/08  13998 WALMART 5166 SC    061825001      17.92-     0.28       0.00        18.20-
09/06/2008  09/06  09/08  54063 CONVENIENCE MGHT SE 320 061825003  36.21      0.00       0.00        36.21

            **  DATE  TOTALS     5 ENTRIES              577.59     73.25      18.88       485.46


            **  ROUTE TOTALS    52 ENTRIES            8,956.46    599.60     316.77   | 7,640.09 |
```

```
RUN DATE.: 09/10/2008                DISTRIBUTION MANAGEMENT SYSTEM        REPORT #1
RUN TIME : 09:29:11
APPL DATE: 09/06/2008                IO WEEKLY SETTLEMENT SUMMARY - TYPE II
DISTRIBUTOR NUMBER: 00000         WEEK ENDING: 09/06/2008       ROUTE: 000
              (A) CREDITS                                  (B) CHARGES

CUSTOMER INVOICES          $7,640.09      PURCHASES                    $8,103.50
PA REIMBURSEMENT             $852.58
PROMO PA'S                   $250.33      STALE CREDIT                   $528.76-
PROMOTION BILLBACK             $0.00      DROP SHIPMENT ADJ               $27.84

TOTAL CREDITS:             $8,743.00      TOTAL CHARGES:               $7,602.58

         WEEKLY SETTLEMENT (A - B)                            $1,140.42
```

## Sales Customer List Cash– (Report #5)

This report will print only if you have cash customers that Sara Lee has agreed to share in the PA's.  The detail of cash customer invoices with PA's will be listed on this report.  The report will indicate the net amount of the invoices as well as Promo PA's and PA's that were calculated from the invoice.  The only information from this report included in the Settlement Summary will be the reimbursement of PA's and Promo PA discounts.

```
RUN DATE.: 09/10/2008                    DISTRIBUTION MANAGEMENT SYSTEM     REPORT #5              PAGE:   16
RUN TIME : 09:29:05                                                                               PGM.: B157326B
APPL DATE: 09/06/2008                    SALES CUSTOMER LIST CASH - TYPE II                       RPT : ROT
DISTRIBUTOR NUMBER: 00000     WEEK ENDING: 09/06/2008          ROUTE:   000
DLVRY DATE INVOICE  A/R  CUSTOMER #/NAME            INVOICE # INV TYP     GROSS      PA'S    PROMO PA'S         NET
09/01/2008  09/01  09/02 00000 HOME SIDE SUITES     000024506     B        23.98      0.93       0.00        23.05
09/01/2008  09/01  09/02 00000 DAIRY QUEEN          000024517     B       120.65     20.35       0.00       100.30

           ** DATE TOTALS      2 ENTRIES                         144.63     21.28       0.00       123.35
                                                              --------- --------- --------- ---------
09/02/2008  09/02  09/04 00000 THAI PALACE          000024613     B        24.00      0.58       0.00        23.42
09/02/2008  09/02  09/04 00000 EL CAMINO REAL RESTAURANT 000024610 B      14.53      0.15-       0.00        14.68
09/02/2008  09/02  09/04 00000 MAMAS HOME COOKIN    000024618     B        80.66      2.22       0.00        78.44

           ** DATE TOTALS      3 ENTRIES                         119.19      2.65       0.00       116.54
                                                              --------- --------- --------- ---------
09/04/2008  09/04  09/05 00000 HINES PIZZA          000024813     B        23.20      0.19       0.00        23.01
09/04/2008  09/04  09/05 00000 THAI PALACE          000024811     B        16.86      0.60       0.00        16.26
09/04/2008  09/04  09/05 00000 OFF THE PATH CAFE    000024815     B        22.10      0.79       0.00        21.31
09/04/2008  09/04  09/05 00000 EL CAMINO REAL RESTAURANT 000024809 B      18.73      0.07       0.00        18.66
09/04/2008  09/04  09/05 00000 MAMAS HOME COOKIN    000024814     B        21.10      0.95       0.00        20.15

           ** DATE TOTALS      5 ENTRIES                         101.99      2.60       0.00        99.39
                                                              --------- --------- --------- ---------
09/05/2008  09/05  09/06 00000 DAIRY QUEEN          000024911     B       131.03     17.46       0.00       113.57
09/05/2008  09/05  09/06 00000 MAMAS HOME COOKIN    000024909     B        18.00      0.80       0.00        17.20

           ** DATE  TOTALS     2 ENTRIES                         149.03     18.26       0.00       130.77
                                                              --------- --------- --------- ---------

           ** ROUTE TOTALS    12 ENTRIES                         514.84     44.79       0.00       470.05
                                                              --------- --------- --------- ---------
```

Drop Ship Report -- (Report #6)

This report provides information about price adjustments that are made for the product that you purchase and resell to drop ship customers. This report will adjust your purchase price based on the actual units you sell to your drop ship customers. The report will show the date of the sale, the customer number, customer name, invoice number and the items and quantities sold.

```
RUN DATE.: 09/10/2008          DISTRIBUTION MANAGEMENT SYSTEM    REPORT #6          PAGE:   77
RUN TIME :  09:28:46                                                               PGM.: B15732SB
APPL DATE: 09/06/2008             IO DROP SHIPMENT ADJUSTMENTS - TYPE II           RPT : RED
DISTRIBUTOR NUMBER: 00000     WEEK ENDING: 09/05/2008    ROUTE:  000
                                                                  FULL SRV   DROP SHIP   PRICE    ADJUSTMENT
                                               INVOICE #   PROD   UNITS   DISC PRICE   PRICE     DIFF     AMOUNT
DLVRY DATE   INVOICE   A/R   CUSTOMER #/NAME
----------   -------   ----  --------------     --------   ----   -----   --------   --------   ------   --------
09/01/2008   09/01     09/02 00000 COUNTY JAIL  000024516   068     90    1.4615     1.6280     0.1665    $14.99
09/01/2008   09/01     09/02 00000 COUNTY JAIL  000024516  57102     10    1.2628     1.3552     0.0924     $0.92
09/01/2008   09/01     09/02 00000 COUNTY JAIL  000024516  57109     10    1.3284     1.4256     0.0972     $0.97
                                               09/01/2008 DROP SHIP ADJ...:  110                          $16.88

09/04/2008   09/04     09/05 00000 COUNTY JAIL  000024818   068     60    1.4615     1.6280     0.1665     $9.99
09/04/2008   09/04     09/05 00000 COUNTY JAIL  000024818  57102     10    1.3284     1.4256     0.0972     $0.97
                                               09/04/2008 DROP SHIP ADJ....:   70                        $10.96  Dailey
                                                                                                                 Total

                                               TOTAL DROP SHIP ADJUSTMENTS....:  180                     $27.84  Week
                                                                                                                 Total
```

The Drop Ship Adjustment amount will be reflected on your daily dump sheet.

```
RUN DATE : 09/05/2008          DISTRIBUTION MANAGEMENT SYSTEM                        PGM : B155073
RUN TIME : 10:43:19                        SARA LEE -                                RPT : RH3
RUN BY : DOAS903              DAILY UNIT CHARGE/RTAC ROUTE SETTLEMENT                PAGE:   90
                               RTAC DATE 09/05/2008 - VERSION 001
                                                                                DELIVERY DATE: 09/05/2008
ROUTE:   -                          DEPOT:   -

ORIGINAL ORDER:               068     70   072    25   683    10   1269    5   1392    20   1971   18
 1972    10   1991    30    2522     3   2528     3  2656    30  2714    55  2849    15  2563    15
 3109     4   3292     8    3305    44   3325    18  3408    12  3517    16  5303    12  5304    9
 5471     8   5493     9    5484    24   5485     9  5487    70  5693    36  5507    50  5515    40
 5518    40   5522    10    5529     4   5530     4  6635    10  40738   14  40740   14  50030   9
 50032   12   50080     4   51253     7  51255     6  51265    7  51266    7  51267     7  53045   50
 53066   40   53067    50   53069    16  53100    42  53101   12  53102    5  53103     6  53105   60
 53109   15   53128     8   53131    30  53171     7  53172    6  53174    7  53175     7  53176    5
 53180    3   53181     3   53182     6  53285     3  53286    3  54098    6

DISTRIBUTION ADJUSTMENTS:      51267     7-

SPECIALS:     5471     8-   53128     8-

MHC STALE FROM 09/04/2008:     2522     1   2528     2  2849     5  3325     2  3408     2  5304    10
 5493     1   5507     1    5510     2   5515     2  5518     3  5522     3  5529     3  40740   3
 50032    4   53045     3   53069     5  53105     2  53171    2  53175    3  53176    1  53180    3
 53181    2

LOAD VALUE    2280.53       YSTR A/R CHARGES   1965.58
LOAD ADJ        34.83-      YSTR TOTAL PA       379.44
TRANSFERS         .00       YSTR PA CREDIT      308.25
NET LOAD      2245.70       YSTR RETURNS        130.22
                           YSTR DROPSHIP ADJ    10.96
```

The "TOTAL DROP SHIP ADJUSTMENTS" from this report will match the "DROP SHIPMENT ADJ" on the Weekly Settlement Summary report.

# REPORT #1

```
RUN DATE.: 09/10/2008                    DISTRIBUTION MANAGEMENT SYSTEM
RUN TIME : 09:29:11                       IC WEEKLY SETTLEMENT SUMMARY - TYPE II
APP. DATE: 09/06/2008            WEEK ENDING: 09/06/2008            ROUTE: 000
DISTRIBUTOR NUMBER: 00000                                          (B) CHARGES
              (A) CREDITS

CUSTOMER INVOICES              $7,640.09   PURCHASES               $8,103.50
PA REIMBURSEMENT                 $852.58
PROMO PA"S                       $250.33   STALE CREDIT             $528.76-
PROMOTION BILLBACK                 $0.00   DROP SHIPMENT ADJ         $27.84

TOTAL CREDITS:                 $8,743.00   TOTAL CHARGES:          $7,602.59

              WEEKLY SETTLEMENT (A - B)                           $1,140.42
```

# Frequency Report – (Report #7)

This report provides you with a summary of the gross sales, returns, and net sales to both cash and charge customers for all outlets served for the week.  This is an information report only and provides you summary information by outlet.

```
RUN DATE.: 09/10/2008            DISTRIBUTION MANAGEMENT SYSTEM    Report #7        PAGE:    20
RUN TIME : 09:29:31                                                                 PGM: BL5733CB
APPL DATE: 09/06/2008               IO FREQUENCY REPORT                             RPT: R22

ROUTE....: 000    NAME:          DISTRIBUTOR NUMBER: 00000        FOR WEEK ENDING: 09/06/2008
```

| CUST | CUSTOMER NAME | MONDAY 09/01/2008 | | | TUESDAY 09/02/2008 | | | THURSDAY 09/04/2008 | | | FRIDAY 09/05/2008 | | | SATURDAY 09/06/2008 | | | TOTALS | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | GRS | RET | NET | GRS | RET | NET | GRS | RET | NET | GRS | RET | NET | GRS | RET | NET | GRS | RET | NET | CALLS |
| 00000 | HEMORIAL HOSPITAL | 65 | 0 | 65 | | | | 69 | 0 | 69 | 42 | 0 | 42 | | | | 177 | 0 | 177 | 3 |
| 00000 | DO DROP INN | 48 | 0 | 48 | 18 | 0 | 18 | 42 | 0 | 42 | 36 | 0 | 36 | | | | 145 | 0 | 145 | 4 |
| 00000 | SONIC | 94 | 0 | 94 | 98 | 0 | 98 | 91 | 0 | 81 | 112 | 0 | 112 | 61 | 0 | 61 | 448 | 0 | 448 | 5 |
| 00000 | BURGER PLACE | 23 | 0 | 23 | | | | 20 | 0 | 20 | | | | | | | 44 | 0 | 44 | 2 |
| 00000 | LAKES GROCERY | 78 | 0 | 78 | | | | 98 | 6 | 91 | 72 | 0 | 72 | | | | 248 | 6 | 242 | 3 |
| 00000 | PH MARKET | 686 | 213 | 473 | 435 | 33 | 402 | 532 | 103 | 429 | 673 | 27 | 645 | | | | 2328 | 377 | 1950 | 4 |
| 00000 | DENNYS | 116 | 0 | 116 | 120 | 0 | 120 | 91 | 0 | 91 | 111 | 0 | 111 | 66 | 0 | 66 | 505 | 0 | 505 | 5 |
| 00000 | WALMART SC | 853 | 144 | 708 | 789 | 15 | 743 | 938 | 90 | 848 | 798 | 30 | 767 | 321 | 0 | 321 | 3671 | 281 | 3389 | 5 |
| 00000 | COUNTY JAIL | 87 | 0 | 87 | | | | 56 | 0 | 56 | | | | | | | 144 | 0 | 144 | 2 |
| 00000 | RANCH MARKET | 133 | 0 | 133 | | | | 172 | 0 | 172 | | | | | | | 305 | 0 | 305 | 2 |
| 00000 | VICS | 78 | 0 | 78 | 46 | 0 | 46 | 60 | 0 | 60 | 63 | 0 | 63 | 36 | 0 | 36 | 285 | 0 | 285 | 5 |
| | CHARGE TOTALS: | 2266 | 358 | 1908 | 1477 | 49 | 1428 | 2165 | 199 | 1966 | 1910 | 58 | 1852 | 485 | 0 | 485 | 8306 | 666 | 7640 | 40 |
| | # OF CALLS: | 11 | | | 6 | | | 11 | | | 8 | | | 4 | | | | | | |
| 00000 | MIKES PIZZA | | | | | | | 23 | 0 | 23 | | | | | | | 23 | 0 | 23 | 1 |
| 00000 | THAI PALACE | | | | 23 | 0 | 23 | 16 | 0 | 16 | | | | | | | 39 | 0 | 39 | 2 |
| 00000 | OFF THE PATH CAFE | | | | | | | 21 | 0 | 21 | | | | | | | 21 | 0 | 21 | 1 |
| 00000 | EL CAMINO REAL RESTAURA | | | | 14 | 0 | 14 | 18 | 0 | 18 | | | | | | | 33 | 0 | 33 | 2 |
| 00000 | SPECIAL SALES | 63 | 0 | 63 | 261 | 127 | 134 | 36 | 0 | 36 | | | | | | | 360 | 127 | 233 | 3 |
| 00000 | HOME SIDE SUITES | 23 | 0 | 23 | | | | | | | | | | | | | 23 | 0 | 23 | 1 |
| 00000 | DAIRY QUEEN | 100 | 0 | 100 | | | | | | | 113 | 0 | 113 | | | | 213 | 0 | 213 | 2 |
| 00000 | MAMAS HOME COOKIN | | | | 78 | 0 | 78 | 20 | 0 | 20 | 17 | 0 | 17 | | | | 115 | 0 | 115 | 3 |
| | CASH TOTALS: | 186 | 0 | 186 | 376 | 127 | 251 | 135 | 0 | 135 | 130 | 0 | 130 | | | | 831 | 127 | 703 | 15 |
| | # OF CALLS: | 3 | | | 4 | | | 6 | | | 2 | | | | | | | | | |
| | ROUTE TOTALS: | 2453 | 358 | 2095 | 1856 | 176 | 1679 | 2300 | 199 | 2100 | 2041 | 58 | 1983 | 485 | 0 | 485 | 9137 | 793 | 8343 | 55 |
| | # OF CALLS: | 14 | | | 10 | | | 17 | | | 10 | | | 4 | | | | | | |

Confidential



You don't get paid commission.

You aren't paid a percent of net sales.

Pay attention to the daily paperwork, it is your money!

Confidential

10/25/2010

# New Address for Settlement Payments Due Sara Lee



Beginning February 1, 2009 all payments being made for negative settlement balances should be sent to:

**Franchise Settlement Services**
**Sara Lee Shared Services**
**3470 Rider Trail S**
**Earth City, MO 63045**

Confidential

10/25/2010

Be sure to include a copy of your weekly settlement summary along with the payment.



# IO Balances / Payment Plans

| A-2 |
| --- |
| Policy Number |

| June 2010 |
| --- |
| Policy Effective Date |

| September 2010 |
| --- |
| Supersedes Policy Dated |

I.     **IO Balances / Payment Plans**

## POLICY

Minimizing and/or eliminating Independent Operator (IO) debt is critical in order to maximize profitability and cash flow in the Fresh DSD division. To maximize the cash flow potential and avoid unnecessary risk while servicing the Sara Lee external customer, IO debit balances must be carefully monitored and effective collection procedures established. All accounts, new and existing, are subject to the guidelines set forth in this policy.

This policy provides the guidelines applicable to any and all IO's carrying a debit balance in the Fresh DSD division. The management of all IO debt is the shared responsibility of SSNA, the Alternative Distribution channel and Finance. It is the policy of the Sara Lee Bakery Group division to deem an IO high risk if balances age greater than 30 days past due or demonstrate lack of sustained profitability.

## PROCEDURE

I.     Once an IO debit balance exceeds 30 days, SSNA will initiate a call to the appropriate IO. Payment in full will be requested immediately.

II.    If payment in full is not possible, the selected IO will be given an opportunity to make weekly payments (not exceeding one year) if certain parameters are met.

III.   In order to qualify for an IO payment plan, the IO must take immediate corrective action to reduce the outstanding debt. Prior to approving a formal payment plan, the IO must submit the current week's settlement in addition to a "good faith" payment (established by SSNA) for three consecutive weeks with the first week commencing the Saturday following the initial contact. If the initial contact is made on a Thursday or Friday, the first of three payments will be due one week from the next Saturday date.

IV.    After three attempts to contact an IO via phone, the third voicemail will be considered a "conversation" and will then assume the schedule noted above.

Confidential

V.      All IO's with a debit balance greater than 30 days are expected to remit payment directly to their Territory Development Manager (TDM) every Saturday until the debit balance is paid in full.

VI.     Once payments are collected from the predetermined IO's, the TDM is responsible for communicating payment information to SSNA by the following Monday.  In addition, all payments remitted to the TDM should be overnighted every Monday to SSNA, without exception, to 3470 Rider Trail South, Earth City MO 63045, Attn: Russ Sadler.

VII.    For those IO's not in the same location as their TDM, the IO is expected to send their weekly payment to the appropriate bakery office location on Saturday for receipt by the office location on Monday or Tuesday the following week.  It is the TDM's responsibility to confirm payment with the bakery office location and communicate payment information to SSNA.

VIII.   If an IO fails to make the first three "good faith" payments in addition to paying the weekly bread bill, the IO will be subject to an immediate Seven Day Demand Letter, pursuant to Sections 9.3 and 9.4 in the Agreement.

IX.     Any and all exceptions to the aforementioned policy need to be approved by SSNA and the Alternative Distribution channel.


## ADMINSTRATION


All questions pertaining to the interpretation or administration of this policy should be directed to the Credit Department - Financial Shared Services Center, Earth City, MO.

Confidential

10/25/2010

# MARGIN ADJUSTMENT ON PROMOTIONAL PRODUCT

## How does it work?

Overall, you receive the same margin % on all sales whether they are at full store cost or whether they are on discount.  The difference between promotional or discounted items and full cost items is the actual number of cents you make per item sold.

As an Independent Distributor for Sara Lee, you purchase products at a discount rate ranging from 10% to 22% based on each individual product from suggested list price.  These are examples of how PA and Promo PA margin adjustment works on a 22% discount item.

Full Price Sales
This is simple to see when an item is sold at suggested list price or full store cost.

Example: Let's look at Ball Park Buns (item #1314)

| | |
|---|---|
| If Full store cost is | $1.92 |
| Distributor cost at 22% discount is | $1.50 |
| Net Profit to IO | $ .42 |

To check that this is accurate, take 22% (margin) on net sale price:

$1.92 x .22 = $ .42

Confidential

10/25/2010

Now let's looks at what happens when an item is on Promotion or Discount.

Promotion or Discount items earn the same overall margin, (on this product) 22%. However, the margin is achieved through a promotional adjustment or promo correction.  The examples below will show how this is calculated.

When an IO purchases the product, we do not have a way of knowing what price he/she will be selling the product for, so all sales to the distributor remain at the distributor price which is based on the suggested store cost.  <u>Credits to reduce the distributor price are made based on the actual invoiced price and are given to the IO through "Promotion PA's" or "Promo Corrections" to achieve the same % margin per item.</u>  These credits to the distributor price are made as a credit of 78% of the discount amount on 22% items or 82% of the discount amount on 18% items.

<u>Cents off Promotion</u>
A cents off promotion for Ball Park Buns is offered in Albertson's for discount of $.30 per unit from the full store price of $1.92 bringing the store invoice amount down to $1.62.

Example: Ball Park Buns on Promotion (item #1314)
| | |
|---|---|
| Distributor Invoices Customer at | $1.62 |
| Distributor still purchases the item at | $1.50 |
| Net before adjustment | $  .12 |
| | |
| System records a PROMO PA of | $0.30 |
| Promotion PA Payment to IO of 78% | x  .78 |
| Net Promotion PA Paid to IO | $  .23 |
| | |
| Total margin made by IO | $  .35 |

To check that this is accurate, take 22% (margin) of net sale price:

$$\$1.62 \times .22 = \$ .35$$

These types of Promotional discounts are shown on your weekly Sales Customer List under the "PROMO PA" column and the credits issued to you for the additional discount are shown on the top portion of the Distributor Weekly Settlement under "Promotion PA's"

Confidential

10/25/2010

Now let's look at how price adjustments work.  Price adjustments or Discounts can be "everyday low pricing" items, price corrections made in the hand held or any other difference between the actual invoice price and full store cost.

Price Adjustments / Discounts

A customer has an everyday low pricing for Ball Park Buns.  Their every day low price is $1.50 compared to suggested retail price.

Example: Ball Park Buns Discount Price (item #1314)

| | |
|---|---|
| Distributor Invoices Customer at | $1.50 |
| Distributor still purchases the item at | $1.50 |
| Net before adjustment | $ .00 |
| | |
| System records a PA of | $0.42 |
| Promo Correction Payment to IO of 78% | x .78 |
| Net Promotion PA Paid to IO | $ .33 |
| | |
| Total margin made by IO | $ .33 |

To check that this is accurate, take 22% of net sale price:

$1.50 x .22 = $ .33

All of these types of discounts are shown on your weekly Sales Customer List under the "PA" column and the credits issued to you for the additional discount are shown on the Distributor Weekly Settlement on the bottom portion of the statement under "Promo correction".

Although the actual number of cents profit made on promotion products changes, the overall margin that a distributor ever makes remains the same.

Confidential

## Person to Person Selling Procedures

**EFFECTIVE: January 1, 2011**

### Transfer/Sale Overview

A transfer or partial transfer, as is described in your Distribution Agreement under Article 7 must be completed any time that the following events occur:

- For a sale or transfer of the territory with a third party
- For a sale or transfer of a portion of the territory with a third party
- Death of the business owner

The length of time for the transfer to be completed varies widely based upon the state that the incorporation occurs, the buyer and sellers' desires, the complexity of the sale and the thoroughness of the paperwork submitted.  Transfers/Sales on average take 4-8 weeks to complete.

Samples of the current documents needed for a transfer are included.  A Sara Lee Franchise Sales Coordinator is available to assist you in this process.

Sara Lee Distribution LLC. makes no evaluations or determinations of the value of your business.  Upon request of the current owner, we can provide the amount of available financing through the current lending program that may exist at the time of transfer. The price of any sale or transfer is determined between the buyer and seller directly.

The amount of available financing may change from time to time as is determined by the lending institution.  Current loan programs do not permit the transfer of Distribution Rights for the purposes of refinancing the business.  The amount of financing available will also differ if the transfer is to a family member.  A sale or transfer can be done through any lending institution or through a cash transaction.

Steps to complete a transfer:

1) An interested Buyer must receive a FDD (Federal Disclosure Document).  The acknowledgement receipt must be signed and returned before the process can continue.  Receipts can be faxed to Distributor Support Service at 323-277-8324.
2) Current Franchisee requests maximum financing availability if desired.
3) Ownership of all outlets and territory boundaries are verified by Sara Lee Distribution, LLC.
4) Current owner and potential buyer should agree upon a transfer price and terms of the transfer.
5) Current owner must complete a transfer notification form or partial transfer notification form and submit to Distributor Support Services.
6) Buyer should complete and submit all other forms to Distributor Support Services:
    - BOA Loan Application if financing is needed
    - I/O Release Forms
    - Loan Compliance Form
    - Incorporation Information
    - DSA Membership Application - optional
    - Vehicle Lease Application - optional
    - Applicant Questionnaire
    Delay in receiving completed paperwork will delay the transfer/sale process
7) Bank Loan Request submitted to lending institution
    -Credit approval takes on average 2-3 days
8) A Background Verification is completed
    -Background Verification on average takes 2-7 business days
9) Distributor Support Services advises on results of the credit approval and background verification.
10) Buyer completes an interview with zone level personnel.
11) A request for incorporation is requested through DSA if the buyer requests this service.  (If the buyer is handling their own incorporation and establishing their EIN number, documentation of the Corporation and the EIN MUST be submitted prior to setting a closing date).  Length of time varies according to the guidelines of the Buyer's state of incorporation.
12) Distributor Support Services will contact Buyer, Seller, and zone to set closing date.
13) Execution documents are sent to the Franchisee for review at least 5 days prior to closing date.
14) **Buyer must establish insurance before the closing date**. Closing documents are sent to ZVP or ZBM to sign with the Franchise.  Both Buyer and seller must arrange an appointment to sign closing documents prior to the effective date.
15) Any cash payments must be presented at the time the documents are signed.
16) The seller will receive their proceeds directly from the lending institution usually within 15 business days.



# APPLICANT QUESTIONNAIRE

APPLICANT'S NAME _____

ROUTE BEING APPLIED FOR _____

**1. Sara Lee requires that all Independent Contractors be incorporated as an S-Corporation recognized by the IRS. If you are not already incorporated as an S-Corporation, DSA (a third party vendor not affiliated with Sara Lee), its legal staff or agents, can file incorporation papers on your behalf for a fee. Please select one:**

_____*I am already incorporated as an S-Corporation, will provide a copy of my Articles of Incorporation, and already have an EIN _____.*

_____*I am already incorporated as an S-Corporation, will provide a copy of my Articles of Incorporation, and would like to use DSA Tax & Bookkeeping services to establish my EIN (see #3 below).*

_____*I would like to have DSA file incorporation papers for me and establish my EIN.*

**2. If you have chosen to utilize DSA's services to incorporate, please select one:**

_____*I will pay the fee at closing by personal check.*

_____*I would like to take out a DSA loan to pay the fee. Payments will be deducted from my settlement proceeds over a 52-week period.*

**3. You will need to provide information as to who will be performing bookkeeping for your corporation. DSA also offers optional Tax & Bookkeeping services for a weekly fee of $17.31 (which would be deducted from your weekly settlement proceeds). This service provides you with a quarterly financial statement, an income tax estimate, and annual tax filing. See attached handout for further details. Please select one:**

_____*I would like to utilize DSA Tax & Bookkeeping Services.*

_____*I will provide my tax preparer's information (fully complete the Loan Compliance Form).*

**4. If the route you are interested in utilizes a leased vehicle, the lease will be transferred and assumed by you upon closing. It is your responsibility to thoroughly inspect the truck before you assume the lease. All licensing, repairs, and maintenance will be your responsibility and any questions and/or issues should be discussed with the current lessee PRIOR TO CLOSING. Sara Lee will not be involved or responsible for any leased vehicle matters and advises you to inspect the vehicle as soon as possible. Please select one:**

_____*I have my own vehicle.*

_____*The route I am interested in has a leased vehicle. I understand all repairs and licensing will be my responsibility as the new lessee.*

_____*The route I am interested in does NOT have a leased vehicle. I would like to discuss my options with Sara Lee Zone Management.*

**NOTE: At closing, you will be <u>required</u> to provide proof of automobile AND commercial general liability insurance as outlined in your Franchise Offering Circular. If you would like to participate in the optional Allstate automatic settlement deduction program, you must contact Allstate directly. Please contact your zone or Nydia Saucedo in Distributor Support Services at (323) 277-8602 for more information.**

# FRANCHISEE NOTIFICATION OF DISTRIBUTION RIGHTS TRANSFER

**CORPORATION NAME:** _____

**PRINCIPAL OPERATOR NAME:** _____

**CURRENT ADDRESS:** _____

_____

**TELEPHONE NUMBERS:** _____

**ZONE & ROUTE NUMBER:** _____

Pursuant to terms of my Distribution Agreement dated _____, I wish to inform SARA LEE (SL) of my intent to transfer my Distribution Rights. I understand that all liens created by me must be satisfied out of the proceeds of this transaction and agree to pay any additional costs or expenses if those proceeds are insufficient. I understand that SL may exercise its right of first refusal and purchase the franchise at the sale terms and conditions offered by a bona fide purchaser. I further acknowledge that at the closing of this transaction a transfer fee of 2% of the sales price shall be paid by me to SL.

**NAME OF TRANSFEREE (BUYER):** _____

**CURRENT ADDRESS:** _____

_____

**TELEPHONE NUMBERS:** _____

**TRANSFER PRICE:** _____

II.   **TERMS OF TRANSFER:** _____
**(i.e. Amount of B of A financing**
**needed, whether a truck will be** _____
**involved in the transfer, etc.)**

I hereby certify that the information provided above as to the terms and conditions of my proposed transfer is true and complete.

**Dated:** _____   _____   _____
                              **Seller**                      **Buyer**

Confidential                                                          10/25/2010

**Banc of America Leasing & Capital, LLC**
231 South LaSalle Street
Chicago, IL 60697
FAX (312) 974 - 9327



### APPLICATION FOR SARA LEE DISTRIBUTION LOAN

**GENERAL INFORMATION**

Applicant Name _____   Tax ID # _____

Address _____   City _____   State _____   Zip _____

Phone # _____   Fax # _____   Contact/Title _____

Date Business Started _____   State of Incorporation _____   ☐ Corporation   ☐ Partnership   ☐ Proprietorship

Current SLBG Employee:  Yes _____   No _____   If yes, how long? _____

**GUARANTOR INFORMATION (required unless a sole proprietor)**

Distributor (Principal) Name _____   Social Security Number _____

Address _____   City _____   State _____   Zip _____

Phone # _____   Have you ever filed bankruptcy? _____   If so, when? _____

*I understand the above information will be used to obtain a consumer credit report.*

---

**TRANSACTION INFORMATION**

Estimated Loan Amount _____   Estimated Term (months) _____   Route # _____

**VEHICLE INFORMATION (if applicable)**

Year _____   Make _____   Model _____   VIN _____

If your application is approved and the loan closes, you will be charged a documentation fee of $350 plus an origination fee equal to ½ of 1% of the amount borrowed.  These fees may be added to your loan balance if you wish.  Your loan documents will require you to file business financial statements at the end of every calendar quarter.  You will need to provide at closing information concerning the accountant, financial advisor or other individual who will prepare those documents for you.

---

**CREDIT REFERENCES**

Creditor _____   Account # _____   Phone # _____

Creditor _____   Account # _____   Phone # _____

---

I/We hereby authorize Banc of America Leasing & Capital LLC to investigate my/our responsibility and credit worthiness and will provide financial statements, tax returns, etc. as you deem necessary.  I/We hereby authorize Banc of America Leasing & Capital LLC to share any information with Sara Lee Fresh, Inc. and/or Sara Lee Bakery Group, Inc.  You, the credit applicant, certify that you are applying for credit for business purposes, and not for personal, family, or household purposes.  By execution of this lease application, I/we warrant that the information submitted herein is true and correct and hereby authorize references contained herein to release any necessary information.

Print Name: _____   Signature _____   Date _____

"NOTICE: If your application for business credit is denied, you have the right to a written statement of the specific reason for the denial.  To obtain the statement, please contact Credit Disclosure Administrator, Banc of America Leasing & Capital, LLC, 231 S. LaSalle Street, 8th Floor, Chicago, IL 60606-6514, within 60 days from the date you are notified of our decision.  We will send you a written statement of reason for the denial within 30 days of receiving your request for the statement.  The Federal Equal Opportunity Act prohibits creditors from discriminating against credit applications on the basis of race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act.  The federal agency that administers compliance with this law concerning the creditor is the Office of the Comptroller of the Currency, Customer Assistance Group, 1301 McKinney, Suite 3710, Houston, Texas 77010."

## NOTICE TO POTENTIAL INDEPENDENT OPERATORS

A consumer report and/or investigative consumer report including information concerning your police record, driving record, qualifications and/or credit and indebtedness may be obtained from a consumer reporting agency, other agency, or directly in connection with your application for Independent Operator (including contract for services) with SARA LEE DISTRIBUTION, LLC ( "SARA LEE"), or its affiliates.  SARA LEE with not actively seek information concerning your character, employment history, or education, but such information could be provided to SARA LEE by third parties in a good-faith effort to provide SARA LEE with the information it does actively seek.  **A consumer report and/or an investigative consumer report may be obtained at any time during the application process or during your Independent Operator Agreement (including contract for services) with SARA LEE.**  Upon timely written request of the Independent Operator Department of SARA LEE, and within 5 days of the request, the name, address, and phone number of the reporting agency and the nature and scope of the investigation will be disclosed to you.

Before any adverse action is taken, based in whole or part on the information contained in the consumer report, you will be provided a copy of the report, the name, address, and phone number of the reporting agency, a summary of your rights under the Fair Credit Reporting Act, as well as additional information on your rights under the law.

Nothing contained herein is intended to establish an employer-employee relationship between you and SARA LEE or any of its affiliates.  At all times, and for all purposes, it is the intent of you and SARA LEE or its affiliates to enter into an independently contracted business relationship, pending review of the above identified information.

## APPLICANT'S DISCLOSURE REGARDING CRIMINAL OFFENSES:

SARA LEE does not enter into business relationships with persons or business entities with certain criminal convictions or arrests, including but not limited to, prior felony criminal convictions, pending felony charge(s), and certain misdemeanor convictions or charges.  For the purposes of this application, SARA LEE considers a sentence of deferred adjudication probation the same as a conviction.

This is page one of a two page document.  After carefully reading and completing the entire document, you may retain this first page for your records.

Page 1 of 2

**APPLICANTS MUST FULLY COMPLETELY AND TRUTHFULLY ANSWER THE FOLLOWING:**

Print First, Middle, and Last Name

Social Security Number

Date of Birth

Home address

Drivers License Number

City, State, Zip Code

State issuing License

Home Phone Number

____M ____F
Gender

U.S. Citizen? ____YES ____NO
If no, please list resident alien number

SARA LEE SALES ZONE

|   |   | Yes | No |
|---|---|---|---|
| 1. | Have you ever been convicted of a felony? | □ | □ |
| 2. | Have you ever been arrested for a felony? | □ | □ |
| 3. | Have you been convicted of any misdemeanor offense? within the past 15 years (other than traffic tickets)? | □ | □ |
| 4. | Are you currently indicted or charged with, but not convicted of, any criminal offense? | □ | □ |
| 5. | Are you currently on probation or parole or any offense? | □ | □ |

**BY SIGNING BELOW, I AM INDICATING THAT I HAVE READ BOTH PAGES OF THIS TWO PAGE DOCUMENT AND THAT THE INFORMATION THAT I PROVIDED ON THIS DOCUMENT, OR ANY ADDITIONAL DOCUMENT PROVIDED PURSUANT TO THIS DOCUMENT, IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE. IF INFORMATION IS LATER DISCOVERED BY SARA LEE THAT CONTRADICTS MY ANSWERS PROVIDED HEREIN, I ACKNOWLEDGE AND AGREE THAT SUCH FACT, BY ITSELF, SHALL CONSTITUTE SUFFICIENT GROUNDS FOR SARA LEE TO IMMEDIATELY TERMINATE ANY WRITTEN AGREEMENTS WITH ME, AND THAT I WILL FOREVER WAIVE ANY AND ALL LEGAL CLAIMS RESULTING FROM ANY ASPECT OF MY RELATIONSHIP WITH SARA LEE OR ANY OF ITS AFFILIATED COMPANIES.**

Applicant Signature          Date

Page 2 of 2

Confidential

10/25/2010

**Loan Compliance Center**
PMB 2740
15 East Putnam Avenue
Greenwich, CT  06830-5424

## Distributor Loan Filing Requirements

*(**This document must be submitted <u>prior to closing</u>.  No loan can
be approved until this document has been completed and filed.**)*

In connection with my application for a loan from Banc of America Leasing and
Capital, LLC, I understand that I am required to file certain business financial
statements.  This is to advise that the name of the professional tax preparer* who
will file those documents for me is:

Tax Preparer's Name: _____

Address: _____

_____

Tel. #: _____

Tax Preparer's ID#: _____

I hereby authorize the person named above to deliver all such reports and
statements to the Loan Compliance Center  at the address shown above or such
other address as I or my representative may be advised of.

**Borrower's Signature: _____**

**Print Name: _____**

**Telephone # _____**

* If you are not using a professional tax preparer with a valid Tax Preparer's
Identification number, the individual who will prepare your financial statements must
attach a Pro Forma financial statement to this document in the form he or she will be
submitting, <u>as a condition of your approval for this loan</u>.

Confidential                                                    10/25/2010

Form **SS-4**
(Rev. July 2007)
Department of the Treasury
Internal Revenue Service

# Application for Employer Identification Number

(For use by employers, corporations, partnerships, trusts, estates, churches, government agencies, Indian tribal entities, certain individuals, and others.)
▶ See separate Instructions for each line.   ▶ Keep a copy for your records.

OMB No. 1545-0003

EIN

**Type or print clearly.**

1 Legal name of entity (or Individual) for whom the EIN is being requested

2 Trade name of business (if different from name on line 1)

3 Executor, administrator, trustee, "care of" name

4a Mailing address (room, apt., suite no. and street, or P.O. box)

5a Street address (if different) (Do not enter a P.O. box.)

4b City, state, and ZIP code (if foreign, see Instructions)

5b City, state, and ZIP code (if foreign, see Instructions)

6 County and state where principal business is located

7a Name of principal officer, general partner, grantor, owner, or trustor

7b SSN, ITIN, or EIN

8a Is this application for a limited liability company (LLC) (or a foreign equivalent)? ☐ Yes ☐ No

8b If 8a is "Yes," enter the number of LLC members ▶

8c If 8a is "Yes," was the LLC organized in the United States? ☐ Yes ☐ No

9a Type of entity (check only one box). Caution. If 8a is "Yes," see the instructions for the correct box to check.
☐ Sole proprietor (SSN) _____
☐ Partnership
☐ Corporation (enter form number to be filed) ▶ _____
☐ Personal service corporation
☐ Church or church-controlled organization
☐ Other nonprofit organization (specify) ▶
☐ Other (specify) ▶

☐ Estate (SSN of decedent) _____
☐ Plan administrator (TIN) _____
☐ Trust (TIN of grantor) _____
☐ National Guard   ☐ State/local government
☐ Farmers' cooperative   ☐ Federal government/military
☐ REMIC   ☐ Indian tribal governments/enterprises
Group Exemption Number (GEN) if any ▶

9b If a corporation, name the state or foreign country (if applicable) where incorporated

State | Foreign country

10 Reason for applying (check only one box)
☐ Started new business (specify type) ▶
☐ Hired employees (Check the box and see line 13.)
☐ Compliance with IRS withholding regulations
☐ Other (specify) ▶

☐ Banking purpose (specify purpose) ▶
☐ Changed type of organization (specify new type) ▶
☐ Purchased going business
☐ Created a trust (specify type) ▶
☐ Created a pension plan (specify type) ▶

11 Date business started or acquired (month, day, year). See instructions.

12 Closing month of accounting year

13 Highest number of employees expected in the next 12 months (enter -0- if none).
Agricultural | Household | Other

14 Do you expect your employment tax liability to be $1,000 or less in a full calendar year? ☐ Yes ☐ No (If you expect to pay $4,000 or less in total wages in a full calendar year, you can mark "Yes.")

15 First date wages or annuities were paid (month, day, year). Note. If applicant is a withholding agent, enter date income will first be paid to nonresident alien (month, day, year) ▶

16 Check one box that best describes the principal activity of your business. ☐ Health care & social assistance ☐ Wholesale-agent/broker
☐ Construction ☐ Rental & leasing ☐ Transportation & warehousing ☐ Accommodation & food service ☐ Wholesale-other ☐ Retail
☐ Real estate ☐ Manufacturing ☐ Finance & insurance ☐ Other (specify)

17 Indicate principal line of merchandise sold, specific construction work done, products produced, or services provided.

18 Has the applicant entity shown on line 1 ever applied for and received an EIN? ☐ Yes ☐ No
If "Yes," write previous EIN here ▶

**Third Party Designee**

Complete this section only if you want to authorize the named individual to receive the entity's EIN and answer questions about the completion of this form.

Designee's name

Designee's telephone number (include area code)
( )

Address and ZIP code

Designee's fax number (include area code)
( )

Under penalties of perjury, I declare that I have examined this application, and to the best of my knowledge and belief, it is true, correct, and complete.

Name and title (type or print clearly) ▶

Applicant's telephone number (include area code)
( )

Signature ▶                          Date ▶

Applicant's fax number (include area code)
( )

For Privacy Act and Paperwork Reduction Act Notice, see separate instructions.   Cat. No. 16055N   Form **SS-4** (Rev. 7-2007)

**dsa** DISTRIBUTION
SERVICES
OF AMERICA

**1-914-696-7500**

# Why Should I Incorporate My Business?
## and other
# Frequently Asked Questions

**Why Should I incorporate My Business?**
If you run as a small business, incorporation will give you two significant benefits, limited liability and significant new tax savings.

**What is Limited Liability?**
If you are a sole proprietor, all of your personal possessions and money are at risk if anyone sues you for an incident that occurs while operating your business. Incorporating limits your liability to only the assets owned by your corporation. Your home, cars and personal bank accounts are all protected from lawsuits.

**How much in tax savings can I expect if I Incorporate?**
This of course varies greatly from business to business and your DSA Tax & Bookkeeping Representative can help you estimate for your business. However, on average Independent Distributors realize savings every year of $1,500 or more depending on Business income.

**What is a corporation?**
A corporation is a legal entity, chartered by the state government, and separate and distinct from the person(s) who own it. It is regarded by the courts as an artificial person; it may own property, incur debts, sue or be sued.

**Is it difficult to Incorporate?**
Absolutely not. Just pick a corporate name and submit your application DSA does the rest. We will prepare all state incorporation filings, expedite the process and have you incorporated in a matter of days.

**How do I pick a name for my Corporation?**
Almost any name you like that is not obscene, confusing with your Supplier's names or trade names, or the same or similar to one already filed in your state will be accepted. For example, many people pick initials, their own name, a funny name or a religious name.  See the application for more information

**Do I have to pay the costs all at once?**
DSA allows you to pay the low fee either by check when you make the application or close on your Business, or by 52 Weekly Settlement Deduction Payments.  If you are a new Distributor just

buying your business and borrow down-payment funds from the DSA Loan Program, you may request that we just add the fee to the loan balance.

### Once I am incorporated what else do I have to do?

If you are a DSA Tax & Bookkeeping client, everything related to taxes and State or Federal registration will be done for you. If you use a different accounting firm, they will know what to do. Feel free to call DSA Tax & Bookkeeping for more information at 1-800-879-6605.

### Most important, who will be president of my corporation?

In most cases, you will be the sole shareholder (you own it) and the President of your own corporation. However if your Spouse would make a better president, you can appoint him or her. It's your choice.

### What if I sell my business? Does it complicate things?

Not a bit. Incorporating will give you ongoing tax savings and liability protection as long as you are in business and, if you sell, the corporation will be terminated and be of no further concern.

### Where do I incorporate, what state?

In most all cases the best place to incorporate is in the state where you live. There are very seldom any reasons to incorporate elsewhere and your ongoing costs will always be higher if you incorporate out of state.

### How do I get started?

Just fill out the application and mail or fax to DSA. If you have any questions, please feel free to call us.

We are offering low cost incorporation to all Franchisee's and a special discounted fee if you decide to join DSA Tax & Bookkeeping.



**DISTRIBUTION SERVICES OF AMERICA**

## 1-914-696-7500

# INCORPORATION APPLICATION

Distribution Services of America, Inc.(DSA) has an extended accounting and legal staff employed specifically to assist small business corporations with every service required to successfully start up a small business and to maintain proper records and tax planning & compliance.

DSA will be pleased to assist you in the formation of your new corporation that will be qualified to purchase and operate a SARA LEE FRESH, INC. Distributorship.

- Your corporation name must end in either "INC." or "INCORPORATED" or "CORP." or "CORPORATION".
- You may not use the **Sara Lee** name in your corporate name
- One of your choices should include your personal name, such as **"John Smith Distribution Company, Inc."**
- Names that are similar to other corporations will be rejected

### PLEASE PROVIDE THREE CHOICES OF CORPORATE NAME

1st **Choice** Corporate Name        _____

2nd **Choice** Corporate Name        _____

3rd **Choice** Corporate Name        _____


Your full legal Name        _____

Your Street Address
(PO Box not acceptable)
City, State, Zip        _____

County:        _____

Your Phone Number        (_____)_____


I hereby authorize DSA, its legal staff or agents to file incorporation papers on my behalf in the State of my residence, and agree to pay the applicable fee:


_____        _____
**Signature**                        **Date**


Confidential                                        10/25/2010



## Driving Your Business!

**For over 35 years,** Bush Truck Leasing has been an established leader in the commercial truck industry and we have used this experience and expertise to create a leasing program that is tailored for you:

- Guaranteed credit approval
- Own your truck at the end of the lease
- No money out of pocket
- Leases easily assumable
- Lease programs up to six (6) years
- Free nationwide delivery



\* 5.9 liter 190 hp diesel engine also available

### Isuzu NPR Heavy Duty Tilt Cab

6.0 liter Vortec gas engine • 4-speed automatic transmission
14,500 GVWR chassis • air conditioning • AM/FM/CD
176" wheelbase • 225/70R 19.5F tires • 20' aluminum body - 92" x 96"
hardwood floor • plywood lined - front & sides • mud flaps
2 interior halogen spotlights • 2 dome lights - switch at rear
halogen spotlight on rear header - switch at rear
roll up rear door w/positive door stop • 2 shoring bars
2 rows E trac at 24" and 56" • 12 ga. scuff plate up 18" on sides & front
Maxon RCM-20AB liftgate - 2,000 lb capacity - 48 x 90 + 12 with aluminum flip up with cart stops • fire extinguisher • reflector kit • decals
auxiliary battery for liftgate - cab cutoff switch • 10 gauge printer cable
36" extruded aluminum roll up side door - street side
side door steps with aluminum step well hinged cover
grab handles - 2 side and 2 rear
2 louvered vents - 10 x 12 front wall - curbside & roadside



### Ford Aerocap

14,050 GVWR • 190 inch wheelbase • 6.8 liter V10 gas engine
5-speed automatic transmission • AM/FM radio • air conditioning
bucket seats • LT255/75RX16E tires • dual rear wheels
17'6" aerocap walk-through FRP body • partition with 6' door 84H X 96W
roll up rear door with inside release • 2 rows E track • mudflaps
grab handles • 2 halogen dome lights • hardwood floor • decals
printer cable • 1600 lb railgate

---

## Contact Us Today for a Free Quote!

800-200-0404       bushmail@bushtrucks.com       www.bushtruckleasing.com

Confidential

10/25/2010

## Excellent Lease Terms & Quick Decisions!



### Services Manifest

Bush Truck Leasing's Services Manifest℠ delivers a comprehensive range of options to help independent Owners succeed.

**Lease Options**
We make our own credit decisions (no 3rd party) and offer great rates

**Up-fitting**
Full up-fit services to get you equipped, decaled and ready to go

**Maintenance**
A managed maintenance program of authorized service providers



**Contact us today to get your truck!**



### Credit Application

| Type of Unit : | Terminal City: | | Company applying with: |
|---|---|---|---|
| First Name: | Middle: | Last Name: | Jr. / Sr. |
| DOB: | Social Security #: | | Marital Status:   M / S / D |
| # of Dependents: | Driver's License #: | | State Issued: |
| Current Street Address: | | Zip: | Years/Months at Current Address: |
| City: | County: | | ST: |
| Home Phone #: | Cell Phone #: | Email Address: | |
| Rent or Own Current Residence: | Monthly Payment: | Citizenship? Yes or Other: | 100% of Business Done in U.S.   Y or N |
| Previous Street Address: | | | |
| City: | ST: | Zip: | Years/Months at this Address: |
| Current Employer: | | How Long? | |
| Previous Employer: | | How Long? | |

I/we affirm my/our identity and authorize Bush Truck Leasing, Inc. and/or its Lenders/Corporate Sponsors to investigate my/our credit history. Upon request from Bush Truck Leasing, Inc. I/we authorize any credit grantor to release to Bush Truck Leasing, Inc. and/or its Lenders/Corporate Sponsors, my/our credit record. A photostat or facsimile of this authorization shall be valid as the original. TO THE BEST OF MY/OUR KNOWLEDGE THE ABOVE INFORMATION IS TRUE AND ACCURATE.

Signature _____   Date _____

### Fax Completed Form to 513-234-7941

Sara Lee

**B & G LEASING, INC.**
2900 WESTCHESTER AVENUE STE 201

*PURCHASE, NEW YORK 10577*
(888) 463-3752



## VEHICLE BONDED LEASE APPLICATION

| APPLICANT SECTION - PLEASE COMPLETE ALL INFORMATION |
|---|

DISTRIBUTOR NAME

First                                                                 MI

CORPORATION NAME

ADDRESS

Street                          Apt#

City                                                                    Zip

DATE OF BIRTH _____   *State* DRIVER'S LICENSE # _____

SOCIAL SEC. # _____   HOME PHONE _____

CELL PHONE _____

INSURANCE CONTACT (IF NOT ALLSTATE) _____

INSURANCE PHONE _____

| APPLICANT VERIFICATION |
|---|

This application is submitted to obtain credit.  I certify that the above information is true and complete to the best of my knowledge.  You are authorized to check my credit, work history and weekly sales figures.  Any third party to whom a copy of this application is delivered is authorized to provide you with any pertinent information they may have.

**I HAVE READ AND AGREE TO THE TERMS DESCRIBED AND UNDERSTAND THESE ARE A PART OF THIS APPLICATION AND WILL BE PART OF ANY LEASE AGREEMENT I MAY SIGN.**

SIGNATURE _____          DATE _____

## PLEASE FAX COMPLETED FORM TO (914) 696-7505

Confidential

10/25/2010

**dsa**
SERVICES
OF AMERICA

## MEMBERSHIP APPLICATION & INFORMATION SHEET

### MEMBERSHIP INFORMATION

Name: _____

Street Address: _____

City, State, Zip _____     County: _____

Telephone: _____     Social Security: _____

Driver's License: _____     Date of Birth: _____

E-mail Address: _____

### HEALTH INSURANCE INFORMATION

If married, Spouse's Name: _____     Spouse's Date of Birth: _____

Number of Children _____ Ages of Children _____
*Please only list children under 19 years of age (or children that are between 19 and 24 who attend school full time). **The following questions are for health insurance purposes only:*

**Tobacco Use: Male Y/ N, Female Y/ N ** Height & Weight M _____ F _____

**Any Health Problems/ Pregnancy: _____

**Take Any Medications: _____

### VEHICLE INSURANCE INFORMATION

VIN# of Truck: _____     Year: _____     Make: _____

If you would like a quote on a new vehicle, please check here.     ☐

Terminal or Depot: _____

Garage Location (if different than terminal or depot) _____

_____

I hereby apply to be a DSA member. I understand membership in the association is free. I request that DSA and its vendors provide me with quotes and other relevant information. I hereby authorize DSA or its designated insurance carrier to obtain a copy of my driving record or motor vehicle report. I further release DSA or its designated insurance carrier from any and all liability on account of furnishing this information.

_____     _____
**Signature**                          **Date**

Confidential                                                    10/25/2010

Dear Sara Lee Franchisee:

Name _____

ID No._____

(Office use only)

If you choose we are able to direct deposit your funds into your bank account. This process provides you with faster access to your funds and eliminates the need for you to travel to the bank. When the funds are direct -deposit you have immediate access to the funds, no waiting period for them to clear.

If you would like to participate in the direct deposit program, we ask that you provide us with the following information:

Bank Name_____

Bank Routing Number_____

Your Bank Account Number_____

If your funds are going into your checking account, please **staple a copy of your check** to this document, otherwise, we will assume it is your savings account.

We have two options of notification when your funds are directly deposited into your account. Please select one of the following:

**Option One**

**Email notification**: Two days before the deposit is made into your account you will receive an email notification. This notification provides you with the dollar amount and the date of the deposit. The normal process is that the email is sent on Wednesday and the funds appear in your account on Friday morning.

Provide email address: _____ (Print clearly)

**Option Two**

**Notification through US Post Office**: Two days before the deposit is made into your account the notification is mailed through the US Post Office. This notification provides you with the dollar amount and the date of the deposit. The normal process is that the notification is mailed on Wednesday and the funds appear in your account on Friday morning. Most likely you will receive the notification after the deposit into your account.

My signature below indicates I have read the above and agree to allow the direct-deposit of funds into my account.

Signature_____
Date_____

PLEASE COMPLETE AND RETURN TO DISTRIBUTOR SUPPORT SERVICES,  5200 S. ALAMEDA ST, VERNON, CA  90058 (OR FAX TO 323-277-8324)MOR

Confidential

10/25/2010



## CareerBuilder Franchise Posting Request Form



*Please complete all of the required fields and Fax signed form to 312-698-0507.*
*Any questions e-mail to brad.miller@careerbuilder.com or 312-698-0792*

Listing Franchises for sale on CareerBuilder.com has been a cost effective way for Franchise Owners to find quality leads for potential buyers.

As a Sara Lee Franchisee, you may utilize their service at a significantly reduced price of **$85/per posting** (vs. $485) for you to advertise directly on their site. In order to qualify for this special rate, the fee must be paid through the weekly settlement process.

Career Builder has a detailed standard template used for the Franchise Owner opportunity. Please provide the following details:

1) Name:_____

2) Phone:_____

3) Route#:_____

4) Bakery#:_____

5) City/State of Business:_____

6) Closest major metro area to that city:_____

7) Do you want your phone number on the posting for potential Buyers?  Yes / No

8) Do you have a vehicle available for sale? Yes / No

9) Make/Model and mileage._____

**careerbuilder**.com



**Please provide a detailed description of your business.  Below are two examples:**

Well established route. 6 Majors - 1 Kroger, 3 Safeway's, 2 Independents. 4 Fast Foods - 2 Wendy's and 2 Jack in the Box's. 7 restaurants and 1 nursing home. Weekly average $XX,XXX asking $XXX,XXX. Other assets. Truck & trailer negotiable.

MUST SELL! Asking only $XX,XXX. Includes: Truck (Assume Lease), all equipment needed to run business. 1 Major Chain store, 3 Fast Foods, 10 Cafes, plus other stores. Approximately 35 stops. Desperate to sell. Financing available

**Leads can be either emailed or faxed to you**

**Email Address:**_____

**Fax Number:** _____

**I authorize Sara Lee to deduct this cost from my settlement.**

**Corporation Name:**_____

**Print Name:**_____

**Sign:**_____

## Fax to:  Brad Miller @ 312 698 0507

**careerbuilder.com**

**SARA LEE**
**INDEPENDENT DISTRIBUTOR PROGRAM**
**DATA CHANGE REQUEST FORM**



CORPORATE NAME: _____

ZONE: _____

ROUTE NUMBER: _____

*(PLEASE PRINT CLEARLY - CHANGES ONLY)*

STREET ADDRESS: _____

APT. OR SUITE NO.: _____

CITY: _____

STATE: _____

ZIP: _____

PHONE NUMBER:   (_____)_____

E-MAIL ADDRESS: _____

_____
CORPORATE PRESIDENT SIGNATURE
*(Required)*

Confidential

10/25/2010

## REQUEST TO SPLIT ROUTE AND TRANSFER STOPS

CORPORATION NAME: _____

PRESIDENT: _____

ZONE NAME / BUSINESS AREA: _____ / _____

DISTRIBUTION ROUTE #(s): _____

DATE OF REQUEST: _____

Please transfer the following stops to a new stub route.  I understand that the new stub route will not alter the above-noted corporation's existing territory boundaries or contractual obligations.

I further understand that the above-noted corporation will be required to present proof of insurance prior to the route split for any additional distribution vehicles.

Store Name & Number                          Customer Number

_____                    _____

_____                    _____

_____                    _____

_____                    _____

_____                    _____

_____                    _____

_____                    _____

_____                    _____

_____                    _____

_____                    _____

_____

PRESIDENT – SIGNATURE

Confidential

10/25/2010

# EXHIBIT C

# EXHIBIT D

# Code of Business Conduct
# BBU, INC./BIMBO BAKERIES USA

BBU, Inc. and its U.S. bakery business subsidiaries, referred to collectively in this code as "BBU" or the "Company", pursue all their activities with a commitment to the basic values and principles of ethical behavior, a cornerstone of which is integrity. BBU's reputation for integrity and good corporate citizenship is based on adherence to the highest of ethical standards, embracing open and honest relations between individuals employed by Company ("associates"), shareholders, customers, suppliers, competitors, communities and governments. To maintain this reputation, BBU expects all of its directors, officers and associates to act ethically with the highest standards of integrity and abide by the principles of lawful conduct in all their business dealings. No one in the Company, from the President to the newest associate, is ever permitted to commit or condone any illegal or unethical act, or to instruct other associates to do so. Any doubt as to the legality of any course of action should be discussed with one's immediate supervisor or BBU legal counsel, as necessary.

This Code of Business Conduct is meant to supplement the Global Policies (including the Anti-Corruption Policy) and the Code of Ethics of our parent, Grupo Bimbo, and applies to all associates, officers and directors of BBU (collectively referred to as "associate(s)"). Any person who violates the Global Policies, the Code of Ethics or this Code of Business Conduct will be subject to appropriate disciplinary measures up to and including dismissal and/or legal action.

It is every associate's responsibility to report when he or she becomes aware of or suspects a violation of the Global Policies or this Code of Business Conduct. The report should be made to the most senior manager at the location or area of work, the Legal Department or Human Relations Department, the communication channel set forth in the Global Policies or by calling "The Network" at 1-866-458-5428. Reports made to "The Network" may be made anonymously.

No reprisals will be taken for any report made in good faith, regardless of the method used to report a violation, incident or concern.

## Human Relations

Associates, the people who are a vital part of our success, must be treated with dignity, respect and fairness at all times. BBU is committed to the highest standards of ethics in all relations with and among its associates.

BBU endeavors to communicate with associates in an open, honest and timely manner in all matters that affect them, encouraging feedback to ensure a two-way flow of communication between management and other associates.

BBU is an Equal Opportunity Employer and provides equal employment opportunity regardless of race, color, religion, gender, age, national origin, disability, sexual orientation or any other personal characteristic protected by law. This policy applies to all aspects of employment, including recruiting, promotion, demotion, transfer, layoff and termination, rates of pay and other forms of compensation, education and training and other working conditions.

No associate will be subject to discrimination and/or harassment based on a personal characteristic protected by law. BBU will not tolerate any discrimination and/or harassment as outlined above.

BBU is committed to provide equal employment opportunity to qualified individuals with disabilities, special disabled veterans, and other protected veterans of the Vietnam-era.

BBU has developed affirmative action plans for minorities and women, those with disabilities, and Vietnam-era and special disabled veterans and other protected veterans. Our Human Relations Department will provide information regarding these plans upon request.

February 2, 2015

2

## Responsibilities to BBU

BBU expects associates to commit their best efforts to the Company's success, to act prudently in their use of Company property and other resources, and to attempt in every way to uphold BBU's good name in all day-to-day dealings.

*Appropriation of Company assets*

Associates are not permitted to borrow or make use of the Company's funds or other assets, including electronic devices and services, such as computers and related equipment, products and services, for their personal gain or economic benefit except as part of an authorized compensation or benefit program. The Company's names, property and goodwill must not be used by associates for personal advantage.

*Proper maintenance and retention of records*

All transactions and agreements of the Company must be properly recorded and accounted for in the books of the Company, and retained in accordance with the Company's records retention policies and guidelines. This is essential to the integrity of the Company's governmental, financial and ethical reporting obligations. In particular:

- Each associate is responsible and accountable for the accurate reporting of transactions in which he or she is directly involved.

- No associate shall make, or allow to be made, entries that are false or which obscure the true nature of a transaction.

- No fund or transaction is to be concealed from management or the Company's internal or external auditors.

- Adequate and effective accounting, auditing and business-control practices must be maintained at all times in accordance with industry standards and generally accepted accounting principles.

- All assets and liabilities must be recorded in the books of the Company and all contingent liabilities must be disclosed in accordance with the Company's accounting practices.

- No transaction should be effected and no payment should be made where the transaction or payment is other than as described in supporting documentation.

- The Company's guidelines and policies regarding the retention and destruction of documents must be followed.

*Confidential and Proprietary Information*

Every associate is required to protect BBU's confidential and proprietary information from unauthorized disclosure and use. This applies to information about customers and fellow associates as well as proprietary information about the Company's business, strategies, operations and products. The Company and associates are required to protect and safeguard sensitive personal information about individual associates and customers. It is every associate's responsibility to report when he or she becomes aware of or suspects the unauthorized disclosure or use of Company confidential or proprietary information. As noted on page 1 of this Code of Business Conduct, the report should be made to the most senior manager at the location or area of work, the Legal Department or Human Relations Department, or by calling "The Network" at 1-866-458-5428.

Furthermore, associates may not use confidential information or trade secrets gained by virtue of their employment with BBU for personal gain or for any purpose other than the performance by the associate of his or her duties.

Associates, officers and directors may not trade in the securities of Grupo Bimbo while in possession of undisclosed information obtained from any source that would reasonably be expected to affect the value of such securities. This practice of "insider trading" is contrary to Company policy and is illegal. All trading in securities of Grupo Bimbo is to be done in accordance with the Company's Policy on Insider Trading.

When an associate leaves the service of BBU for any reason, that associate is required to ensure that all confidential and proprietary information of BBU remains with the Company and agrees not to

use or disclose such information, which is the exclusive property of the Company, in any way following the termination date of his or her employment with the Company. Furthermore, except as otherwise stated for a longer period in an agreement between an associate and the Company, associates shall not, for a period of 18 months from their date of cessation or termination of employment, directly or indirectly solicit, induce or attempt to induce any associate of BBU to terminate his or her employment with or otherwise cease the relationship with BBU.

*Reporting of Fraudulent Activity*

"Fraud" means an intentional act by one or more individuals (management, any individual charged with governance, associates or third parties), involving the use of deception to obtain an unjust or illegal advantage. Fraud is intentional and usually involves deliberate attempt at concealment of the facts.

Examples of fraud include, but are not limited to: misappropriation of Company funds, assets or property, intentional misstatement of financial results, and alteration or forgery of documents.

Any associate who becomes aware of fraudulent or potentially fraudulent activity affecting the Company must, within 24 hours of becoming aware of the relevant facts, report the information. As noted on page 1 of this Code of Business Conduct, the report should be made to the most senior manager at the location or area of work, the Legal Department or Human Relations Department, or by calling "The Network" at 1-866-458-5428.

**Conflicts of Interest**

The term "conflict of interest" describes a circumstance where an associate may not act with objectivity and loyalty to BBU. It generally occurs when an associate's personal interest interferes, or seems to interfere, with obligations to the Company. There is no finite list of the conflicts that could possibly arise. The general rule is that associates, including officers and directors, must avoid directly or indirectly through family members or others, any activity that compromises,

or could be seen to compromise, their judgement, causes them to show favoritism to any party or causes them to receive a benefit of some kind. Associates are required to act in the best interests of the Company at all times.

The responsibility to avoid conflicts of interest or the perception of conflicts of interest arising from outside activities lies with the individual associate. If in doubt, it is the responsibility of the associate to discuss the situation with his or her manager or supervisor to determine whether there is a conflict of interest and what steps, if any, may be required to address the situation.

The following are examples of conflicts of interest commonly encountered, but this is by no means an exhaustive list.

*Gifts from customers or suppliers*

Associates must not accept gifts or favors from customers or suppliers or prospective customers or suppliers, or use their status with the Company to obtain personal gain, directly or indirectly, from those doing or seeking to do business with the Company even if there is no expectation of receiving anything in return.

"Safe harbor" limits have been established in the Global Policies to recognize occasional gifts such as a fruit basket or a meal so long as they are reasonable and customary. As a general rule, the safe harbor limit on giving or receiving gifts is $100.00 per gift and $500.00 annually. Each associate is urged to review the limits stated in the Global Policies.

Associates must ensure that no obligation could be, or be perceived to be, expected in connection with any gift. If an associate believes in a particular circumstance that a departure from the above guidelines is justified, or if there is any doubt about a particular gift or invitation, the associate must seek advice and approval from the Local Business Conduct, Ethics and Compliance Committee.

*Outside business activities of associates*

Associates must not accept outside positions which deprive the Company of the time and attention and business judgement required to perform their duties, without the approval of the Local Business Conduct, Ethics and Compliance Committee.

*Self-dealing*

Associates must avoid activities and situations which involve or appear to involve self-dealing conflicts of interest with the Company including:

- The transaction of business by the Company with a business owned in whole or in part by an associate or any member of an associate's immediate family.

- The purchase or sale of shares or interests in supplier companies and their subsidiaries or direct affiliates where the Company's relations with such suppliers could be considered to have a material impact.

- The hiring, promotion or transfer of an associate into a position reporting to a close relative (a person with whom you have a special relationship including family members and individuals residing in the same household), unless approved by the Local Business Conduct, Ethics and Compliance Committee.

- An associate having financial interest in, or performing services for, a competitor.

*Activities of family members*

A conflict of interest may arise if a close relative of an associate (including a person living in the same household as the associate) is or becomes employed by a competitor or supplier of the Company. In general, a relative of an associate should not have any significant business dealings with such associate or with any other associate who reports to him or her. In any case it is the responsibility of the associate to discuss the situation with his or her manager or supervisor who in turn should direct this matter to the Local Business Conduct, Ethics and Compliance Committee, the Human Relations or the Legal Department to determine whether there is a conflict of interest and what steps, if any, may be required to address the situation.

## Computer Systems and Business Communications

Technical advances are making it easier and easier, via cellular phones, networks, E-mail, and the Internet, to share information with others. Of course these are useful tools, but it means that valuable information needs to be protected from unwanted access, use or disclosure.

Every associate is responsible for protection of information. This applies at all times, whether an associate is using a Company computer or electronic device or accessing the Company's systems in a Company office, an outside location, or while traveling.

*General use*

All Company issued telephones, electronic communication devices and computer systems, including, but not limited to, computers, laptops, servers, networks, mainframes, cell phones, pagers, and personal digital assistants are Company property. The purpose of these systems is to conduct Company business. Company systems are not to be used to solicit others for commercial ventures, religious or political causes. Further, the systems must not be used in any way that would violate any Company policy, including the Company's policies against discrimination, slander and harassment, for example, by the transmittal or accessing of offensive material of any kind (obscene jokes, stories, or pornography). Users have the responsibility to operate all Company and computer resources in a professional, lawful, and ethical manner. Use of electronic communications must conform to BBU's business standards and policies, including the electronic security standards and privacy policies. Occasional and limited use of the Company systems for personal reasons such as telephone calls, email and limited Internet usage is permissible provided such personal use does not violate Company policies or law, interfere with an associate's job responsibilities or minimum hours of work or overburden Company resources on an individual or aggregate basis. The Company reserves the right to terminate an associate's right

to use Company systems for personal communications and to take further appropriate employment action if in the judgment and sole discretion of the Company, such personal use of Company systems is inappropriate.

All documents, data, and information, and any E-mail, voice mail or other forms of electronic messages, composed, sent, stored and received on or over the Company's systems, including personal communications, are the property of the Company. The Company reserves the right to monitor all information systems. This includes, but is not limited to, telephone and computer systems, voice mail, websites (Internet and intranet), and E-mail systems to prevent abuses or misuses, or for any other legitimate business reason. Since information technology resources are the property of the Company, users of these systems are advised that there is no expectation of privacy while using these systems in connection with business or personal use.

Use of the Company's systems must be in compliance with all applicable laws and regulations of the United States. Compliance includes ensuring that proper licensing agreements are in effect, and that copyrights and other intellectual property rights are not being infringed. Any questions regarding these issues should be addressed to the Company's Legal Department.

The authenticity, confidentiality, and integrity of electronic communications cannot be guaranteed, whether transmitted over the Internet or through the E-mail or voice mail systems. Although these systems accommodate the use of security passwords and firewalls, their reliability for maintaining confidentiality cannot be guaranteed. Associates should assume that any and all messages might be accessed and read by someone other than the designated recipient. It should be noted that even when a message is erased, it might still be possible to recreate the message. Therefore, ultimate privacy of messages cannot be ensured.

*E-mail and voice mail*

The Company maintains electronic messaging systems, including voice mail and E-mail. These systems are provided to assist in conducting Company business.

In order not to overload the voice mail and E-mail systems, and to maintain orderly records, local administrators limit the size and/or the amount of messages that can be maintained. It should be noted that the E-mail systems may be backed up on a daily basis and these records can be used to respond to legal document requests or can be audited in the normal course of business. Subpoenas and other legal document requests usually require production of electronically stored documents and records.

E-mail, like other forms of electronic communication, is susceptible to misdirection and may be misaddressed. Information of a highly sensitive nature should be sent by electronic means with great care. Addresses of messages should be checked, and sensitive documents should be password protected or encrypted prior to sending.

*Cellular phones*

It is each associate's responsibility to comply with applicable law and Company policies in connection with the use of cell phones and other electronic communication devices. Any questions regarding applicable law should be addressed to the Company's Legal Department. This Code of Business Conduct applies to the business use of cell phones and other electronic communication equipment while operating a motor vehicle, whether or not the equipment is issued to the associate by the Company and whether or not the associate is operating the Company's or the associate's vehicle. It is the responsibility of each associate to safely operate a motor vehicle in the course of business. No associate may use a cell phone and other electronic communications devices while operating a motor vehicle in connection with business even in a "hands free" mode. This prohibition applies to (a) Company issued devices, (b) a Company motor vehicle, or (c) Company business.

*Password usage*

One of the Company's most valuable assets is the information stored on the Company network and computer systems. The confidentiality and integrity of data stored on Company systems must be protected. The use of passwords and the implementation of password controls ensure that access is limited only to authorized personnel. Passwords provide the entry checkpoint to all computer resources. Users have the responsibility to create passwords that are not easily revealed, and to periodically change passwords to protect their individual Company accounts. Every associate must keep passwords private to prevent unauthorized access.

*Internet usage*

Keep in mind that all information posted on the Internet is published material; nothing is "off the record". The proliferation of negative or careless E-mail, associate blogs, websites, news, or bulletin board messages can be damaging to the Company. Therefore, only the Company's authorized spokespersons may author material on the Internet that contains information about the Company (including any of the Company's subsidiaries, units and affiliates) or any of its products; respond to E-mail or reply to a bulletin board on behalf of the Company. Any associate who finds or receives negative information about the Company or any of its products on any news group bulletin board or a mail list should not reply but immediately contact the Company's Legal Department.

Associates are not permitted to refer to any of our trademarks, legal entities, etc., in any associate blogs, websites, news, or bulletin board messages unless authorized in writing by the Company to do so. It is inappropriate for associates to make any public comments of a negative or disparaging nature about the Company which could in any way harm its business interests or reputation.

All uses of the Internet must be in compliance with all applicable laws and regulations of the United States. Compliance includes, but is not limited to, ensuring that proper licensing agreements are in effect, ensuring proper use of copyrights or other proprietary rights to prevent infringement and ensuring that advertising meets applicable regulations. Any questions regarding compliance issues should be addressed to the Company's Legal Department.

Any Company computer or laptop that has an Internet connection must also have up-to-date virus software installed and running. For more information about virus protection, as well as use of Company systems and devices, contact the IT Department.

**Our Communities and Environment**

The Company operates and conducts business predominantly within the United States from which we derive our associates, customers and revenues. Every associate has the responsibility to consider the impact that our actions, as individuals and as a company, may have on these communities on which the Company's own health depends.

BBU is committed to being a socially and environmentally responsible company, recognizing that the competitive pressures for economic growth and cost efficiency must be integrated with environmental stewardship and ecological considerations. The Company encourages the implementation of creative ideas for waste management and reduction, recycling and re-use programs.

The Company has committed to responsibly manage all aspects of its business to meet or exceed recognized environmental, health and safety standards and legal requirements.

The health and well-being of associates and customers is a priority, not only of management, but of everyone who works at BBU.

Associates must report immediately to their supervisor any known breach of the Company's environmental, health and safety standards in accordance with BBU's established environmental policies and manuals. As noted on page 1 of this Code of Business Conduct, the report can also be made to the most senior manager at the location or area of work, the Legal Department or Human Relations Department, or by calling "The Network" at 1-866-458-5428.

Each associate, with his or her own expertise in the Company's operations, is encouraged to advance ideas to upgrade the Company's existing environmental, health and safety practices.

## Dealing with Governments, Regulators and Charitable Organizations

BBU and its associates are committed to honest and ethical communications and dealings with officials at all levels of government, including full, fair, accurate, timely and understandable disclosure in reports and documents filed with securities regulators as well as in public communications.

Under no circumstances may associates offer Company benefits, or accept economic or other personal benefits, in dealings with government or regulatory officials. This applies to all situations, regardless of motive.

The Company is required to report immediately to the proper authorities any corroborated instance where a public official at any level of government attempts to obtain money, property or favors from the Company by the wrongful use of his or her official position or as a condition to perform certain duties he or she is normally obligated to perform. All such incidents should be immediately reported to BBU's legal counsel.

All associates are encouraged and entitled to make political and charitable contributions from their personal time and funds in the exercise of responsible citizenship. It is a violation of law in some jurisdictions for the Company to make contributions to candidates for certain elective offices. Therefore, corporate commitments or contributions of any kind, to political candidates or organizations, can be made only if approved by the Local Business Conduct, Ethics and Compliance Committee.

## The Local Business Conduct, Ethics and Compliance Committee

Where the circumstances of a particular activity are complex, as may be the case in areas of potential conflict of interest, or where more specific guidance is required, as in the case of gifts from customers or suppliers, the guidance of the Local Business Conduct, Ethics and Compliance Committee should be sought. The Committee includes in its membership the most senior executives of BBU. In addition to providing guidance on the application of this Code of Business Conduct, the Committee reviews reports of violations of the Code. All issues before the Committee are dealt with on a confidential basis. In no instance will there be reprisals for reports unless the report was known to be false.

## Conclusion

It is not possible in a document of this nature to cover the full range of possible associate activities. Nor is it possible to enforce ethical behavior with a set of rules. Upholding a high standard of business conduct is the responsibility of BBU and each individual associate. Often answering such simple questions as "Is this course of action good for the Company?" and "Can I justify it?" or referring to the basic guiding principle, "Am I doing what is right?" will provide guidance. The Local Business Conduct Committee will provide a source of objective interpretation where required.

As noted previously, this document is intended to supplement the Grupo Bimbo Global Policies and Code of Ethics, and all associates should be familiar and knowledgeable about all such policies. Any associate who violates the Grupo Bimbo Global Policies, Code of Ethics or this Code of Business Conduct is subject to appropriate disciplinary measures up to and including dismissal and/or legal action.

8

Please remove this page and place the signed copy in the associate's file

I have read and been given copies of the Grupo Bimbo Global Policies, Vision and Code of Ethics and the BBU, Inc./Bimbo Bakeries USA Code of Business Conduct.  I understand and will abide by their provisions. I further understand that the Codes may be revised from time to time and that I will be made aware of the revisions and that as a condition of my employment, I will be required to abide by any such revised Global Policies, Code of Ethics and Code of Business Conduct.

Date: _____

Signature: _____

Name: _____
(Please print)

# EXHIBIT E

**Earthgrains Distribution, LLC**
**7301 South Freeway**
**Fort Worth, TX 76134**

**Hand deliver**

June 23, 2016

**CRS DISTRIBUTING, INC**
**ATT: CHRISTOPHER STEELE**
**7746 S. TRUMPET VINE AVE**
**TUCSON, AZ 85747**

RE:    **Notice of Breach of Franchise Agreement**

Dear CHRISTOPHER:

On June 22, 2016, a representative of Earthgrains Distribution, LLC ("EDL") observed out of stock conditions of a top selling EDL product(s) in one of your customer's Oulets as described below:

| Date | Store | Condition Observed |
|------|-------|-------------------|
| 06/22/2016 | Walmart 5031 | Ball Park Buns, Ball Park Hots Buns, Sara Lee Plain Bagels, Sara Lee Seeded Buns 8 ct, Great Value Wheat Hot Dog Buns |

As you know, out of stock conditions represent missed sales opportunities for you, your customer and EDL. They also increase the likelihood that consumers will purchase the products of EDL's competitors. If as a result, sales decrease, there is the additional threat that your customer will de-authorize or limit the shelf and display space allocated to EDL product.

Your failure to maintain a fresh and adequate supply of products constitutes a material breach of your Franchise Agreement with EDL.

According to the terms of your Franchise Agreement, you have three days to cure the breach. If you fail to do so, we will take appropriate action under the Franchise Agreement.

Sincerely,

BBU Associate

Pat Patterson

# EXHIBIT 4

### **Declaration of Troy Korver**

1.      I am resident of Pima County, Arizona.

2.      I have worked for BBUSA or its predecessors in interest since 2001.

3.      From 2001 to 2004 I received benefits and was called "an employee."

4.      In 2004 I was notified that I was being terminated and could either take a severance package as a cash payout or apply it to the purchase of a "route" to deliver fresh baked bread products under terms unilaterally set by the company.

5.      I paid approximately $78,000 for my BBUSA route in 2004.

6.      In all meaningful respects, my job duties and level of supervision were the same when I was officially deemed an employee and when I had purchased a distribution route.

7.      I do not exercise independent business judgment in connection with the services I perform for BBUSA.

8.      BBUSA tells me the pricing of the products I deliver to the outlets on my route.

9.      BBUSA requires me to use a handheld computer it provides, which is preloaded with a particular price and inventory structure for the BBUSA products I am required to distribute.

10.      BBUSA prohibits me from delivering fresh baked goods that are in direct competition with brands represented by BBUSA, on pain of termination. As a result, I cannot distribute any goods other than those required by BBUSA.

11.      BBUSA also employs my supervisor who works at the depot and who enforces strict rules and requirements set forth by BBUSA, such as when I can arrive and depart from the depot, when I must deliver stale products to the discount store, and how that product must be physically arranged when I deliver it.

12.      BBUSA has created written policies and procedures outside of the Distribution Agreements that I am required to follow.  The written policies are drafted by BBUSA management personnel.  These written rules typically relate to the return of

1  BBUSA products for credit and placing orders for BBUSA product.  The written policies

2  are handed to all the distributors at the depot by the BBUSA District Manager. All

3  distributors are required to sign an acknowledgement of receipt of the new BBUSA policy.

4         13.    It is also common for me to receive new BBUSA policies by email or by

5  word of mouth. These policies govern the ordering of product, frequency of deliveries and

6  manner of store service.   For example, BBUSA has a policy of refusing to accept

7  "excessive" returned products.

8         14.    I am aware that BBUSA supervisor provides written warnings if he believes

9  we have failed to keep all products within code or violated a policy set by BBUSA. These

10  written warnings are called "Cure Letters" or "Notice of Breach" letters.

11         15.    These warnings usually come with a threat of a "breach," which is a unilateral

12  termination of my Distribution Agreement and effectively terminates my ability to work

13  for the company.

14         16.    I typically work six (6) days a week, approximately fifty-eight (58) hours per

15  week.

16         17.    My weekly schedule is typically as follows:  On Mondays I work from 1:00

17  a.m. to 2:00 p.m., on Tuesdays from 1:30 a.m. to 1:00 p.m., on Wednesdays from 8am a.m.

18  to 12:00 p.m., on Thursdays from 1:00 a.m. to 1:00 p.m., on Fridays from 3:00 a.m. to

19  10:30 a.m., on Saturdays from 1:30 a.m. to 12:00 p.m.

20         18.    BBUSA requires distributors like me to do "pull-ups" as a condition of

21  working for BBUSA as a distributor multiple times per week. These are trips to the stores

22  distributors like myself are required to service for BBUSA that are performed in the

23  distributors' personal vehicles during which we are required to rotate BBUSA stock. My

24  personal vehicle is a 2015 Chevy Silverado and it weighs less than ten thousand (10,000)

25  pounds. As a BBUSA distributor, I do pull-ups in my personal vehicle at least four (4)

26  hours a week.

27         19.    My fellow distributors and I are all paid directly by BBUSA, in a procedure

28  BBUSA calls a "settlement." My settlement and that of my fellow distributors does not

- 2 -

1   compensate us for time worked above forty (40) hours per week.

2       20.    I have discussed the settlement process with coworkers so I know that they

3   are paid in a similar manner to me, such as Teresa Mejia, Bill Belander, and Chris Steele.

4

5

6       I declare under the penalty of perjury under the laws of the United States of America

7   that the forgoing is true and correct.

8

9   _____          _____

10              Troy Korver                            Date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 5

1

2              **Declaration of John Rosales**

3      1.    I am resident of Pima County, Arizona.

4      2.    I have worked for Bimbo Bakeries USA, Inc. ("BBUSA") or its
5   predecessors in interest since 2000.

6      3.    In 2000 I paid approximately $95,300 for my first route. I bought my
7   current BBUSA route in January 2002. The franchise agreement, which is also referred
8   to as a distribution agreement, for my current route is attached as Exhibit A.

9      4.    To my knowledge, there are currently 324 BBUSA bread routes in
10  Arizona, which are each served by a BBUSA distributor like myself.

11     5.    In all meaningful respects, my job duties and level of supervision were the
12  same when I was officially deemed an employee and when I had purchased a
13  distribution route.

14     6.    I do not exercise independent business judgment in connection with the
15  services I perform for BBUSA.

16     7.    BBUSA mandates the pricing of the products I deliver to the outlets on my
17  route.

18     8.    BBUSA requires me to use a handheld computer it provides, which is
19  preloaded with a particular price and inventory structure for the BBUSA products I am
20  required to distribute.

21     9.    BBUSA prohibits me from delivering fresh baked goods that are in direct
22  competition with brands represented by BBUSA, on pain of termination. As a result, I
23  cannot distribute any goods other than those required by BBUSA.

24     10.   BBUSA also employs my supervisor who works at the BBUSA depot and
25  who enforces strict rules and requirements set forth by BBUSA, such as when I can
26  arrive and depart from the depot, when I must deliver stale products to the discount
27  store, and how that product must be physically arranged when I deliver it.

28     11.   It is a common practice for my BBUSA supervisor to change the amount

1  and type of BBUSA products I have ordered from one day to the next. I am incapable of
2  blocking those changes.

3      12.    BBUSA has created written policies and procedures outside of the
4  Distribution Agreement that I am required to follow. The written policies are drafted by
5  BBUSA management personnel. These written rules typically relate to the return of
6  BBUSA products for credit and placing orders for BBUSA product.   The written
7  policies are handed to all the distributors at the depot by the BBUSA District Manager.
8  All distributors are required to sign an acknowledgement of receipt of the new BBUSA
9  policy.

10     13.    I know the BBUSA job requirements and policies that applied to me, as
11  well as the hours I regularly worked, applied to all the BBUSA distributors who work in
12  the position I do.

13     14.    I have observed BBUSA's policies, such as those regarding the ordering
14  of BBUSA products, the expected hours of service, and payment of wages, applied to
15  my coworkers who also worked as distributors, including John Diaz, Brian Isles, Art
16  Estrada, Nickolas Susco, James Murphy, and Randy Poplin.

17     15.    It is also common for me to receive new BBUSA policies by email or by
18  word of mouth. These policies govern the ordering of product, frequency of deliveries
19  and manner of store service. For example, BBUSA has a policy of refusing to accept
20  "excessive" returned products. There is also a BBUSA Communications Board (see
21  Exhibit B) displayed for the distributors to be apprised of company promotions and
22  policies the distributors should be apprised of, including the Code of Business Conduct.
23  See Exhibit C.

24     16.    BBUSA supervisors also frequently provide distributors like myself
25  written warnings if we fail to keep BBUSA products within code or violated a policy set
26  by the company.

27     17.    I typically work six (6) days a week, approximately fifty nine (59) hours
28  per week.

-2-

1      18.    On Mondays, I work from 2:00 a.m. to 1:00 p.m., on Tuesdays from 2:00

2  a.m. to 1:00 p.m., on Wednesdays from 6:00 a.m. to 12:00 p.m., on Thursdays from 2:00

3  a.m. to 1:00 p.m., on Fridays from 2:00 a.m. to 1:00 p.m. and on Saturdays from 2:00

4  a.m. to 11:00 a.m.

5      19.    BBUSA requires distributors like me to do "pull-ups" as a condition of

6  working for BBUSA as a distributor multiple times per week. These are trips to the

7  stores distributors like myself are required to service for BBUSA that are performed in

8  the distributors' personal vehicles during which we are required to rotate BBUSA stock.

9  My personal vehicle is a 2012 Ford F250 and it weighs less than 10,000 pounds. I

10  perform pull-ups in my personal vehicle multiple times a week, which is required

11  according to BBUSA policy.

12      20.    When I arrive at the depot at 2 a.m., I interact with my fellow distributors.

13  We discuss our working conditions regularly. I also converse with them by phone or text

14  during the work day as we deliver bread. When I return to the depot after my deliveries,

15  I interact with them again.

16      21.    Through that regular contact and communication, I am aware of the

17  working hours of my fellow distributors. They all regularly work over forty (40) hours

18  per week.

19      22.    Through that contact and communication, I know that my fellow

20  distributors are required to do pull-ups multiple times a week in their personal vehicles

21  as well.

22      23.    My fellow distributors and I are all paid directly by BBUSA, in a

23  procedure BBUSA calls a "settlement." My settlement and that of my fellow distributors

24  does not compensate us for time worked above forty (40) hours per week. We are not

25  paid overtime.

26      24.    I have discussed the settlement process with coworkers who work as

27  distributors so I know that they are paid in a similar manner to me, including the long

28  hours they worked over forty in a workweek and the failure of the company to pay them

1  overtime for these hours.  For example, I have spoken with Bill Belander, Troy Korver,

2  John Diaz, Raymond Sardinia, Craig Burns, Anthony Santa Cruz, and Art Estrada.

3

4       I declare under the penalty of perjury under the laws of the United States of

5  America that the forgoing is true and correct.

6

7

8                           John Rosales                Date

                                                2-13-17

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

DISTRIBUTION CONSULTANTS, INC.
2900 WESTCHESTER AVENUE
PURCHASE, NEW YORK 10577

## BIMBO BAKERIES USA

## DISTRIBUTION AGREEMENT

**T**HIS **AGREEMENT** made effective **July 8, 2002** by and between BIMBO BAKERIES USA a business corporation with offices at 7301 South Freeway, Fort Worth, Texas, 76134, (herein referred to as "BBU") and **JOHN ROSALES**, residing at **1242 NORTH CALLE GARDENIA, TUCSON, ARIZONA 85745**, (herein referred to as "DISTRIBUTOR").

### W I T N E S S E T H :

**WHEREAS**, BBU has heretofore developed and or acquired the exclusive distribution rights, to distribute and sell various fresh baked products throughout much of the United States; and

**WHEREAS**, DISTRIBUTOR has the ability and experience necessary to sell and distribute Products successfully within a specific geographic area; and

**WHEREAS**, DISTRIBUTOR has purchased from DISTRIBUTOR'S predecessor distributor or BBU the Distribution Rights in the Sales Area hereinafter described; and

BBU Distribution Agreement

WHEREAS, the parties desire to enter into a written agreement describing and setting forth the terms and conditions under which they will do business with each other;

NOW THEREFORE, in consideration of the premises, covenants and conditions set forth herein, and for other good and valuable consideration given and received, the parties mutually agree as follows:

## ARTICLE 1
## DEFINITIONS

§1.1 **SALES AREA:** Shall mean that geographic area within which DISTRIBUTOR owns the Distribution Rights, as more specifically described in Schedule A attached hereto and made a part hereof.

§1.2 **OUTLETS:** Shall mean those purchasers of products as specifically defined and described in Schedule B attached hereto and made a part hereof.

§1.3 **PRODUCTS:** Shall mean all those bakery products as specifically defined and described in Schedule B attached hereto and made a part hereof.

§1.4 **DISTRIBUTION RIGHTS:** Shall mean the sole right to sell and distribute Products to Outlets in the Sales Area, which right has been purchased by DIS-TRIBUTOR from BBU or from DISTRIBUTOR'S predecessor, as evidenced by a Bill of Sale executed heretofore.

§1.5 **CHAIN:** Shall mean a person or business entity that operates more than one Outlet and makes decisions regarding the purchase of Products for its Outlets at a central office.

DISTRIBUTION CONSULTANTS, INC.
2900 WESTCHESTER AVENUE
PURCHASE, NEW YORK 10577

§1.6 **FORCE MAJEURE:** Shall mean an Act of God, war, fire, explosion, riot, looting, civil commotion, failure of machinery or plant, restrictions by a Government or any competent authority, strikes or lock-outs at either party's premises or in any related trade or business or any other similar circumstances of whatsoever kind beyond the control of the party affected which affects either party's performance of its obligations under this Agreement.

## ARTICLE 2
## RELATIONSHIP

§2.1 **EXTENT AND DURATION:** BBU hereby recognizes DISTRIBUTOR'S ownership of the Distribution Rights, which ownership will continue until the Distribution Rights are sold or transferred as provided herein.

§2.2 **TERMINATION OF THIS AGREEMENT:** The parties agree that the Distribution Rights can be exercised only pursuant to the terms of this Agreement and that any termination of this Agreement requires DISTRIBUTOR or BBU, for the account of DISTRIBUTOR, to sell such Distribution Rights as provided herein.

§2.3 **INDEPENDENT CONTRACTORS:** The parties intend to create an independent contractor relationship and it is of the essence of this Agreement that DISTRIBUTOR be an independent contractor for all purposes and DISTRIBUTOR shall only identify himself as such in all third party dealings. Any contrary final determination by any board, tribunal or court of competent jurisdiction shall require the amendment of this Agreement in any way necessary to establish an independent contractor relationship. As an independent contractor, DISTRIBUTOR has the right to operate the business as DISTRIBUTOR chooses, and shall bear all risks and costs of operating such business. DISTRIBUTOR has no authority to retain any person on behalf of BBU. It is expressly understood that DISTRIBUTOR has no

3

claim, or right under any circumstances, to any benefits or other compensation currently paid by BBU to employees, or hereafter declared by BBU for the benefit of employees. No fiduciary relationship exists between the parties.

**§2.4**   **NOTICE:** DISTRIBUTOR agrees to have painted in a conspicuous manner on any delivery vehicle owned or leased by DISTRIBUTOR to carry out the terms hereof: "Owned and operated by [DISTRIBUTOR'S name], an Independent Contractor."

### ARTICLE 3
### SALE OF PRODUCTS

**§3.1**   **TITLE:** All Products will be sold to DISTRIBUTOR absolutely, and title to and risk of loss of the Products shall pass to DISTRIBUTOR upon delivery of the Products in accordance with §3.2 below.

**§3.2**   **DELIVERY:** Except as otherwise provided herein, BBU agrees to sell and deliver to DISTRIBUTOR or to arrange for such sale and delivery by affiliates, and DISTRIBUTOR agrees to buy and accept, at such location as BBU may from time to time reasonably designate or approve, sufficient quantities of the Products to adequately and properly supply the Outlets in the Sales Area. BBU agrees to use commercially reasonable efforts to fill DISTRIBUTOR'S orders in a reasonable and timely fashion. In case of strike, shortage of materials, equipment breakdown or other cause, BBU reserves the right to fill orders on such reasonable basis as circumstances then permit. BBU and DISTRIBUTOR recognize that cuts and pluses and, on rare occasions, cancellations of deliveries, in whole or in part, are an unavoidable aspect of fresh baked goods production. In the event of such pluses, DISTRIBUTOR agrees to use DISTRIBUTOR'S reasonable efforts to effect the sale of the additional product. BBU further agrees to accept and give full credit for any damaged or off code Product which is not damaged or off code by reason of

DISTRIBUTION CONSULTANTS, INC.
2900 WESTCHESTER AVENUE
PURCHASE, NEW YORK 10577

DISTRIBUTOR'S negligence, and which has been promptly returned in accordance with BBU'S then current stale and damage return policy. BBU reserves the right to make reasonable amendments to such stale and damage return policy from time to time.

§3.3   **TERMS:** Products will be sold to DISTRIBUTOR on terms and prices established by BBU from time to time.

§3.4   **SETTLEMENT OF ACCOUNT:** On or before Friday of each week, DISTRIBUTOR will remit to BBU or its affiliates the purchase price of all Products delivered to DISTRIBUTOR during the preceding week, less credit for any off code or damaged Products which have been returned in accordance with §3.2 above.

§3.5   **PURCHASE OF RECEIVABLES:** In cases where the DISTRIBUTOR sells and distributes Products to Chains or Outlets, which have been approved by BBU for credit, BBU or its affiliates shall, at the request and for the convenience of DISTRIBUTOR, purchase properly filled out and executed charge slips and/or invoices from the DISTRIBUTOR at their face value, and credit DISTRIBUTOR'S account therefor. DISTRIBUTOR shall promptly remit all such necessary documentation to BBU and sign such assignments and agreements as may be necessary to transfer to BBU all receivables and accounts. If a Chain elects to pay for purchases of product on a scan, rather than delivery basis, BBU or its affiliates shall purchase the receivable from DISTRIBUTOR at the full face value of the scan report.

§3.6   **PROMOTION PARTICIPATION PROGRAM:** In cases where DISTRIBUTOR wishes to sell Products to Outlets at prices which are less than those reflected on BBU's then current Suggested Price List, and DISTRIBUTOR wishes to have BBU participate and BBU or its affiliates agree to participate in such promotion or

DISTRIBUTION CONSULTANTS, INC.
2900 WESTCHESTER AVENUE
PURCHASE, NEW YORK 10577

5

discount price, BBU will contribute pursuant to BBU's Promotion Participation Policy as amended from time to time.

§3.7 **SECURITY INTEREST:** To secure the payment of any indebtedness or liability of DISTRIBUTOR to BBU or its affiliates now or hereafter arising pursuant to this Agreement or otherwise, DISTRIBUTOR hereby grants and conveys to BBU a continuing and general security interest in the Distribution Rights, all other assets used in connection with the operation of the Distribution Rights, all rights hereunder and all Products and receivables of the DISTRIBUTOR, and grants to BBU the rights of a secured party. DISTRIBUTOR agrees to execute the BBU Security Agreement and financing statement(s) to evidence such security interest. Any default under the BBU Security Agreement by DISTRIBUTOR shall be a default under this Agreement.

§3.8 **DEFAULT:** Nothing herein shall be deemed to require BBU to fill an order of DISTRIBUTOR during any time when DISTRIBUTOR is in default of any payment or other obligation to BBU or its affiliates.

**ARTICLE 4**
**DISTRIBUTOR'S OBLIGATIONS**

§4.1 **RESULTS:** In order to maximize its purchases from BBU, DISTRIBUTOR agrees to develop and maximize sales of Products to Outlets within the Sales Area by maintaining an adequate and fresh supply of Products in all Outlets; rotating Products to promote their sale before they become stale or off code; promptly removing all stale or off code Products; cooperating with BBU or its affiliates in its marketing programs, maintaining a computer assisted record-keeping system compatible with the system maintained by BBU now or in the future; and providing service on a basis consistent with good industry practice to all Outlets requesting

DISTRIBUTION CONSULTANTS, INC.
2900 WESTCHESTER AVENUE
PURCHASE, NEW YORK 10577

6

service in the Sales Area. DISTRIBUTOR is not required to service any Outlet that has proven consistently to be unprofitable, provided that where a Chain requires that such an Outlet be served as a condition for serving its other outlets, the profitability of any Outlet which is part of that Chain shall be judged on the basis of the profitability of the Chain as a whole. Nothing herein shall be deemed to prohibit DISTRIBUTOR'S right to carry and distribute merchandise for other companies or otherwise engage in any other business activity unless and except to the extent that such other merchandise is competitive with or could contaminate the Products or such other business activity is inconsistent or interferes with the obligations of the DISTRIBUTOR hereunder.

**§4.2    COMPLIANCE:**  DISTRIBUTOR shall operate the business in compliance with all federal, state and local laws, rules and regulations.

**§4.3    PERSONAL SERVICES NOT REQUIRED:** Nothing herein shall be deemed to contemplate or require that DISTRIBUTOR perform any of the services called for by this Agreement personally, and DISTRIBUTOR shall be free to engage such persons as DISTRIBUTOR deems appropriate to assist in discharging DISTRIBUTOR'S responsibilities hereunder. DISTRIBUTOR shall have the exclusive right to select, fix the compensation of, discharge and otherwise to manage, supervise and control all persons engaged by DISTRIBUTOR and shall, with respect to all such persons, perform all obligations and discharge all liabilities imposed upon DISTRIBUTOR under all government laws, rules or regulations ("Laws"), whether such Laws relate to labor, employment standards, worker's compensation, unemployment insurance, pay equity or any other governmental requirement; file all required tax information, reports and pay and/or withhold all applicable payroll-related taxes with respect to any employees of DISTRIBUTOR. DISTRIBUTOR in all events shall be and remain responsible for insuring that all

DISTRIBUTION CONSULTANTS, INC.
2900 WESTCHESTER AVENUE
PURCHASE, NEW YORK 10577

7

persons engaged by DISTRIBUTOR comply fully with all the terms and conditions of this Agreement. Any breach of this Agreement by any person engaged by DISTRIBUTOR shall be deemed to be a breach by DISTRIBUTOR.

§4.4 **NON-COMPLIANCE:** Failure to carry out the terms, conditions and obligations listed in this Article or elsewhere in this Agreement shall be considered a breach of this Agreement and shall entitle BBU to terminate this Agreement as more specifically set forth in Article 8 hereof, except that DISTRIBUTOR shall not be responsible for failures caused by Force Majeure, provided however, that an event of Force Majeure shall not excuse DISTRIBUTOR from any obligations to pay for Products pursuant to Article 3.

### ARTICLE 5
### BBU' OBLIGATIONS

§5.1 **DELIVERY AND COOPERATION:** BBU shall use commercially reasonable efforts to deliver to DISTRIBUTOR sufficient quantities of the Products to supply Outlets requesting service in the Sales Area, to assist in the development of new Outlets, to pursue the development of new Products, to preserve and develop the quality and marketability of the Products and to assist and cooperate with DISTRIBUTOR'S sales efforts, except that BBU shall not be responsible for failures caused by Force Majeure.

§5.2 **SALES TO CHAINS:** In order to enable DISTRIBUTOR to pursue business opportunities with Chains, which may require standard terms for all DISTRIBUTORS, DISTRIBUTOR hereby designates BBU and its affiliates and BBU hereby agrees to act, as DISTRIBUTOR'S agent. BBU shall use commercially reasonable efforts to obtain from Chains authorization to sell Products in the Chains and information regarding the prices and terms at which the

DISTRIBUTION CONSULTANTS, INC.
2900 WESTCHESTER AVENUE
PURCHASE, NEW YORK 10577

BBU Distribution Agreement

Chains would be willing to purchase Products for their Outlets, and BBU will communicate the information concerning such authorizations, prices and terms to DISTRIBUTOR. This appointment of BBU and its affiliates as DISTRIBUTOR'S agent shall not prevent DISTRIBUTOR from having the right to negotiate prices and terms directly with a Chain and selling Products to the Chain at whatever prices and terms DISTRIBUTOR can negotiate. In addition, DISTRIBUTOR shall have the option to revoke the designation of BBU as DISTRIBUTOR'S agent at any time on thirty (30) days notice. Nothing herein shall require BBU to pay slotting allowances or other similar fees or charges imposed by the Chains.

### ARTICLE 6
### TRANSFER OF RIGHTS

**§6.1** **CONDITIONS OF ASSIGNABILITY:** The Distribution Rights are owned by the DISTRIBUTOR and may be sold or otherwise transferred in whole or in part by DISTRIBUTOR, or in the event of DISTRIBUTOR'S death, by a legal representative of DISTRIBUTOR'S estate, provided that any such sale or transfer shall be subject to: (a) the prior written approval of BBU, which approval will not be unreasonably withheld; and (b) a right of first refusal on the part of BBU at the same terms and conditions offered to DISTRIBUTOR or DISTRIBUTOR'S estate (the "Offer") by a bona fide purchaser or transferee (the "Offeror"). The right of approval and right of refusal referred to herein shall expire unless DISTRIBUTOR is notified by BBU that it does not approve the sale or transfer or that it wishes to exercise its right of first refusal by notice given within ten (10) days after the last to occur of the following:

(i) receipt by BBU of written notice of intent to sell or transfer to a named Offeror on terms and conditions fully set forth in such notice, and

DISTRIBUTION CONSULTANTS, INC.
2900 WESTCHESTER AVENUE
PURCHASE, NEW YORK 10577

BBU Distribution Agreement

(ii) receipt by BBU of the Offeror's current financial statements and such additional information concerning the Offeror's financial condition, credit, driving records, and other matters reasonably appropriate to BBU in its determination. If the contemplated sale or transfer is not a bona fide transfer for value, the price to be paid by BBU shall be the market value of the Distribution Rights at the time of receipt of such notice of intent.

If BBU right of approval and right of first refusal expire as provided above, DISTRIBUTOR may consummate the transfer to the Offeror on the terms of the Offer; provided (i) such action or inaction will not eliminate or in any way affect BBU right of approval or its right of first refusal on future transfers of the Distribution Rights; and (ii) if no transfer to the Offeror is consummated on the terms of the Offer within 90 days after the expiration of BBU right of approval or right of first refusal, all of the provisions of this Section 6.1 shall reapply.

§6.2 **DEATH:** In the event of the death of DISTRIBUTOR, BBU may require the DISTRIBUTOR'S estate to sell the Distribution Rights. If the estate does not sell such Distribution Rights within a period of ninety (90) days from the date on which BBU requires it to do so, BBU shall have the right to sell the same, as the estate's agent, to a qualified purchaser.

§6.3 **PROCEEDS:** Any sale shall be for the account of DISTRIBUTOR or DISTRIBUTOR'S estate, and the proceeds of the sale, after deducting therefrom any monies owed by DISTRIBUTOR to BBU, all reasonable costs and expenses in connection with the sale (including without limitation the cost of removing any off code or damaged Products in DISTRIBUTOR'S Sales Area) and the satisfaction of any outstanding debts, liens, security interests, legal fees and similar expenses, shall be turned over to DISTRIBUTOR or DISTRIBUTOR'S estate.

DISTRIBUTION CONSULTANTS, INC.
2900 WESTCHESTER AVENUE
PURCHASE, NEW YORK 10577

10

**§6.4**   **TRANSFER DOCUMENTS**: In the event of a sale or transfer by or for the account of DISTRIBUTOR or DISTRIBUTOR'S estate as described in this Article 6, the DISTRIBUTOR or the estate shall execute an appropriate bill of sale to the purchaser, and a general release terminating, canceling and surrendering DISTRIBUTOR'S rights under this Agreement and releasing any and all claims against BBU and its affiliates and its officers, directors, shareholders, employees, successors and assigns arising under or out of this Agreement, and BBU agrees to enter into a new Distribution Agreement with the purchaser in the form of agreement then being used by BBU.

## ARTICLE 7
## SERVICE FAILURES AND CHANGES

**§7.1**   **PARTIAL ABANDONMENT**: If DISTRIBUTOR fails to service any Outlet in the Sales Area and such failure is not remedied within three (3) days after receipt of written notice thereof, then, in addition to any other lawful rights and remedies BBU may have, BBU may deem such Outlet abandoned and may make other arrangements for the service thereof. DISTRIBUTOR shall not be entitled to any proceeds derived from such service or proceeds in connection with the sale of Distribution Rights to such Outlet

**§7.2**   **CHANGE IN DELIVERY METHOD**: In the event any Outlet makes an independent determination to accept delivery of the Products by any method other than store door delivery, and so informs BBU or DISTRIBUTOR, the informed party shall promptly communicate to the other the service requirements and terms under which the Outlet now desires service, and provided those new service requirements continue to call for delivery in the Sales Area, DISTRIBUTOR shall have the first right to effect such alternative service. DISTRIBUTOR shall elect to

DISTRIBUTION CONSULTANTS, INC.
2900 WESTCHESTER AVENUE
PURCHASE, NEW YORK 10577

11

provide such alternative services by (i) providing written notice thereof to BBU within five (5) days after receiving notice of the alternative service requirements, and (ii) commencing such alternative service promptly thereafter (or on such schedule as may be acceptable to the Outlet). If DISTRIBUTOR elects not to effect such alternate service or if the Outlet's new requirements include delivery outside the Sales Area, BBU shall thereafter be permitted to make other arrangements to serve such Outlet, which service shall not be deemed to violate DISTRIBUTOR'S rights hereunder and DISTRIBUTOR shall not be entitled to any proceeds derived from such service.  However, DISTRIBUTOR shall continue to own those Distribution Rights defined herein to the Outlet within the Sales Area.

§7.3  **TEMPORARY SERVICE BY BBU**:  If DISTRIBUTOR or DISTRIBUTOR'S estate, as the case may be, is not able to or does not perform the obligations under this Agreement, DISTRIBUTOR or DISTRIBUTOR'S estate shall make other adequate provision for such performance at the expense of DISTRIBUTOR or DISTRIBUTOR'S estate.  If no such provision is made, BBU, within the limits of its ability to do so, may make arrangements to have these obligations performed for the account of DISTRIBUTOR, deducting from the revenues generated the reasonable expenses of such performance and delivering the balance, if any, to DISTRIBUTOR.  Such temporary performance shall not relieve DISTRIBUTOR of any of the obligations imposed by this Agreement, constitute an assumption by BBU of any obligations of DISTRIBUTOR, nor act to cure any default which may exist on the part of DISTRIBUTOR.

DISTRIBUTION CONSULTANTS, INC.
2900 WESTCHESTER AVENUE
PURCHASE, NEW YORK 10577

## ARTICLE 8
## TERMINATION

§8.1 **BREACH:** Except as set forth in this Article or upon the sale or transfer of all of the DISTRIBUTOR'S Distribution Rights, this Agreement shall not be terminated or canceled provided DISTRIBUTOR carries out the terms hereof. In the event of DISTRIBUTOR'S breach of any obligations or covenants under this or any other Agreement with BBU, BBU may terminate the Agreement as set forth below.

§8.2 **NON-CURABLE BREACH:** If the breach by DISTRIBUTOR involves criminal activity or fraud, threatens public health or safety, or threatens to do significant harm to BBU, its affiliates, it operations, its trademarks or commercial reputation, BBU may terminate this Agreement immediately upon written notice and DISTRIBUTOR shall have no right to cure.

§8.3 **CURABLE BREACH:** In the event of breach by DISTRIBUTOR other than under §8.2, BBU shall give DISTRIBUTOR three (3) business days written notice within which DISTRIBUTOR may cure the breach. If DISTRIBUTOR fails to cure such breach within said three (3) day period, BBU may thereafter terminate this Agreement and DISTRIBUTOR shall have no further right to cure; provided, further, that the parties agree that repeated violations constitute a chronic breach and threaten significant harm to BBU, its operations, its trademarks or commercial reputation, and in such event BBU shall be entitled to terminate this Agreement pursuant to §8.2 and DISTRIBUTOR shall have no further right to cure.

§8.4 **ACTIONS FOLLOWING TERMINATION:** Termination under §8.2 or §8.3 above shall entitle BBU to operate the business for the account of the DISTRIBUTOR, deducting from the revenues generated the reasonable expenses of such performance and delivering the balance, if any, to DISTRIBUTOR. Termination shall require DISTRIBUTOR to sell the Distribution Rights, and in the

DISTRIBUTION CONSULTANTS, INC.
2900 WESTCHESTER AVENUE
PURCHASE, NEW YORK 10577

13

event that DISTRIBUTOR has not consummated a sale to a qualified purchaser within 90 days of the date of termination, BBU shall be authorized to sell DISTRIBUTOR'S Distribution Rights to a purchaser at the best price which can be obtained after proper notice and advertisement. Said sale shall be for the account of the DISTRIBUTOR, and the provisions of §6.3 and §6.4 hereof shall apply.

**ARTICLE 9**
**TRANSFER FEE**

§9.1   **PAYMENT OF FEE:** In the event of a sale or transfer by DISTRIBUTOR or by BBU for the account of DISTRIBUTOR of all or any portion of DISTRIBUTOR'S Distribution Rights, including a sale to BBU, DISTRIBUTOR shall pay a Transfer Fee to BBU in an amount equal to TWO PER CENT (2%) of the sales price, in full consideration for the administrative activities undertaken by BBU in connection therewith.

**ARTICLE 10**
**TRADEMARKS, TRADE NAMES**
**AND COMPUTER SOFTWARE USAGE**

§10.1 **PERMISSION FOR USE:** BBU hereby grants to DISTRIBUTOR a limited, non-exclusive right in the Sales Area only to use the trademarks set forth on Schedule B and any other trademarks, trade names or graphical designations on the packaging of the Products supplied by BBU to DISTRIBUTOR hereunder (the "Marks"), solely to identify said products and to identify DISTRIBUTOR as a distributor of said products. DISTRIBUTOR acknowledges that the Marks are the exclusive property of BBU or its affiliates, or if applicable, the licensor thereof, as the case may be (the "Owners"), and DISTRIBUTOR agrees that it will not dispute or

14

BBU Distribution Agreement

DISTRIBUTION CONSULTANTS, INC.
2900 WESTCHESTER AVENUE
PURCHASE, NEW YORK 10577

contest the exclusive right, title and interest of the Owners in, or the validity of, any of the Marks. DISTRIBUTOR acknowledges that it does not have, and will not acquire, any right, title or interest in any of the Marks or in the good will now or hereafter attaching thereto, and that all such goodwill shall inure solely to the benefit of the Owner of each Mark. DISTRIBUTOR agrees that it shall not use any of the Marks in any corporate title or trading name of any corporation, company, partnership, association, business or sole proprietorship of the DISTRIBUTOR, or with which the DISTRIBUTOR may become affiliated or related through ownership or otherwise. DISTRIBUTOR agrees that it shall not tamper with any of the Marks or other written matter or graphical designations on the packaging of the products supplied by BBU to DISTRIBUTOR hereunder and shall not otherwise modify or change the packaging thereof in any way. Any marketing or promotional material proposed to be used by DISTRIBUTOR which references the Marks (other than marketing or promotional material supplied by BBU or any of the Owners) shall be submitted to BBU for approval, and said material shall not be used without the prior written consent of BBU.

**§10.2 SOFTWARE ACCOUNTING SYSTEM:** DISTRIBUTOR is hereby authorized to use any proprietary software system and program developed by BBU or its affiliates for route sales accounting as the same may be amended from time to time, but shall acquire no other interest or right in the software and shall not attempt to modify, decompile, disassemble or otherwise reverse engineer the software.

**§10.3 RETURN UPON TERMINATION:** Upon the termination of this Agreement or of DISTRIBUTOR'S right to use any of the Marks, DISTRIBUTOR shall immediately cease its use of the Marks (or the terminated Marks, as the case may be), and shall not thereafter use any trademarks, trade names or other designations associated with

DISTRIBUTION CONSULTANTS, INC.
2900 WESTCHESTER AVENUE
PURCHASE, NEW YORK 10577

15

or confusingly similar to said Marks, or make any representations, directly or indirectly, that it continues to distribute products bearing said Marks.

## ARTICLE 11
## MISCELLANEOUS

§11.1 **NOTICES:** Any notice required or permitted under this Agreement shall be deemed properly given when personally received or one (1) day after delivery to an overnight courier service for first day delivery, or five (5) days after deposit in the mails, return receipt requested, first class postage pre-paid. All notices shall be addressed to DISTRIBUTOR at the address stated above and to BBU, at the address indicated in Schedule B attached hereto. Either party may designate another address for receipt of notices by written notice duly given in accordance with this §11.1.

§11.2 **SURVIVAL; BBU AFFILIATES:** This Agreement shall be binding upon heirs, personal representatives, successors or assigns of the parties hereto. The parties recognize and agree that any obligations of BBU hereunder may from time to time be undertaken by affiliates of BBU but BBU shall remain responsible therefor.

§11.3 **INCORPORATION BY REFERENCE:** This Agreement is subject to and affected by the terms and conditions of a certain Bill of Sale executed by the parties immediately prior hereto and said Bill of Sale and the Schedules hereto, are incorporated herein by reference as though fully set forth in this Agreement.

§11.4 **ENTIRE AGREEMENT:** This Agreement, together with the Bill of Sale referred to in §11.3 above and any other agreements executed between the parties on even date herewith, sets forth the entire agreement between the parties and supersedes all prior agreements, discussions, negotiations, understandings, representations, conditions, warranties and covenants between them with respect to this subject matter. Unless set forth herein, neither party shall be liable for any representation

DISTRIBUTION CONSULTANTS, INC.
2900 WESTCHESTER AVENUE
PURCHASE, NEW YORK 10577

16

made to the other. This Agreement may be amended or modified only by a writing signed by both parties.

§11.5 **INDEMNIFICATION**: Each party hereby agrees to defend, indemnify and hold the other harmless against a third party as to any costs, charges or claims including, without limitation, reasonable attorneys' fees and costs of settlement which may arise out of such party or its employees' or independent contractors' direct or indirect failure to perform any obligation and/or discharge any liability arising hereunder.

§11.6 **DESIGNATION AS AGENT**: DISTRIBUTOR hereby irrevocably grants BBU a limited power of attorney with full and complete authority to transfer DISTRIBUTOR'S Distribution Rights, or perform any of DISTRIBUTOR'S obligations hereunder for DISTRIBUTOR'S account in accordance with the terms of this Agreement. This appointment shall survive the death or disability of DIS-TRIBUTOR or the termination of this Agreement.

§11.7 **ACQUISITIONS**: Notwithstanding anything to the contrary contained herein, this Agreement shall not apply to any products or product lines obtained by BBU, or any corporation related thereto, through acquisition after the date hereof.

§11.8 **CONTROLLING LAW**: The validity, interpretation and performance of this Agreement shall be controlled by and construed in accordance with the laws of the State of Texas.

§11.9 **NECESSARY MODIFICATION**: In the event any provision of this Agreement is found to be invalid, contrary to, or in conflict with any applicable present or future law or regulation in a final ruling by any court, agency or tribunal possessing competent jurisdiction, this Agreement shall be deemed modified to the extent necessary to conform with any such ruling, law or regulation. The remainder of this Agreement shall not be affected thereby and shall remain in full force and effect.

DISTRIBUTION CONSULTANTS, INC.
2900 WESTCHESTER AVENUE
PURCHASE, NEW YORK 10577

17

§11.10 <u>COUNTERPARTS:</u>   This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same instrument.

§11.11 <u>TIME CALCULATION:</u>   In computing the number of days for purposes of this Agreement, all days shall be counted, including Saturdays, Sundays, and holidays; provided, however, that if the final day of any time period falls on a Sunday, or holiday, then the final day shall be deemed to be the next day which is not a Sunday or holiday.

§11.12 <u>DAMAGES:</u>   **Notwithstanding anything to the contrary contained in this Agreement, in no event shall either party be liable to the other for any consequential, incidental, indirect or special damages, including lost profits and punitive damages.**

§11.13 <u>NO JURY TRIAL:</u> **The parties hereby knowingly, voluntarily and intentionally waive the right either of them may have to a trial by jury in respect of any litigation based hereon or arising out of this Agreement or any acts, omissions, transactions or course of dealing hereunder.**

**IN WITNESS WHEREOF**, BBU and DISTRIBUTOR have caused this Agreement to be duly executed as of the day and year first above written.

**BIMBO BAKERIES USA (BBU)**

By: _H. Darrell Miller_____     _____

    **H. DARRELL MILLER,**                       **DISTRIBUTOR**
    **CHIEF FINANCIAL OFFICER**

2900 WESTCHESTER AVENUE
PURCHASE, NEW YORK 10577

18

# SCHEDULE "A"

## SALES AREA DESCRIPTION

**DEPOT: Tucson**                                    **SALES AREA# 5442**

Unless otherwise indicated, only the inside (side facing the interior of the Sales Area) of all the city, town or state lines, rivers or other natural boundaries or border streets and highways is included in the Sales Area. The location of any Outlet shall be determined by its street address. There are no additions or exceptions unless noted.

- Beginning at a point where Speedway intersects with Houghton Road
- Houghton Road north to Catalina Highway
- Catalina Highway north to Coronado National Forest boundary.
- Coronado National Forest boundary east to Coronado National Forest boundary
- Coronado National Forest boundary south to Speedway Boulevard
- Speedway Boulevard west to Wentworth Road
- Wentworth Road south to Broadway Boulevard
- Broadway Boulevard west to Freeman Road
- Freeman Road south to Old Spanish Trail
- Old Spanish Trail south to Escalante
- Escalante Road west to Harrison Road
- Harrison Road north to 22nd Street
- 22nd Street west to Kolb Road
- Kolb Road north to Broadway Boulevard
- Broadway Boulevard east to Camino Seco
- Camino Seco north to Speedway Boulevard
- Speedway Boulevard west to Houghton Road, the point or place of beginning.

**Additions:**
None

**Exceptions:**
None

DISTRIBUTION CONSULTANTS, INC.
2900 WESTCHESTER AVENUE
PURCHASE, NEW YORK 10577

## SCHEDULE "B"
CONTRACTUAL DEFINITIONS:

## SALES AREA #5442
### RETAIL SALES AREA

The following definitions shall apply for the purposes of this Distribution Agreement:

**OUTLETS:** As referred to in §1.2, Outlets shall mean all **RETAIL STORES**, which purchase Products by store door delivery. Outlets shall not be deemed to include restaurant and institutional accounts, bakery thrift stores, street vendors, or any Outlets serviced by methods other than store door delivery.

**PRODUCTS:** As referred to in §1.3, Products shall mean all fresh baked breads, rolls, Italian bread shells, cereal bars, muffins, cakes, pies, bread stuffings, packaged croutons and similar fresh baked products intended to be sold as fresh, and sold under the names and trademarks:

| | | | |
|---|---|---|---|
| **OROWEAT** | **THOMAS'** | **FRANCISCO** | **SAHARA** |
| **ENTENMANN'S** | **BOBOLI** | **OLD COUNTRY** | |

Products shall <u>not</u> include products distributed by BBU under the name or trademark **LENDER'S** or **SUN MAID** or products distributed by BBU under any names or trade marks other than those listed above or products intended to be sold as frozen or refrigerated, or damaged, stale or off code products.

**ADDRESS FOR NOTICE:** As referred to in §11.1, notices to BBU shall be addressed to:
**Bimbo Bakeries USA**
7301 South Freeway
Fort Worth, TX 76134

DISTRIBUTION CONSULTANTS, INC.
2900 WESTCHESTER AVENUE
PURCHASE, NEW YORK 10577

# EXHIBIT B

**Employee Assistance Program**

## Contact the EAP
Call toll free 24 hours a day, 7 days a week at: 1-866-207-6106
or
Online: www.lifeworks.com
User ID: bimbobake
Password: lifeworks

### What is EAP (LifeWorks)?
- An employer-sponsored program
- Confidential help to manage the competing demands of work, home, and life
- 24-hour assistance, every day
- Information available by phone, in person, and online
- Referrals to community resources
- Online articles, newsletters, worksheets and self assessment tools
- Free booklets and audio recordings

### Support on a range of Life Issues:
- **Health and well-being**
- **Everyday issues**
- **Balancing work and family**
- **Personal issues and transitions**
- **Parenting, adoption, and education**
- **Caring for older relatives**
- **Budget and legal issues**
- **Landlord/tenant law**
- **Your job and career**

## Disabled Persons Notice

Bimbo Bakeries USA                                        1/1/2013



**BIMBO**
Bakeries USA

### Section 402 Notice

This employer is a government contractor subject to Section 402 of the Vietnam Era Veterans' Readjustment Assistance Act of 1974 which requires government contractors to take affirmative action to employ and advance in employment qualified veterans.

1. Supervisors and managers may be informed regarding restrictions on the work or duties of disabled veterans, and regarding necessary accommodations; and,

2. First aid personnel may be informed, when and to the extent appropriate, if the condition might require emergency treatment.

If you feel that you are a covered veteran, please contact the Human Relations Department. Note, if you have particular job skills, please contact the Human Relations Department.

AAP documents are available in the Human Relations Office during regular business hours 8 a.m. – 5 p.m. Monday thru Friday or by appointment.

Bimbo Bakeries USA                                        1/1/2012



# Employee Rights
### Under the National Labor Relations Act

Under the NLRA, you have the right to:

Under the NLRA, it is illegal for your employer to:

Under the NLRA, it is illegal for a union or for the union that represents you in bargaining with your employer to:

## New reporting procedures for Family Medical Leave Act (FMLA) for BBU

Beginning January 1, 2013, All FMLA, Long Term Disability (LTD) & Short Term Disability (STD) will be completed through

**Cigna Leave Solutions**

Cigna will administer all aspects of this process, including:
New Leave Request
Eligibility Notification
Intermittent Leaves & Recertification
Leave Related Questions

If you have any questions regarding the new FMLA procedure, please call:
(location specific HR contact)

### Reporting Absences to Cigna Leave Solutions

| What you need to do: | |
| --- | --- |
| If your leave is planned: | Report up to 30 days in advance |
| If your leave is unplanned: | Report within 48 of absence<br>Call your supervisor & report absence per site policy<br>Submit doctor's notes to HR as usual |
| When Cigna requests medical certification: | It is **YOUR** responsibility to provide within 15 days |
| During your leave: | Keep in contact with your supervisor to provide updates on your status |
| Before returning to work: | Notify HR and Cigna one week prior to your anticipated return |

**You can reach Cigna Leave Solutions by calling:**
1-888-647-6467



## Code of Business Conduct
### BBU, INC./BIMBO BAKERIES USA

BBU, Inc. and its U.S. bakery business subsidiaries, referred to collectively in this code as "BBU," or the "Company", pursue all their activities with a commitment to the basic values and principles of ethical behavior, a cornerstone of which is integrity. BBU's reputation for integrity and good corporate citizenship is based on adherence to the highest of ethical standards, embracing open and honest relations between individuals employed by Company ("associates"), shareholders, customers, suppliers, competitors, communities and governments. To maintain this reputation, BBU expects all of its directors, officers and associates to act ethically with the highest standards of integrity and abide by the principles of lawful conduct in all their business dealings.

This Code of Business Conduct is meant to supplement the Global Policies (including the Anti-Corruption Policy) and the Code of Ethics of

No reprisals will be taken for any report made in good faith, regardless of the method used to report a violation, incident or concern.

### Human Relations

Associates, the people who are a vital part of our success, must be treated with dignity, respect and fairness at all times. BBU is committed to the highest standards of ethics in all relations with and among its associates.

BBU endeavors to communicate with associates in an open, honest and timely manner in all matters that affect them, encouraging feedback to assure a two-way flow of communication between management and other associates.

BBU is an Equal Opportunity Employer and provides equal employment opportunity regardless of race, color, religion, gender, age, origin, disability, sexual orientation, or any personal characteristic protected by law. This policy applies to all aspects of employment including recruiting, promotion, compensation, transfer, layoff and termination.

# EXHIBIT C

# Code of Business Conduct
# BBU, INC./BIMBO BAKERIES USA

BBU, Inc. and its U.S. bakery business subsidiaries, referred to collectively in this code as "BBU" or the "Company", pursue all their activities with a commitment to the basic values and principles of ethical behavior, a cornerstone of which is integrity. BBU's reputation for integrity and good corporate citizenship is based on adherence to the highest of ethical standards, embracing open and honest relations between individuals employed by Company ("associates"), shareholders, customers, suppliers, competitors, communities and governments. To maintain this reputation, BBU expects all of its directors, officers and associates to act ethically with the highest standards of integrity and abide by the principles of lawful conduct in all their business dealings. No one in the Company, from the President to the newest associate, is ever permitted to commit or condone any illegal or unethical act, or to instruct other associates to do so. Any doubt as to the legality of any course of action should be discussed with one's immediate supervisor or BBU legal counsel, as necessary.

This Code of Business Conduct is meant to supplement the Global Policies (including the Anti-Corruption Policy) and the Code of Ethics of our parent, Grupo Bimbo, and applies to all associates, officers and directors of BBU (collectively referred to as "associate(s)"). Any person who violates the Global Policies, the Code of Ethics or this Code of Business Conduct will be subject to appropriate disciplinary measures up to and including dismissal and/or legal action.

It is every associate's responsibility to report when he or she becomes aware of or suspects a violation of the Global Policies or this Code of Business Conduct. The report should be made to the most senior manager at the location or area of work, the Legal Department or Human Relations Department, the communication channel set forth in the Global Policies or by calling "The Network" at 1-866-458-5428. Reports made to "The Network" may be made anonymously.

No reprisals will be taken for any report made in good faith, regardless of the method used to report a violation, incident or concern.

## Human Relations

Associates, the people who are a vital part of our success, must be treated with dignity, respect and fairness at all times. BBU is committed to the highest standards of ethics in all relations with and among its associates.

BBU endeavors to communicate with associates in an open, honest and timely manner in all matters that affect them, encouraging feedback to ensure a two-way flow of communication between management and other associates.

BBU is an Equal Opportunity Employer and provides equal employment opportunity regardless of race, color, religion, gender, age, national origin, disability, sexual orientation or any other personal characteristic protected by law. This policy applies to all aspects of employment, including recruiting, promotion, demotion, transfer, layoff and termination, rates of pay and other forms of compensation, education and training and other working conditions.

No associate will be subject to discrimination and/or harassment based on a personal characteristic protected by law. BBU will not tolerate any discrimination and/or harassment as outlined above.

BBU is committed to provide equal employment opportunity to qualified individuals with disabilities, special disabled veterans, and other protected veterans of the Vietnam-era.

BBU has developed affirmative action plans for minorities and women, those with disabilities, and Vietnam-era and special disabled veterans and other protected veterans. Our Human Relations Department will provide information regarding these plans upon request.

February 2, 2015

2

## Responsibilities to BBU

BBU expects associates to commit their best efforts to the Company's success, to act prudently in their use of Company property and other resources, and to attempt in every way to uphold BBU's good name in all day-to-day dealings.

*Appropriation of Company assets*

Associates are not permitted to borrow or make use of the Company's funds or other assets, including electronic devices and services, such as computers and related equipment, products and services, for their personal gain or economic benefit except as part of an authorized compensation or benefit program. The Company's names, property and goodwill must not be used by associates for personal advantage.

*Proper maintenance and retention of records*

All transactions and agreements of the Company must be properly recorded and accounted for in the books of the Company, and retained in accordance with the Company's records retention policies and guidelines. This is essential to the integrity of the Company's governmental, financial and ethical reporting obligations. In particular:

- Each associate is responsible and accountable for the accurate reporting of transactions in which he or she is directly involved.

- No associate shall make, or allow to be made, entries that are false or which obscure the true nature of a transaction.

- No fund or transaction is to be concealed from management or the Company's internal or external auditors.

- Adequate and effective accounting, auditing and business-control practices must be maintained at all times in accordance with industry standards and generally accepted accounting principles.

- All assets and liabilities must be recorded in the books of the Company and all contingent liabilities must be disclosed in accordance with the Company's accounting practices.

- No transaction should be effected and no payment should be made where the transaction or payment is other than as described in supporting documentation.

- The Company's guidelines and policies regarding the retention and destruction of documents must be followed.

*Confidential and Proprietary Information*

Every associate is required to protect BBU's confidential and proprietary information from unauthorized disclosure and use. This applies to information about customers and fellow associates as well as proprietary information about the Company's business, strategies, operations and products. The Company and associates are required to protect and safeguard sensitive personal information about individual associates and customers. It is every associate's responsibility to report when he or she becomes aware of or suspects the unauthorized disclosure or use of Company confidential or proprietary information. As noted on page 1 of this Code of Business Conduct, the report should be made to the most senior manager at the location or area of work, the Legal Department or Human Relations Department, or by calling "The Network" at 1-866-458-5428.

Furthermore, associates may not use confidential information or trade secrets gained by virtue of their employment with BBU for personal gain or for any purpose other than the performance by the associate of his or her duties.

Associates, officers and directors may not trade in the securities of Grupo Bimbo while in possession of undisclosed information obtained from any source that would reasonably be expected to affect the value of such securities. This practice of "insider trading" is contrary to Company policy and is illegal. All trading in securities of Grupo Bimbo is to be done in accordance with the Company's Policy on Insider Trading.

When an associate leaves the service of BBU for any reason, that associate is required to ensure that all confidential and proprietary information of BBU remains with the Company and agrees not to

use or disclose such information, which is the exclusive property of the Company, in any way following the termination date of his or her employment with the Company. Furthermore, except as otherwise stated for a longer period in an agreement between an associate and the Company, associates shall not, for a period of 18 months from their date of cessation or termination of employment, directly or indirectly solicit, induce or attempt to induce any associate of BBU to terminate his or her employment with or otherwise cease the relationship with BBU.

*Reporting of Fraudulent Activity*

"Fraud" means an intentional act by one or more individuals (management, any individual charged with governance, associates or third parties), involving the use of deception to obtain an unjust or illegal advantage. Fraud is intentional and usually involves deliberate attempt at concealment of the facts.

Examples of fraud include, but are not limited to: misappropriation of Company funds, assets or property, intentional misstatement of financial results, and alteration or forgery of documents.

Any associate who becomes aware of fraudulent or potentially fraudulent activity affecting the Company must, within 24 hours of becoming aware of the relevant facts, report the information. As noted on page 1 of this Code of Business Conduct, the report should be made to the most senior manager at the location or area of work, the Legal Department or Human Relations Department, or by calling "The Network" at 1-866-458-5428.

**Conflicts of Interest**

The term "conflict of interest" describes a circumstance where an associate may not act with objectivity and loyalty to BBU. It generally occurs when an associate's personal interest interferes, or seems to interfere, with obligations to the Company. There is no finite list of the conflicts that could possibly arise. The general rule is that associates, including officers and directors, must avoid directly or indirectly through family members or others, any activity that compromises,

or could be seen to compromise, their judgement, causes them to show favoritism to any party or causes them to receive a benefit of some kind. Associates are required to act in the best interests of the Company at all times.

The responsibility to avoid conflicts of interest or the perception of conflicts of interest arising from outside activities lies with the individual associate. If in doubt, it is the responsibility of the associate to discuss the situation with his or her manager or supervisor to determine whether there is a conflict of interest and what steps, if any, may be required to address the situation.

The following are examples of conflicts of interest commonly encountered, but this is by no means an exhaustive list.

*Gifts from customers or suppliers*

Associates must not accept gifts or favors from customers or suppliers or prospective customers or suppliers, or use their status with the Company to obtain personal gain, directly or indirectly, from those doing or seeking to do business with the Company even if there is no expectation of receiving anything in return.

"Safe harbor" limits have been established in the Global Policies to recognize occasional gifts such as a fruit basket or a meal so long as they are reasonable and customary. As a general rule, the safe harbor limit on giving or receiving gifts is $100.00 per gift and $500.00 annually. Each associate is urged to review the limits stated in the Global Policies.

Associates must ensure that no obligation could be, or be perceived to be, expected in connection with any gift. If an associate believes in a particular circumstance that a departure from the above guidelines is justified, or if there is any doubt about a particular gift or invitation, the associate must seek advice and approval from the Local Business Conduct, Ethics and Compliance Committee.

*Outside business activities of associates*

Associates must not accept outside positions which deprive the Company of the time and attention and business judgement required to perform their duties, without the approval of the Local Business Conduct, Ethics and Compliance Committee.

*Self-dealing*

Associates must avoid activities and situations which involve or appear to involve self-dealing conflicts of interest with the Company including:

- The transaction of business by the Company with a business owned in whole or in part by an associate or any member of an associate's immediate family.

- The purchase or sale of shares or interests in supplier companies and their subsidiaries or direct affiliates where the Company's relations with such suppliers could be considered to have a material impact.

- The hiring, promotion or transfer of an associate into a position reporting to a close relative (a person with whom you have a special relationship including family members and individuals residing in the same household), unless approved by the Local Business Conduct, Ethics and Compliance Committee.

- An associate having financial interest in, or performing services for, a competitor.

*Activities of family members*

A conflict of interest may arise if a close relative of an associate (including a person living in the same household as the associate) is or becomes employed by a competitor or supplier of the Company. In general, a relative of an associate should not have any significant business dealings with such associate or with any other associate who reports to him or her. In any case it is the responsibility of the associate to discuss the situation with his or her manager or supervisor who in turn should direct this matter to the Local Business Conduct, Ethics and Compliance Committee, the Human Relations or the Legal Department to determine whether there is a conflict of interest and what steps, if any, may be required to address the situation.

## Computer Systems and Business Communications

Technical advances are making it easier and easier, via cellular phones, networks, E-mail, and the Internet, to share information with others. Of course these are useful tools, but it means that valuable information needs to be protected from unwanted access, use or disclosure.

Every associate is responsible for protection of information. This applies at all times, whether an associate is using a Company computer or electronic device or accessing the Company's systems in a Company office, an outside location, or while traveling.

*General use*

All Company issued telephones, electronic communication devices and computer systems, including, but not limited to, computers, laptops, servers, networks, mainframes, cell phones, pagers, and personal digital assistants are Company property. The purpose of these systems is to conduct Company business. Company systems are not to be used to solicit others for commercial ventures, religious or political causes. Further, the systems must not be used in any way that would violate any Company policy, including the Company's policies against discrimination, slander and harassment, for example, by the transmittal or accessing of offensive material of any kind (obscene jokes, stories, or pornography). Users have the responsibility to operate all Company and computer resources in a professional, lawful, and ethical manner. Use of electronic communications must conform to BBU's business standards and policies, including the electronic security standards and privacy policies. Occasional and limited use of the Company systems for personal reasons such as telephone calls, email and limited Internet usage is permissible provided such personal use does not violate Company policies or law, interfere with an associate's job responsibilities or minimum hours of work or overburden Company resources on an individual or aggregate basis. The Company reserves the right to terminate an associate's right

5

to use Company systems for personal communications and to take further appropriate employment action if in the judgment and sole discretion of the Company, such personal use of Company systems is inappropriate.

All documents, data, and information, and any E-mail, voice mail or other forms of electronic messages, composed, sent, stored and received on or over the Company's systems, including personal communications, are the property of the Company. The Company reserves the right to monitor all information systems. This includes, but is not limited to, telephone and computer systems, voice mail, websites (Internet and intranet), and E-mail systems to prevent abuses or misuses, or for any other legitimate business reason. Since information technology resources are the property of the Company, users of these systems are advised that there is no expectation of privacy while using these systems in connection with business or personal use.

Use of the Company's systems must be in compliance with all applicable laws and regulations of the United States. Compliance includes ensuring that proper licensing agreements are in effect, and that copyrights and other intellectual property rights are not being infringed. Any questions regarding these issues should be addressed to the Company's Legal Department.

The authenticity, confidentiality, and integrity of electronic communications cannot be guaranteed, whether transmitted over the Internet or through the E-mail or voice mail systems. Although these systems accommodate the use of security passwords and firewalls, their reliability for maintaining confidentiality cannot be guaranteed. Associates should assume that any and all messages might be accessed and read by someone other than the designated recipient. It should be noted that even when a message is erased, it might still be possible to recreate the message. Therefore, ultimate privacy of messages cannot be ensured.

*E-mail and voice mail*

The Company maintains electronic messaging systems, including voice mail and E-mail. These systems are provided to assist in conducting Company business.

In order not to overload the voice mail and E-mail systems, and to maintain orderly records, local administrators limit the size and/or the amount of messages that can be maintained. It should be noted that the E-mail systems may be backed up on a daily basis and these records can be used to respond to legal document requests or can be audited in the normal course of business. Subpoenas and other legal document requests usually require production of electronically stored documents and records.

E-mail, like other forms of electronic communication, is susceptible to misdirection and may be misaddressed. Information of a highly sensitive nature should be sent by electronic means with great care. Addresses of messages should be checked, and sensitive documents should be password protected or encrypted prior to sending.

*Cellular phones*

It is each associate's responsibility to comply with applicable law and Company policies in connection with the use of cell phones and other electronic communication devices. Any questions regarding applicable law should be addressed to the Company's Legal Department. This Code of Business Conduct applies to the business use of cell phones and other electronic communication equipment while operating a motor vehicle, whether or not the equipment is issued to the associate by the Company and whether or not the associate is operating the Company's or the associate's vehicle. It is the responsibility of each associate to safely operate a motor vehicle in the course of business. No associate may use a cell phone and other electronic communications devices while operating a motor vehicle in connection with business even in a "hands free" mode. This prohibition applies to (a) Company issued devices, (b) a Company motor vehicle, or (c) Company business.

6

## Password usage

One of the Company's most valuable assets is the information stored on the Company network and computer systems. The confidentiality and integrity of data stored on Company systems must be protected. The use of passwords and the implementation of password controls ensure that access is limited only to authorized personnel. Passwords provide the entry checkpoint to all computer resources. Users have the responsibility to create passwords that are not easily revealed, and to periodically change passwords to protect their individual Company accounts. Every associate must keep passwords private to prevent unauthorized access.

## Internet usage

Keep in mind that all information posted on the Internet is published material; nothing is "off the record". The proliferation of negative or careless E-mail, associate blogs, websites, news, or bulletin board messages can be damaging to the Company. Therefore, only the Company's authorized spokespersons may author material on the Internet that contains information about the Company (including any of the Company's subsidiaries, units and affiliates) or any of its products; respond to E-mail or reply to a bulletin board on behalf of the Company. Any associate who finds or receives negative information about the Company or any of its products on any news group bulletin board or a mail list should not reply but immediately contact the Company's Legal Department.

Associates are not permitted to refer to any of our trademarks, legal entities, etc., in any associate blogs, websites, news, or bulletin board messages unless authorized in writing by the Company to do so. It is inappropriate for associates to make any public comments of a negative or disparaging nature about the Company which could in any way harm its business interests or reputation.

All uses of the Internet must be in compliance with all applicable laws and regulations of the United States. Compliance includes, but is not limited to, ensuring that proper licensing agreements are in effect, ensuring proper use of copyrights or other proprietary rights to prevent infringement and ensuring that advertising meets applicable regulations. Any questions regarding compliance issues should be addressed to the Company's Legal Department.

Any Company computer or laptop that has an Internet connection must also have up-to-date virus software installed and running. For more information about virus protection, as well as use of Company systems and devices, contact the IT Department.

## Our Communities and Environment

The Company operates and conducts business predominantly within the United States from which we derive our associates, customers and revenues. Every associate has the responsibility to consider the impact that our actions, as individuals and as a company, may have on these communities on which the Company's own health depends.

BBU is committed to being a socially and environmentally responsible company, recognizing that the competitive pressures for economic growth and cost efficiency must be integrated with environmental stewardship and ecological considerations. The Company encourages the implementation of creative ideas for waste management and reduction, recycling and re-use programs.

The Company has committed to responsibly manage all aspects of its business to meet or exceed recognized environmental, health and safety standards and legal requirements.

The health and well-being of associates and customers is a priority, not only of management, but of everyone who works at BBU.

Associates must report immediately to their supervisor any known breach of the Company's environmental, health and safety standards in accordance with BBU's established environmental policies and manuals. As noted on page 1 of this Code of Business Conduct, the report can also be made to the most senior manager at the location or area of work, the Legal Department or Human Relations Department, or by calling "The Network" at 1-866-458-5428.

Each associate, with his or her own expertise in the Company's operations, is encouraged to advance ideas to upgrade the Company's existing environmental, health and safety practices.

## Dealing with Governments, Regulators and Charitable Organizations

BBU and its associates are committed to honest and ethical communications and dealings with officials at all levels of government, including full, fair, accurate, timely and understandable disclosure in reports and documents filed with securities regulators as well as in public communications.

Under no circumstances may associates offer Company benefits, or accept economic or other personal benefits, in dealings with government or regulatory officials. This applies to all situations, regardless of motive.

The Company is required to report immediately to the proper authorities any corroborated instance where a public official at any level of government attempts to obtain money, property or favors from the Company by the wrongful use of his or her official position or as a condition to perform certain duties he or she is normally obligated to perform. All such incidents should be immediately reported to BBU's legal counsel.

All associates are encouraged and entitled to make political and charitable contributions from their personal time and funds in the exercise of responsible citizenship. It is a violation of law in some jurisdictions for the Company to make contributions to candidates for certain elective offices. Therefore, corporate commitments or contributions of any kind, to political candidates or organizations, can be made only if approved by the Local Business Conduct, Ethics and Compliance Committee.

## The Local Business Conduct, Ethics and Compliance Committee

Where the circumstances of a particular activity are complex, as may be the case in areas of potential conflict of interest, or where more specific guidance is required, as in the case of gifts from customers or suppliers, the guidance of the Local Business Conduct, Ethics and Compliance Committee should be sought. The Committee includes in its membership the most senior executives of BBU. In addition to providing guidance on the application of this Code of Business Conduct, the Committee reviews reports of violations of the Code. All issues before the Committee are dealt with on a confidential basis. In no instance will there be reprisals for reports unless the report was known to be false.

## Conclusion

It is not possible in a document of this nature to cover the full range of possible associate activities. Nor is it possible to enforce ethical behavior with a set of rules. Upholding a high standard of business conduct is the responsibility of BBU and each individual associate. Often answering such simple questions as "Is this course of action good for the Company?" and "Can I justify it?" or referring to the basic guiding principle, "Am I doing what is right?" will provide guidance. The Local Business Conduct Committee will provide a source of objective interpretation where required.

As noted previously, this document is intended to supplement the Grupo Bimbo Global Policies and Code of Ethics, and all associates should be familiar and knowledgeable about all such policies. Any associate who violates the Grupo Bimbo Global Policies, Code of Ethics or this Code of Business Conduct is subject to appropriate disciplinary measures up to and including dismissal and/or legal action.

8

Please remove this page and place the signed copy in the associate's file

I have read and been given copies of the Grupo Bimbo Global Policies, Vision and Code of Ethics and the BBU, Inc./Bimbo Bakeries USA Code of Business Conduct.  I understand and will abide by their provisions. I further understand that the Codes may be revised from time to time and that I will be made aware of the revisions and that as a condition of my employment, I will be required to abide by any such revised Global Policies, Code of Ethics and Code of Business Conduct.

Date: _____

Signature: _____

Name: _____
(Please print)